IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| AMGEN INC.,<br><br>                              Plaintiff,<br><br>       v.<br><br>SANOFI, SANOFI-AVENTIS U.S. LLC,<br>AVENTISUB LLC, f/d/b/a AVENTIS<br>PHARMACEUTICALS INC.; and<br>REGENERON PHARMACEUTICALS, INC.,<br><br>                              Defendants. | Civil Action No.: 14-CV-1317 SLR<br>              (CONSOLIDATED) |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com

*Attorneys for Amgen Inc.*

OF COUNSEL:
MCDERMOTT WILL & EMERY LLP
William G. Gaede, III
Eric W. Hagen
Terry W. Ahearn
Bhanu K. Sadasivan
Shane G. Smith
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

MCDERMOTT WILL & EMERY LLP
Sarah C. Columbia
K. Nicole Clouse
Lauren Martin
28 State Street
Boston, MA 02109-1775
(617) 535-4074

Dated:       July 10, 2015

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. AMGEN'S PATENTED INVENTIONS ...................................................................... 2

    A. Dyslipidemias And the Unmet Medical Need ..................................................... 2
    B. Amgen's Elucidation of the PCSK9/LDLR Biological Pathway and the
        Production of Highly Effective Antibodies to Block the Binding of PCSK9
        to LDLR ................................................................................................................ 3

III. TUTORIAL ON THE UNDERLYING TECHNOLOGY OF THE PATENTS .............. 5

    A. The Immune System Makes Antibodies to Fight Infection ................................... 5
    B. Basics of Antibody Structure and Antibody-Antigen Binding ............................. 6
    C. Protein And Antibody Composition ..................................................................... 7
    D. Protein-to-Protein Binding and Non-Covalent Interactions ................................. 8

IV. DEFINITION OF ONE OF ORDINARY SKILL IN THE ART ................................... 10

V. AGREED CONSTRUCTION ...................................................................................... 10

VI. DISPUTED CLAIM TERMS AND CONSTRUCTIONS ............................................. 10

    A. "An isolated monoclonal antibody" .................................................................... 10
        1. "Isolated monoclonal antibody" does not include fragments ................. 11
        2. There is no process limitation to "monoclonal antibody" ...................... 13
    B. The Monoclonal Antibody Binds To At Least One {or Two or Four} of
        the Identified Amino Acids of SEQ ID 1 and/or 3 .............................................. 15
    C. "wherein the isolated monoclonal antibody binds an epitope on PCSK9" .......... 19
    D. "binds an epitope …comprising at least one of residues 237 or 238" ................. 21
    E. "Wherein the Epitope is a Functional Epitope" .................................................. 22
    F. "PCSK9" ............................................................................................................. 23
    G. "and wherein the monoclonal antibody blocks binding of PCSK9 to
        LDLR" ................................................................................................................ 27
    H. "wherein the isolated monoclonal antibody is a human antibody" ...................... 28

VII. CONCLUSION ........................................................................................................... 30

01:17371178.1

# TABLE OF AUTHORITIES

**Page**

CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*
314 F.3d 1313 (Fed. Cir. 2003) .................................................................... 29

*Biacore, AB v. Thermo Bioanalysis Corp.*
79 F. Supp. 2d 422 (D. Del. 1999) ............................................................... 14

*Cias, Inc. v. Alliance Gaming Corp.*
504 F. 3d 1356 (Fed. Cir. 2007) ................................................................... 21

*GE Lighting Solutions, LLC v. AgiLight, Inc.*
750 F.3d 1304 (Fed. Cir. 2014) .................................................................... 13

*Johnson & Johnson Vis. Care v. Ciba Vision Corp.*
648 F. Supp. 2d 1294 (M.D. Fla. 2009) ....................................................... 29

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................... 11, 12, 14, 24

*Starhome GmbH v. AT & T Mobility LLC*
743 F.3d 849 (Fed. Cir. 2014) ...................................................................... 11

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
299 F.3d 1313 (Fed. Cir. 2002) .................................................................... 11

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*
No. 2012-1567, 2015 WL 3772402 (Fed. Cir. June 18, 2015) ................. 12, 25

*Thorner v. Sony Computer Entm't Am. LLC*
669 F.3d 1362 (Fed. Cir. 2012) .................................................................... 13

*Vitronics Corp. v. Conceptronic, Inc.*
90 F.3d 1576 (Fed. Cir. 1996) ...................................................................... 14

OTHER REFERENCES

C.A. Janeway, Jr., *et al.,* IMMUNOBIOLOGY (5th ed. 2001) ............................ 16, 18, 23

H. Lodish, *et al.,* MOLECULAR CELL BIOLOGY (4th ed. 1999) ........................ 16, 18, 23

T. Clackson, *et al., A Hot Spot of Binding Energy in a Hormone-Receptor Interface*
SCIENCE (1995) 267:383-86 ......................................................................... 22

Plaintiff Amgen Inc. respectfully submits this brief supporting its proposed constructions of the disputed claim terms of U.S. Patent Nos. 8,829,165 ("the '165 Patent"), 8,859,741 ("the '741 Patent"), and 8,871,914 ("the '914 Patent") (collectively, "the patents;" Declaration of William G. Gaede, III, filed herewith ("Gaede Decl."), ¶ 2-4, Exs. 1-3, respectively). All selected claims are appended as Attachment 1, hereto.

## I. INTRODUCTION

Amgen's patents claim a new class of antibody therapeutics that can be used to effectively lower LDL or "bad" cholesterol. They describe considerable scientific discoveries that produced novel monoclonal antibodies to a target molecule known as PCSK9. One such antibody product is Amgen's Repatha™ for which Amgen hopes to gain FDA approval shortly. Upon approval, Amgen will bring this path-breaking therapeutic to patients battling high cholesterol and cardiovascular disease, and who do not benefit from or cannot tolerate statins — the current standard of care for high cholesterol.

Amgen's innovation in elucidating and producing these new antibody therapeutics is protected in part by the patents. The common patent specification provides a rich, detailed description of the inventions and gives clear guidance for understanding the claim terms and the metes and bounds of the claimed inventions. Further, a person of ordinary skill in the art understands the claim terms and the patent specification in line with how these claim terms were used in the art at the time the patents were filed.

Defendants' efforts to develop a competing therapeutic, Praluent™, trailed Amgen's patented inventions. Now faced with infringing Amgen's patents, Defendants propose claim constructions and arguments that deviate from the claim text and clear guidance in the specification in an attempt to broaden some claim limitations and unduly limit others. A common theme of Defendants' proposed constructions is an impermissible importation of

01:17371178.1

isolated language from the specification that attempts to sweep up embodiments clearly at odds with the claim language as a whole and the totality of the patent disclosure.

Amgen's proposals adhere to the plain claim text, are consistent with the intrinsic evidence, and how a skilled artisan would understand the terms.  Amgen respectfully requests that the Court adopt its proposed constructions.

