IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC.; AMGEN MANUFACTURING, LIMITED; AMGEN USA INC., <br><br> Plaintiffs, <br><br> v. <br><br> SANOFI; SANOFI-AVENTIS U.S. LLC; AVENTISUB LLC, f/d/b/a AVENTIS PHARMACEUTICALS INC., and REGENERON PHARMACEUTICALS, INC., <br><br> Defendants. | C.A. No.: 14-1317-SLR (CONSOLIDATED) <br><br><br> **PUBLIC VERSION** |

**AMGEN'S MEMORANDUM IN SUPPORT OF
<u>MOTION TO EXCLUDE EXPERT TESTIMONY OF ASHLEY STEVENS</u>**

Pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Amgen moves that the Court preclude Ashley J. Stevens, one of Defendants' damages experts, from offering expert opinions or testimony at trial concerning any reasonable royalty terms that the parties would have agreed to in a hypothetical license negotiation for the patents-in-suit. Dr. Stevens's opinions are based on two fundamental flaws that violate controlling Federal Circuit law on patent damages.

*First*, Dr. Stevens improperly relies on non-comparable licenses. In identifying "comparable" licenses, Dr. Stevens relies on agreements that are far different – economically and technologically – from the circumstances in a hypothetical negotiation here. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (overturning reasonable royalty verdict; holding that evidence of royalty rates from licenses without a relationship to the claimed invention cannot form the basis of a reasonable royalty calculation). Making bad matters worse, Dr. Stevens disregards key consideration provisions of these agreements, including substantial cost- and profit-sharing provisions, equity ownership, and large upfront and milestone payments

totaling hundreds of millions of dollars. Instead, he arbitrarily isolates and extracts running royalty rates from those agreements and selectively focuses on the rates at the lower end of the running royalty range.

*Second*, Dr. Stevens exacerbates the aforementioned fatal errors by using inadmissible rules of thumb to make arbitrary adjustments to the royalty rates. He does this in two instances. He applies a 50% reduction to the extracted royalty rates on the grounds that the hypothetical license here would be "non-exclusive," basing this adjustment on an arbitrary rule of thumb pulled from a 2012 newsletter article and his "experience." He also applies a 25% adjustment, not based on any evidence, to account for the fact that he ignores the large upfront and milestone payments in the purportedly "comparable" agreements. Both of these adjustments violate *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), which, in reversing a reasonable royalty verdict, held that an expert's use of a general rule of thumb is inadmissible because it fails to tie a reasonable royalty to the facts of the case at issue.

In sum, Dr. Stevens offers an unreliable and irrelevant analysis of non-comparable licenses from which he cherry-picks select financial terms, ignores other key terms, and then further adjusts these terms based upon arbitrary rules of thumb. That is not allowed under Rule 702, *Daubert*, and Federal Circuit law governing permissible reasonable royalty methodology. His opinions should be excluded.

I.  **ARGUMENT**

   A.  **Dr. Stevens improperly relies on non-comparable agreements.**

"When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). A "comparable" license must have a relationship to the patented technology or the accused infringing products, *id.*, and

2

"comparisons of past licenses must account for 'the technological and economic differences' between them." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (quoting *ResQNet*, 594 F.3d at 873). The Federal Circuit "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet*, 594 F.3d at 869. And this scrutiny has led to reversals when damages experts were permitted to rely on license agreements with no relationship to the claimed technology. *See, e.g., LaserDynamics*, 694 F.3d at 79-81; *Wordtech*, 609 F.3d at 1319-22; *ResQNet*, 594 F.3d at 870; *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325, 1332 (2009). Dr. Stevens's opinions suffer from these errors.

### 1. The purported "comparable" agreements are radically different, technologically and economically.

Here, the hypothetical license would have been an agreement whereby Amgen granted Defendants a bare license to the patents-in-suit to enable Defendants to compete directly against Amgen in the United States for the same FDA-approved indications. The hypothetical license would have been effective as of July 24, 2015, the date Defendants began selling the accused product (Praluent®). Praluent® was the first and only anti-PCSK9 antibody on the market until Amgen obtained FDA approval for Repatha® on August 27, 2015, at which point Praluent® and Repatha® became and continue to be the only anti-PCSK9 antibodies on the market.

