IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMGEN INC.; AMGEN MANUFACTURING,  )
LIMITED; and AMGEN USA INC.                        )
                                                                         )          C.A. No.:  14-1317-SLR
          Plaintiffs,                                              )          (CONSOLIDATED)
                                                                         )
          v.                                                            )          ▆▆▆▆▆▆▆▆▆▆▆▆
                                                                         )
SANOFI; SANOFI-AVENTIS U.S. LLC;        )
AVENTISUB LLC, f/d/b/a AVENTIS            )
PHARMACEUTICALS INC., and REGENERON )          PUBLIC VERSION
PHARMACEUTICALS, INC.,                         )
                                                                         )
          Defendants.                                          )

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
MOTION FOR PERMANENT INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   NATURE AND STAGE OF THE PROCEEDINGS ......................................... 3

III.  SUMMARY OF THE ARGUMENT ................................................................. 3

IV.  STATEMENT OF FACTS ................................................................................. 5

V.   ARGUMENT ...................................................................................................... 6

    A.    An Injunction Should Issue Because Defendants' Continued Infringement
        Is Causing Amgen Irreparable Harm .................................................................. 6

        1.    Defendants' Continued Infringement Is Causing Amgen to Suffer
              Price Erosion .......................................................................................... 6

        2.    Defendants' Continued Infringement Is Causing Harm to Amgen's
              Reputation and the Reputation of Its Product Repatha® ......................... 8

        3.    Defendants' Continued Infringement Is Causing Amgen Lost Sales
              and Lost Market Share ........................................................................... 9

        4.    Defendants' Continued Infringement Is Causing Amgen
              Irreparable Harm by Threatening Amgen's Business Model .................. 10

    B.    The Inadequacy of Monetary Damages to Compensate Amgen for the
        Harm Caused by Defendants' Continuing Infringement Weighs Strongly
        in Favor of an Injunction .................................................................................. 12

        1.    Amgen's Practice of Not Licensing Its Patents to Enable
              Competitors Is an Intangible and Unquantifiable Asset, the Loss of
              Which Cannot Be Compensated with Monetary Damages ..................... 12

        2.    Monetary Damages Are Inadequate to Compensate Amgen for Its
              Future Losses Because Those Losses Cannot Be Calculated with
              Any Reasonable Certainty ..................................................................... 13

        3.    The Loss of Innovator Status and Reputational Harm that
              Defendants Have Caused Amgen Are Incalculable ................................ 14

    C.    The Balance of the Hardships Factor Weighs Decidedly in Favor of An
        Injunction ......................................................................................................... 15

        1.    Defendants Pursued Praluent® Despite Knowledge of the
              Infringement Risk and Then Launched At-Risk During the
              Pendency of This Litigation ................................................................... 16

        2.    Regeneron's Costs to Develop the Infringing Product Do Not
              Weigh in Defendants' Favor When Balancing the Hardships
              Because Those Costs Are Mitigated by Defendants' Collaboration
              Agreement ............................................................................................ 19

    D.    A Permanent Injunction Will Serve the Public Interest ...................................... 20

## TABLE OF CONTENTS
### (continued)

1.    The Public Has a Strong Interest in a Robust Patent System that Maintains the Incentives for Pharmaceutical Innovation ............................ 20

2.    Because the FDA Approved Repatha® and Praluent® to Treat the Same Patients, Repatha® Could Be Substituted for Praluent® and No Patient Would Go Untreated If an Injunction Issued ........................ 23

3.    Amgen Can Supply the Entire Market Demand and Transition Patients from Praluent® to Repatha® ........................................ 24

4.    There Is No Medical Necessity for 75 mg of Praluent® ........................... 25

      a.    There Is No Evidence of Safety Risks from LDL-C Levels Below 25 mg/dL or 15 mg/dL, but There Is Objective Evidence of Benefit .................................................................. 25

      b.    75 mg of Praluent® Does Not Avoid LDL-C Levels Below 25 mg/dL ....................................................................... 28

5.    Defendants' Public Interest Argument Boils Down to Speculation About Physician Preference, Which Must Yield to the Incentives Advanced by the United States Patent System ........................................ 29

VI.    CONCLUSION ........................................................................................... 30

## TABLE OF AUTHORITIES

### CASES

*Abbott Labs. v. Sandoz, Inc.*
  544 F.3d 1341 (Fed. Cir. 2008)..................................................................................21

*Acumed LLC v. Stryker Corp.*
  551 F.3d 1323 (Fed. Cir. 2008)............................................................ 15, 16, 25, 30

*Amgen, Inc. v. F. Hoffman-La Roche Ltd.*
  581 F. Supp. 2d 160 (D. Mass. 2008) ..................................................... 11, 21, 23, 29

*Becton Dickinson and Co. v. Tyco Healthcare Group LP*
  No. 02-1694 GMS, 2008 WL 4745882 (D. Del. Oct. 29, 2008) ................... 15, 25, 30

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*
  664 F.3d 922 (Fed. Cir. 2012)..............................................................................6, 8

*Douglas Dynamics, LLC v. Buyers Prods. Co.*
  717 F.3d 1336 (Fed. Cir. 2013)...........................................................................12, 14

*eBay Inc. v. MercExchange, L.L.C.*
  547 U.S. 388 (2006)...............................................................................................3, 6

*Edwards Lifesciences AG v. CoreValve, Inc.*
  No. CV 08-91, 2014 WL 1493187 (D. Del. Apr. 15, 2014) ....................................... 6

*Ericsson, Inc. v. Harris Corp.*
  352 F.3d 1369 (Fed. Cir. 2003)............................................................................... 13

*Finjan Software, Ltd. v. Secure Computing Corp.*
  C.A. No. 06-369-GMS, 2009 WL 2524495 (D. Del. Aug. 18, 2009) ...................... 12

*Invista N. Am. S.A.R.L. v. M & G USA Corp.*
  35 F. Supp. 3d 583 (D. Del. 2014)............................................................................ 9

*Janssen Prods., L.P. v. Lupin Ltd.*
  109 F. Supp. 3d 650 (D.N.J. 2014) ......................................................................... 22

*Johns Hopkins Univ. v. Datascope Corp.*
  513 F. Supp. 2d 578 (D. Md. 2007) ........................................................................ 11

*Kewanee Oil Co. v. Bicron Corp.*
  416 U.S. 470 (1974)................................................................................................. 21

*Merial Ltd. v. Cipla Ltd.*
  681 F.3d 1283 (Fed. Cir. 2012)........................................................................... 18, 19

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*
  505 F. Supp. 2d 359 (S.D. Tex. 2007) .................................................................... 12

## TABLE OF AUTHORITIES
### (continued)

*Muniauction, Inc. v. Thomson Corp.*
  502 F. Supp. 2d 477 (W.D. Pa. 2007) ........................................................................... 8

*Radio Corp. of Am. v. Radio Eng'g Labs., Inc.,*
  293 U.S. 1, 3 (1934) ..................................................................................................... 21

*Robert Bosch LLC v. Pylon Mfg. Corp.*
  659 F.3d 1142 (Fed. Cir. 2011) .............................................................................. 18, 19

*Sanofi-Synthelabo v. Apotex, Inc.*
  470 F.3d 1368 (Fed. Cir. 2006) .............................................................................. 18, 21

*Smith & Nephew, Inc. v. Synthes (U.S.A.)*
  466 F. Supp. 2d 978 (W.D. Tenn. 2006) ................................................................ 13, 14

*TruePosition Inc. v. Andrew Corp.*
  568 F. Supp. 2d 500 (D. Del. 2008) .................................................................... 8, 9, 14

*Windsurfing Int'l, Inc. v. AMF, Inc.*
  782 F.2d 995 (Fed. Cir. 1986) ..................................................................................... 15

**CONSTITUTIONAL PROVISIONS**

US Const., art. I, sec. § 8, cl. 8 ......................................................................................... 2

## I.    INTRODUCTION

Claims 2, 7, 9, 15, 19, and 29 of U.S. Patent No. 8,829,165 and claim 7 of U.S. Patent No. 8,859,741 ("the patents-in-suit") have been adjudicated valid and infringed.   Amgen has requested an injunction to prohibit Defendants from any further infringement of these patents. Given the circumstances of this case—that Amgen has an FDA-approved product, Repatha®, on the market for the same indications and treating the same patients as Defendants' product—an injunction is the only appropriate remedy.[1]

Each of the four injunction factors weighs heavily in favor of entering an injunction. Defendants' infringement is causing Amgen irreparable harm in the form of price erosion, lost market share, and reputational injury.   Any attempt to quantify the continuing and future effects of these harms would be speculative, particularly given the evolving and dynamic nature of this emerging market.   In contrast, the harm Defendants claim they would suffer by grant of an injunction is self-inflicted as they took the calculated risk of developing Praluent® and launching it on the market in full view of Amgen's patents.   Thus, the balance of the harms is decidedly in favor of issuing the injunction.

