**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMGEN INC; AMGEN MANUFACTURING, LIMITED; and AMGEN USA, INC., | ) ) ) | C.A. No.:  14-1317-RGA |
| Plaintiffs, | ) ) | (CONSOLIDATED) |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| SANOFI; SANOFI-AVENTIS U.S. LLC; AVENTISUB LLC, f/d/b/a AVENTIS PHARMACEUTICALS INC., and REGENERON PHARMACEUTICALS, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**[PROPOSED] FINAL DAMAGES/WILLFULNESS PHASE JURY INSTRUCTIONS**

Dated:  January 18, 2019

## DAMAGES AND WILLFULNESS[1]

1. **INTRODUCTION**

As before, I will refer to plaintiffs Amgen Inc., Amgen Manufacturing, Limited, and Amgen USA Inc. collectively as "Amgen."  Defendants are Sanofi, sanofi-aventis U.S. LLC, Aventisub LLC, f/d/b/a Aventis Pharmaceuticals Inc., and Regeneron Pharmaceuticals, Inc. I will again refer to these parties collectively as "Sanofi and Regeneron."  Because you have found that one or more of Amgen's patent claims is valid, you must now consider what amount of damages to award to Amgen.

I will now instruct you about the measure of damages for patent infringement occurring during the period of February 1, 2016 through September 30, 2018.

The damages you award must be adequate to compensate Amgen for Sanofi and Regeneron's infringement.  Your damages award should put Amgen in approximately the same financial position that it would have been in had the infringement not occurred.

You may not add anything to the amount of damages to punish Sanofi or Regeneron **[[By Amgen:** for their infringement]] or to set an example.  You also may not add anything to the amount of damages for interest.

There are different types of damages that Amgen may be entitled to recover.  In this case, Amgen seeks lost profits (from lost sales and from price erosion).  Lost profits are actual reductions in business profits Amgen **[[By Defendants:** may have[2]]]** suffered as a result of

---

[1] Defendants' position is that willfulness is not at issue in this case. *See* Defendants' Motion for Judgment on the Pleadings regarding willfulness, which is still pending before the Court.  D.I. 448.  However, consistent with the Court's comments at the January 3, 2019 hearing, Defendants have included jury instructions to address willfulness without waiver of their position.

[2] **By Amgen:** Amgen objects to this proposal because although the parties' experts disagree on their damages calculations, Defendants' damages expert acknowledges that Amgen *has* suffered

Sanofi and Regeneron's infringement.

 [[**By Amgen:** If, and only if there are any units for which lost profits are not awarded, Amgen seeks a reasonable royalty on those units; **By Defendants:** If Amgen cannot establish that it would have made all or some portion of Sanofi and Regeneron's sales "but-for" the infringement, Amgen is instead entitled to a reasonable royalty on any such sales**]]**.  A reasonable royalty is defined as the amount of money Amgen and Defendants would have agreed upon as a fee for use of the invention before the infringement first began.  Plaintiffs are entitled to recover no less than a reasonable royalty for each infringing unit.  Thus, a reasonable royalty should be awarded if and only if there are any infringing units not included in any lost profits award.

 [[**By Amgen:** You may not award (1) lost profits (including price erosion) and (2) a reasonable royalty on the same units.  **By Defendants:**  Damages that may be awarded under more than one of these damages theories may only be counted once in coming up with a total damages award.  In other words, Amgen may not receive both loft profits damages and a reasonable royalty for the same sale of Praluent.**]]**

**Amgen's Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.1 (July 2016)

**Defendants' Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.1 (2016) ("DAMAGES—INTRODUCTION").  *See* 35 U.S.C. § 284; *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d

---

lost profits.  Mulhern Dep. at 77-78 ("the amount of those lost profits would be no more than $174.9 million").  **By Defendants:** Amgen has the burden of proof as to the amount of lost profits damages, if any, it has suffered due to infringement.  Consequently, it is possible that Amgen may fail to prove lost profits at trial, making the "may have" language Defendants propose appropriate.  Furthermore, Amgen mischaracterizes the context of Carla Mulhern's opinions.  Ms. Mulhern is not affirmatively offering any opinion that Amgen has suffered lost profits, but rather is rebutting the opinions of Amgen's own expert by correcting his calculations.  She does not necessarily agree with his framework as an initial matter.

1370, 1381-82 (Fed. Cir. 2003); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 870 (Fed. Cir. 2003); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1108-09 (Fed. Cir. 1996); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983). *Minco, Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1118 (Fed. Cir. 1996); *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360 (Fed. Cir. 1991); *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1354 (Fed. Cir. 2001) (patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate "but for" causation and reasonable royalties for any remaining infringing sales).

2.      **BURDEN OF PROOF**

Unlike in the liability portion of the trial, Amgen has the burden to establish the amount of its damages.  **[[By Amgen:** And unlike in the liability portion of the trial,**]]** Amgen's burden is to establish the amount of its damages by a preponderance of the evidence**[[By Amgen:**—not clear and convincing evidence**]]**.  When a party has the burden of proof by a preponderance of the evidence, it means that you must be persuaded that what the party seeks to prove is more probably true than not true.  **[[By Amgen:** To put it differently, if you were to put Amgen's and Defendants' evidence on opposite sides of a scale, the evidence supporting Amgen's assertions would have to make the scale tip somewhat to Amgen's side.**]]**  In other words, you should award only those damages that Amgen establishes that it more likely than not suffered due to Sanofi and Regeneron's infringement.  While Amgen is not required to prove the amount of damages with mathematical precision, it must prove them with reasonable certainty.  **[[By Amgen:** If the amount of damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringers.]]  **[[By Defendants:** Amgen is not entitled to speculative damages.  You should not award any amount for loss that, although possible, is remote or left to conjecture or guesswork**]]**.

**Amgen's Authorities:**
*Amgen Inc. v. Hospira, Inc.*, C.A. No. 15-839-RGA, D.I. 323, Final Jury Instructions (Sept. 22, 2017); *E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, D.I. 325, Final Jury Instructions (May 15, 2017).  D. Del. Uniform Patent Jury Instruction 5.3 (2004) ("Any doubts regarding the computation of the amount of damages should be resolved against Defendant and in favor of Plaintiff.").