## II.    AMGEN'S PATENTED INVENTIONS[1]

### A.    DYSLIPIDEMIAS AND THE UNMET MEDICAL NEED

More than 300 million people in the Western world suffer from dyslipidemia, a condition marked by abnormal cholesterol and/or fat levels in the blood.  In particular, doctors recognize dyslipidemia caused by elevated LDL ("low density lipoprotein" or "bad" cholesterol) as a major risk factor for cardiovascular disease.  Yet many people with elevated LDL do not fully respond to the conventional cholesterol-lowering drugs (such as statins) that have been the standard of care for the last two decades.  For millions of patients with dyslipidemia, there is an unmet medical need for a new dyslipidemia therapy because of a large residual risk that they will develop atherosclerosis or experience side effects that preclude them from reaching their cholesterol-lowering goals.

When the standard of care leaves millions at-risk of life-threatening disease for more than a decade, a meaningful medical breakthrough may require a return to basic research to re-examine the prevailing assumptions and more deeply elucidate the body's biological pathways involved in the disease state.  Without further answers, the scientific community's lack of success can be confounding — uncertain whether they are focused on the wrong target, have

---

[1] The factual basis for Sections II and III of Amgen's opening brief is the Expert Declaration of Gregory A. Petsko, D. Phil., Regarding the Proper Construction of the Disputed Claim Elements from the Patents-at-Issue ("Petsko Decl.") and all references cited therein.

insufficient information to take proper aim, have not found the right tool to get the job done, or any combination of these.

Amgen met this unmet medical need through its path-breaking basic scientific research to elucidate the body's biological pathways involved in dyslipidemia, and its development of antibody products that alter those pathways in a therapeutically effective and safe manner. The discoveries and inventions disclosed in the patent specification not only resulted in the therapeutic development of Amgen's Repatha™, but illuminated the path for others to develop similar monoclonal antibody products. The active ingredient in Repatha™ ("evolocumab") is a monoclonal antibody that targets the protein PCSK9 ("proprotein convertase subtilisin/kexin type 9"). As will be explained in more detail in the following section, Repatha™ binds PCSK9, blocking PCSK9 from engaging another protein called LDLR (the "LDL receptor") and ultimately lowering the levels of LDL in the blood.

**B.      AMGEN'S ELUCIDATION OF THE PCSK9/LDLR BIOLOGICAL PATHWAY AND THE PRODUCTION OF HIGHLY EFFECTIVE ANTIBODIES TO BLOCK THE BINDING OF PCSK9 TO LDLR**

Amgen was the first to define the mechanism by which PCSK9 intercedes in the cholesterol-lowering function of the liver: PCSK9's binding to LDLR.

In the absence of PCSK9, liver cells capture and remove LDL from the blood as LDLR, which is on the surface of these cells, binds circulating LDL. The bound LDLR:LDL "complex" is then internalized by the liver and the LDL is degraded by the liver. The LDLR is returned to the surface of the liver and thus available to capture more LDL. However, as illustrated below in the left panel of Figure 1, when PCSK9 (another protein circulating in the vicinity) is present, LDLR can bind both LDL and PCSK9. This entire LDLR:LDL:PCSK9 "complex" is then internalized by the liver and degraded such that the LDLR is removed rather than returned to the

cell surface to capture more LDL.  Over time, PCSK9 causes LDLR levels on the liver surface to drop and "bad" cholesterol levels in blood to rise.

With their elucidation of this pathway, Amgen's inventors sought effective ways to block the binding of PCSK9 to LDLR and potentially open the door to new dyslipidemia therapies. One strategy they pursued led them to develop monoclonal antibodies that bind PCSK9 in a manner that would block PCSK9 from binding to LDLR.  This painstaking research is described in the patent specification.  The inventors generated many antibodies to PCSK9 (Examples 1-2, 4.1-7), and then designed assays to identify those antibodies that effectively blocked binding between LDLR and PCSK9 (Examples 3, 11).  They further carefully characterized the antibodies' structure and binding to PCSK9 using various methods.  (Examples 9-9.2, 10, 25, 26, 29-39.)  The inventors conducted experiments in both cells and mice (*see, e.g.*, Examples 12, 13-17, 24, 26), to demonstrate the ability of their antibodies to lower LDL cholesterol and increase LDLR.  Ultimately, the inventors created monoclonal antibodies that bound to specific regions on PCSK9 and were highly effective in blocking PCSK9 from binding LDLR.  The patent claims identify these preferred antibody binding regions by reciting amino acid residues on PCSK9.

One such antibody, evolocumab (identified as "21B12" in the patent specification), is the fully-human monoclonal antibody within Amgen's anti-PCSK9 drug product Repatha™. Evolocumab harnesses the inventors' knowledge of antibody binding to PCSK9 as a way to disrupt the PCSK9/LDLR pathway by blocking PCSK9 from binding to LDLR.  Figure 1, right panel, illustrates this invention in which the monoclonal antibody binds to PCSK9 in such a way as to effectively block its ability to bind to LDLR.  The LDLR:LDL complex free of PCSK9 is then internalized by the liver, LDL cholesterol is degraded, and LDLR is returned to the liver surface to capture more LDL.

### FIGURE 1:  Amgen's Antibodies Prevent LDL Receptor Degradation



In this way, Amgen's Repatha™ addresses the public health need for an effective new dyslipidemia therapy that statins leave unresolved.  Repatha™ is currently pending FDA approval.

## III.   TUTORIAL ON THE UNDERLYING TECHNOLOGY OF THE PATENTS

### A.   THE IMMUNE SYSTEM MAKES ANTIBODIES TO FIGHT INFECTION

Antibodies are an essential part of our body's immune system and help to protect us against infection.  Our immune system responds to foreign substances (*e.g.*, an "antigen") in a number of ways, including by producing an army of antibodies that can identify and tag these foreign substances for removal.  They do so by uniquely binding to the antigen and not to the self (assuming an otherwise healthy immune system).  Antibodies are a type of protein called "immunoglobulins," and fall into several subclasses called "isotypes."  The specialized process by which the immune system produces antibodies generates an enormous diversity of antibodies capable of binding virtually any target antigen.

01:17371178.1

- 5 -

### B.     BASICS OF ANTIBODY STRUCTURE AND ANTIBODY-ANTIGEN BINDING

An intact antibody is a large, Y-shaped protein made up of four chains of amino acids (two identical heavy chains and two identical light chains) folded together into a characteristic three-dimensional structure.  (Petsko Decl., ¶ 41.)  The heavy chains form the antibody's Y-shaped frame, while the light chains attach to the arms of either heavy chain.  (*Id.*; *see* Figure 2, left-hand panel.)  The heavy and light chains each have portions that are constant across all antibodies of a given isotype, as well as portions that vary from antibody to antibody.  (*See* Figure 2, right-hand panel; Petsko Decl., ¶ 41.)  The variable portions of the two chains come together at the tip of the "Y" to create an antigen binding site — the portion of the antibody that binds the antigen.  (*Id.* at ¶¶ 42-44.)  Although the macromolecular Y-shaped structure is common among antibodies, the antigen binding site (the tip of the Y) itself has a unique three-dimensional shape based on the sequence of amino acid subunits that make up the amino acid chains of the antibody.  It is by virtue of unique three-dimensional structures at the antigen binding site that an antibody binds an antigen.  (*Id.* at 44-45.)