In evaluating whether any past agreements of the parties were "comparable" to this hypothetical license, Dr. Stevens examined various documents that were either produced in discovery or were publicly available. The agreements that he relies on as "comparable" – which he characterizes as "somewhat helpful" to "helpful" to "highly informative" – are identified and summarized below in Table 1 (Amgen's agreements) and Table 2 (Defendants' agreements).

Table 1: Comparability of Amgen's transactions relied on by Dr. Stevens[1]

| Comparison to Hypothetical Negotiated License for Patents-In-Suit | Dezima Acquisition, Sept. 2015 ("helpful comparable")[2] | Amgen/Glaxo Collaboration Agreement, July 2009 ("highly informative comparable")[3] | Amgen/AstraZenica Collaboration Agreement, March 2012 ("helpful comparable")[4] | Amgen/Takeda Collaboration Agreement, Feb. 2008 ("helpful comparable")[5] |
|---|---|---|---|---|
| Includes the patents-in-suit? | No | No | No | No |
| Includes PCSK9 Therapy? | No | No | No | No |
| Grants U.S. commercialization rights? | N/A | No | Yes | No |
| Is a bare patent license? | No | No | No | No |
| Includes no co-development or co-commercialization efforts? | N/A | No | No | No |
| Authorizes the development of a product that would compete with an Amgen developed product? | N/A | No | No | No |
| Authorizes direct competition in the same indications, in the same geography? | N/A | No | No | No |
| Licensor technology was FDA-approved at time of transaction? | No | No | No | No |

---

[1] Adopted from Table 2 of Supplemental Expert Report of Paul K. Meyer ("Meyer Suppl. Rpt.") (Ex. 1).
[2] Ex. 2, Expert Report of Ashley J. Stevens ("Stevens Rpt.") ¶¶ 115-20.
[3] *Id.* ¶¶ 121-28.
[4] *Id.* ¶¶ 129-34.
[5] *Id.* ¶¶ 135-40.

Table 2: Comparability of Defendants' transactions relied on by Dr. Stevens[6]

| Comparison to Hypothetical Negotiated License for Patents-In-Suit | Novartis/ Regeneron Collaboration Agreement, March 2003 ("helpful comparable")[7] | Genentech/ Regeneron Settlement Agreement, Dec. 2011 ("somewhat helpful")[8] | Regulus/ Sanofi Alliance Agreement, June 2010 ("somewhat helpful")[9] | Sanofi/ Ardelyx Agreement, Feb. 2015 ("somewhat helpful")[10] | Sanofi/ Lumena Agreement, Sept. 2012 ("somewhat helpful")[11] |
|---|---|---|---|---|---|
| Includes the patents-in-suit? | No | No | No | No | No |
| Involves PCSK9 Therapy? | No | No | No | No | No |
| Grants U.S. commercialization rights? | Yes | Yes | Yes | Yes | Yes |
| Is a bare patent license? | No | No | No | No | No |
| Includes no co-development or co-commercialization efforts? | No | N/A | No | No | Yes |
| Authorizes the development of a product that would compete with a licensor-developed product? | No | N/A | No | No | No |
| Authorizes direct competition in the same indications, in the same geography? | No | N/A | No | No | No |
| Licensor technology is FDA-approved at time of transaction? | No | Yes | No | No | No |

---

[6] Adopted from Table 3 of Meyer Suppl. Rpt. (Ex. 1).
[7] Ex. 2, Stevens Rpt. ¶¶ 160-63.
[8] Id. ¶¶ 164-70.
[9] Id. ¶¶ 171-80.
[10] Id. ¶¶ 181-84.
[11] Id. ¶¶ 185-87.