Most of Defendants' efforts at the hearing centered on what they consider to be evidence of "public interest" in their product remaining on the market—preserving physicians' choice and the so-called low-dose option offered by Praluent®.   But neither of these arguments justifies denying an injunction in this case.   First, the concept that physicians, insurers, and even patients have an interest in competition and desire choice between products could be raised in every patent case involving a therapeutic product to argue against an injunction.   Such evidence,

---

[1] Praluent® is the trade name for Defendants' drug alirocumab.   Repatha® is the trade name for Amgen's drug evolocumab.   For the purposes of this brief, both drugs will be referred to by their trade names throughout.

however, is rarely considered sufficient to establish a cognizable public interest, as injunctions have issued in nearly every biotech or pharmaceutical patent case where the patents are held valid and infringed. As for the low-dose option and the concern that patient LDL-C levels could go "too low," Defendants ask this Court to substitute its judgment for that of the FDA, which concluded (1) there was no evidence that either Repatha® or Praluent® is unsafe when used as approved; and (2) there was not sufficient evidence to differentiate between the efficacy, i.e., the LDL-C lowering, of 75 mg and 150 mg of Praluent®. Significantly, there is nothing in the record to contradict the FDA's conclusion that Repatha® can safely treat every patient who has been or would in the future be prescribed Praluent® for the approved indications.

The overriding public interest in this case is served by giving force to the patent system. As set forth in the Constitution, the patent laws "promote the progress of science and useful arts, by securing for limited times to . . . inventors the exclusive right to their respective . . . discoveries." Art. I, § 8, cl. 8. The evidence at the hearing demonstrated that developing new therapeutic products is a costly endeavor—here, Amgen spent over $2 billion in bringing Repatha® from research plan to market. And the failure rate is high—over 90%. In order for companies such as Amgen to allocate resources in such a risky endeavor, the promise of exclusivity provided by the patent system must be real. If patents are not enforced by injunctions, the business model of an innovative biotech or pharmaceutical company collapses. No company will expend the resources necessary to bring breakthrough products to market only to have others develop similar products and compete in the marketplace. The public will be disserved by not having access to new treatments for the health challenges and diseases of our day. Most decidedly, upon the facts of this case, the public interest is in granting an injunction to exclude infringing products.

## II.  NATURE AND STAGE OF THE PROCEEDINGS

On October 17, 2014, Amgen filed a complaint seeking, among other things, a judgment that Defendants' Praluent® product infringes the patents-in-suit.  Compl., D.I. 1.  In its Complaint, Amgen requested that the Court enjoin Defendants from infringing the patents by manufacturing, using, offering to sell, or selling Praluent® within the United States or importing Praluent® into the United States, prior to the expiration of the patents-in-suit.

The Court encouraged an accelerated trial schedule in lieu of Amgen filing a preliminary injunction motion.  *See* Tr. of Feb. 24, 2015, Rule 16 Scheduling Conference 16:25-17:4.  In April 2015, the Court set a trial date of March 7, 2016.  Scheduling Order, D.I. 49.  Three months later, on July 24, 2015, the FDA approved Praluent®.  Defendants launched Praluent® in the United States immediately thereafter.  On February 22, 2016, Defendants stipulated to infringement.  Stipulation of Infringement of Selected Claims, D.I. 235.

The jury trial commenced March 8, 2016.  The jury returned a unanimous verdict on March 16, 2016, finding for Amgen on all claims and all issues submitted to the jury.[2]  This Court entered judgment in favor of Amgen and against Defendants on March 18, 2016, and then held an evidentiary hearing on Amgen's motion for permanent injunction on March 23 and 24, 2016.

## III.  SUMMARY OF THE ARGUMENT

The Court should enjoin Defendants from infringing the patents-in-suit because each of the factors set forth in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), strongly favors the grant of a permanent injunction.

---

[2] The '165 patent claims 2, 7, 9, 15, 19, 29 and the '741 patent claim 7 are hereinafter referred to as "the asserted claims."  Amgen filed a written Rule 50(a) motion for JMOL on non-obviousness (D.I. 282), which the Court granted (Tr. 1076:21-1077:6).

3

1.      Absent a permanent injunction, Amgen will suffer irreparable injuries, including price erosion, reputational harm, lost sales, lost market share, and disruption to its core business model of investing in innovation.  Defendants' infringing Praluent® product directly competes with Amgen's Repatha® in the PCSK9 inhibitor market—every Praluent® prescription is a prescription that would have been written for Repatha®.  And Defendants compounded the harm to Amgen by spending $67.5 million on a voucher that allowed the infringing Praluent® product to leapfrog Repatha® in the FDA review process and launch first into the market, followed by implementing very aggressive sales and marketing techniques to gain market share at Amgen's expense.

2.      The irreparable harm Amgen continues to suffer is not quantifiable, and monetary damages are inadequate to compensate Amgen for these injuries.  The evidence at the hearing, much of which was unrebutted, established that Amgen's harm is not quantifiable.  Amgen has suffered and will suffer harm to its reputation and business model—in addition to unpredictable and increasing economic harm—that cannot be addressed through monetary damages.

3.      The balance of hardships weighs in favor of granting a permanent injunction.  The harm to Defendants is largely self-inflicted as Defendants took a calculated business risk in developing Praluent® in full view of Amgen's patent disclosure.  And, despite the Court's willingness to fashion an expedited schedule to get the questions of validity and infringement decided, Defendants chose to launch Praluent® at-risk before that process was completed.

4.      An injunction will not disserve the public interest.  It will help ensure that innovators in the biotech and pharmaceutical industry have the incentive to continue to invest in breakthrough therapies to serve patients in need.  Absent enforcement of patents, there would be no incentive for innovative pharmaceutical companies like Amgen to continue making the huge

4

investments, over many years and against formidable odds, in order to discover and develop new, breakthrough therapies. And, as set forth below, there simply is no evidence of any medical need for Praluent® that Repatha® does not serve.

## IV. STATEMENT OF FACTS

Amgen Inc. owns the patents-in-suit. *See* JTX 0002 ('165 patent), JTX 0003 ('741 patent). The sole licensees to the patents-in-suit are both subsidiaries of Amgen Inc.: Amgen Manufacturing, Limited and Amgen USA Inc.

Amgen was the first to invent antibodies that bind and block PCSK9 and sought patent protection for that invention. Amgen's research began in earnest in 2005, ultimately leading to the development of Repatha® and then filing for FDA approval on August 27, 2014. Defendants' development and FDA application trailed Amgen—Defendants filed with the FDA for regulatory approval in November 2014. Defendants, however, were able to jump ahead of Amgen in the queue to obtain FDA approval of Praluent® by using an orphan drug priority review voucher Defendants bought for $67.5 million. Defendants received FDA approval and launched Praluent® at-risk in July 2015. Amgen received FDA approval and launched Repatha® in August 2015.

Repatha® and Praluent® have been approved by the FDA to lower LDL cholesterol ("LDL-C") in a targeted group of very high risk patients. Repatha® is approved as safe and effective to treat the entire population approved for Praluent®. Repatha® and Praluent® are the only therapeutics in the PCSK9 inhibitor marketplace, and they compete head-to-head.