**3.     LOST PROFITS FROM LOST SALES [[BY DEFENDANTS: AND PRICE EROSION[3]]] – "BUT FOR" TEST**

We now turn to lost profits **[[By Amgen:** based on lost sales.**]]**

To prove **[[By Amgen:** that it lost sales; **By Defendants:** lost profits**]]**, Amgen must prove that it is more probable than not that purchasers of Praluent would have instead purchased Repatha if Sanofi and Regeneron had not been **[[By Amgen:** making infringing sales of; **By Defendants:** selling]]** Praluent.  This test is often called the "but for" test:  that is, Amgen must **[[By Amgen:** show that, "but for" Sanofi and Regeneron's infringement, Amgen would have made the sales and earned the profits that Amgen claims it lost; **By Defendants:** prove that, if there had been no infringement, it would have made all or some of the sales Sanofi and Regeneron made of Praluent]]**.  To apply the "but for" test, you must imagine the marketplace as it would have existed if the infringement had not occurred and consider what would have happened.  In other words, you should determine what purchasers of Praluent would have done if Praluent was not on the market. **[[By Defendants:**  You may only award lost profits damages on those sales of Praluent made by Sanofi and Regeneron that Amgen proves to you it would have more likely than not made as Repatha sales had Praluent not been on the market.[4]]]**

**Amgen's and Defendants' Authorities:**
AIPLA Model Patent Jury Instruction 10.2.1.1 (2018); *Boston Scientific Corp. v. Cordis*

---

[3] **By Amgen:** Amgen objects to the inclusion of "and Price Erosion" in the title of this instruction because (1) price erosion is the subject of a separate instruction; and (2) price erosion is not encompassed in the lost sales instruction which is focused on whether Amgen would have made the sales in the but for world which were actually made by Defendants.  **By Defendants:** While price erosion is the subject of a separate instruction, conceptually and legally, price erosion is a form of lost profits.  Although Amgen's damages expert, Paul Meyer, analyzes them separately (and consequently, Defendants' experts rebut accordingly), this does not change the fact that both lost sales and price erosion are lost profits damages.  For this reason, the but-for test applies to both, and the jury should be so instructed.

[4] **By Amgen:** Amgen objects to this as redundant of previous sentences in this instruction.  **By Defendants:** Defendants view this as an appropriate conclusion to this instruction that summarizes the test to be applied by the jury in a simple, easy to understand sentence.  It is not redundant.

*Corp.*, No. 1:10-cv-315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011).


**Defendants' Additional Authority:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions (2016) and authorities cited therein.

4.    **ESTABLISHING LOST PROFITS**

Amgen is entitled to lost profits if it establishes each of the following by a preponderance of the evidence:

(1)    That there was demand for the **[[By Defendants':**  Repatha]]**[5]** patented product;

(2)    That there are no available and acceptable noninfringing alternatives to the patented invention or, if there were, the proportion of Sanofi and Regeneron's sales that Amgen would have made despite the availability of other acceptable noninfringing substitutes;

(3)    That Amgen had the manufacturing and marketing capability to meet the demand; and

(4)    The amount of profit that Amgen would have made had Sanofi and Regeneron not infringed.

> **Amgen's and Defendants' Authorities:**
> Fed. Cir. Bar Ass'n Model Patent Jury Instructions (2016) and authorities cited therein. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017); *E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, D.I. 325, Final Jury Instructions (May 15, 2017); *Boston Scientific Corp. v. Cordis Corp.*, C.A. No. 10-315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011).
>
> *See also* 35 U.S.C. § 284; *Aro Mfg. Co. v. Convertible Top Co.*, 377 U.S. 476, 502-07 (1964); *Ericsson, Inc.v. Harris Corp.*, 352 F.3d 1369, 1377-79 (Fed. Cir. 2003); *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed. Cir. 2003); *Gargoyles, Inc.v. United States*, 113 F.3d 1572,1577-78 (Fed. Cir. 1997); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*), *BICLeisure Prods., Inc.v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218-19 (Fed. Cir. 1993); *Carella v. Starlight Archery*, 804 F.2d 135, 141 (Fed. Cir. 1986); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152,1156 (6th Cir. 1978).

---

[5] **By Amgen:** Amgen objects to limiting this factor to demand for Repatha as contrary to the law as reflected in the cited authorities.  The demand to be considered is for the patented product—which, in this case, is both Repatha and Praluent, during the damages period.  **By Defendants:** Defendants disagree.  Under the applicable law, the only relevant showing is demand for Amgen's patented product.

5.       **LOST PROFITS – DEMAND**

Demand for the patented product can be proven by significant sales of a patent holder's

patented product (here, Repatha) or significant sales of an infringing product containing the

patented features (here, Praluent).

> **Authorities**:
> *E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, D.I. 325,
> Final Jury Instructions (May 15, 2017); *Boston Scientific Corp. v. Cordis Corp.*, C.A. No. 10-
> 315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011).  *See also DePuy Spine, Inc.v.*
> *Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009).

**6.      LOST PROFITS—LACK OF AVAILABLE, ACCEPTABLE NON-INFRINGING SUBSTITUTES**

In determining whether Amgen lost sales due to Sanofi and Regeneron's infringement, you must consider **[[By Amgen:** , had Sanofi and Regeneron not been selling Praluent, whether or not some or all of the purchasers who bought Praluent would have bought Amgen's Repatha or whether they would have bought an alternative to Amgen's Repatha instead; **By Defendants:** whether, if Sanofi and Regeneron were not selling Praluent, some or all of the people who actually bought Praluent would have bought a different, noninfringing product from somebody else, rather than buy Repatha.**]]**  Such a product is called an acceptable, noninfringing substitute. **[[By Amgen:**  You may only consider alternative products that you determine were both (1) available, or on the market during the infringement, and (2) acceptable to purchasers as a substitute for Repatha; **By Defendants:**  To determine whether there were any acceptable noninfringing substitutes, you must determine whether there were products that were both (1) available or on the market during the infringement, and (2) acceptable to the market**]]**.