**FIGURE 2: Antibody Structures as Heavy/Light Chain or Variable/Constant Region Pairs**



The region on the antigen to which the antibody binds is commonly called the "epitope." (*Id.* at ¶ 47.)  The epitope is spatially complementary to the three-dimensional structure of the

01:17371178.1

antigen binding site at the tip of the antibody (like a lock and key or two interlocking puzzle pieces). (*Id*.) Monoclonal antibodies are a composition of antibodies having the same amino acid sequence and as a result, bind the same epitope.[2] (*Id*. at ¶ 48.) This is in contrast to "polyclonal" antibodies which are a mixture of antibodies that have different amino acid sequences and bind different epitopes. (*Id*.)

### C. PROTEIN AND ANTIBODY COMPOSITION

Antibodies, like all other proteins, comprise one or more chains of amino acids linked together by peptide bonds (thus forming a "polypeptide" chain). Amino acids differ from one another based on their charge, overall size, flexibility, and hydrophobicity (*i.e.*, how soluble they are in water). Human proteins primarily contain any of 20 different amino acids in a linear sequence arranged in countless ways. (*See* Figure 3; Petsko Decl., at ¶¶ 24-25.)

At the atomic level, all amino acids have the same "backbone" structure, but each amino acid has its own characteristic "side chain" of additional atoms that protrude from the common backbone and give each amino acid "residue" its distinct set of chemical properties. The atoms that make up individual amino acids are held together by covalent bonds, which are very strong bonds because the atoms share electrons with one another. (*Id*. at ¶¶ 25, 27.)

A protein chain can be thought of as a beaded necklace, with each bead corresponding to an amino acid residue.[3] But unlike a beaded necklace, a protein chain folds into a unique three-dimensional structure, dictated by its amino acid sequence, which allows the protein to perform a specific function. (*Id*. at ¶ 27.) The function of a protein is inextricably linked to its three-

---

[2] A monoclonal antibody can also be a human or mouse or many other species of monoclonal antibody. (Petsko Decl., ¶¶ 54-55.)

[3] Scientists refer to each specific amino acid residue in a protein chain according to (1) its relative position in the linear sequence, and (2) its unique single letter abbreviation. (Petsko Decl., at ¶ 26.) For example, if the 238th amino acid on a protein chain is a glutamic acid, whose single letter abbreviation is "D," scientists refer to that residue as "D238." (*Id*.)

dimensional shape because its shape determines how it behaves around and in response to other molecules — for example, how it binds to other proteins.  (*Id*.)  Figure 3 shows the relationship between individual amino acids, their arrangement in a linear (or "primary") amino acid sequence, and the final three-dimensional folded protein:

### FIGURE 3:  Amino Acids Are the Building Blocks of Proteins



Scientists use a technique called X-ray crystallography to map the atomic structure of proteins.  They do this by first crystalizing the protein, and then causing a beam of X-rays to diffract through that crystal into a pattern that is characteristic of the protein's structure. Scientists can also use this technique to examine the structure and spatial relationship of two proteins when they are bound together by co-crystalizing the bound proteins in a complex. (Petsko Decl., at ¶ 28.)

### D.    PROTEIN-TO-PROTEIN BINDING AND NON-COVALENT INTERACTIONS

Proteins bind to other proteins to achieve specific biological effects.  Protein binding occurs when the three-dimensional contours of one protein (*e.g.*, an antigen binding site of an antibody) allow some of its amino acids to align with those of another protein (*e.g.*, an epitope of an antigen), such that one or more individual ***interactions*** form between the aligned amino acids. (*Id*. at ¶ 30)   These "non-covalent" interactions form between individual atoms on either protein's surface amino acids that come into close physical proximity and are reversible.  (*Id*. at

¶¶ 30-31.)   Indeed, the two proteins can disassociate and then bind again in a repeated disassociation/re-association cycle.   These types of interactions include ionic (*i.e.,* charged or "electrostatic"), hydrogen, van der Waals, and hydrophobic interactions, and describe relationships between atoms, such as carbon, nitrogen, hydrogen and oxygen.  (*Id.*)  Collectively, these individual interactions result in overall protein binding.  (*See e.g.*, Figure 4; Petsko Decl., at ¶¶ 30-31.)[4]

### FIGURE 4: Non-Covalent Interaction Depends on Three-Dimensional Structure



The propensity of two proteins to *remain associated* describes their *affinity* for each other.  (*Id.* at ¶ 32.)  The ability of a protein to preferentially bind a protein because of the shape of its binding site relative to other proteins describes the *specificity* of that binding event.  (*Id.* at ¶ 33.)  For therapeutic purposes, effective antibodies are those that are highly specific for the intended target molecule and bind with the appropriate level of affinity to achieve the intended biological effect.

---

[4] The overall binding that occurs at the level of proteins, as a whole, is also often referred to as an "interaction," even though scientists study binding phenomena at the macromolecule through a different lens than at the amino acid level.  (Petsko Decl., at ¶ 31.)

## IV. DEFINITION OF ONE OF ORDINARY SKILL IN THE ART

Amgen submits that the appropriate level of ordinary skill in the art at the time of the inventions of the patents was a person with an M.D. or a Ph.D. in immunology, cellular biology, biochemistry, biophysics, or a related field, and had at least two years of post-doctoral or industry experience studying the structural and/or functional properties of complex proteins.

## V. AGREED CONSTRUCTION

The parties agree to this construction of the dependent element in '741 Patent Claim 2.

| PATENT AND CLAIM | CLAIM TERM | AGREED CONSTRUCTION |
|---|---|---|
| '741 Patent, Claim 2 {on which selected Claims 3, 4, 7 and 11 depend} | **wherein the isolated monoclonal antibody is a neutralizing antibody** | "wherein the claimed antibody reduces a biological effect of PCSK9" |

## VI. DISPUTED CLAIM TERMS AND CONSTRUCTIONS[5]

### A. "AN ISOLATED MONOCLONAL ANTIBODY"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| All claims at issue | **[An] isolated monoclonal antibody** | "A composition of intact immunoglobulins of any isotype characterized by intact immunoglobulins having identical amino acid sequences, *i.e.*, essentially free of non-identical amino acid sequences" | "Composition of intact immunoglobulins of any isotype, or fragments thereof that can compete with the intact immunoglobulin for specific binding to the target antigen, produced by a single clone and separated from other proteins." |

---

[5] Because the patents-at-issue share a common specification, this document cites to the '165 Patent in the form of column:line citations ("X:Y") when discussing the Amgen patent specification unless otherwise stated.

01:17371178.1

All of the patent claims at issue in this case include the claim term "isolated monoclonal antibody." As seen from the table above, the Parties are in agreement as to portions of the construction of this term, but Defendants seek to include "fragments" and add a production limitation ("produced by a single clone") to Amgen's proposed construction. Neither addition is justified by the claim language, the intrinsic record, nor the understanding of one of skill.