As is readily apparent from Tables 1 and 2, Dr. Stevens selected transactions that are materially different – technologically and economically – from the circumstances in the hypothetical negotiation:

- None of the agreements involve the patents-in-suit or the accused product.
- None of the agreements involve any PCSK9-related therapy.
- None of the agreements are bare patent licenses.
- None of the agreements grant a license that enables a competitor to commercialize products in the same geographic area for the same therapeutic use as the patentee.
- All of the agreements have multiple forms of consideration, not just a royalty rate.
- All but two of the agreements are complex collaboration agreements where the parties are working in partnership to co-develop and co-commercialize drugs that have not yet received FDA approval and are therefore subject to significant uncertainty.
- One of the non-collaboration agreements governs Amgen's acquisition of a privately held Dutch company, Dezima Pharma B.V. Although it may include patent rights, it is not a patent license.
- The other non-collaboration agreement (Regeneron's settlement agreement with Genentech, Inc.) is a litigation settlement, the use of which in determining a reasonable royalty is "questionable." *See LaserDynamics*, 694 F.3d at 77-78 (finding abuse of discretion for admitting settlement for royalty purposes).
- The one agreement that Dr. Stevens determines is a "highly informative comparable" (Amgen's 2009 collaboration agreement with Glaxo Group Ltd.) does not involve a license of any U.S. patent rights.

### 2. Dr. Stevens ignores key financial terms of the "comparable" agreements.

Just as the Federal Circuit warned that a damages expert is not free to rely on "conveniently selected licenses without an economic or other link to the technology in question," *LaserDynamics*, 694 F.3d at 79, it follows *a fortiori* that an expert cannot "conveniently select" provisions from those licenses while ignoring other provisions. Such selective use of financial provisions further undermines the economic comparability of these agreements.

Here, as noted above, all of the agreements Dr. Stevens analyzes contain multiple forms of financial consideration beyond running patent royalties, including upfront and milestone payments, as well as cost-sharing, profit-sharing, and even transfers of equity. These are not insignificant financial terms. As Dr. Stevens acknowledges, these payments can add up to hundreds of millions of dollars. (Ex. 2, Stevens Rpt. ¶¶ 144-49, 190-96.)

Dr. Stevens concedes that he cannot convert any of these very different and complex financial arrangements into a pure royalty. (Ex. 3, Stevens Dep. Tr. at 179:22-25, 214:20-3, 223:5-9, 290:2-9, 291:8-12, 295:11-296:8, 302:24-303:11, 305:12-22.) Yet he proceeds to derive a running royalty benchmark by isolating the agreements' respective running royalty provisions to come up with a range of high-end and low-end royalty rates. In doing so, he fails to account for other aspects of value exchanged by the parties. For example, he ignores the 50:50 profit-sharing provisions typically found in the collaboration agreements. Such provisions help ensure that the licensor is able to further recoup its costs of developing the patented invention. (*Id.* at 200:17-201:8.) These consideration components cannot be ignored without severely undervaluing the patent license. As such, the Court here should reject Dr. Stevens's selective use of running royalty provisions as speculative, incomplete, and unreliable.

### 3. The purported "comparable" agreements are not tied to the date of the hypothetical negotiation.

A reasonable royalty determination also requires returning to the date when infringement began. *LaserDynamics*, 694 F.3d at 75 (reversing reasonable royalty determination). Here, Dr. Stevens relies heavily on agreements that were executed many years before the hypothetical negotiation in this case – as many as twelve years prior to the date of the hypothetical negotiation. Indeed, the one agreement that Dr. Stevens opines is a "highly informative comparable" (Ex. 2, Stevens Rpt. ¶ 128), *i.e.*, the Amgen/Glaxo Collaboration Agreement of July 2009, was executed six years before the date of the hypothetical negotiation. And this agreement was terminated last year. (Ex. 3, Stevens Dep. Tr. at 348:16-24.) Dr. Stevens's failure to tie these agreements to the time of the hypothetical negotiation is a further reason to exclude his opinions.

In sum, none of the agreements identified by Dr. Stevens are "comparable" under controlling Federal Circuit law. And although Dr. Stevens acknowledges many of the irreconcilable differences between these agreements and the hypothetical license at issue, he does not account for them. Rather, he continues to use the royalty ranges provided in those agreements as if they would apply to this case. That is contrary to the law. As such, his opinions on license comparability should be excluded.