Before trial, Defendants stipulated that Praluent® infringes the asserted claims of the patents-in-suit. At trial, Defendants argued the asserted claims were invalid. The jury returned a unanimous verdict finding that Defendants failed to prove that the asserted claims of the patents-

in-suit are invalid.   Defendants' infringement has continued unabated since judgment was entered against Defendants.  Amgen now seeks a permanent injunction.

## V.   ARGUMENT

Analyzing the facts of this case under the well-known, four-factor test for an injunction as described by the Court in *eBay*, 547 U.S. at 394, leads to one conclusion: that entry of a permanent injunction is the only appropriate remedy.

### A.   AN INJUNCTION SHOULD ISSUE BECAUSE DEFENDANTS' CONTINUED INFRINGEMENT IS CAUSING AMGEN IRREPARABLE HARM

Defendants' infringement and direct competition in this two-supplier market is causing Amgen to suffer price erosion, reputational harm, lost sales, and lost market share.   It also threatens to disrupt the very business model on which Amgen depends for the long-term, autonomous operation of its business.   A permanent injunction is the only remedy to prevent such harm.

#### 1.   Defendants' Continued Infringement Is Causing Amgen to Suffer Price Erosion

Price erosion alone is sufficient to establish irreparable harm. *See Edwards Lifesciences AG v. CoreValve, Inc.*, No. CV 08-91, 2014 WL 1493187, at *6 (D. Del. Apr. 15, 2014) (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)).   Amgen has experienced and will continue to experience significant price erosion.   By launching Praluent® at-risk, Defendants have enabled insurers to pit the parties against each other to extract larger and larger rebates and other concessions as a condition to being included (even in a parity position) on national formularies, thereby eroding Amgen's net price for Repatha®.[3]  *See* Ex. A (summary

---

[3] Defendants' economics expert Dr. Oster agrees that there is price erosion in this case, and she expects price erosion to continue into the future.  Hr'g Tr. 492:4-10 (Oster cross).

of agreements with insurers covering largest number of people);[4] Hr'g Tr. 152:15-156:17 (Ryan direct); ██████████████████████████████████████████████████████; Hr'g Tr. 161:18-164:17 (Broadhurst direct); Hr'g Tr. 225:19-226:15 (Berndt direct).

Defendants' infringement also triggered competitive contracts for exclusive formulary position. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████     █████████████████████████

███████████████████████████████████████████████████

████████████████   Hr'g Tr. 143:14-16 (Ryan direct).[5]

These highly competitive negotiations resulting from Defendants' infringement have also forced Amgen to give other unprecedented concessions, ████████████████████████████ ███████████████████████████████████████   Hr'g Tr. 148:5-149:9 (Ryan direct), Hr'g Tr. 227:3-5 (Berndt direct).  And there is every reason to believe this will continue over the term of the patents.  The uncontested evidence is that—due to the head-to-head competition from Praluent® being on the market—the insurers will continue to

---

[4] *See* Amgen Agreements: PTX 6147, PTX 6148, PTX 6150–PTX 6158, PTX 6174, JTX 034, JTX 145, JTX 237, JTX 271, JTX 284, JTX 293, JTX 340–JTX 343; *see* Defendants' Agreements: PTX 6179–PTX 6184, PTX 6187, PTX 6189, PTX 6190, PTX 6193, PTX 6196, PTX 6201, PTX 6210, PTX 6211, PTX 6221–PTX 6227, DTX 2190, JTX 418–JTX 420.

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████

demand higher discounts and more restrictive contracts.  Hr'g Tr. 145:21-146:4 (Ryan direct); Hr'g Tr. 165:3-11 (Broadhurst direct); Hr'g Tr. 226:16-228:9 (Berndt direct).

>    **2.    Defendants' Continued Infringement Is Causing Harm to Amgen's Reputation and the Reputation of Its Product Repatha®**

Amgen has also suffered past and ongoing irreparable harm to its reputation as the innovator in this class of cholesterol-lowering medicine.  *Cf. Celsis In Vitro*, 664 F.3d at 930 (holding that damage to reputation is "valid grounds for finding irreparable harm"); *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 532 (D. Del. 2008) (granting permanent injunction where patentee suffered harm to reputation as an innovator); *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 483 (W.D. Pa. 2007) ("Recognition as the industry innovator is a tangible benefit afforded by a patent."), *rev'd on other grounds*, 532 F.3d 1318 (Fed. Cir. 2008). Not only did Defendants harm Amgen's reputation by launching Praluent® at all, they also usurped first-to-market status.  Defendants filed their BLA with the FDA *after* Amgen, but leapfrogged Amgen to be first to market with the use of a $67.5 million priority review voucher. Hr'g Tr. 61:2-13 (Bradway direct); Hr'g Tr. 173:10-177:7 (Broadhurst direct); PTX 4530; PTX 4758.  Defendants are now capitalizing on this first-to-market status by, among other things, marketing Praluent® as "The First U.S. FDA-Approved PCSK9 Inhibitor." *See* PTX 5357; Hr'g Tr. 177:8-178:11 (Broadhurst direct); Hr'g Tr. 230:22-231:2 (Berndt direct).

First impressions, particularly when trying to enter a new market, are critically important and lasting.  The unrebutted evidence is that Repatha® is the centerpiece of Amgen's attempt to expand its business into cardiovascular medicine.  Hr'g Tr. 62:6-15 (Bradway direct).  Amgen spent considerable resources and energy building a commercial infrastructure around Repatha®, with the well-founded expectation that Amgen would reap the significant benefits of Repatha®

being recognized as an innovative, first-in-class, breakthrough therapy.  Hr'g Tr. 60:2-12, 63:5-64:5 (Bradway direct).    These reputational benefits cannot materialize in the shadow of Defendants' infringement, a harm compounded by Defendants' repeated marketing claim as the first-in-class innovator.    Hr'g Tr. 65:9-66:23 (Bradway direct); Hr'g Tr. 160:23-161:10 (Broadhurst direct).  Harm to Amgen's reputation as the first-in-class innovator is impossible to quantify, but it is real.  The undisputed evidence showed that the reputational harms include the inability to recruit and retain top talent, investors, and clinical investigators.  Hr'g Tr. 62:16-63:4 (Bradway direct); Hr'g Tr. 229:23-230:19 (Berndt direct).

### 3.    Defendants' Continued Infringement Is Causing Amgen Lost Sales and Lost Market Share

Where the parties are the only two suppliers in the relevant market, "a sale to defendant is the loss of sale to plaintiff." *Invista N. Am. S.A.R.L. v. M & G USA Corp.*, 35 F. Supp. 3d 583, 610 (D. Del. 2014) (quoting *TruePosition*, 568 F. Supp. at 531).  Here, the parties do not dispute that Repatha® and Praluent® are the only FDA-approved PCSK9 inhibitors available.   The product labels and agreements with insurers establish that the products are for the same patients. Hr'g Tr. 86:15-87:15 (Stein direct); Hr'g Tr. 217:6-14 (Berndt direct); JTX 392, PTX 5012 (FDA labels); JTX 342 at -157, JTX 284 at -177, PTX 6155 at -356, PTX 6201 at -503-04, PTX 6164 at -561, PTX 6234 at -239, JTX 308 at -261, JTX 411 at -140, JTX 413 at -169, JTX 417 at -238 (agreements with insurers).

Absent Defendants' infringement, Repatha® would be the only PCSK9 inhibitor on the market.  Instead, there is head-to-head competition, and insurers view Repatha® as substitutable for Praluent®.  *See* PTX 5402 (CVS press release); Hr'g Tr. 485:6-24 (Oster cross); Hr'g Tr. 222:9-20 (Berndt direct).  The head-to-head competition enables insurers to choose one of the

two as the exclusive PCSK9 inhibitor offered to the patients they insure.[7] Hr'g Tr. 223:13-224:4,

224:25-225:18 (Berndt direct); Hr'g Tr. 150:8-12 (Ryan direct).  As of the injunction hearing,

several large insurers—including OptumRx/United (providing insurance coverage for around 70

million people), ████████████████████████████—had decided to only

cover Praluent®.  Hr'g Tr. 162:15-20 (Broadhurst direct); Hr'g Tr. 223:13-224:8 (Berndt direct).