An alternative product is "available" if it is either on the market, for sale, or is a product that is technologically and economically capable of being produced during the time of the alleged infringement.  **[[By Defendants:**  That is, an alternative product may be considered "available" as a potential substitute even if the product was not actually on sale during the infringement period.  The correct inquiry is not whether a non-infringing alternative is a substitute for Praluent, but rather whether it would have been acceptable as compared to Repatha in a "but for" world.  This "but for" analysis requires a reconstruction of the market as it would have developed in the absence of Praluent to determine what sales Repatha would have made.**]]** To be an **[[By Amgen:** "acceptable non-infringing substitute" a product must be acceptable compared to Amgen's Repatha.  The focus is not on whether it is a substitute for the infringing

product, Praluent.  To be an "acceptable non-infringing substitute" the product must also have the advantages of the patented invention that were important to purchasers; **By Defendants:** alternative product, the product need not be sold by Sanofi or Regeneron.  If the realities of the marketplace are that competitors other than Sanofi and Regeneron would likely have captured the sales made by Sanofi and Regeneron, despite a difference in the products, then Amgen is not entitled to lost profits on those sales.**]]**

[[**By Defendants:**  Even if you find that there are no non-infringing substitutes, Amgen is nonetheless required to prove to you that they, in fact, would have made Sanofi and Regeneron's sales.[6]**]]**

**Amgen's Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.2 (July 2016); *Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017); *Callaway Golf Co. v. Acushnet Co.*, C.A. No. 06-091-SLR (D. Del. Mar.  26, 2010) ; *Boston Scientific Corp. v. Cordis Corp.*, C.A. No. 10-315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011).

**Defendants' Authorities:**
Federal Circuit Bar Assoc. Model Patent Jury Instructions (2016) and authorities cited therein; *see also Presidio Components Inc. v. American Technical Ceramics Corp*., 875 F.3d 1369, 1380-1381 (Fed. Cir. 2017).

**Defendants' Objection to Amgen's Proposal:**
Amgen's proposal ails to fully explain what a non-infringing substitute is.  Further, it fails to admonish the jury that even if there are no non-infringing substitutes, Amgen still has the burden of proof to demonstrate that it would have made Sanofi and Regeneron's sales.

**Amgen's Response to Defendants' Objections:**
See Amgen's footnote to this instruction.

---

[6] **By Amgen:** Amgen objects to this instruction as redundant of prior instruction 3 and an effort through repetition to influence the jury away from awarding lost profits.  **By Defendants:** This language is intended to place into appropriate context the concept of non-infringing substitutes. In particular, this is intended to clarify for the jury that the inquiry into whether Amgen would have made Sanofi and Regeneron's sales is not answered solely by whether or not the jury finds that there are non-infringing substitutes

7.        **LOST PROFITS—CAPACITY**

**[[By Amgen:** The parties agree that Amgen had the manufacturing and marketing capability to make the sales Amgen claims it lost;

**By Defendants:**   Amgen should only receive lost profits for sales it would have made and could have made but-for the infringement.   Accordingly, to be awarded lost profits based on additional sales of Repatha that Amgen claims it would have made, Amgen must prove that it would have had the capacity to manufacture enough Repatha to make those additional sales, as well as the marketing and sales capability to make those additional sales.   This means that Amgen must prove it is more probable than not that it could have made and sold, or could have had someone else make or sell for them, the additional products Amgen says it could have sold but for the infringement.**]]**

**Defendants' Authorities:**
Federal Circuit Bar Assoc. Model Patent Jury Instructions (2016) and authorities cited therein.

**Objection to Amgen's Proposed Instruction:**
Amgen has the burden of proof and Defendants' have not agreed that Amgen has the capacity, as its proposed instruction erroneously states.

**Amgen's Response to Defendants' Objection:**
The parties have very limited time to try damages, and Defendants' damages expert admitted that Amgen had sufficient manufacturing and marketing capacity during the damages period.  Mulhern Dep. at 268 ("Q.  You agree that Amgen has sufficient marketing capacity and manufacturing capacity to make the sales that are claimed in Mr. Meyer's calculation of lost profits?  A. So based on my review of the evidence, it appears that demand for these drugs has been disappointing, which -- and it follows from that that Amgen should have sufficient capacity to make these -- make the additional sales.  Q.  So you agree that there's sufficient marketing and manufacturing capacity; that is Amgen has sufficient marketing and manufacturing capacity to make the sales that are claimed in lost profits?  A.  I don't disagree with that.").  Defendants have no other witness who can challenge Amgen's manufacturing and marketing capacity, and Amgen objects to Defendants' effort to force Amgen to spend valuable time at trial on proving something that is undisputed.

8.      **LOST PROFITS—AMOUNT OF PROFIT**

[[**By Amgen:**  Amgen is entitled to recover its lost profits for sales which you find Amgen would have made had Sanofi and Regeneron not been selling Praluent; **By Defendants:** If Amgen has proved that it lost profits due to infringement by Sanofi and Regeneron, then you are to determine the amount of profits that Amgen lost.  As I have already instructed you, Amgen must prove the amount of their lost profits to a reasonable probability, but absolute or mathematical precision is not required.  The amount of lost profits damages, however, should not include amounts that are merely based on speculation, damages that are only possible, or damages that are based on guesswork.  Likewise, your damages award is not meant to punish Sanofi and Regeneron nor should it reward Amgen.  Instead, your damages award should put Amgen in approximately the same financial position that it would have been in had the infringement not occurred[7]]].

Amgen may calculate its lost profits on lost sales by computing the lost revenue for sales it would have made but for the infringement and subtracting from the lost revenue figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs.  [[**By Amgen:**  Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patent holder's lost revenue.  The amount of lost profits cannot be speculative, but need not be proved with unerring certainty.]]

**Amgen's Authorities:**
*E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, D.I. 325,

_____

[7] **By Amgen:** Amgen objects to Defendants' proposal as redundant of prior instructions 1, 2, and 3 and an effort through repetition to influence the jury away from awarding lost profits.  **By Defendants:** This instruction is intended to ensure the jury awards only the appropriate amount of lost profits.  Should the jury determine that Amgen is entitled to at least some lost profits damages, the jury is likely to look to this instruction for guidance on the amount to award, rather than introductory sections.