### 1. "Isolated monoclonal antibody" does not include fragments

Defendants seek to rely on the specification's description of the broader term "antibody" as support for fragments while ignoring that the claim term to be construed is "monoclonal antibody." That different claim term (monoclonal antibody) is recognized by those of skill in the art and consistently used in the patent specification as being distinct from and not including antibody fragments. Amgen's construction is grounded in this claim language, which recites only "[an] isolated *monoclonal* antibody" and does <u>not</u> include the phrase "or fragments thereof" that Defendants seek to include in the construction. Given the absence of such "fragment" language in the claims, there is no basis for reading it in. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (claim construction inquiry focuses on actual claim language). As explained below, both the skilled person and the patent specification use the term "monoclonal antibody" as not including "fragments."

There is a "heavy presumption" that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art. *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 857 (Fed. Cir. 2014) (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)). As Dr. Petsko explains, one of skill in the antibody art understands and views a "monoclonal antibody" as an *intact* immunoglobulin. (Petsko Decl., ¶¶ 46, 58, 61, 64.) He further explains that to identify an isolated monoclonal antibody *fragment*, that person expressly identifies it as such by using the word "fragment." If a monoclonal antibody is fragmented,

persons of ordinary skill in the art refer to the parts individually as, for example, "Fab" (for "*fragment* antigen binding") or "Fc" (for "*fragment* crystallizable") fragments — not as "antibodies." (*Id.*) Amgen's construction is consistent with this ordinary meaning "in the relevant art during the relevant time period." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, No. 2012-1567, 2015 WL 3772402, at *5 (Fed. Cir. June 18, 2015).

Amgen's construction is likewise supported by the patent's consistent use of the term "monoclonal antibody" as distinct from "fragments." *Phillips*, 415 F.3d at 1313 (finding that claim terms must be read in the context of the entire patent specification). For example, the specification at 32:60-66 lists the different types of antibodies contemplated within the broader scope of the patent disclosure and states: "antibodies include monoclonal antibodies, bispecific antibodies, . . . and fragments thereof." If the term "monoclonal antibodies" included fragments, there would be no need to recite "and fragments thereof." Again, at 30:50-59, the specification in describing the broader term of "antigen binding protein" lists "antibodies" as including "monoclonal antibodies, bispecific antibodies, . . . and fragments thereof." And in perhaps the most distinct contrast in the use of the terms, the patent specification at 6:54-58 lists different embodiments described in the details of the patents and states: "In some embodiments, the isolated antigen binding protein is a monoclonal antibody, a polyclonal antibody, . . . . or an antibody fragment thereof." The next sentence describes the contemplated antibody fragments (6:58-61), and a sentence later the specification simply states that "[i]n some embodiments, the isolated antigen binding protein is a "monoclonal antibody" (6:62-3), without any reference to the fragments just discussed. The specification carefully identifies "an isolated monoclonal antibody" as a subset of "antibody" and does not include the separate and distinct subset of "fragments."

In attempting to read "fragments" into the claims, Defendants cite to a portion of the specification's discussion of the more general term "antibody": "[t]he term antibody refers to an intact immunoglobulin of any isotype, or a fragment thereof that can compete with the intact antibody for specific binding to the target antigen, and includes, for instance, chimeric, humanized, fully human, and bispecific antibodies." (32:40-42.)   But, Defendants fail to recognize that later in that same paragraph "monoclonal antibodies" are listed as one of many distinct subclasses of "antibodies," and, as noted, "fragments" are listed separately from monoclonal antibodies. (32:60-66.)   Even though the patent describes fragments in separate detail, Defendants apparently seek to include fragments within monoclonal antibody in order to sweep in additional embodiments that they will then argue are not described and/or enabled by the patent disclosure.   But the patent claims do not recite "fragments."

When the claim phrase is "isolated monoclonal antibody," it would be error to ascribe an act of lexicography to a sentence in the specification relating to the term "antibody."   The standards for finding lexicography . . . are exacting" and require that the disputed claim term be "clearly set forth" and "clearly express an intent to define the term." *GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1308-09 (Fed. Cir. 2014), *reh'g denied* (June 17, 2014) (citing *Thorner v. Sony Computer Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012)).   The patent specification does not set forth an express definition for "isolated monoclonal antibody," but consistently uses it as being distinct from fragments.

### 2.   There is no process limitation to "monoclonal antibody"

Defendants' construction likewise errs because it seeks to impute a process requirement that the monoclonal antibody is "produced by a single clone" cell.   The claim language expresses no requirement that the recited isolated monoclonal antibody be "produced" in a particular manner.   Defendants do not cite anything in the specification in support of their proposal.

Reading in such a process limitation into a product claim is improper. *See Biacore, AB v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 456 (D. Del. 1999) (improper to import in process limitation into product claim).

The patent specification does not limit the manner in which monoclonal antibodies can be produced. At 52:23-53:60 and 56:43-57:9, the specification describes various standard methods to produce monoclonal antibodies — phage display, transgenic mice and the use of transformed host cells. Examples 4.1, 4.2, 5, 6, 7 and 8 describe production of monoclonal antibodies using hybridomas and transfected cells. While it is true that an "isolated monoclonal antibody" can be produced by a single clone cell, the specification exemplifies typical alternative techniques. This is consistent with the understanding of one of skill in the art that, factually, isolated monoclonal antibodies need not be produced by a single clone cell. (Petsko Decl., ¶¶ 52, 65.) Given the breadth of disclosure, Defendants' proposal to limit the claims to monoclonal antibodies produced by a particular method is simply unfounded.

Defendants appear to base this limitation on an extrinsic glossary definition. JCCS [D.I. 61] at 4. That glossary is contrary to the intrinsic record, which plainly demonstrates other techniques for producing an isolated monoclonal antibody, and cannot form the basis for a proper construction. *Phillips*, 415 F.3d at 1322-23 (finding that dictionary definitions may not contradict definitions ascertained from the patent) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n. 6 (Fed. Cir. 1996).) As Dr. Petsko explains, the original source of the term arose in the early 1980s for antibodies produced by a single cell, but changed over the years to include monoclonal antibodies produced by, *e.g.*, phage display or recombinant expression, consistent with the specification's broader teachings. (Petsko Decl., ¶¶ 56, 65.)

Amgen's proposed construction should be adopted as it rests on the plain language of the claims, the specification, and the understanding of one skilled in the art.