### B. Dr. Stevens applies inadmissible rules of thumb to adjust royalty rates.

After using inappropriate methodology to select non-comparable licenses and then cherry-picking financial terms, Dr. Stevens compounds the problem by applying two arbitrary rules of thumb that are inadmissible under Rule 702, *Daubert*, and *Uniloc*.

1.  **Dr. Stevens applies an arbitrary rule of thumb to reduce the royalty rate by 50%, purportedly to account for lack of exclusivity.**

Dr. Stevens notes that the isolated running royalty provisions range from 2% to 13% in the selected Amgen agreements and range from 4% to 15% in the selected Sanofi and Regeneron agreements, but he then decides to cut these rates in half to account for the lack of exclusivity in the hypothetical negotiation license. (Ex. 2, Stevens Rpt. ¶¶ 148-53, 196-97.) He cites two sources for applying this 50% reduction: (1) a 2012 newsletter article and (2) his "experience." (Stevens Rpt. ¶¶ 151-52 (citing Thomas R. Varner, "Empirical Data on 'Comparable Licenses' in Patent Infringement Suits," *Economists Ink*, Fall 2012, at 4 (Ex. 4)).) These rationalizations do not pass muster under *Daubert*. Dr. Steven's 50% reduction is precisely the type of abstract, theoretical construct that the Federal Circuit emphatically rejected in *Uniloc*.

In *Uniloc*, the Federal Circuit considered the admissibility of the previously widely used "25% rule," which "suggests that the licensee pay a royalty rate equivalent to 25 per cent of its expected profits for the product that incorporates the IP at issue," 632 F.3d at 1312, and concluded:

> This court now holds as a matter of Federal Circuit law that the 25 percent rule of thumb is a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue.

*Id.* at 1315. The Federal Circuit refused to countenance the fact that the 25% rule was found in the published literature, had been accepted in many other cases, and that Uniloc's expert claimed to have experience using the rule in negotiations. *Id.* at 1312-18. The critical inquiry, rather, is whether application of the rule is tied to the facts of the case. *Id.* at 1317-18.

Courts, indeed this Court, have followed *Uniloc* and excluded similar arbitrary rules of thumb that are unrelated to the facts of the case. *See, e.g., Robocast, Inc. v. Microsoft Corp.*, No.

10-1055-RGA, 2014 WL 350062 (D. Del. Jan. 29, 2014) (ECF No. 452) (excluding expert's reasonable royalty analysis based on the "Nash Bargaining Solution" absent any evidence to show that this theoretical tool is warranted by the facts of the case).

Dr. Stevens's reliance on a 2012 newsletter article fares no better here. Indeed, the article is based on technology licenses in general, not on facts unique to this case. (Ex. 4, Varner article at 3 (discussing "[r]esearch conducted on thousands of technology licenses," which include licenses in the "software, hardware, pharmaceutical, medical, and telecommunications" industries).) *See LaserDynamics*, 694 F.3d at 80 (rejecting as irrelevant an expert's reliance on a published licensing survey because it was "removed from the patented technology, since it was not even limited to any particular industry."). In addition, the 50% reduction addressed in the 2012 newsletter article is actually based on a unique type of contractual provision giving the licensor an option to convert the license from exclusive to non-exclusive. (Ex. 4, Varner article at 4.) So the article has no relevance to the facts at hand. Finally, the article itself undermines Dr. Stevens's opinions because it notes that "little significant difference in royalty rates was observed between exclusive and nonexclusive patent licenses in the dataset" and further observes that "[d]etermining how exclusivity affects royalty rates is complicated by the presence of other factors that are difficult to observe." (*Id.*)

Dr. Stevens's reliance on his "experience" is likewise to no avail. Indeed, *Uniloc* also rejected rule-of-thumb testimony that was premised on the expert's experience. 632 F.3d at 1318. And in any event, Dr. Stevens has no relevant experience. As he testified in his deposition, his "experience" is limited to negotiating on behalf of universities. He conceded that those negotiations involved agreements that "are generally the lowest type of royalty rates or economic consideration received in the pharmaceutical industry." (Ex. 3, Stevens Dep. Tr. at