As a result, Amgen has limited or no access to patients covered by these plans who might benefit

from Repatha®—an antithetical outcome given Amgen's exclusionary rights under the patent

law.

### 4.   Defendants' Continued Infringement Is Causing Amgen Irreparable Harm by Threatening Amgen's Business Model

Inventing and developing new medicines that safely and effectively treat human disease

takes substantial human and capital investment, time, and sustainability through failure until the

next success can be realized.  Amgen is committed to innovation.  Since its founding 35 years

ago, Amgen has invested over $50 billion in research and development, amounting to about 20

percent of its annual revenues each year.  Hr'g Tr. 56:11-57:25 (Bradway direct).  Why?

Because Amgen, like other innovative biopharmaceutical companies, knows that it has to make

that investment to develop breakthrough products for the future.  As Judge Young noted in an

earlier case involving an Amgen patent: "In order to maintain its business model and its research

and development, Amgen must be able to demonstrate to its investors that the full investment

---

[7] The head-to-head competition is also shrinking the market as a whole and causing Amgen to lose sales, as insurers use this competition as leverage to establish and maintain stringent UM criteria.  Hr'g Tr. 169:15-170:5 (Broadhurst direct).  The UM criteria for Repatha® are, as a result, far more restrictive than the FDA-approved label, significantly narrowing the patient population that will receive the medicine under insurance.  Hr'g Tr. 146:23-148:4 (Ryan direct); Hr'g Tr. 172:1-173:3 (Broadhurst direct).  If not for Defendants' infringement, Amgen would have had leverage to secure less restrictive UM criteria, with at most a modest rebate to only the largest insurers, giving more patients access to Repatha®.  Hr'g Tr. 143:14-19 (Ryan direct).

10

they make can be recaptured." *Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 581 F. Supp. 2d 160, 226 (D. Mass. 2008), *aff'd in part, rev'd in part on other grounds*, 580 F.3d 1340, 1386 (Fed. Cir. 2009) ("We do not disturb the [district] court's injunction.").

Patent protection is fundamental to Amgen's business model of investing in innovation. Hr'g Tr. 58:1-60:1 (Bradway direct). Amgen's financial investment of more than $2 billion in Repatha® was its largest investment in the development of a new medicine. The undisputed evidence was that Amgen made that investment relying on the strong intellectual property protection around Repatha®. Hr'g Tr. 60:2-15, 65:3-20 (Bradway direct). Without an injunction, Amgen will be unable to fully recoup its investment in Repatha® and therefrom fully reinvest in its R&D pipeline. Hr'g Tr. 60:16-20, 62:6-15 (Bradway direct); Hr'g Tr. 229:7-22 (Berndt direct). Without confidence that it will enjoy exclusivity for its patent-protected products during the limited term of exclusivity promised by its patents, Amgen's future ability to invest in innovation as an autonomous enterprise will be compromised.

If successful, Defendants' unapologetic strategy of launching at-risk will embolden other infringers to bring their products to market with impunity, further depriving Amgen of the fundamental patent right to exclude and the return on investment that fuels the renewal of Amgen's R&D engine. *See Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007) ("If the Plaintiffs do not obtain injunctive relief, others may be encouraged to infringe their patents and risk litigation, thus devaluing the Plaintiffs' property."), *rev'd on other grounds*, 543 F.3d 1342 (Fed. Cir. 2008).

**B.    THE INADEQUACY OF MONETARY DAMAGES TO COMPENSATE AMGEN FOR THE HARM CAUSED BY DEFENDANTS' CONTINUING INFRINGEMENT WEIGHS STRONGLY IN FAVOR OF AN INJUNCTION**

Monetary damages are not adequate compensation to Amgen.   It would be entirely contradictory to Amgen's business model to license its patents to enable a competitor to offer a directly competing product, yet a denial of a permanent injunction would force Amgen to accept exactly that.

**1.    Amgen's Practice of Not Licensing Its Patents to Enable Competitors Is an Intangible and Unquantifiable Asset, the Loss of Which Cannot Be Compensated with Monetary Damages**

The Federal Circuit has recognized that where a patentee has a history of not licensing the infringed patents in order to maintain market exclusivity, the right to exclude is viewed as "an intangible asset that is part of a company's reputation" which is "under attack by [the defendant's] infringement." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).  "The law is quite clear [that] . . . [t]he statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages." *Finjan Software, Ltd. v. Secure Computing Corp.*, C.A. No. 06-369-GMS, 2009 WL 2524495, at *10 (D. Del. Aug. 18, 2009), *aff'd in part, rev'd in part on other grounds*, 626 F.3d 1197 (Fed. Cir. 2010); *accord MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 379 (S.D. Tex. 2007) (finding monetary damages inadequate to compensate for "continued loss of [] exclusive rights" in light of patentee's "existing policy not to license its patented technology"), *aff'd*, 264 F. App'x 900 (Fed. Cir. 2008).

Amgen has not licensed the patents-in-suit to third parties and has no intention to do so. Hr'g Tr. 68:22-69:11 (Bradway direct).  This is consistent with Amgen's historical practice of

12

not licensing patents in circumstances where a license would enable direct competition.   Hr'g Tr. 68:12-15 (Bradway direct).

>   **2.   Monetary Damages Are Inadequate to Compensate Amgen for Its Future Losses Because Those Losses Cannot Be Calculated with Any Reasonable Certainty**

Praluent[®] and Repatha[®] were approved in July and August 2015, respectively.   The PCSK9 inhibitor market is less than a year old and is still developing.   Negotiations with insurers are ongoing, and insurers have already demonstrated that any contract can be re-negotiated, regardless of its terms.   Thus, the magnitude and longevity of the harms resulting from existing and increasing price erosion, as well as other concessions to insurers, is unknowable.[8]   It is simply not possible to quantify even the financial harm Amgen will suffer, much less the intangible harms.   Hr'g Tr. 231:7-13, 233:9-234:18 (Berndt direct); *see* Hr'g Tr. 154:13-155:1 (Ryan direct).   Meanwhile, long-term cardiovascular outcomes studies are nearing completion. The results from those studies may lead to a significant expansion in the market through greater recognition of the benefits of these therapies and potentially through an expansion of FDA-approved indications.   Hr'g Tr. 72:4-19 (Bradway cross); Hr'g Tr. 234:19-235:5 (Berndt direct); Hr'g Tr. 295:1-3 (Terifay direct).   All of these uncertainties make calculating damages through August 2028, when the patents-in-suit expire, impossible or speculative at best.   *See Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003) (finding that a damages analysis "must be supported by sound economic proof of the nature of the market"); *Smith & Nephew,*

---

[8] At the permanent injunction hearing, Defendants alluded to the fact that the parties had been prepared to put on a case for past damages to suggest that experts had already engaged in quantifying the past harms suffered by Amgen.   Hr'g Tr. 53:4-9 (Maslowski Opening).   As Defendants know, full well, Amgen's expert on past harms explicitly and repeatedly opined that the full magnitude even of Amgen's past damages *could not be fully quantified and calculated.*

*Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 984 (W.D. Tenn. 2006) (noting that dynamic

market forces rendered damages award "speculative at best").

### 3. The Loss of Innovator Status and Reputational Harm that Defendants Have Caused Amgen Are Incalculable

Courts routinely recognize that certain types of harm, such as reputational harm and loss

of innovator status, are unquantifiable and thus cannot be compensated with monetary damages.

*See, e.g., Douglas Dynamics*, 717 F.3d at 1344 ("Irreparable injury encompasses different types

of losses that are often difficult to quantify, including lost sales and erosion in reputation and

brand distinction."); *TruePosition*, 568 F. Supp. 2d at 531 (finding inadequate remedy at law

where "[d]efendant has taken from plaintiff not only this important business, but the recognition

of being a technology innovator and the first global supplier of the patented technology, and an

unquantifiable amount of business opportunities flowing therefrom"); *Smith & Nephew*, 466 F.

Supp. 2d at 983-85 (same).