Final Jury Instructions (May 15, 2017); *Boston Scientific Corp. v. Cordis Corp.*, C.A. No. 10-315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011); *Callaway Golf Co. v. Acushnet Co.*, C.A. No. 06-091-SLR, D.I. 606, Final Jury Instructions (Mar. 26, 2010).

Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.2 (2016) ("LOST PROFITS – AMOUNT OF PROFIT").  *See Paper Converting Mack Co. v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed. Cir. 1984)).

**Defendants' Authorities:**
Federal Circuit Bar Assoc. Model Patent Jury Instructions (2016) and authorities cited therein.

**<u>Objections to Amgen's Proposed Instruction</u>:**
Amgen's proposal fails to fully explain that damages are not a reward or a punishment.  It also fails to fully explain the level of proof required to make a damages award not speculative.

**Amgen's Response to Defendants' Objections:**
See Amgen's footnote to Defendants' proposal.

9.      <u>**LOST PROFITS – PRICE EROSION**</u>

We now turn to lost profits based on price erosion.

Amgen can recover additional lost profits damages if it can establish that it is more likely than not that, had there been no infringement, Amgen **[[By Amgen:** would not have had to accept a lower net price for Repatha because Amgen would not have had to compete with Defendants on price to make sales.  Here, Amgen alleges that, due to Defendants' infringement, Amgen had to provide greater discounts (in the form of "rebates") to third parties (for example insurance companies and pharmacy benefit managers), resulting in lower net prices and thus lower profit for Amgen.; **By Defendants:** would have been able to charge a higher price for Repatha**]]**.

**[[By Amgen:**

If you are persuaded that it is more likely than not that Amgen's selling price was more heavily discounted than it would have been because Defendants were competing with Amgen for sales on price, then you may award Amgen additional damages for price erosion.  Price erosion damages are the amount of profits Amgen lost through rebates it would not otherwise have given third party purchasers but for Defendants' infringement.  If you find that Amgen suffered price erosion, you must first determine the net price at which Amgen would have sold Repatha had there not been price erosion—in other words, without the increased discounts to third parties caused by Defendants' infringement.  You must then use that net price in determining Amgen's lost profits for both sales Amgen made of Repatha and for sales Amgen would have made to purchasers of Defendants' infringing Praluent.

For the price erosion Amgen suffered for sales Amgen made of Repatha, you may award the difference between:

(A)      the amount of profits Amgen would have made by selling Repatha at the

15

net price at which Amgen would have sold Repatha had there not been price erosion; and

      (B)     the amount of profits Amgen actually made by selling Repatha.

For the price erosion Amgen suffered for sales Amgen would have made to purchasers of Defendants' infringing Praluent you may award an amount equal to the number of infringing Praluent units sold multiplied by the difference between:

      (A)     the net price at which Amgen would have sold Repatha had there not been price erosion; and

      (B)     the actual net price at which Defendants actually sold the infringing Praluent.

In calculating Amgen's total loss from price erosion, you must take into account whether any drop in sales would have resulted had Amgen sold Repatha at the net price you determined.**;**

**By Defendants:**

In order to be awarded price erosion damages, Amgen must present a credible economic analysis that takes into account the effect that a higher price of Repatha (as compared to the actual price of Repatha) would have had on the demand for the Repatha.  In calculating Amgen's total losses from price erosion, you must take into account any drop in sales that would have resulted from charging a higher price for Repatha in the absence of competition from Praluent.

In addition, market forces other than infringement may affect the price of a product, and may cause a manufacturer to lower prices.  In determining whether Amgen is entitled to damages based on price erosion, these other factors, including market forces and economic factors, must be considered and accounted for by Amgen, who bears the burden of proof.  Amgen must prove the fact of price erosion damages and, if so, the amount of price erosion damages to a reasonable degree of probability.

If Amgen proves that it could have charged a higher price for Repatha absent

infringement, you may award as additional damages the difference between:

(A)     the amount of profits Amgen would have made by selling Repatha at the higher

price, and

(B)     the amount of profits Amgen actually made by selling Repatha at the lower price.

If you find that Amgen suffered price erosion damages, you may also use the higher price

to determine Amgen's price erosion damages from Sanofi and Regeneron's sales of Praluent.]]

**Amgen's Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.4 (2016) ("LOST PROFITS –
PRICE EROSION"). *Compare Crystal Semiconductor Corp. v. Tritech Microelectronics,
Int'l Inc.*, 246 F.3d 1336, 1357-58 (Fed. Cir. 2001) (upholding denial of price-erosion
damages where patentee failed to show how higher prices would have affected demand
for the patented product) *with Ericsson, Inc.v. Harris Corp.*, 352 F.3d 1369, 1377-79
(Fed. Cir. 2003) (upholding award of price-erosion damages where patentee offered
sufficient proof of an inelastic market that would support price increases without a drop
in sales of the patented product); *Anesta AG v. Mylan Pharms., Inc.*, 2014 WL 3976456,
*2-3 n. 3 (D. Del. Aug. 14, 2014)  (denying a generic company's motion seeking to
exclude a patentee's damages expert's lost profits analysis for not accounting for price
elasticity and summary judgment that the patentee was not entitled to any lost profit
damages because the expert had, given the unique circumstances related to the
pharmaceutical industry, presented sufficient credible economic evidence that price
elasticity was not a factor); *see also Vulcan Eng'g Co. v. FATA Aluminum, Inc.*, 278 F.3d
1366, 1377 (Fed. Cir. 2002); *Minco, Inc.v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1120
(Fed. Cir. 1996); *BIC Leisure Prods., Inc.v. Windsurfing In'l, Inc.*, 1 F.3d 1214, 1220
(Fed. Cir. 1993); *Kalmanv. Berlyn Corp.*, 914 F.2d 1473, 1485 (Fed. Cir. 1990).