**B. THE MONOCLONAL ANTIBODY BINDS TO AT LEAST ONE {OR TWO OR FOUR} OF THE IDENTIFIED AMINO ACIDS OF SEQ ID 1 AND/OR 3**

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '165 Patent, claims 1, 17, 19, 20, 29; | **"the monoclonal antibody binds to at least one {or two or four} of the"** identified residues of SEQ ID NO:3 in the specific claim | "the claimed antibody interacts with at least one {two / four} of the claim's identified residues" | "Binds" to a residue: "directly contacts an amino acid and directly contributes to the specificity and affinity of the PCSK9-antibody interaction (e.g., hydrogen bonds, ionic interactions)" |
| '914 Patent, claim 24 (including limitations from claims 16, 17 from which selected claim 24 depends | **binds . . . at two or more of amino acid residues S123, E129, A311, D313, or D337 of SEQ ID NO: 1**<br><br>**wherein the isolated human monoclonal antibody further binds at least one of amino acid residues 132, 351, 390, or 413 of SEQ ID NO: 1** | "the claimed antibody interacts with at least one {two} of the claim's identified residues" wherein the claimed antibody also interacts with at least one of the amino acid residues identified in Claim 24" | |

The Parties appear to agree that when the isolated monoclonal antibody "binds to" or "binds at" one or more specifically identified amino acid residues on PCSK9, it requires that the monoclonal antibody "interacts with" the specified amino acid(s) of PCSK9.[6] This common ground is Amgen's proposed construction: binding to a particular PCSK9 residue means that the monoclonal antibody "interacts" with that specified residue on PCSK9. As discussed in the tutorial section, interactions between amino acids on an antibody and sites on an antigen (here

---

[6] For convenience, Amgen uses the phrase "the claims' identified residues" in place of the long strings of cited residues on PCSK9 to which the claimed antibody binds.

PCSK9) can be one of several types, including through hydrogen bonds, ionic (charged) interactions, van der Waals interactions, and hydrophobic interactions. (Petsko Decl., ¶¶ 30, 31, 69.) When the claimed monoclonal antibody binds to a specific PCSK9 residue identified in the claim, one or more of these different types of forces can be occurring. (*Id*. at ¶ 30, 31, 71-73) The word "interacts" captures these different types of recognized interactions.

Defendants seek to unduly limit the scope of what it means to "bind" a residue by importing several limitations. First, Defendants seek to limit the interactions between residues to only those involving "direct contact." But interactions between atoms are not limited to "direct contacts," and nothing in the claim language or the specification indicates otherwise. Second, Defendants seek to narrow the claims by reading in that the binding "directly contributes to the specificity and affinity of the PCSK9-antibody interaction (*e.g*., hydrogen bonds, ionic interactions)." But again, neither the claim language nor the specification ascribes these limitations to the plain meaning of the word "binds." Moreover, as described below, a skilled artisan would not understand the word "binds" to be so limited.

The claim phrase "binds to [a residue]" conveys that an interaction has formed with the identified residue. An antibody "binding to" or "binding at" a specific amino acid residue of a target antigen has the ordinary meaning that the monoclonal antibody has "interactions with" the specified residues. (Petsko Decl., ¶¶ 69, 71-73.) Scientists recognize these interactions as weak, "noncovalent" associations between amino acid residues on the antibody and the identified residues on the target antigen. (Gaede Decl., ¶ 5, Ex. 4 (C.A. Janeway, Jr., *et al.,* IMMUNOBIOLOGY (5th ed. 2001) ("Janeway")) at 103, second full paragraph; Gaede Decl., ¶ 6, Ex. 5, (H. Lodish, *et al.,* MOLECULAR CELL BIOLOGY (4th ed. 1999) ("Lodish")) at 22, left-hand column, last paragraph ("these weak bonds are referred to as *interactions* rather than bonds").)

Scientists also understand that interactions may be "direct" when they form between two residues themselves or "indirect" when an intervening molecule, such as water, mediates an interaction between amino acids on the antibody and the antigen.  (Petsko Decl., ¶¶ 70, 78.)  One of skill understands that "*direct* contact" between residues as Defendants propose typically excludes "indirect interactions" mediated by a water molecule or other charged molecule.  (*Id*.)

The patent specification repeatedly describes various embodiments of antibodies that "bind" to specified amino acid residues on PCSK9.  (*See, e.g.*, 11:30-46 and 103:57-60.)  The examples further illustrate the methods used to determine the residues to which several of the particular antibodies described in the specification bind.  (*See, e.g*., Example 29.)  Significantly, in reporting the results of these studies, the patent uses the term "interacts" or "interaction" to describe the binding of monoclonal antibodies to PCSK9.  For example, the subtitle to Example 30 states in part, "21B12 Binds to the Catalytic Domain of PCSK9," and then in describing the results of the analysis states:  "As will be appreciated by one of skill in the art, FIG 19B depicts the <u>interaction</u> between the CDRs on the antigen binding protein and PCSK9."  (102:14-16.)  Further down that same column, the patent states: "As will be appreciated by one of skill in the art, the results from Example 30 demonstrate where antigen binding proteins to PCSK9 can interact on PCSK9 and still block PCSK9 from interacting with EGFa (and thus LDLR)."  (102:56-59.)  Thus, the patent specification uses interacts as the term to define "binds."

The specification also provides the basis for including "indirect" contacts, such as through a water-mediated hydrogen bond, within the meaning of "binds."  Example 35 describes some of the methodology used in the structural determination of the binding sites on PCSK9.  Distance between amino acid residues was used as a criteria in the crystal studies to determine those residues that were involved in binding.  Certain residues were identified as being within 5

Angstroms of each other and this distance "was chosen as the core region cutoff distance to allow for atoms within a van der Waals radius, plus a possible water-mediated hydrogen bond." (108:49-52, 109:49-52.)   One of skill recognizes "van der Waals radius" and "water-mediated hydrogen bond" as exemplifying interactions between two amino acid residues.  (Petsko Decl., ¶ ¶ 70, 74, 78.)   And plainly, water-mediated bonds are "indirect" contacts and are part of the contemplated interactions.   There is no basis for reading in a limitation of "direct" contact, as Defendants propose.

Defendants' proposed construction also seeks to import the distinct concept that "binds to" a residue implies a "direct contribution" of that particular residue to the "specificity" and "affinity" of the monoclonal antibody binding to PCSK9.   Such limitations are not stated in the claim and there is no basis for reading such limitations into the meaning of the word "binds." Such a construction would be at odds with the ordinary meaning of "binds" and the use of the terms "specificity" and "affinity" in the patent specification. Scientists understand that "specificity" describes the relative ability of an antibody to bind to only one target, whereas "affinity" describes the overall strength of an antibody binding to its antigen.  (Janeway at 104, last paragraph; Lodish at 26, fourth paragraph.)[7]  Both "specificity" and "affinity" are concepts that relate to the fit and binding strength between a monoclonal antibody and its target (PCSK9) – not between individual amino acid residues. The specificity and affinity of an antibody for its antigen are measured by assays that test the attraction between the molecules as a whole and not by the attraction of individual amino acid residues.  (*See, e.g.*, Example 9.2 (describing experiments to determine affinity between molecules as a whole).) Discussing whether *one* particular amino acid residue contributes to the binding *specificity* of the monoclonal antibody to

---

[7]   An example of a claim with an affinity requirement is Claim 4 of the '741 Patent, which has a requirement for an affinity as measured by a disassociation constant.

PCSK9 does not square with how one of ordinary skill understands specificity or how one uses the term.   (Petsko Decl., ¶ 32, 33, 78, 79.)

The specification contradicts Defendants efforts to cast affinity and specificity as concepts applied to interactions of particular amino acid residues and to import such into a construction of the claim term "binds." Amgen's construction of "binds to" or "binds at" the identified residue(s) as "interacts with" aligns with the plain claim text, the specification, and the extrinsic evidence.