96:2-13.) He has never negotiated a patent license on behalf of a pharmaceutical or biotechnology company. (*Id.* at 332:21-24.) And he has never negotiated a patent license concerning an FDA-approved therapeutic. (*Id.* at 94:19-95:13, 151:16-21.) He certainly does not link his experience to the facts and circumstances of the hypothetical negotiation here. Moreover, he does not recall the economic terms of any licenses he has negotiated or any licenses he has reviewed as an expert witness in prior litigation matters (*Id.* at 21:16-25, 24:6-10, 33:18-21, 80:11-20, 88:13-89:5, 108:9-25, 132:24-133:8.) It is impossible to understand how he could apply his experience, which he does not himself recall the details of, to the facts of this case.

In sum, Dr. Stevens offers no evidence that the parties here had a practice of reducing royalty rates by 50% based on non-exclusivity. Nor does he offer evidence that such a reduction would be justified under the circumstances. Indeed, Dr. Stevens asserts that the license would be *non*-exclusive even though Defendants' Praluent® product was the *only* FDA-approved anti-PCSK9 antibody on the market during the one-month period covered by the hypothetical license. Thus, Praluent® was, in essence, an *exclusive* licensee until the FDA approved Repatha®. As such, Dr. Stevens's arbitrary, irrelevant, and unreliable 50% reduction opinion violates *Uniloc* and his analysis should be excluded.

        **2.    Dr. Stevens applies an arbitrary rule of thumb when he increases the royalty rate by 25% to account for his ignoring upfront and milestone payments.**

Dr. Stevens attempts to compensate for the fact that he ignores the substantial upfront and milestone payments in the "comparable" agreements by increasing the royalty rate by 25%. (Ex. 2, Stevens Rpt. ¶ 203.) He derived this 25% adjustment through what he refers to as a "pro forma" license. (*Id.* ¶ 201 & Table 1.) But he admits that his "pro forma construct . . . isn't related to, it does not model specifically on anything." (Ex. 3, Stevens Dep. Tr. at 345:7-22.)

11

Thus, his 25% adjustment is little more than a finger-in-the-air estimate, as Dr. Stevens readily admitted at his deposition:

> Now, heaven knows, there's a lot of numbers. And this was a pro forma attempt to say, okay, are we looking at one percent or a hundred percent? And the answer that comes out is, it looks like 25 percent is a reasonable way to deliver the same economic value over the lifetime of the license agreement.

(*Id.* at 225:7-14.) He acknowledged that this 25% adjustment is not based on "any math," and it does not reflect "an average" or a "statistical correlation." (*Id.* at 348:25-351:23.) Moreover, Dr. Stevens makes no attempt to account for the time-value of money that comes with fixed upfront and milestone payments. *See Lucent*, 580 F.3d at 1326-32 (observing the "fundamental differences" between running royalties and fixed lump-sum payments and the impropriety of equating the two forms of consideration without meaningfully recalculating them).

In sum, Dr. Stevens application of his 50% and 25% adjustments is purely arbitrary. Such *ipse dixit* testimony has no place in this case. *Uniloc*, 632 F.3d at 1318.

## II. <u>CONCLUSION</u>

For the reasons stated above, Amgen respectfully requests that the Court exclude Ashley J. Stevens from offering expert opinions or testimony at trial. Likewise, Defendants' other experts should not be permitted to rely on Dr. Stevens's opinions.

OF COUNSEL:

William G. Gaede, III
Eric W. Hagen
Terry W. Ahearn
Bhanu K. Sadasivan
Shane G. Smith
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA 94025
(650) 815-7400

Sarah C. Columbia
K. Nicole Clouse
Lauren Martin
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4074

Dated: February 2, 2016

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *James L. Higgins*

---

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

*Attorneys for Amgen Inc., Amgen Manufacturing, Limited, and Amgen USA Inc.*

13