Here, Amgen is suffering harm to its reputation, including loss of innovator and first-in-

class status.  Hr'g Tr. 69:12-70:1 (Bradway direct); Hr'g Tr. 235:6-15 (Berndt direct); Hr'g Tr.

150:23-151:13 (Ryan direct).   Defendants' expert Dr. Oster, though she suggests that

reputational harm can be quantified, never provides a way to calculate such harm.  Hr'g Tr.

479:18-25 (Oster direct).[9]  As Amgen's expert Dr. Berndt testified: "How do you quantify the

foregone R&D opportunities, the lost reputation, the imposition on Amgen of a forced change in

business model to rely instead [of] on patent protected products, on bringing products to market

that will suddenly have fast followers[?]  I don't know how you can quantify those damages with

---

[9] Indeed, the sum total of Dr. Oster's conclusory testimony on the subject is: "Q: Ok.  And to the extent there even was reputational harm, could that be quantified? A: Yes."  Hr'g Tr. 479:18-20 (Oster direct).

any reasonable, credible certainty." Hr'g Tr. 235:8-15 (Berndt direct); *accord* Hr'g Tr. 477:1-24

(Oster direct).  Monetary damages are inadequate to remedy the harms caused by Defendants'

infringement.

### C.   THE BALANCE OF THE HARDSHIPS FACTOR WEIGHS DECIDEDLY IN FAVOR OF AN INJUNCTION

If an injunction is denied, the hardships that Amgen will suffer—further price erosion,

injury to reputation, reduced revenue for R&D investment, and risk to its business model—will

be incalculable and irreparable.  If an injunction is granted, any harm to Defendants—alleged

loss of sunk costs in R&D, lost opportunity to earn sales in the United States to recoup R&D and

earn profits, and potential layoffs at both Sanofi and Regeneron—is a result of their calculated

decision that it was more advantageous to launch at-risk and face the possible attendant

consequences of infringing Amgen's patents, than to wait for a resolution of the patent dispute.

*See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) (citing *Windsurfing*

*Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986)) ("One who elects to build a

business on a product found to infringe cannot be heard to complain if an injunction against

continuing infringement destroys the business so elected."); *Becton Dickinson and Co. v. Tyco*

*Healthcare Group LP*, No. 02-1694 GMS, 2008 WL 4745882, at *4 (D. Del. Oct. 29, 2008) (one

that invests in a potentially infringing product cannot benefit from the harms it would suffer as a

result of this risk to avoid an injunction), *vacated on other grounds*, 616 F.3d 1249 (Fed. Cir.

2010).

**1.     Defendants Pursued Praluent® Despite Knowledge of the Infringement Risk and Then Launched At-Risk During the Pendency of This Litigation**

Defendants were aware of the potential infringement risk when they chose to pursue Praluent® and should not now be permitted to avoid an injunction by relying on the harms suffered when this business decision did not pan out in their favor.[10]

As early as February 2009, Defendants knew of Amgen's published patent application and immediately identified multiple risks. Hr'g Tr. 187:18-188:7 (Papadopoulos designations). First, the PCT included the full specification of the patents-in-suit as well as both broad *and* specific claims that would have covered Defendants' REGN727, which Defendants knew and understood. *See* PTX 3888 at -232 (*see* claims 1, 7, 8, 9); *see* Hr'g Tr. 378:10-15 (Stahl cross). Second, by June 2009, Defendants had identified the risk of a "patent issue" if the "binding epitopes" between REGN727 and Amgen's antibodies were "similar." Hr'g Tr. 191:7-22 (Papadopoulos designations); PTX 3965. Defendants then confirmed that was the case when they discovered overlap in the epitopes between REGN727 and Amgen's antibodies. Hr'g Tr. 188:22-25, 192:20-194:2 (Papadopoulos designations); PTX 3972 at -755; PTX 3957; *see also* Hr'g Tr. 376:19-378:15 (Stahl cross); PTX 3880.

Defendants then performed x-ray crystallography studies for the express purpose of assessing whether Praluent® bound to the PCSK9 residues identified in Amgen's patent

---

[10] At the hearing, Defendants suggested that Amgen was re-arguing willfulness in support of its injunction position. Hr'g Tr. 38:20-24 (Maslowski opening). Not so. The Court need not reach issues of intent or objective or subjective reasonableness or belief. What the uncontested evidence showed was that Defendants took a calculated business risk, despite Amgen's patents, to press forward with their investment and, ultimately the launch of Praluent®. It does not matter whether they took that risk with a good faith belief that Amgen's patents were not valid. What matters is that they took the risk knowing that Amgen was seeking patent protection and that Amgen's patents might well be found to be valid and, in that event, Defendants' infringing product might be staring at an injunction. *See Acumed*, 551 F.3d at 1330.

16

application, which itself suggests that Defendants understood which residues would be important from a patent perspective, even without issued claims.   Hr'g Tr. 199:12-203:9 (Engel designations); PTX 6077 at -792, PTX 6131 at -522-23; Hr'g Tr. 378:16-21 (Stahl direct).   In fact, Dr. Engel's study of the PCSK9 residues at the PCSK9/LDLR interface as set forth in Amgen's patent application (*see* PTX 6131 at -522-23, "projection of binding residues onto PCSK9 sequence: REGN727 . . . , Amgen 31H4, 21B12 *and LDLR-EGFa as described in patent WO 2009/026558A1*" (emphasis added)), are the same exact set of residues that became claim 1 of the '165 patent, which come directly from Example 28 in the patent.   In sum, *each* experiment performed by Defendants demonstrates that they understood all along the risk that patent claims would issue directed to the PCSK9 residues at the LDLR interface and/or to which 21B12 and 31H4 bound.   Notwithstanding Defendants' knowledge of Amgen's pending patent portfolio, as well as their own experimental evidence of infringement, Defendants elected to continue their investment in Praluent®.   *See, e.g.*, Hr'g Tr. 342:20-343:8, 357:9-12 (Edelberg cross); PTX 4051 at -878.

Thus, Defendants' suggestion at the hearing that they should not be held accountable for their choices because Amgen's published patent applications might never have issued or might have issued with different claims should not be credited.   Indeed, one of the very purposes behind enacting the legislation that mandates publication of patent applications is to provide notice to potential infringers.   *See* Hr'g Before the Subcomm. on Cts. and Intellectual Property, 104th Cong. 36 (1995) (statement of Bruce Lehman, Asst. Sec. of Commerce and Comm'r of Patents and Trademarks, Patent and Trademark Office, U.S. Dept. of Commerce).[11]

---

[11] Available at: https://archive.org/details/patentslegislati00unit.

Even if the Court were to countenance Defendants' hubris in moving forward in the face of Amgen's patent application, Defendants' actions after this lawsuit was filed in October 2014 are telling. Defendants intentionally accelerated their infringement by exercising a priority review voucher to speed up the FDA approval process and their commercial launch by four months. Hr'g Tr. 61:2-13 (Bradway direct); Hr'g Tr. 174:1-13, 175:16-176:13 (Broadhurst direct); PTX 4530, PTX 4758. Defendants chose to launch Praluent® at-risk despite the fact that the Court discussed, and then implemented, an accelerated trial date in lieu of preliminary injunction proceedings. *See* Compl., D.I. 1; Tr. of Feb. 24, 2015 Rule 16 Scheduling Conference 12:14-24, 16:25-17:4; Scheduling Order, D.I. 49. Upon the launch of Praluent®, Defendants knowingly exacerbated the harm to Amgen by "flooding" the market with free goods and by adopting highly aggressive negotiation tactics to secure exclusive agreements with various insurers, including one of the largest insurance companies in the country. JTX 195 at -758; Hr'g Tr. 315:7-15; 316:3-20 (Terifay cross); Hr'g Tr. 166:20-169:19 (Broadhurst direct); Hr'g Tr. 226:16-227:6 (Berndt direct); Hr'g Tr. 285:8-287:12 (Carey cross); JTX 266 at -954. The logical inference drawn from Defendants' actions is that they chose to develop at-risk and launch at-risk — in order to argue that Praluent® should not be enjoined. Defendants are now asking the Court to reward them for their risky business decisions and their infringement. But such a reward would undermine the very purpose of obtaining a patent.