**Defendants' Authorities:**

Federal Circuit Bar Assoc. Model Patent Jury Instructions (2016) and authorities cited
therein.
*Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l*, 246 F.3d 1336 (Fed. Cir.
2001); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1120 (Fed. Cir. 1996); *BIC
Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220 (Fed. Cir. 1993); *Volterra
Semiconductor Corp. v. Primarion, Inc.*, No. 08-CV-05129-JCS, 2013 WL 6905555, at
*25 (N.D. Cal. Nov. 18, 2013); *Ericsson, Inc. v. Harris Corp.*, No. 4:98CV325, 2001 WL
36131932, at *7 (E.D. Tex. Mar. 13, 2001);  *W.R. Grace & Co.--Conn. v. Intercat, Inc.*,
60 F. Supp. 2d 316, 327 (D. Del. 1999)

**Objections to Amgen's Proposed Instruction:**

Amgen's proposal fails entirely to instruct the jury that they must consider macroeconomic factors and how increased prices would affect the volume of sales. It discusses price erosion in terms of rebates, rather than selling prices.

**Amgen's Response to Defendants' Objections:**

Amgen's proposal is consistent with the Federal Circuit Bar Association Model Patent Jury Instruction on price erosion, which Defendants also rely upon. Defendants' proposal risks jury confusion because the list prices during the damages period are constant (with the exception of one minor increase to Repatha's list price). Instructing the jury on price erosion in the form of increased rebates is less likely to confuse the jury than instructing the jury on "higher prices" and risking confusion over gross and net price after rebates.

10. <u>**REASONABLE ROYALTY**</u>

If you find that Amgen has not proved that it is entitled to recover lost profits on **[[By Amgen:** one or more units of infringing sales; **By Defendants:** all or some portion of the infringing sales]]**, then you must award Amgen no less than a reasonable royalty to compensate for any portion of Sanofi and Regeneron's infringing sales for which you have not awarded lost profits.  **[[By Amgen:**  A reasonable royalty is not necessarily the actual measure of damages, but is merely the floor below which damages should not fall with respect to such units; **By Defendants:**  The patent law specifically provides that the amount of damages that Sanofi and Regeneron must pay Amgen for infringing Amgen's patents may not be less than a reasonable royalty for the use that Sanofi and Regeneron made of the patented invention.  Amgen bears the burden of proving what royalty rate is reasonable]]**.

A royalty is a payment made to Amgen in exchange for the right to make, use, or sell the claimed invention.  A reasonable royalty in this case is the amount of royalty payment that Amgen on the one hand and Sanofi and Regeneron on the other would have agreed to in a hypothetical negotiation taking place at a time prior to when infringement first began  (July 24, 2015).  In considering this hypothetical negotiation, you should focus on what the expectations of Amgen and Sanofi and Regeneron would have been had they willingly entered into an agreement at the time, and had they acted reasonably in their negotiations.  In determining this, you must assume that both sides believed the patent was valid and infringed.  You must also assume that the patent holder and infringer were both willing to enter into an agreement.

**[[By Amgen:**

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.

A reasonable royalty in this case is the amount of money that represents the value of the

claimed invention to the parties and represents fair compensation for use of the claimed invention.  One of the factors in determining the value of the claimed invention is the royalty that would be agreed to in a hypothetical arms-length negotiation between the patentee and the licensee, with both operating under the assumption that the negotiated patent is valid and is being infringed, *i.e.*, that absent the "reasonable royalty" payment, the licensee would respect the patent by not selling infringing anti-PCSK9 monoclonal antibodies. **;**

**By Defendants:**

In determining a reasonable royalty, you should place yourself at the time just before Sanofi and Regeneron's infringement began (July 24, 2015), which is when the hypothetical negotiation would have occurred.  In the hypothetical negotiation, you must assume that the person negotiating on behalf of Sanofi and Regeneron, who was willing to take a license, would have known that the patents in suit were valid, enforceable, and infringed.  You should also assume that both Amgen on the one hand and Sanofi and Regeneron on the other knew all the pertinent information at the time of the hypothetical negotiation.

The reasonable royalty you determine cannot be based on mere speculation or conjecture.  Rather, it must be a royalty that Amgen has proved would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred.  You may consider events and facts that occurred after the hypothetical negotiation took place. This is true even of subsequent events that could not have been known or predicted by the hypothetical negotiators, so long as the evidence aids in assessing what royalty would have resulted from the hypothetical negotiation.

Having that in mind, you may consider any relevant fact in determining the reasonable royalty for Sanofi and Regeneron's use of the patented invention.**]]**

**Amgen's Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.6 (2016) ("REASONABLE ROYALTY"); *Amgen Inc. v. Hospira, Inc.*, C.A. No. 15-839-RGA, D.I. 323, Final Jury Instructions, (Sept. 22, 2017); *E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, D.I. 325, Final Jury Instructions (May 15, 2017); *Boston Scientific Corp. v. Cordis Corp.*, C.A. No. 10- 315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011); *Callaway Golf Co. v. Acushnet Co.*, C.A. No. 06- 091-SLR, D.I. 606, Final Jury Instructions (Mar.  26, 2010).


**Defendants' Authorities:**
Federal Circuit Bar Assoc. Model Patent Jury Instructions (2016) and authorities cited therein.  *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 33 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009); *Amgen Inc. v. Hospira, Inc.*, 1:15-cv-839-RGA, D.I. 323, Final Jury Instructions at 29 (D. Del. Sep. 22, 2017).

**Objections to Amgen's Proposed Instruction:**
Amgen's proposal fails to adequately instruct on the consideration of events and facts that occurred after the hypothetical negotiation would have taken place.  It also fails to explain that Amgen bears the burden of proof as to what a reasonable royalty would be.

**Amgen's Response to Defendants' Objections:**
Consideration of events and facts that occurred after the hypothetical negotiation (*e.g.*, the impact of Defendants' infringement on payer negotiations) to inform the hypothetical negotiation analysis is improper in this setting, because the ultimate destructive impact that Defendants' infringement had on the market was not an "uncertainty" present at the hypothetical negotiation upon which later events shed light.  *See St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, 2004 WL 2213562, at *2 (D. Del. Sept. 28, 2004) (discussing the "book of wisdom" approach and explaining that "to correct uncertainty 'is not to charge the offender with elements of value nonexistent at the time of his offense.  It is to bring out and expose of light the elements of value that were there from the beginning") (quoting *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933)); *see also Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) (finding that district court "did err in treating the profits [Defendant] actually earned during the period of infringement as a royalty cap.  That treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened.").