### C.     "WHEREIN THE ISOLATED MONOCLONAL ANTIBODY BINDS AN EPITOPE ON PCSK9"

| PATENT(S) AND CLAIM | "CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '741 Claim 1 | **wherein the isolated monoclonal antibody binds an epitope on PCSK9** | "wherein the claimed antibody interacts with a region on PCSK9 that includes determinants to which the antibody binds, including specific amino acids that directly contact the antibody" | Epitope:  "region of amino acids on PCSK9 that encompasses specific amino acids that directly contribute to the affinity of the interaction (e.g., hydrogen bonds, ionic interactions) (functional epitope) and amino acids that are covered by the antibody (structural epitope)" |

An "epitope" is the region on the antigen (here PCSK9) to which the antibody binds. Amgen's proposed construction of this claim element flows from the specification's explanation of "epitope" (36:48-63) whereas Defendants attempt to piece together the definitions for two subtypes of epitopes — functional and structural — to create a construction for the term epitope itself.  Amgen's construction is more consistent with the specification and the understanding of those skilled in the art.

The patent specification describes an epitope at 36:48-63 as a region of an antigen to which an antigen binding protein (a monoclonal antibody in the claims) binds and which includes determinants and specific amino acids that directly contact the antibody:

> The term 'epitope' includes any *determinant* capable [of] being bound by an antigen binding protein, such as an antibody or to a T-cell receptor.  An *epitope is a region of an antigen* that is bound by an antigen binding protein that targets that antigen, and when the antigen is a protein, *includes specific amino acids that directly contact the antigen binding protein*. … Epitope ***determinants*** *can include chemically active surface groupings of molecules such as amino acids, sugar side chains, phosphoryl or sulfonyl groups, and can have specific three dimensional structural characteristics, and/or specific charge characteristics*.  Generally, antibodies specific for a particular target antigen will preferentially recognize an epitope on the target antigen in a complex mixture of proteins and/or macromolecules.

(*Id*. (emphasis added).)

This concept of an epitope as the specific region on the antigen to which the antibody binds, and which includes residues in direct contact, is consistent with the immunological roots of the term.  (Petsko Decl., ¶¶ 47, 48, 51.) Notably, the specification does not *limit* the epitope to residues in direct contact, but rather that the epitope must include at least some residues that are in direct contact with the antibody.[8]  The inclusion of determinants is also consistent with the specification and highlights that there may be chemical moieties in addition to amino acids to which antibodies can bind.  The patent specification exemplifies ways to determine the epitope.  (*See, e.g.*, Examples 18, 28-32, 35-39.)

Defendants' construction effectively assigns the same definition to "epitope" and to "structural epitope," contrary to the specification and the doctrine of claim differentiation.  Rather than draw on the specification's language of "epitope" at column 36, Defendants rely on

---

[8] As discussed in the section on "binds to," interactions may be direct or indirect, and thus it is improper to limit the term "binds to" to direct interactions.  *See* Section VI.B, *supra*.  This does not conflict with the specification's description of "epitope" and its language of "includes" direct contacts because, when the antibody binds the epitope, included in those interactions will be direct contacts.  But it is improper to require that all contacts be "direct," as Defendants propose.

the language describing (i) a structural epitope as "those residues in the antigen that contact or are buried by the antibody" (114:2-5; Petsko Decl., ¶¶ 49, 83), and (ii) a "functional epitope" as "those residues that directly contribute to the affinity of the interaction" between antibody and antigen. (*Id.* at ¶¶ 49, 83; 115:1-2.) A skilled artisan at the time would agree with the patent's statement that "functional epitopes are generally a subset of the structural epitopes." (114:67-115:1; Petsko Decl., ¶¶ 49, 83.) On a plain reading, the patent describes "epitope" in different terms from a structural epitope and so the terms should not be read to mean the same thing.

Amgen correctly construes "epitope" in accordance with the plain teaching of "epitope" set forth at column 36 of the specification.

### D. "BINDS AN EPITOPE …COMPRISING AT LEAST ONE OF RESIDUES 237 OR 238"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '741 Patent – all selected claims | **binds an epitope …comprising at least one of residues 237 or 238** | "wherein said epitope includes residues 237 or 238 of SEQ ID NO: 3" | "binds to any amino acid within an epitope that includes at least one of amino acids 237 or 238" |

The claim term "comprising" means including but not limited to. *See*, *e.g.*, *Cias, Inc. v. Alliance Gaming Corp.*, 504 F. 3d 1356, 1359-61 (Fed. Cir. 2007) ("In the patent claim context the term "comprising" is well understood to mean 'including but not limited to.'"). Amgen's construction applies this well-accepted legal meaning in a straightforward manner to the claim language. For a discussion of the issues on the construction of "binds" and "epitope," *see* Sections B and C above.

### E.  "WHEREIN THE EPITOPE IS A FUNCTIONAL EPITOPE"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '741 Patent, Claim 7 | **wherein the epitope is a functional epitope** | "wherein the epitope is defined by those residues that directly contribute to the affinity of the interaction" | Functional Epitope: "directly contacts an amino acid and directly contributes to the specificity and affinity of the PCSK9-antibody interaction (e.g., hydrogen bonds, ionic interactions)" |

Claim 7 of the '741 Patent delineates the "epitope" of Claim 1 to be a "functional epitope" which refers to the subset of residues that directly contribute to the overall affinity between the antibody and PCSK9.  (Petsko Decl., ¶¶ 49, 83, 89-91.)  The specification instructs:

> Epitopes can be further defined as structural or functional.  Functional epitopes are generally a subset of the structural epitopes *and have those residues that directly contribute to the **affinity** of the interaction (e.g. hydrogen bonds, ionic interactions).*  Structural epitopes can be thought of as the patch of the target which is covered by the antibody.

(114:66-115:4 (emphasis added).)  The patent specification discloses methods for determining the residues involved in the functional epitope, *see e.g.*, Example 18, 94:38-46.  Scientists understand that the patent's notation of "*e.g.,* hydrogen bonds, ionic interactions" indicates that interactions between residues of an antibody and PCSK9 (as exemplified by ionic or hydrogen bonds) are hallmarks of residues within the functional epitope.  (115:2-3; Petsko Decl., ¶ 89.)[9]

Defendants' construction incorrectly imports the additional requirement that the functional epitope directly contribute to the "*specificity*" of the PCSK9 and antibody binding, in addition to the specification's teaching related to "affinity."  As discussed above, "specificity"

---

[9] The structural immunology literature considers functional epitope residues as those within the smaller subset of contacted residues making a contribution to the affinity of antibody to antigen.  (T. Clackson, *et al., A Hot Spot of Binding Energy in a Hormone-Receptor Interface*, SCIENCE (1995) 267:383-86, at 384, Figure 2A (Gaede Decl., ¶ 7, Ex. 6; Petsko Decl., ¶ 49, 89, 83.)

describes the relative ability of an antibody to bind to only one target; "affinity" describes the overall strength of antibody binding to its antigen.  (31:44-67; Janeway at 104, last paragraph; Lodish at 26, fourth paragraph.)  So while affinity is a measure of binding strength, specificity is a different property that measures the antibody's ability to differentiate between two different proteins.  Defendants' untethered addition of "specificity" to the specification's discussion of the term "functional epitope" would erroneously limit the claim's requirements beyond what is express in the specification and its ordinary meaning in the art.  (Petsko Decl., ¶¶ 32, 33, 92.)