Courts have held that where infringers launched at-risk, any damage caused by this at-risk activity weighs against the infringer in the balance of the hardships analysis. *See, e.g.*, *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1306 (Fed. Cir. 2012); *see also Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011) (requiring a patentee to compete against its own patented invention places a substantial hardship on the patentee, weighing in favor of the

18

entry of an injunction); *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (affirming grant of preliminary injunction where generic drug manufacturer launched at-risk, stating that the balance of the hardships weighs in favor of the patentee where the infringer's hardships "were the result of its own calculated risk to launch its product pre-judgment"). The harms Defendants allege they will suffer simply do not outweigh the incalculable and irreparable harms inflicted upon Amgen due to Defendants' at-risk conduct.

### 2.   Regeneron's Costs to Develop the Infringing Product Do Not Weigh in Defendants' Favor When Balancing the Hardships Because Those Costs Are Mitigated by Defendants' Collaboration Agreement

At the injunction hearing, Defendants signaled that they will claim harm because they spent time and money developing Praluent[®] and because Regeneron is a small biotech company. *See, e.g.*, Hr'g Tr. 481:3-6 (Oster direct). The decision to invest at-risk in development of Praluent[®] is addressed above. To the extent Defendants rely upon Regeneron being a "small" company, that argument fails. First, "[a] party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch*, 659 F.3d at 1156; *see also Merial Ltd.*, 681 F.3d at 1306 (affirming entry of permanent injunction even where it would have a "crippling effect" on the infringer's business). Second, contrary to Defendants' assertion, Regeneron is by no means a small business and undoubtedly will continue due to its success as a pharmaceutical company, specifically with its Eylea[®] product, a self-proclaimed "best in class" drug for the treatment of macular degeneration, as well as other diseases of the eye. Trial Tr. 344:19-345:7 (Schleifer direct).

Third, if Praluent[®] is enjoined, Regeneron is shielded from significant harm due to its Collaboration Agreement with Sanofi. JTX 089 at §§ 9.1-9.12, Schedules 2 and 3; JTX 369 at §§ 4.1-4.10; Hr'g Tr. 237:22-238:22 (Berndt direct); Hr'g Tr. 312:10-18 (Terifay cross) (Sanofi

responsible for 100% of development costs up to the first successful Phase 3 clinical trial, after which Sanofi is responsible for 80%); *see also* Hr'g Tr. 489:23-490:6 (Oster cross).  In the face of an injunction, Regeneron will not earn potential future revenue from the sale of Praluent® in the United States, but—because it will not earn revenue—it will not have to pay back the expense of development.  Hr'g Tr. 238:6-22 (Berndt direct).  By contrast, Sanofi, a large, diversified, global company (indeed, much larger than Amgen), really has no risk.  Hr'g Tr. 238:23-239:6 (Berndt direct); Trial Tr. 359:13-360:6 (Edelberg direct).  A permanent injunction would not force Sanofi to change its business model.  Hr'g Tr. 238:23-239:6 (Berndt direct).  There was no evidence to the contrary.

### D.   A PERMANENT INJUNCTION WILL SERVE THE PUBLIC INTEREST

The compelling public interest here is manifest: the assurance that there will be a continuous cycle of invention of new medicines to treat the diseases of today and tomorrow. Injunctive relief here will foster the incentives of the patent system to achieve this goal.

### 1.   The Public Has a Strong Interest in a Robust Patent System that Maintains the Incentives for Pharmaceutical Innovation

Since Amgen was founded more than 35 years ago, it has been in the business of inventing, developing, manufacturing, and selling biopharmaceutical medicines to treat serious human illness, with 16 medicines currently on the market today.  Trial Tr. 227:12-15 (Bradway direct).  Amgen's ability to sustain this engine of innovation is built upon the right to exclude infringers from practicing their inventions for the period of time afforded by their patents. Hr'g Tr. 58:16-59:2 (Bradway direct); Hr'g Tr. 229:7-22 (Berndt direct).  Without this patent right, Amgen would not have been able to protect its investment, generate adequate capital to re-invest in innovation-based R&D, or maintain the confidence of its investors.  Hr'g Tr. 59:3-10, 61:14-

62:5 (Bradway direct). The same can be said of nearly every other innovation-based biotech and

pharmaceutical company. Judge Young made this very point almost a decade ago:

> If the Court allowed [the defendant] to introduce [its infringing product] into the market, perhaps a few patients would benefit, and maybe Medicare would save a few dollars. These arguments, however, could be made for almost any infringing drug. Were courts to refuse injunctions on the basis of such speculation, then pharmaceutical patents would be worth far less than they are today because they would no longer include a right to exclude infringers from the market. The diminishing returns would disincentivize research and development for pathbreaking drugs by lowering the expected value of discovery. By contrast, granting injunctions encourages companies to devote their energies toward developing drugs that will satisfy unmet medical needs. *Were it possible to obtain market entry by making incremental improvements to existing drugs, it is doubtful that companies designed to generate discoveries could exist.*

*Amgen*, 581 F. Supp. 2d at 226-27 (emphasis added).

The patent laws are designed to reward inventors based on the profits the invention can

command in the marketplace over the life of the patent "by offering a right of exclusion for a

limited period as an incentive to inventors to risk the often enormous costs in terms of time,

research, and development." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1363 (Fed. Cir. 2008)

(quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974)); Hr'g Tr. 239:10-240:13

(Berndt direct). It is of no consequence that others may have independently arrived at the

invention later. *See Radio Corp. of Am. v. Radio Eng'g Labs., Inc.*, 293 U.S. 1, 3 (1934) (J.

Cardozo reinstating injunction where four different entities independently arrived at same or

nearly the same discovery, stating, "The prize of an exclusive patent falls to the one who had the

good fortune to be first."). Indeed, there is a "significant public interest in encouraging

investment in drug development and protecting the exclusionary rights conveyed in valid

pharmaceutical patents." *Sanofi-Synthelabo*, 470 F.3d at 1384 (internal quotation marks

omitted).

The biotech and pharmaceutical industries are particularly vulnerable to any erosion of the right to exclude infringing competition. Typically, investment of billions of dollars is necessary just to develop a single new lifesaving human therapeutic. *See* Hr'g Tr. 56:14-18 (Bradway direct); Hr'g Tr. 241:19-24 (Berndt direct). It can take a significant number of years to go from discovery to launch of a medicine. Hr'g Tr. 241:13-18 (Berndt direct); Hr'g Tr. 56:14-18 (Bradway direct). And there is immense uncertainty and risk of failure along the way. Hr'g Tr. 242:1-9 (Berndt direct); Hr'g Tr. 56:19-24 (Bradway direct).

Here, for example, Amgen invested over $2 billion and approximately a decade of work to take Repatha® from a research plan to a medicine available to patients. Hr'g Tr. 60:13-20 (Bradway direct); Hr'g Tr. 241:13-242:1 (Berndt direct). Amgen did so knowing that only one in one hundred pharmaceutical products ever makes it out of development and to the marketplace. Hr'g Tr. 242:1-3 (Berndt direct); Hr'g Tr. 56:19-24 (Bradway direct). Publicly traded biopharmaceutical companies like Amgen can justify such massive research and development investments in the face of such dismal odds because of the protections afforded by the patent system and, more specifically, the right to exclude infringers. Hr'g Tr. 60:2-12 (Bradway direct) ("The intellectual property position was foundational to our willingness and ability to invest heavily over a long period of time in what we knew was a risky project."). Amgen relies on the right to exclude infringing competition to ensure it can capture the sales necessary to recoup its investments so that it has the resources to continue to discover and develop new breakthrough therapies. Hr'g Tr. 228:10-229:4, 229:7-22 (Berndt direct); Hr'g Tr. 62:6-15 (Bradway direct); *see Janssen Prods., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 702 (D.N.J. 2014) ("[E]ncouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.").