## 11.    FACTORS FOR DETERMINING A REASONABLE ROYALTY

In determining the value of a reasonable royalty, you should consider all of the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors (often referred to as the *Georgia-Pacific* factors) that you may consider in this case are:

1.    Factor 1:  The royalties, if any exist, received by Amgen for licensing the patents in suit;

2.    Factor 2:  The rates paid by a licensee for the use of other patents comparable to the patents in suit;

3.    Factor 3:  The nature and scope of the license, such as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory;

3.    Factor 4:  Whether Amgen had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity;

4.    Factor 5:  The commercial relationship between the Amgen and Sanofi and Regeneron, such as whether they are competitors in the same territory in the same line of business, or whether they are [[**By Amgen:** inventor and promoter; **By Defendants:** inventors or promoters]];

6.    Factor 6:  The effect of selling the patented product in promoting sales of other products of Sanofi and Regeneron, the existing value of the invention to Amgen as a generator of sales of its non-patented items, and the extent of such collateral sales;

7.    Factor 7:  The duration of the patents in suit and the term of the hypothetical license;

8.    Factor 8:  The established profitability of the patented products, their commercial

success, and their current popularity;

9.      Factor 9:  The utility and advantages of the patented invention over the old modes

or devices, if any, that had been used for working out similar results;

10.     Factor 10:  The nature of the patented invention, the character of the commercial

embodiment of it as owned and produced by the Amgen, and the benefits to those

who have used the invention;

11.     Factor 11:  The extent to which **[[By Amgen:** the infringers (Sanofi and

Regeneron)**; By Defendants:** Sanofi and Regeneron**]]** have made use of the

invention, and any evidence probative of the value of that use;

12.     Factor 12:  The portion of the profit or of the selling price that may be customary

in the particular business or in comparable businesses to allow for the use of the

invention or analogous inventions;

13.     Factor 13:  The portion of the realizable profit that should be credited to the

invention as distinguished from non-patented elements, the manufacturing

process, business risks, or significant features or improvements added by **[[By

Amgen:** the infringer (Sanofi and Regeneron); **By Defendants:** Sanofi and

Regeneron**]]**;

14.     Factor 14:  The opinion testimony of qualified experts; and

15.     Factor 15:  The amount that a willing licensor (such as Amgen) and a willing

licensee (such as Sanofi and Regeneron) would have agreed upon (at the time the

infringement began) if both had been reasonably and voluntarily trying to reach an

agreement; that is, the amount that a prudent licensee (here, Sanofi and Regeneron)—

who desired, as a business proposition, to obtain a license to manufacture and sell a

particular article embodying the patented invention—would have been willing to pay

as a royalty and yet be able to make a reasonable profit and which amount would

have been acceptable by a prudent patentee (here, Amgen) who was willing to grant a

license.

No one factor is dispositive and you can and should consider the evidence that has been

presented to you in this case on each of these factors.  You may also consider any other factors

which in your mind would have increased or decreased the royalty **[[By Amgen:** the infringer

(Sanofi and Regeneron); **By Defendants:** Sanofi and Regeneron**]]** would have been willing to

pay and **[[By Amgen:** the patent holder (Amgen); **By Defendants:** Amgen]] would have been

willing to accept, acting as normally prudent business people.  The final factor establishes the

framework which you should use in determining a reasonable royalty, that is, the payment that

would have resulted from a negotiation between Amgen and Sanofi and Regeneron taking place

at a time prior to when the infringement began (July 24, 2015).

**Amgen's and Defendants' Authorities:**
*Amgen Inc. v. Hospira, Inc.*, C.A. No. 15-839-RGA, D.I. 323, Final Jury Instructions
(Sept. 22, 2017); *E.I. Du Pont de Nemours and Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA,
D.I. 325, Final Jury Instructions (May 15, 2017); *Boston Scientific Corp. v. Cordis Corp.*, C.A.
No. 10- 315-SLR, D.I. 189, Final Jury Instructions (May 10, 2011); *Callaway Golf Co. v.
Acushnet Co.*, C.A. No. 06-091-SLR, D.I. 606, Final Jury Instructions (Mar.  26, 2010).

Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 6.7 (2016).

## 12.     USE OF COMPARABLE LICENSE AGREEMENTS (DEFENDANTS' PROPOSAL)

When determining a reasonable royalty, you may consider evidence concerning the amounts that other parties have paid for rights to the patents in question, or for rights to similar technologies.  An agreement need not be perfectly comparable to a hypothetical license that would be negotiated between Amgen and Sanofi and Regeneron in order for you to consider it. However, if you choose to rely upon evidence from any other agreements, you must account for any differences between those agreements and the hypothetically negotiated license between Amgen and Sanofi and Regeneron, when you make your reasonable royalty determination.

**Authorities:**
AIPLA Model Patent Jury Instructions § 11.21 (2018) and authorities cited therein.

**Objections to Defendants' Proposed Instruction:**
Amgen objects to the inclusion of an instruction on comparable licenses on the basis that Defendants' damages expert provided no opinion on comparable licenses.  Instead, Defendants' expert uses two highly non-comparable licenses as a "reasonableness check," on her analysis.  *See M2M Solutions LLC v. Enfora, Inc.*, 167 F.Supp.3d 665, 678 (D. Del. 2016) ("I find little merit in Defendants' argument that Dr. Choi can use incomparable licenses in his reasonable royalty analysis if he only uses them as a 'sanity check,' rather than using them to drive the analysis.  Federal Circuit precedent requires that for a license to be used in a damages analysis, the license must be proven comparable to the hypothetical negotiation.").  Defendants' expert acknowledges that she does not rely on any comparable licenses in her analysis.  Mulhern Dep. at 327:17-24 ("Q.  You do not rely on any licenses as comparable licenses in connection with your royalty analysis; is that correct?  A.  I do not rely on any comparable licenses in arriving at my royalty rate.  I do however consider evidence regarding licenses for therapeutic antibodies in -- in conducting a reasonableness check on the royalty rate.").