Likewise, Defendants' construction errs by reading in again "direct contact" — a phrase not found in the specification's discussion of "functional epitope."  (114:67-115:2.)  A "direct contact" would exclude "indirect interactions," such as a water-mediated interaction, even though a water-mediated interaction could directly contribute to the affinity of the PCSK9:antibody complex and is expressly cited in the specification.  (108:51-52; Petsko Decl., ¶ 70, 74, 78, 93.)  Amgen's proposal tracks the specification's use of "functional epitope," is consistent with the ordinary meaning in the art and should be adopted.

### F.    "PCSK9"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '165 Patent, Claims 1, 17, 20, 23, 29; '741 Patent Claims 1, 4; '914 Patent, Claim 16 {on which selected Claim 24 depends} | **'165 Claim 1:** **PCSK9 . . . wherein the [isolated] monoclonal antibody binds to at least one of the following residues . . . of SEQ ID NO:3, and … blocks binding of PCSK9 to LDLR** | PCSK9: "a polypeptide of SEQ ID NO: 1 and/or 3 that binds LDLR" | "polypeptide as set forth in SEQ ID NO:1 and/or 3 or fragments thereof; allelic variants, splice variants, derivative variants, substitution variants, deletion variants, and/or insertion variants thereof; fusion polypeptides, interspecies homologs, and both the proprotein and the product generated following autocatalysis of the proprotein" |

All of the claims at issue specifically recite an amino acid sequence of PCSK9 by reference to SEQ ID NO: 1 and/or 3, consistent with Amgen's construction.  More particularly, the claims reference specific amino acids at designated positions in SEQ ID NO: 1 and/or 3.  These sequence-specific references in the claim pin the amino acid sequence of PCSK9 to those recited in the SEQ IDs NO:1 or 3 which are listed at columns 124-133 of the patent specification.  In addition, the claims require that PCSK9 be active and bind to LDLR, but for the presence of the blocking monoclonal antibody.  These other elements of the claim give contextual meaning to the term "PCSK9" and, as they themselves are claim language, must be given primacy as a tool of claim construction.  *Phillips*, 415 F.3d at 1314 (context in which term used in the claim "can be highly instructive").  The claim together with the understanding of such by a person of skill in the art, and the teachings of the patent specification as a whole, demonstrate that Amgen's proposed construction is correct while Defendants' cannot stand.

Defendants' construction agrees that "PCSK9," as used in the claims, covers a polypeptide of SEQ ID NO: 1 and/or 3.  But Defendants add "fragments thereof, allelic variants, splice variants, derivative variants, substitution variants, deletion variants, and/or insertion variants thereof; fusion polypeptides, interspecies homologs, and both the proprotein and the product generated following autocatalysis of the proprotein," citing a sentence in the specification.  (*See* 22:23-28.)  Defendants seemingly seek to expand the scope of the claim in the hopes of easing their burden on their invalidity challenges.  But, as with "antibody," Defendants incorrectly rely on a statement in the specification without regard to the modifying claim language itself, the absence of particular identifiers of such variants, or the context of the specification as a whole.

As noted, all of the patent claims at issue reference the sequences of SEQ ID NOS: 1 or 3 with respect to identifying particular amino acids and specified positions in those sequences.  For example, Claim 1 of the '165 patent recites 15 amino acid residues at positions ranging from 153 to 381 of SEQ ID NO:3, *i.e.,* "D238" means the aspartic acid residue at position 238. Defendants' proposed construction for PCSK9 would include fragments, variants, deletions, and non-human forms of PCSK9 many of which would not have the recited amino acid residues at the specified positions, thus rendering the claim senseless.  Moreover, as required by the claims, the PCSK9 must bind to LDLR.   And again, many of the forms sought to be added by Defendants' proposal would be inactive and not bind LDLR.  For example, Defendants seek to include the "proprotein" of PCSK9, but the patent specification makes clear that such form is "inactive."  (*See* 22:37-45 (the "pro-form" or "unprocessed" is the same as the "proprotein").) Thus, Defendants' proposed construction would include large numbers of "PCSK9" forms that are simply inconsistent with other elements of the claims and the use of the term in the claim as a whole.

As explained by Dr. Petsko, one of skill would understand that the claim term  PCSK9 – absent any indication to the contrary – applies to its most common physiological form.  (Petsko Decl., ¶ 95.)  And where specific sequence identification (*e.g.*, SEQ ID NO: 3) are provided, as here, a scientist would understand a protein to be defined by those sequences.  (*Id.* at ¶¶ 95-97.) As the claim language does not refer to any other forms of PCSK9 besides SEQ ID NOS: 1 and/or 3, a skilled artisan would not import into the ordinary meaning of "PCSK9" all of the additional limitations Defendants' construction requires.  *Teva Pharm. USA, Inc.,* 2015 WL 3772402, at *5 (meaning of term in the art a factual issue).  (Petsko Decl., ¶¶ 95-99.)

The specification is in accord. Significantly, in the sentence relied on by Defendants, the specification uses the word "refer" ("The term … 'PCSK9' refers to a polypeptide as set forth in SEQ ID NO: 1 and/or 3 ….") meaning that the given amino acid sequences are the reference sequence to which any changes or variants are noted and called out. Where the specification describes a variant form of PCSK9, it does so by affixing some additional description to the term.  For instance, the patent describes a specific variant form of PCSK9 by noting the change to its aspartic acid residue ("D") at position no. 374 to a tyrosine residue ("Y"):  "In some embodiments, the antibody binds selectively to variant PCSK9 proteins, *e.g.,* D374Y over wild type PCSK9." (43:55-56.)  Elsewhere, the patent contrasts both the name and the properties of this variant PCSK9 with wild-type PCSK9:  "In order to determine if the antibodies were specific for the wild type or also bound to the D374Y form of PCSK9, the samples were then screened for binding to the mutant PCSK9 sequence comprising the mutation D374Y."  (79:8-12.)  In yet other instances the patent includes additional description when referencing splice, mutant, or other variant forms of wild-type PCSK9.  (43:60-63, 51:43-47, 79:51-53.)