22

In this case, the surest way to reassure the biotech and pharmaceutical industries that they can continue to make the big investments, take the substantial risk, and sustain this commitment over time to achieve the public's interest in an ongoing stream of new and useful medicines, is to grant the permanent injunction requested by Amgen. *See Amgen*, 581 F. Supp. 2d at 210 ("[T]he public's interest in a robust patent system that maintains incentives for pharmaceutical innovation outweighs the highly speculative, de minimis benefits that might occur as the result of a denial of an injunction.").

> 2. **Because the FDA Approved Repatha® and Praluent® to Treat the Same Patients, Repatha® Could Be Substituted for Praluent® and No Patient Would Go Untreated If an Injunction Issued**

In examining whether patients need Praluent® to remain on the market, the Court need look no further than the FDA's informed and expert decision to approve Repatha® to treat all patients covered by the Praluent® label (as well as an additional patient population with severe, inherited forms of high cholesterol). JTX 392; PTX 5012; Hr'g Tr. 217:6-14, 17-24 (Berndt direct); Hr'g Tr. 86:19-87:6, 96:1-4 (Stein direct). Defendants provided no evidence to rebut the propriety of the FDA's decisions to approve Repatha® as safe and effective for the entire indicated patient population within the scope of the Praluent® label.

In addition, numerous insurers have demonstrated their belief that Praluent® and Repatha® are equivalent. Hr'g Tr. 144:22-25 (Ryan direct). During negotiations, insurers treated the products as substitutable. Hr'g Tr. 144:22-25 (Ryan direct); Hr'g Tr. 182:16-24 (Broadhurst cross); *see also* Hr'g Tr. 254:16-24 (Berndt cross) (testifying that insurer actions demonstrated that "this option on the lower dose PCSK9 is one that is not valued very highly by the market"). Even more telling is the fact that some of the largest insurers acted on their beliefs by entering into agreements that cover *either* Repatha® or Praluent® as the *exclusive* PCSK9

antibody on their national formulary.  Hr'g Tr. 218:13-219:13 (Berndt direct); Hr'g Tr. 145:5-9

(Ryan direct).  For example, CVS/caremark, which covers approximately 22 percent of people

with insurance in the United States, entered into an exclusive agreement whereby only Repatha®

is covered.  Hr'g Tr. 485:6-24 (Oster cross); PTX 5402; JTX 340-343.  CVS's Pharmacy and

Therapeutics committee—comprised of independent doctors—analyzed both FDA-approved

medicines and found Repatha® and Praluent® were "therapeutically equivalent."  PTX 5402;

Hr'g Tr. 222:21-223:12 (Berndt direct); Hr'g Tr. 485:20-24 (Oster cross).  Similarly, several

insurers, including OptumRx/United, which provides or manages insurance coverage for around

70 million people, ███████████████████████████ have decided to cover

only Praluent®. [12]  Hr'g Tr. 223:13-224:4, 225:1-18 (Berndt direct); Hr'g Tr. 162:15-20

(Broadhurst direct).  Insurers would not deny more than 70 million people access to one of these

products if they did not view them as equivalent.  Hr'g Tr. 222:9-224:8 (Berndt direct).  Further,

Defendants' own medical expert admitted that when one of these products is not available

through a patient's insurance, he prescribes the other.  Hr'g Tr. 411:13-25 (Eckel direct).

### 3. Amgen Can Supply the Entire Market Demand and Transition Patients from Praluent® to Repatha®

The evidence is undisputed that Amgen has ample manufacturing, marketing, and sales

force capacity to serve the entire PCSK9 inhibitor market in the United States today and going

forward.  Hr'g Tr. 67:14-21 (Bradway direct); Hr'g Tr. 171:1-21 (Broadhurst direct); Hr'g Tr.

134:18-136:1 (Waller direct).  Amgen has never had a product shortage.  Hr'g Tr. 134:13-17

(Waller direct).  It is also undisputed that Amgen will provide support services to patients

---

[12] Similar to the United States insurers, the British Public Health Agency received a recommendation from public servants to give Repatha® exclusive access.  Hr'g Tr. 356:7-14 (Edelberg cross).

transitioning from Praluent® to Repatha® to ensure a smooth transition.  Hr'g Tr. 515:10-22 (Broadhurst rebuttal direct).[13]

### 4.    There Is No Medical Necessity for 75 mg of Praluent®

In the medical field, absent compelling public health risks, courts consistently find that the public interest will not be disserved by enjoining an infringing product. *See, e.g., Acumed*, 551 F.3d at 1330-31; *Becton Dickinson*, 2008 WL 4745882, at *3-4.  Speculative or conjectural injuries to the public health are not sufficient to overcome the strong public interest in enforcing valid patent rights. *Id.*

Defendants' suggestion that there is a medical need for 75 mg of Praluent® is wholly unsupported by any objective evidence and rests on two *false* assumptions: *first*, that there are actual safety risks associated with the approved use of Repatha® to lower levels of LDL-C; and *second*, that using 75 mg of Praluent® avoids such risks.  The FDA approved Repatha® as safe and effective to treat the same patients as Praluent®.  And the objective evidence shows that the 75 mg of Praluent® offers no medical benefit whatsoever over Repatha®.  Amgen respectfully submits that the Court should not second guess the FDA's findings.

### a.    There Is No Evidence of Safety Risks from LDL-C Levels Below 25 mg/dL or 15 mg/dL, but There Is Objective Evidence of Benefit

Defendants proffered no objective evidence of any safety risk from patients achieving LDL-C levels below the arbitrary thresholds of 25 mg/dL or 15 mg/dL. *First*, the data submitted to the FDA from the clinical trials conducted by both parties show that many patients' LDL-C levels went below 25 mg/dL, or even 15 mg/dL, regardless of dose.  The FDA found no safety

---

[13] As of January 29, 2016, approximately 10,538 patients had been prescribed Praluent®.  PTX 6197; Hr'g Tr. 317:21-318:9 (Terifay cross).

signal from the clinical data of either Repatha® or Praluent®.  Hr'g Tr. 436:10-19 (Eckel cross);

Hr'g Tr. 99:7-101:19 (Stein Direct); JTX 392; PTX 5012; PTX 4976.  More than 900 patients in

the Praluent® trials had measured LDL-C levels below 25 mg/dL without experiencing adverse

events resulting from those levels.  Hr'g Tr. 436:10-19 (Eckel cross); 99:7-101:19 (Stein direct);

279:15-20 (Carey cross); PTX 4973 at -981-82; *see also* PTX 4976 at -663, -704-07; JTX 392;

PTX 5012.  And in Amgen's completed studies, in patients who were being treated for at least a

year, no adverse event was recorded that correlated to low LDL-C levels.  Hr'g Tr. 97:8-98:8

(Stein direct).[14]  Consistent with this data, the FDA-approved labels for both Repatha® and

Praluent® state that there is no evidence of adverse consequences from "very low" LDL-C.  JTX

392 at -372-73; PTX 5012 at -249; Hr'g Tr. 105:19-106:13 (Stein direct).

*Second*, individuals with LDL-C levels below 25 mg/dL, or even 15 mg/dL, have no

impairment.  Hr'g Tr. 85:3-17 (Stein direct).  Indeed, both sides' experts pointed out the well-

documented example of an individual who has LDL-C levels below 25 mg/dL from birth

because a genetic mutation has effectively left her with no PCSK9, and yet she is an aerobics

instructor with a college degree and two children.  Hr'g Tr. 85:3-17 (Stein direct); Trial Tr.

391:2-14 (Ravetch direct).  Several reports in the scientific and clinical literature have

documented the lack of adverse consequences of such "very low" LDL-C levels.  Hr'g Tr.

101:20-103:9, 103:22-105:9 (Stein direct); *see also* PTX 3213 (study finding "no intrinsic safety

concern" in patients with LDL-C levels below 40 mg/dL upon treatment with statins); PTX 4732

---

[14] Moreover, affirmative signals of actual benefit from these low LDL-C levels have been reported, including in Defendants' clinical trial data.  Hr'g Tr. 99:23-100:17; 106:14-16, 108:20-109:18 (Stein direct); PTX 4976 at -663, -704-07; PTX 4973 at -907-08, -982 (showing a lower occurrence of adverse events in patients with LDL-C levels under 25 or 15 mg/dL relative to all patients treated with Praluent®).