**Defendants' Response to Amgen's Objection:**
While Ms. Mulhern does not rely on comparable licenses in arriving at her royalty rate rebuttal opinion, she does consider them as a reasonableness check on the royalty rate she calculates, as noted in the portion of her deposition cited in Amgen's objection.  She may testify as such at trial, and accordingly the jury should be instructed as to how to consider comparable licensing agreements during its deliberations.

13.      **WILLFULNESS**

[**By Amgen:**

Willfulness requires you to determine whether Amgen proved by a preponderance of

evidence – that is, that it is more likely than not – that Sanofi and Regeneron knew of Amgen's

patent rights and intentionally infringed at least one asserted claim. You may consider whether

Sanofi and Regeneron's behavior was malicious, wanton, deliberate, consciously wrongful,

flagrant, or in bad faith.  However, you may not find that Sanofi and Regeneron's infringement

was willful merely because Sanofi and Regeneron knew about Amgen's patents, without more.

To determine whether Sanofi and Regeneron acted willfully, you must consider all of the

circumstances and assess Sanofi and Regeneron's knowledge at the time the infringement

occurred.  If you determine that infringement was willful, you may not allow that decision to

affect the amount of the damages award you give for infringement.[8]**;**

**By Defendants:**

Amgen is alleging that Sanofi and Regeneron willfully infringed the patents in suit.  You

are to decide whether Sanofi and Regeneron's infringement was willful.  The term willfulness in

the context of a patent case may not have the same meaning as it would to you in everyday

conversation.  You may not determine that the infringement was willful just because Sanofi and

Regeneron may have known about Amgen's patents, without more.  In the context of a patent

case, a finding of willful infringement is reserved for only the most egregious of conduct, such as

---

[8] **Defendants' Objection to Amgen's Instruction:** Defendants object to Amgen's proposal on
the basis that it: (1) Fails to explain that a finding of willfulness is reserved for only the most
egregious of cases; (2) Fails to provide any guidance to jurors as to factors they may consider in
evaluating willfulness; (3) Fails to provide any guidance to jurors regarding how to consider the
stipulation to infringement; (4)  Fails to provide guidance as to the import of relying upon an
opinion of counsel; (5) Does not adequately impress upon the jury that it cannot increase
damages based on a finding of  willfulness cannot increase damages; and (6) Fails to take into
account that one cannot willfully infringe a patent application.

where the infringement is wanton, malicious, committed in bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.  It is Amgen's burden to prove, by a preponderance of the evidence, that Sanofi and Regeneron's conduct rises to this level of egregiousness to constitute willful infringement.

To determine whether Sanofi and Regeneron acted willfully, you should consider all of the facts and circumstances, as well as Sanofi and Regeneron's knowledge and beliefs at the time the infringement first occurred.  These may include, but are not limited to:

1.      Whether or not Sanofi and Regeneron acted consistently with the standards of behavior for the industry;

2.      Whether Sanofi and Regeneron developed their antibody known as Praluent independently rather than by intentionally copying Amgen's patents;

3.      Whether or not Sanofi and Regeneron reasonably believed that Amgen's patents were invalid;

4.      Whether or not Sanofi and Regeneron tried to cover up their infringement.

Sanofi and Regeneron contend that their conduct was not willful because they relied on a lawyer's opinion that the patents in suit were invalid.  In considering the totality of the circumstances as to whether Sanofi and Regeneron acted willfully, you may consider as one factor whether Sanofi and Regeneron reasonably relied on a competent legal opinion that Amgen's patents were invalid.

The fact that Sanofi and Regeneron stipulated to infringement is not the same as an admission that they willfully infringed.  It is simply an agreement for purposes of the litigation that Praluent comes within the scope of Amgen's patents.

Whether or not Sanofi and Regeneron's infringement was willful may not influence in

any way the amount of damages, if any, that you award to Amgen.  Your determination

regarding whether or not there was willful infringement will be considered by me for other

issues, but you are not to increase or decrease your award to Amgen based on whether or not you

find that Sanofi and Regeneron willfully infringed.[9]]

**Amgen's Authorities:**
*Halo Elecs., Inc. v. Pulse Elecs.*, 136 S. Ct. 1923, 1932 (2016); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016); Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 3.10 (2016); AIPLA Model Patent Jury Instruction 11.0 (2018).  *See also Nox Medical EHF v. Natus Neurology*, C.A. No. 15-709-RGA, D.I. 259, Final Jury Instructions (May 7, 2018); *GlaxoSmithKline LLC v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 14-878-LPS-CJB, D.I. 440, Final Jury Instructions (June 19, 2017).

**Defendants' Authorities:**
Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 3.10 (2016) (citing 35 U.S.C. § 284; *Halo Elecs., Inc. v. Pulse Elecs.*, 136 S. Ct. 1923, 1932 (2016); WMS Gaming Inc. v. Int'l Game Tech, 184 F.3d 1339, 1354 (Fed. Cir. 1999); Read Corp. v. Portec, Inc., 970

---

[9] **By Amgen:** Amgen objects to Defendants' proposal on the basis that Defendants stipulated to infringement and are, therefore, not merely accused infringers. Amgen further objects to Defendants' proposal insofar as it deviates from the form on which it is purportedly based by omitting the factor that considers whether the infringer made a good-faith effort to avoid infringement.  Amgen further objects to Defendants' proposal insofar as it improperly treats "independent development" and "copying" as an either/or proposition, ignoring the evidence in this case that Defendants' development was substantially guided by their review of Amgen's PCSK9 program.  **By Defendants: (1)** Defendants' instruction does not state that they are merely "accused infringers." Amgen's objection on this point is therefore misplaced.  **(2)** Defendants further respond that the Committee Comments to the Fed. Cir. Bar Ass'n Model Patent Jury Instructions § 3.10 (2016) provide that "It is the Committee's view that to the extent the court decides to provide a list of factors for the jury's consideration . . . , only the factors for which there is evidentiary support should be included."  Due to the purely functional nature of Amgen's patent claims which encompass any PCSK9 antibody that works without regard to structure, the factor of good faith effort to avoid infringement is irrelevant and would be misleading to the jury. **(3)** Defendants further respond that given the indisputable evidence that alirocumab was independently developed before Defendants learned of Amgen's patent applications, it is necessary to include "independent development" as an alternative "copying" in the jury instructions to explain the significance of this fact.  There is no case law or evidentiary support for a third category of conduct apart from "independent development" and "copying."  Amgen's objection also ignores that its own PCSK9 program involved the copying of Defendant' alirocumab, Merck's 1D05 and AX132, and Pfizer's J16 antibody.  The evidence Amgen refers to is entirely irrelevant to willful infringement.