Examples 27-30 show the specification identifying "fragments" of PCSK9 as the "ProCat Region" or "Catalytic Domain" when such fragments are used.  The careful identification of the type of fragment, rather than the use of a generic "PCSK9" term to include the fragments, underscores the specification's delineation between PCSK9 and its variant forms. In so doing, PCSK9 fragments and variations of the recited sequences can be easily understood.  No such variant forms are recited in the claims, and as described, the recitation of particular amino acids

at specified positions would preclude the inclusion of such forms.  Accordingly, Defendants'

proposed construction cannot be the correct one.[10]

### G.   "AND WHEREIN THE MONOCLONAL ANTIBODY BLOCKS BINDING OF PCSK9 TO LDLR"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '165 Patent, Claims 1, 17; '741 Patent, Claim 1; '914 Patent 16 {on which selected Claim 24 depends} | **and wherein the monoclonal antibody blocks binding of PCSK9 to LDLR** | "and wherein the claimed antibody prevents binding of PCSK9 to LDLR" | "and wherein the claimed antibody prevents interaction between PCSK9 and LDLR" |

The Parties agree that "blocks" means "prevents" and the dispute seems to focus on the

activity that is being prevented.  The claims recite that the monoclonal antibody prevents

"binding" of PCSK9 to LDLR which, as explained above, accomplishes the effect of preventing

a complex forming between PCSK9 and LDLR.  As exemplified in the patents specification,

"blocking" is measured at a population level and not on an individual molecule basis.  (Petsko

Decl., ¶¶ 101-102.)  Amgen agrees with Defendants' use of "interaction" as a construction of

"binding," as Amgen proposed in Section B above, and the claim language makes plain that the

"interaction" to be blocked is between PCSK9 and LDLR.

Concerning the extent of preventing the interaction of PCSK9 and LDLR, the patent

specification discusses how the term "prevents" is intended to be understood:

---

[10] The skilled artisan recognizes that the claimed monoclonal antibodies may still bind and block variant forms of PCSK9, as the patent discloses.  (*See, e.g.*, 43:55-44:12, 44:33-35, 79:4-80:37.) Understanding those properties provides additional information about the monoclonal antibody structure and function.  (Petsko Decl., ¶ 99, fn. 5.)

> The term 'prevent' does not require the 100% elimination of the possibility of an event. Rather, it denotes that the likelihood of the occurrence of the event has been reduced in the presence of the compound or method.

(38:10-14; Petsko Decl., ¶¶ 103-107.) The specification makes this clear when informing the skilled artisan that she can measure a percent inhibition value for PCSK9 binding to LDLR. (40:50-55; Figures 6A-6D *with* 18:34-45 (Brief Description of the Figures) *and* 89:65-90:2 (prose description of Figures 6A-6D); Petsko Decl., ¶ 108.) The specification further provides an assay for measuring blocking. (*See* Examples 3 and 11.) Also, Claim 23 of the '165 Patent claims the binding of PCSK9 and LDLR to be reduced by 80%, indicating that the independent claims do not require blocking of all binding between the molecules.

### H. "WHEREIN THE ISOLATED MONOCLONAL ANTIBODY IS A HUMAN ANTIBODY"

| PATENT(S) AND CLAIM | CLAIM TERM | AMGEN'S PROPOSED CONSTRUCTION | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|---|
| '165 Patent, Claims 21, 24 | **wherein the isolated monoclonal antibody is a human antibody** | "wherein the amino acid sequence of the monoclonal antibody is characteristic of antibody produced by the human immune system" | "wherein the claimed antibody is encoded or capable of being encoded by genes possessed by a human" |

As described in the patent specification, human antibodies have distinct advantages over other forms of antibodies, especially when they are intended to be administered to humans. (46:25-35; Petsko Decl., ¶¶ 110-111.) For example, non-human antibodies can trigger the immune system in a patient resulting in an immune response and faster clearance of the antibody from the patient's system. (*Id.*) The specification discusses mouse, rat, chimeric, humanized and human antibodies, and the delineation of what is "human" relative to these other categories. (32:60-65, 46:25-35.) Human antibodies have characteristic amino acid sequences that classify

these antibodies as "human."  (Petsko Decl., ¶ 110, 113.)  The patent specification recognizes

that "human antibody sequences" are known within the art.  (*See, e.g.*, 46:36-40.)

As Amgen's proposal states, "human antibodies" are those with characteristics of

antibodies produced by the human immune system.  Indeed, as Dr. Petsko describes, "a skilled

person would understand an antibody — no matter how it was made — to be a "human"

antibody based solely on the characteristics of the antibody itself (namely, if it is characteristic of

an antibody that is produced by the human immune system)."  (Petsko Decl., ¶ 113.)

The specification describes just such human antibodies being produced in mice that have

had large portions of the human immune system introduced into them:

> "One can engineer mouse strains deficient in mouse antibody production with
> large fragments of the human Ig loci in anticipation that such mice would produce
> human antibodies in the absence of mouse antibodies.  Large human Ig fragments
> can preserve the large variable gene diversity as well as the proper regulation of
> antibody production and expression."

(45:62-67.)   Although produced in transgenic mice, the patent specification labels such

antibodies as "human" because they have characteristics of antibodies produced by the human

immune system.  The patent specification shows examples of human antibodies made in exactly

this manner.  (52:44-50, 53:30-35 (XenoMouse®); Petsko Decl., ¶ 112.)

Defendants seek to limit the claims by seeking to import a process or source limitation, at

least as reflected by part of their proposed construction ("encoded . . . by genes possessed by a

human"), based on the DNA or genes used to make the antibodies.  Courts reject attempts to read

process or source elements into product claims reciting a specific structure absent "claim

language that quite clearly demonstrates that method steps are claimed."  *Johnson & Johnson*

*Vis. Care v. Ciba Vision Corp.*, 648 F. Supp. 2d 1294, 1341-42 (M.D. Fla. 2009) (citing *Amgen*

*Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1329 (Fed. Cir. 2003)); *Biacore, AB,* 79 F.

Supp. 2d at 456.   Defendants' position is based on one sentence in the patent mentioning that

human antibodies are "encoded or capable of being encoded by genes possessed by a human." (46:40-42.)  The effect of Defendants' proposed construction is to simply shift the inquiry from "what is a human antibody?" to "what is a human gene?"  That is not a helpful construction. Rather, it is the characteristically human amino acid sequence and the attributes inherently conferred by such sequences that make the antibody human.  (Petsko Decl., ¶ 110, 113.)

Defendants' proposed construction thus focuses on just one aspect of certain human antibodies and does not take into account the broader picture of human antibody development, *i.e.* the development of antibodies that one can claim are "human" because they have characteristic sequences and are recognized as such by the human immune system.  Defendants plainly have such an infringing construct as they represented repeatedly to an advisory panel of the FDA that their antibody is a human antibody.  (Gaede Decl., ¶ 8, Ex. 7 at 1, 31 and 33.)

## VII.    CONCLUSION

Amgen respectfully requests that the Court adopt its proposed claim constructions.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

OF COUNSEL:
MCDERMOTT WILL & EMERY LLP         By:   _____/s/ James L. Higgins_____
William G. Gaede, III                             Melanie K. Sharp (No. 2501)
Eric W. Hagen                                         James L. Higgins (No. 5021)
Terry W. Ahearn                                     1000 North King Street
Bhanu K. Sadasivan                               Wilmington, DE  19801
Shane G. Smith                                       (302) 571-6681
275 Middlefield Road, Suite 100             msharp@ycst.com
Menlo Park, CA  94025
(650) 815-7400                                        *Attorneys for Amgen Inc.*

MCDERMOTT WILL & EMERY LLP
Sarah C. Columbia
K. Nicole Clouse
Lauren Martin
28 State Street
Boston, MA 02109-1775
(617) 535-4074

DATED:      July 10, 2015