(six-year study finding that patients with LDL-C levels below 30 mg/dL upon treatment with statins and ezetimibe had the fewest adverse consequences of any patient group).

*Third*, the evidence is uncontroverted that there have been no safety issues reported by the independent review panel monitoring Amgen's long-term outcomes trial (FOURIER) with Repatha®, involving 27,500 patients. *See* Hr'g Tr. 512:20-513:5 (Scott rebuttal direct).

*Fourth,* Defendants' own internal documents and conduct show that they do not consider LDL-C levels below 25 mg/dL to be a safety issue. In the early days of Praluent® development, the goal of Defendants' scientists was to get cholesterol levels as low as possible and to make sure the field understood that there is no danger in going too low. *See* PTX 4051 at -859 ("All efforts have been made to develop a once monthly regimen by both choosing the highest dose and the device which can allow the delivery of the highest volume."); Hr'g Tr. 341:2-13, 342:12-17 (Edelberg cross); PTX 3881 at -384, -386; Hr'g Tr. 380:18-383:19 (Stahl direct). Regeneron itself has characterized the belief that LDL-C cannot be lowered beyond a certain level as "erroneous," and a "marketing issue." Hr'g Tr. 382:17-383:19 (Stahl cross); PTX 3881 at -386. In fact, notwithstanding their current cries of concern relating to alleged safety issues from LDL-C levels below 25 mg/dL, during Defendants' clinical trials to support Praluent®'s approval, Defendants never down-titrated a patient with LDL-C levels below 25 mg/dL. PTX 4972 at -105 ("[W]e initiated alirocumab at the highest 150-milligram dose every two weeks in the 2400-patient LT study. *Moreover, patients were not allowed to down-titrate in that study or in any of our studies*.") (emphasis added).

b. **75 mg of Praluent® Does Not Avoid LDL-C Levels Below 25 mg/dL**

Defendants further attempted, through testimony, to suggest that 75 mg of Praluent® offers doctors and patients a tool to dial in a patient's LDL-C levels when less LDL-C lowering is required. Hr'g Tr. 410:1-9 (Eckel direct). This was based on Defendants' unsupported representation that LDL-C levels only go down by approximately 45% with 75 mg of Praluent® compared to approximately 60% with 150 mg of Praluent®. Hr'g Tr. 326:18-327:10, 361:15-362:3 (Edelberg direct). This testimony, however, misrepresents Defendants' own data and perpetuates a relative comparison of LDL-C lowering (efficacy) that the FDA rejected as unsupportable due to inadequate clinical data.

The 45% and 60% values *do not* represent the *maximal* reduction in LDL-C from 75 mg and 150 mg of Praluent®, respectively. The LDL-C measurements on which these percentages are based were taken two weeks after administration of a Praluent® dose, *after* LDL-C levels had already hit their lowest point and were beginning to creep back up again as the 75 mg of Praluent® had started to wear off. Hr'g Tr. 91:13-92:21, 95:1-22, 128:18-130:7 (Stein direct and redirect); *see also* Hr'g Tr. 510:24-511:18 (Scott rebuttal direct) (testifying that Amgen tested and rejected a 70 mg dose because it led to too much variation at the end of the dosing period). Defendants never disputed that 75 mg of Praluent® maximally suppresses PCSK9, but does so for a shorter duration than 150 mg of Praluent®. Nor could they. FDA noted that both the 75 mg and 150 mg of Praluent® maximally suppress PCSK9 levels to zero, but that 150 mg of Praluent® has a longer duration of effect. JTX 194A at 40-41; *see* Hr'g Tr. 345:11-346:14, 347:5-23

(Edelberg cross).  In short, there is no evidence that 75 mg of Praluent® offers any medical benefit over 150 mg of Praluent® or the 140 mg dose of Repatha®.[15]

Further, the FDA expressly rejected the very argument Defendants make as insufficiently supported by clinical data and inadequate clinical trial design.  Defendants in this Court are making a comparative efficacy claim—that LDL-C levels only go down by approximately 45% with 75 mg of Praluent® as compared to approximately 60% with 150 mg of Praluent®.  But the FDA *rejected* Defendants' request to market Praluent® 75 mg and 150 mg as achieving distinct levels of LDL-lowering because the clinical studies did not provide adequate data to make such comparisons: "The applicant is proposing high and low dose be available for marketing. However, the designs of the phase 3 trials do not support an evaluation of the difference in efficacy (*if any*) between doses." JTX 194A at Exec. Sum. p. 2; *see also, e.g.*, PTX 6253 at -717, -722 (concluding that Defendants did not demonstrate a difference in efficacy between the two doses); Hr'g Tr. 349:4-350:12 (Edelberg cross).

> **5.  Defendants' Public Interest Argument Boils Down to Speculation About Physician Preference, Which Must Yield to the Incentives Advanced by the United States Patent System**

Lacking any clinical or other scientific evidence that Praluent® offers a medical advantage over Repatha®, Defendants offer evidence that physicians prefer a choice of treatment options.  But mere preference or choice is not sufficient to overcome the public interest in enforcing valid patents.  *See Amgen*, 581 F. Supp. 2d at 213 (finding that "although an additional choice would undoubtedly benefit patients and doctors, it is not clear that [the infringing drug]

---

[15]These results for Praluent® are consistent with studies cited in the FDA-approved label for Repatha® showing that a 140 mg dose and a 420 mg dose of Repatha® both led to the same reduction in LDL-C as 150 mg of Praluent®.  Hr'g Tr. 92:24-94:9 (Stein direct).  In other words, the antibodies suppress PCSK9 to the same extent with the variable being the duration of suppression based on the quantity administered.

offers an advantage so appreciable that it would justify abrogation of Amgen's monopoly privilege").

Tellingly, in all of their market research, Defendants never asked doctors whether they would decline to prescribe Repatha® to patients if Praluent® were unavailable. Hr'g Tr. 279:21-280:5 (Carey cross). There is no evidence that any doctor would actually stop prescribing a PCSK9 inhibitor if Praluent® is enjoined.

Repatha® and Praluent® are approved by the FDA to treat gravely ill patients who are in desperate need of aggressive and further lowering of LDL-C. The single greatest threat of death or catastrophic injury to these patients is cardiovascular disease. The notion that doctors treating these patients would simply deny them the documented benefits of Repatha® if Praluent® were not available is difficult to imagine, unsupported, and ethically not credible. *See* Hr'g Tr. 117:16-118:21 (Stein cross). Given the FDA's approval of Repatha®, physician preference based solely on speculation about possible safety issues that might arise in the future is not sufficient to overcome the strong public interest in enforcing valid patent rights. *See Acumed*, 551 F.3d at 1330-31; *see also Becton Dickinson*, 2008 WL 4745882, at *4.

## VI.   CONCLUSION

The public has a strong interest in promoting the patent rights of companies like Amgen that innovate new medicines like Repatha®. There is no question Amgen is being irreparably harmed by Defendants' continuing infringement and that this harm outweighs any harm Defendants may suffer by their calculated decision to launch at-risk in view of Amgen's patent positions and in view of this lawsuit with its accelerated trial schedule. A permanent injunction should be entered forthwith.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
1000 North King Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com

*Attorneys for Plaintiffs*
*Amgen Inc., Amgen Manufacturing, Limited, and*
*Amgen USA Inc.*

OF COUNSEL:

William G. Gaede, III
David L. Larson
Eric W. Hagen
Terry W. Ahearn
Bhanu K. Sadasivan
Shane G. Smith
MCDERMOTT WILL & EMERY LLP
275 Middlefield Road, Suite 100
Menlo Park, CA  94025
(650) 815-7400

Sarah C. Columbia
K. Nicole Clouse
Lauren Martin
Esther E. Lin
MCDERMOTT WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
(617) 535-4074

Michael V. O'Shaughnessy
Rebecca Harker Duttry
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC  20001
(202) 756-8000

Christopher B. Mead
LONDON AND MEAD
1225 19th Street, NW
Suite 320
Washington, DC 20036
(202) 331-3334

Dated: April 22, 2016

01:18608976.1