F.2d 816 (Fed. Cir. 1992); 35 U.S.C. § 298); AIPLA Model Patent Jury Instructions §§ 11.0-11.1 (2018) (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016); *WesternGeco L.L.C. v. Ion Geophysical Corp.*, No. 2013-1527 (Fed. Cir. Sept. 21, 2016); *WBIP, LLC v. Kohler Co.*, No. 2015-1038, 2016 WL 3902668, at *15 (Fed. Cir. July 19, 2016); 35 U.S.C. § 298; *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347-48 (Fed. Cir. 2011); *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1313 (Fed. Cir. 2010); *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc)).

*Nox Medical EHF v. Natus Neurology*, C.A. No. 15-709-RGA, D.I. 259, Final Jury Instructions (May 7, 2018); *Evonik Degussa GmbH v. Materia, Inc.*, C.A. No. 09-636-NLH/JS, D.I. 903, Final Jury Instructions (Jan. 30, 2017); *Green Mountain Glass, LLC v. Saint-Gobain Containers, Inc.*, C.A. No. 14-392-GMS, D.I. 238, Final Jury Instructions (April 21, 2017); *Idenix Pharmaceuticals LLC v. Gilead Sciences, Inc.*, C.A. No. 14-846-LPS, D.I. 516, Final Jury Instructions (Dec. 15, 2016); *GlaxoSmithKline LLC v. Teva Pharmaceuticals USA, Inc.*, C.A. No. 14-878-LPS-CJB, D.I. 440 at 32, Final Jury Instructions (June 19, 2017).

**14.**   <u>**DELIBERATION AND VERDICT**</u>

## INTRODUCTION

Let me finish up by explaining some things about your deliberations in the jury room, and your possible verdicts.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else except each other about the case.  If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer.  The officer will give them to me, and I will respond as soon as I can.  I will have to talk to the lawyers about what you have asked, so it may take me some time to get back to you.  Any questions or messages normally should be sent to me through your foreperson, who by custom of this Court is the juror seated in the first seat, first row.

One more thing about messages.  Do not ever write down or tell anyone how you stand on your votes.  For example, do not write down or tell anyone that you are split 4-4, or 6-2, or whatever your vote happens to be.  That should stay secret until you are finished.

15.     **UNANIMOUS VERDICT**

Your verdict must represent the considered judgment of each juror.  In order for you as a jury to return a verdict, it is necessary that each juror agree to the verdict.  Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without **[[By Amgen:** violence to your individual judgment; **By Defendants:**  surrendering your honest conviction[10]**]]**.  Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion, if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the purpose of returning a verdict.  Remember at all times that you are judges—judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

A form of verdict has been prepared for you.  The verdict form asks you a series of questions about the parties' claims.  Unless you are directed otherwise in the form of the verdict, you must answer all of the questions posed, and you all must agree on each answer.  When you have reached a unanimous agreement as to your verdict, you will return your verdict to the courtroom deputy.

It is proper to add the caution that nothing said in these instructions and nothing in the form of verdict is meant to suggest or convey in any way or manner what verdict I think you

---

[10] Defendants propose this alteration of the instruction given during the first liability trial in both the liability instructions and these damages/willfulness instructions because it uses language that jurors are likely to better understand.  Amgen objects to Defendants proposed change of this language because it is unnecessary and does not 'reflect new developments in the law or the record at trial, and the reassignment of the case to Judge Andrews."  *See* D.I. 458, Scheduling Order at ¶ 15.

should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the

jury.

16.    **DUTY TO DELIBERATE**

Now that all of the evidence is in and the arguments are completed, you are free to talk about the case in the jury room.  In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement.  Talk with each other, listen carefully and respectfully to each other's views and keep an open mind as you listen to what your fellow jurors have to say.

Try your best to work out your differences.  Do not hesitate to change your mind if you are convinced that other jurors are right and your original position was wrong.  But do not ever change your mind just because other jurors see things differently, or just to get the case over with.  In the end, your vote must be exactly that—your own vote.  It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conscience.

If any member of the jury took notes, let me remind you that notes are not given any greater weight than the memory or impressions of each juror as to what the testimony may have been.  Whether you took notes or not, each of you must form and express your own opinion as to the facts of the case.

No one will be allowed to hear your discussions in the jury room, and no record will be made of what you say.  So you should all feel free to speak your minds.

Listen carefully to what the other jurors have to say, and then decide for yourself.

We generally end our business day at 4:30 p.m.  If we do not hear from you by 4:30, I will send you a note to see whether you are close enough to a verdict to want to deliberate after 4:30 or whether you are going to recess for the evening and resume your deliberations on the next business day.  You will need to respond in writing to that question.

I am going to remind you now, if you go home this evening and resume your deliberations on the next business day, you are not to talk about the case among yourselves or with anyone else during the evening recess.  You may not read or listen to any news about the case in a newspaper, online, through any news apps, on the radio, through any social media, in blogs, or on television during the evening recess.

You may talk about the case only while you are in the jury room and everyone on the jury is present.  Unless I hear from you that you have a different schedule in mind, I will expect you to all come back the next business day at 9:30.  You are not to start deliberating until you are all present in the jury room and participating together.

Because the lawyers have to make themselves available to respond to questions or receive the verdict, I generally give them between 12:30 and 1:30 to step away from the phone.  So whenever you are deliberating over the lunch hours, let me remind you, if you ask a question during that time, you probably will not get an answer right way because we are all going to be stepping away from our phones.

**17.**     **<u>COURT HAS NO OPINION</u>**

Let me finish up by repeating something that I said to you earlier.  Nothing that I have said or done during this trial was meant to influence your decision in any way.  You must decide the case for yourselves based on the evidence presented.

Finally, if I have read any of these instructions inconsistently with the written text, you are to rely on the written instructions in your deliberations.