1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4    AMGEN INC,; AMGEN MANUFACTURING,)
     LIMITED; and AMGEN USA INC.,    )
5                                    )
                     Plaintiffs,     )
6                                    ) C.A. No. 14-1317-RGA
     v.                              ) (CONSOLIDATED)
7                                    )
     SANOFI; SANOFI-AVENTIS U.S. LLC;) JURY TRIAL DEMANDED
8    AVENTISUB LLC, f/d/b/a AVENTIS  )
     PHARMACEUTICALS INC., and       )
9    REGENERON PHARMACEUTICALS, INC.,)
                                     )
10                   Defendants.      )

11                                       J. Caleb Boggs Courthouse
                                         844 North King Street
12                                       Wilmington, Delaware

13                                       Tuesday, February 19, 2019
                                         9:11 a.m.
14                                       Trial Volume I

15   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16   APPEARANCES:

17              YOUNG CONAWAY STARGATT & TAYLOR, LLP
                BY:  MELANIE K. SHARP, ESQUIRE
18              BY:  MICHELLE M. OVANESIAN, ESQUIRE

19                      -and-

20              LONDON & MEAD
                BY:  CHRISTOPHER B. MEAD, ESQUIRE
21
                        -and-
22
                MCDERMOTT WILL & EMORY
23              BY:  WILLIAM G. GAEDE, III, ESQUIRE
                BY:  SARAH C. COLUMBIA, ESQUIRE
24

25                      -and-

1    APPEARANCES CONTINUED:

2                CRAVATH SWAINE & MOORE LLP
                 BY:  KEITH R. HUMMEL, ESQUIRE
3
                                   For the Plaintiffs
4

5                WILKS LUKOFF & BRACEGIRDLE, LLC
                 BY:  DAVID E. WILKS, ESQUIRE
6                BY:  SCOTT CZERWONKA, ESQUIRE

7                          -and-

8                ARNOLD & PORTER
                 BY:  MATTHEW M. WOLF, ESQUIRE
9                BY:  DAVID K. BARR, ESQUIRE
                 BY:  ANNE PEARLMAN, ESQUIRE
10
                           -and-
11
                 STEPTOE & JOHNSON LLP
12               BY:  JOHN MOLENDA, ESQUIRE

13                         -and-

14
                                   For the Defendants
15
                      ***  PROCEEDINGS  ***
16

17               THE COURT:  All right.  Good morning, everyone,

18   please be seated.  So welcome everyone.  So I got

19   preliminary jury instructions submitted by one side or the

20   other last night or this morning that said Amgen was going

21   with two less claims.  I don't know who submitted that, but

22   do both sides agree that is where we stand now and I should

23   use those preliminary jury instructions?

24               MR. WOLF:  Yes, Your Honor.

25               MS. SHARP:  Yes, Your Honor.

```
 1              THE COURT:  Thanks.  The other thing that I was
 2   curious about -- well, so then a second thing, in terms of
 3   the voir dire, thank you for submitting the modified
 4   attorneys and witness list.  Would counsel like to do the
 5   attorney portion in terms of, you know, somebody saying, you
 6   know, here are the attorneys on our side, here are the
 7   attorneys on your side, and perhaps just having them stand
 8   up as opposed to me just reading the names?
 9              MS. SHARP:  Yes, Your Honor.
10              MR. WOLF:  That's fine, Your Honor.  Your Honor,
11   voir dire, we actually have a list of the jurors from last
12   time.  And it occurred to us that perhaps we should read
13   this into the do you know posts just in case their neighbor
14   was a prior juror in a prior case.
15              THE COURT:  Don't we have that in terms of have
16   you heard anything about this case?
17              MR. WOLF:  We do, if that's sufficient.  We just
18   thought as a belt and suspenders.  It's up to Your Honor.
19              THE COURT:  Sure.  I'll do that.
20              MR. WOLF:  May I approach?
21              THE COURT:  When I read the names of these
22   people, what am I going to describe them as, here are just
23   some random Delawareans, do you know them?
24              MR. WOLF:  So potential witnesses.
25              THE COURT:  I don't want to call them potential
```

1    witnesses because if they do know them, they'll know I'm a

2    liar.

3                    MR. WOLF:  Interested party?  What's a good way

4    to phrase it?

5                    MS. SHARP:  This is the first I'm hearing it, so

6    I'm thinking about it as we're standing here.

7                    THE COURT:  I guess I could just ask the

8    stand-alone question, do you know any of these people

9    without bothering to tell them why I'm asking.

10                    MS. SHARP:  Right.

11                    THE COURT:  I'll do that.

12                    MR. WOLF:  Thank you, Your Honor.

13                    THE COURT:  So you may have some things you want

14    to bring up.  One of the things that I did just want to

15    bring up was this, essentially, which is as you -- at least

16    some of you may know, there is a -- I think, I haven't

17    checked very recently, but a winter storm watch for

18    tomorrow.  And I was wondering whether it made sense to just

19    plan if that's going to happen and not have trial tomorrow

20    as opposed to waiting to see what the chief judge decides

21    tomorrow morning at 6:00 a.m., and if he decides to have

22    trial, having -- or decides the courthouse is open, which he

23    might, the weather forecast could change, and then perhaps

24    having it then be closed at some point during the day, I

25    don't know.  Do you all have any reaction to that?

1      MR. WOLF:  Your Honor, we certainly have been

2  monitoring as well and it looks like it's getting more

3  certain and worse by the hour.  So given the likelihood that

4  some of the jurors will be coming from some distance,

5  probably not the best thing to leave uncertainty out there,

6  but I leave it to the discretion of the Court on how you

7  want to handle it.

8      MS. SHARP:  I also leave it to discretion of the

9  Court, but it seems to make sense to let people know in

10  advance.  We would agree if the Court is inclined to say

11  we're canceled for tomorrow.

12      MR. WOLF:  Agreed, tomorrow.

13      THE COURT:  Then that would bring up a second

14  question, or second issue which might be brought up anyhow,

15  which is kind of the way that I imagined this going, given

16  the amount of time each side has, and how long it takes to

17  do various things, I sort of thought that we would be in a

18  position to have the closing arguments at the end of day

19  three, in other words, on the original schedule Thursday.

20  Now that would be Friday.  I take it both sides are planning

21  on using their full seven hours?

22      MR. WOLF:  That's relatively safe assumption,

23  Your Honor.

24      MS. SHARP:  Yes.

25      THE COURT:  So then there is a question of if we

1    did that, would you want to say okay, well, we'll finish

2    Friday whenever we finish and then we will have closing

3    arguments on Monday morning?

4              MR. WOLF:  I think that would be helpful, yes,

5    Your Honor.

6              MR. HUMMEL:  That would be fine, Your Honor.

7              MS. SHARP:  Your Honor, I had something on what

8    was handled, there are two additional voir dire questions

9    and we would object to that.

10             MR. WOLF:  Your Honor, that was just a left

11   over.

12             THE COURT:  Good.  All right.  Well, then, back

13   there, that main point for right now when we're picking the

14   jury, I'll tell them we're not going to have trial tomorrow,

15   and that I will say essentially that they need to not go on

16   vacation until at least next Tuesday.

17             I think that's all that I have.  What do you all

18   have?

19             MR. WOLF:  Your Honor, we exchanged objections

20   last night to openings and we received objections to 95

21   percent of our slides.  We have tried to resolve the ones

22   about the color scheme of certain slides or the size of

23   certain cartoons and we'll try not to bring those to Your

24   Honor's attention and resolve them between the parties.

25   There is, however, at least there are, however, at least a

1   couple of fundamental issues that need to be addressed at

2   Your Honor's convenience.

3          THE COURT:  Well, convenience is in the next

4   seven minutes.

5          MR. WOLF:  So, Your Honor, most significantly is

6   a question of what to do about post priority documents.  We

7   thought Your Honor made it clear in your motions in limine,

8   and we have five or six exhibits that we intend to use in

9   opening.  These are internal Amgen documents, discussions

10  among the inventors in the years, the few years after the

11  filing.  There are a blizzard of objections to those,

12  hearsay which makes no sense, the party opponent admission,

13  relevance which makes no sense.  If I can just give you one

14  example, Your Honor.

15         THE COURT:  Yes.

16         MR. WOLF:  Can we call up 81.

17         MS. SHARP:  Your Honor, I just propose that it

18  might make sense since we're moving to exclude them if we

19  present it first.

20         THE COURT:  Well, it might make sense.  So

21  because basically I'm going to rule on a few of these and

22  then I'm going to let whatever else is in.  Why don't we go

23  with the plaintiff since they're the ones who are objecting.

24         MR. WOLF:  Very good, Your Honor.

25         THE COURT:  All right.  Remind me who you are.

```
 1                    MR. GAEDE:  Yes, Your Honor.  Bill Gaede, Your

 2      Honor.

 3                    THE COURT:  Okay.  Sorry.

 4                    MR. GAEDE:  Your Honor.  May I hand up a package

 5      of documents, please?

 6                    THE COURT:  Sure.

 7                    MR. GAEDE:  Thank you.  And Your Honor, what you

 8      have is a slide deck, and a couple documents that they have

 9      cited they want to show.  And in their documents, I would

10      just turn -- I put a star next to Page 22.

11                    THE COURT:  I see a star.  Yes.

12                    MR. GAEDE:  Okay.  And this is just part of

13      their timeline.  And what's the problem here?  What you see

14      is, of course, we're in a trial for written description and

15      enablement.

16                    MR. WOLF:  I don't have a star.  Which one are

17      we talking about?

18                    MR. GAEDE:  Page 22.

19                    THE COURT:  I'm not sure the pages are numbered.

20      Oh, yes.

21                    MR. GAEDE:  Down at the bottom they are.

22                    THE COURT:  Sorry.

23                    MR. GAEDE:  And it's Slide 22.  Sorry about

24      that.

25                    THE COURT:  Yeah.  Yeah.
```

1          MR. GAEDE:  So what's going on here is that, of

2    course, this is a trial for written description and

3    enablement.  And the question is Amgen's written

4    description, and this patent filed -- application filed as

5    of January 9th, 2008, does that satisfy those requirements?

6          This slide illustrates two issues that are

7    fundamental.  First, on the far right, you can see that

8    they're trying to use the fact that Amgen began to add

9    claims in 2013.

10         THE COURT:  All right.  You don't have to say

11   anymore.

12         MR. GAEDE:  Yeah.

13         THE COURT:  Twenty-two is out.  I mean, it just

14   suggests that they're busy copying your claims.

15         MR. GAEDE:  Yes.

16         THE COURT:  So --

17         MR. GAEDE:  And that's impermissible.

18         THE COURT:  -- there isn't copying of

19   defendants' claims, so anything along those lines is out.

20   What else do you have?

21         MR. GAEDE:  Thank you.  So Your Honor, as to the

22   documents, if you look in the package I just gave you --

23         THE COURT:  Yeah.

24         MR. GAEDE:  -- and I believe that you have their

25   DTX.  The first one should be --

```
 1                    THE COURT:  By the way, just to be clear, the
 2      last thing --
 3                    MR. GAEDE:  Yeah.
 4                    THE COURT:  -- I'm not saying that Amgen
 5      documents about their own problems, if they have some of
 6      making the antibodies according to the claim, I'm not saying
 7      they're out.  But something that's suggesting that the
 8      plaintiff, that Amgen, the patents are basically copies of
 9      what their competitors were doing, I don't think, in fact,
10      that when the patents actually issued makes any actual
11      difference.
12                    MR. GAEDE:  Sure.  And black letter Federal
13      Circuit law establishes that claims, even if what's true,
14      which isn't true here, but even if it were true black letter
15      Federal Circuit law establishes that there's nothing
16      untoward about it.  Essentially they're trying to raise the
17      issue.
18                    THE COURT:  Yeah, so I already ruled in your
19      favor.
20                    MR. GAEDE:  All right.  Thank you.
21                    The next one is 2010 -- 2012.  They say Amgen
22      studies --
23                    THE COURT:  I'm sorry.  What page number is
24      this?
25                    MR. GAEDE:  Same -- sorry.  The same slide, Your
```

1   Honor.  If you look in the middle there, this is the second

2   issue --

3           THE COURT:  Okay.

4           MR. GAEDE:  -- and they cite some documents.

5   And they cited -- they cited additional documents to us.

6   And as Your Honor will recall, there was a ruling on the --

7   Amgen moved to exclude evidence of the development of the

8   catabolic antibodies, and it was undisputed as reflected in

9   your order that "and it is undisputed."  This is DI-6737.

10          "And it is undisputed that the goal of the

11  research program was to identify catabolic antibodies and

12  not antibodies within specific genus."

13          And, therefore, Your Honor -- and your ruling

14  excluded evidence of the research program as irrelevant to

15  the issue of enablement.  And if you see, for example, the

16  first document that I gave you, DTX-3121, and if you look

17  right there on the third line --

18          THE COURT:  Wait a second.  So DTX-3121, that's

19  not one of the things that's pictured on this Slide 22.

20          MR. GAEDE:  Yes.  I'll get to that in one

21  second, if I could, Your Honor.

22          THE COURT:  Okay.

23          MR. GAEDE:  But as you see right there, it

24  refers to catabolics on the third line of the document.

25  This is another document they identified they want to show

1    to the jury.  It's not identified in the specific slide.  If

2    you go, Your Honor, to the next document, which is DTX-3221,

3    which is expressly identified in the slide.

4            And if I may, Your Honor, they like the second

5    page there.  But if you look to the third page of the

6    document at DTX-3121 of 8, it expressly references here the

7    catabolic effort.  Do you see that?

8            THE COURT:  I do see it.

9            MR. GAEDE:  Okay.  And so what's wrong here?

10   And you can look at other documents, but what's wrong here?

11   So the Court has excluded evidence of the catabolic program,

12   and they're seeking to use the documents in the catabolic

13   program to say this:  We studied competitors' antibodies.

14   So let me address that issue.

15           First, the catabolic has been excluded for

16   purposes of enablement.  There's no question these are

17   documents on their face from the catabolic.

18           Secondly, the Court did issue its order that

19   said that post-priority antibodies discovered by Amgen after

20   the date is relevant to the issue of written description.

21   Now, Your Honor, the Court may recall that the Amgen

22   decision talked about species.

23           THE COURT:  Yes.

24           MR. GAEDE:  So is it an antibody discovered by

25   Amgen in the course of its program?  That antibody which

```
1    there is one, we're not disputing that they can show.  But

2    what they're doing is using the development documents to try

3    to show a lack of antibodies.  And that's contrary to the

4    Federal Circuit opinion and your order which said you can

5    show a species and evidence of an affirmative antibody

6    discovered by Amgen.  That is not what is here and is part

7    of the catabolic program.

8              So it fundamentally violates -- A, it's not

9    relevant to the issue of written description.  B, it's going

10   to mislead and prejudice the jury.

11             THE COURT:  Okay.  I get what you're saying.

12   What does Mr. Wolf have to say?

13             MR. GAEDE:  All right.

14             MR. WOLF:  Your Honor, it is hard to imagine

15   anything more probative of the issue of written description

16   in the document we're referring to, if we can call up

17   Exhibit 3193.

18             THE COURT:  Okay.  Well, that's not the one that

19   I was just pointed to, is it?

20             MR. WOLF:  This is in one of those that was in

21   the chart, Your Honor.  The one --

22             THE COURT:  Right.  But it's hard for me to rule

23   when they pointed out to one thing, and you're now pointing

24   out to something else.  What about the thing that they

25   pointed out?
```

1           MR. WOLF:  I'm not even sure what they pointed

2      out.

3           THE COURT:  I think it was DTX-3121.

4           MR. WOLF:  We're not going to use that, Your

5      Honor, so that was a non-issue, but let's look at 3193.

6           THE COURT:  Well, yeah.  Okay.

7           MR. WOLF:  This is on the slide that we gave

8      you.

9           THE COURT:  Yeah.  Yeah.  No, I can't actually.

10     Yeah, okay.  With my x-ray vision, I can just make it out.

11          MR. WILKS:  We see an email from Chadwick King

12     who is one of the inventors.  So he's an inventor on the

13     patent.  And so he says about four lines down, and this is

14     in 2012, We currently do not have an EGFa mimic antibody

15     identified, but Pfizer does so it should be possible RN316.

16          Next paragraph, It will be tricky to find the

17     EGFa mimic because it is in the middle of two overlapping

18     epitopes we currently have antibodies sitting on.  So we

19     have four years after the patent was filed, one of the

20     inventors --

21          THE COURT:  All right.  So hold your thought

22     there.  What do you have to say about that, Mr. Gaede?

23          MR. GAEDE:  Sure.  Two things.

24          First of all, the document that he's referring

25     to isn't cited in his expert report for support of written

1    description.

2              Secondly, what you have here is a document in

3    2012 in which it's discussing the EGFa and the research

4    that's going on at Amgen.  It's part of the research

5    document that is going to the catabolic which is undisputed

6    as a later state of the art.  As we have said all along,

7    we're not saying that evidence that the Pfizer antibody, the

8    species cannot be raised by them for purposes of written

9    description.  And that's what the Federal Circuit says is a

10   species because this is a composition of matter claim.  Is

11   that species represented in the four corners of the written

12   description of the patent application --

13             THE COURT:  So --

14             MR. GAEDE:  -- that was filed in January of

15   2008.

16             THE COURT:  So I don't know what they're talking

17   about here, but if they're talking about, is the RN316 a

18   thing?

19             MR. WOLF:  RN316.

20             MR. GAEDE:  RN316 is their antibody.

21             THE COURT:  Pfizer antibody.

22             MR. GAEDE:  I'm sorry, Pfizer, sorry.

23             THE COURT:  So is that within the genus?

24             MR. WOLF:  Yes, Your Honor.

25             THE COURT:  Yes.

1          MR. GAEDE:  If they meet their burden of proof,

2    yes.

3          THE COURT:  Okay.  All right.  So they can talk

4    about this, right, I mean, they can say here it is.  I mean,

5    you know --

6          MR. GAEDE:  Here is the issue, Your Honor.  If

7    we go into not just saying here is this species, this

8    composition of matter called the Pfizer antibody which the

9    Federal Circuit said may be relevant, now we're into the

10   catabolic research program and we're going to have to go

11   into and undo your MIL around the catabolic program and go

12   into all the evidence to show the jury why it's misleading

13   for them to contend that somehow this is a reflection of a

14   lack of an antibody.  The question is an antibody

15   representative of the scope of the genus of the claims that

16   are described in the application itself.

17         THE COURT:  So presumably before you get into

18   all this stuff, their expert is going to say here is a bunch

19   that are within the genus and look at the problems they had

20   making them, right, is that what your expert is going to

21   say?

22         MR. GAEDE:  That is not what -- that is not,

23   Your Honor, in terms of making --

24         THE COURT:  Sorry, that's enablement, but

25   they're going -- I don't want to see stuff unless the expert

1    starts off by saying this is within the genus, because if

2    it's not within the genus, then we don't care about it.

3              MR. GAEDE:  Sure.  But, Your Honor, here is the

4    problem.  Every reference to any of an antibody that is out

5    there, a Pfizer antibody, for example, or a Merck antibody

6    leads us into the catabolic program which is a subsequent

7    state of the art.  And therefore, the other statements, the

8    fact that there is a reference to a composition of matter,

9    the composition of matter itself, is maybe relevant for

10   purposes of written description under the Federal Circuit

11   decision.

12             It says nothing about, here what this is about

13   is engineering and enhancing PH sensitivity.  That right

14   there is reference to the catabolic program.  And so we're

15   going to have to go into the whole catabolic program which

16   has been admitted by them to be a subsequent state of the

17   art which is not relevant to the issue of written

18   description and enablement for purposes of this trial.

19             And that second sentence right there, right past

20   the yellow one, the interest in this particular epitope is

21   that there are histidines present which potentially make it

22   a well-suited sight for engineering and enhancing pH

23   sensitivity which is part of the catabolic program.

24             MR. WOLF:  Your Honor, they're using catabolic,

25   this mantra of catabolic to undo the very reason we're back

1    in this Court from the Federal Circuit.  Pfizer had an

2    antibody within the scope of the claims that they admit they

3    concede was in the scope of the claims.  Here we have a

4    document four years after the fact with the inventor saying

5    we don't possess it.  That is powerful evidence that if you

6    didn't possess something in 2012, you didn't possess it in

7    2008.  They're going to have experts --

8             THE COURT:  All right.

9             MR. GAEDE:  A final point if I could, briefly.

10            THE COURT:  Yes.

11            MR. GAEDE:  I don't need the document to show

12    the Pfizer composition of matter, the antibody itself.  This

13    is going to lead us into the catabolic program and the jury

14    confusion and your order has excluded that.

15            THE COURT:  All right.  Hold on just a second.

16            MR. WOLF:  Your Honor, could I clarify one thing

17    just for the record.  I said we weren't using 3221, I meant

18    we weren't using 3121.

19            THE COURT:  That's what I understood you to be

20    saying.  Hold on just a minute.

21            All right.  Well so, I'm going to pick a jury

22    and then I will get back to you on this.  Let's take that

23    down.

24            MS. SHARP:  Your Honor, may I ask for a little

25    bit of procedural help.  We did a meet and confer last night

1    for two hours.  It might be helpful for us to know if any of

2    the slides have been pulled and we can narrow the issues in

3    that way.

4              THE COURT:  Well, you know, it is pretty

5    aggravating to like -- you know, do what you can.  But let's

6    get the jury picked.

7              MR. WOLF:  Your Honor, we have another issue

8    that's relevant to the jury itself which is the patent

9    video.  Amgen wants to cut various segments of the patent

10   video.

11             THE COURT:  I thought I saw that Judge Robinson

12   had decided over some dispute to resolve that.

13             MR. WOLF:  We're fine with Judge Robinson's

14   version of the patent video.

15             THE COURT:  Do we still have that versus hanging

16   around?

17             MS. MOSKOWITZ:  Your Honor, this is Lauren

18   Moskowitz.  We do have that version just in case but just to

19   explain where we were coming from, the reason that was

20   edited down was to remove irrelevant information and now on

21   remand we have another topic that's not relevant which is

22   obviousness, prior art, duty of candor.  There is no

23   inequitable conduct here.  We proposed an edited video to

24   remove that material and we have a video for that as well.

25             THE COURT:  No.  It's pretty ridiculous for you

1    to be arguing about this right now.  So we can either play

2    the version that Judge Robinson played or we can skip

3    playing it all together.  What do you want to do?

4              MR. WOLF:  We think it's important to play some

5    of it, at least given the background of the patent.

6              MS. MOSKOWITZ:  We'll present the video from

7    Judge Robinson.  Thank you, Your Honor.

8              THE COURT:  Thank you.  Let's get the jury in

9    here.

10             THE CLERK:  Just to give you all an update over

11   who is not here on the jury panel, if you want to mark these

12   accordingly.  Number 2.  Number 11.  Number 12.  Number 17.

13   Number 19, 29, 31, 32, 35, 39, and 44.

14             MS. SHARP:  I'm sorry, the last one?

15             THE CLERK:   44.

16             MS. SHARP:  Thank you.

17             THE CLERK:   You're welcome.

18             THE COURT:  Mr. Gaede, do you have a physical

19   copy of the letter you had up on the screen, one or the

20   other of you?

21             MR. WOLF:  I have a shortened version of it

22   here.  I can get you a hard copy of it.

23             THE COURT:  I was kind of hoping to have the

24   whole letter.

25             MR. WOLF:  We will.

1          MR. GAEDE:  Would it be helpful to have a copy

2    of your MIL rulings?

3          THE COURT:  No, I got that.

4          MR. GAEDE:  Okay.

5          THE COURT:  Thank you.

6          MR. WOLF:  Here you go, Your Honor.

7          THE COURT:  Thank you.

8          MR. WOLF:  May I approach?

9          THE COURT:  Yes.

10          All right.  Good morning, ladies and gentlemen.

11   My name is Richard Andrews.  I'm a judge at the District

12   Court here.  We're going to select a jury in a civil case

13   that's called Amgen versus Sanofi and Regeneron.  I'm going

14   to ask you a series of questions to help me and the

15   attorneys in the jury selection process, but before I ask

16   any questions, I'm going to ask the deputy clerk to swear

17   the entire jury panel to answer all questions truthfully.

18   Can we please swear the panel.

19          DEPUTY THE CLERK:  Members of the jury panel,

20   will you please rise and raise your right hand.  You and

21   each of you do solemnly swear, those of you who swear, and

22   you and each of you do affirm, those of you who affirm, that

23   you will true answer make to such questions as may be asked

24   you touching the matter now before the Court, so help you

25   God, those of you who swear and you do so affirm, those of

1    you who do affirm.

2              The correct response is I do.

3              JURY PANEL:  I do.

4              THE COURT:  So as I ask these questions, if you

5    answer yes to any of the questions, I want you to raise your

6    hand.  And then when I call on you to tell me your jury

7    number, I don't need an explanation.  I just need to know

8    whether you answered the question yes.

9              And at the end of all the questioning, the

10   Deputy Clerk is going to ask 14 of you to take seats in the

11   jury box to my left.  And those of you who answered yes to

12   one or more of the questions, I will ask to come over to

13   what we call the bench or side-bar over to my right to

14   discuss your answers with the lawyers and me.

15             So the presentation of evidence in this case is

16   expected to take up to three days, which will be today,

17   Thursday and Friday of this week, not tomorrow.  And then we

18   will have closing arguments on Monday morning.  And

19   depending on how long you deliberate, it could be that

20   you'll still be here on Tuesday.  So that's the days that

21   are involved.

22             During the days of evidence presentation later

23   today, and Thursday, and Friday, it will include a morning

24   break of 15 minutes, a lunch break of an hour, and an

25   afternoon break of 15 minutes.  We'll start at 9:30 a.m. and

1    finish no later than 5:00 p.m. each day.

2             So the first question is:  Does the schedule

3    that I've just mentioned present a special problem for you?

4    Okay.  Let's start in the first row in the corner.  You,

5    ma'am.

6             THE JUROR:  Number eight.

7             THE WITNESS:  A little louder.

8             THE JUROR:  Number eight.

9             THE COURT:  Keep your hands up in the first row.

10   Yes, you sir.

11            THE JUROR:  Twenty-five.  Anyone else in the

12   first row?

13            All right.  In the second row corner, yes.

14            THE JUROR:  Five.

15            THE COURT:  Five.  And next to you.

16            THE JUROR:  Thirty-seven.

17            THE COURT:  Okay.  Number 37.  I don't think --

18   you, sir.

19            THE JUROR:  Forty.

20            THE COURT:  And you, ma'am.

21            THE JUROR:  Ten.

22            THE COURT:  Okay.  I think in the next row, you,

23   ma'am.

24            THE JUROR:  Thirty-six.

25            THE COURT:  And you, ma'am.

```
 1                    THE JUROR:  Eighteen.

 2                    THE COURT:  And you, sir.

 3                    THE JUROR:  Twenty-one.

 4                    THE COURT:  And you, ma'am.

 5                    THE JUROR:  4.

 6                    THE COURT:  All right.  Following row, kind of

 7      hard now to see whose hand goes with whom.  You, ma'am.

 8                    THE JUROR:  Fifteen.

 9                    THE COURT:  Fifteen.

10                    THE JUROR:  Seven.

11                    THE COURT:  And next you, ma'am, or I don't

12      know.  Somebody, who's got your hand up.

13                    THE JUROR:  Seven.

14                    THE COURT:  And next to you.

15                    THE JUROR:  Nine.

16                    THE COURT:  Maybe in the back row now.  In the

17      corner, sir.

18                    THE JUROR:  Twenty-two.

19                    THE COURT:  And next to you or near you.

20                    THE JUROR:  Thirty-eight.

21                    THE COURT:  And you, sir.

22                    THE JUROR:  Forty-two.

23                    THE COURT:  And you, sir.

24                    THE JUROR:  Six.

25                    THE COURT:  All right.  Is there anybody I've
```

1    missed?  Okay.

2              So this is a patent lawsuit.  The plaintiffs are

3    Amgen Inc., Amgen Manufacturing Limited, and Amgen U.S.A.,

4    Inc.  The defendants are -- and I may not be pronouncing

5    this right, but I call them Sanofi, but it might also be

6    Sanofi, Sanofi-Aventis U.S. LLC, Aventisub, LLC and

7    Regeneron Pharmaceuticals, Inc.

8              Both plaintiffs and defendants are companies

9    engaged in the research development and manufacturing

10   marketing and sale of drugs known as biologics which are

11   used to treat diseases and illnesses.  Both companies have

12   developed FDA-approved monoclonal antibody products that

13   lower LDL for bad cholesterol.  Amgen's product is called

14   Repatha or evolocumab.

15             Defendants' product is called Praluent or

16   alirocumab.

17             Amgen is the owner of two United States patents

18   that are at issue in this case.  Praluent infringes claims

19   in both patents, if the patents are valid.  Defendants

20   assert that the claims of the patents are invalid.  For

21   those of you who end up being on the jury, you will be asked

22   to decide whether the claims of the two patents are invalid.

23             So have any of you heard or read anything about

24   this case?  No response.

25             While I'm on that subject, if you have a

1    personal device like a Smartphone or something else on you,

2    don't look up to try to find out anything about these

3    companies or that case.  I'll give you these instructions in

4    more detail later, but just pay attention to me and don't

5    try to find out anything about the case.

6             Now, the lawyers and the law firms that are

7    involved in this case are quite a few, and I'm going to ask

8    plaintiff's counsel to say who's on his side that he would

9    like to introduce, including not just the attorneys, but the

10   law firms.

11            MR. HUMMEL:  Good afternoon, ladies and

12   gentlemen.  So from our side we have Cravath Swaine & Moore

13   LLP.  That's my firm.  My name is Keith Hummel.  We also

14   have Lauren Moskowitz from Cravath.

15            We have the law firm of London & Mead.  And from

16   London & Mead is Christopher Mead.

17            MR. MEAD:  Good morning.

18            MR. HUMMEL:  We have the law firm of McDermott

19   Will & Emery, Sarah Columbia.

20            MS. COLUMBIA:  Good morning.

21            MR. HUMMEL:  And William Gaede, also known as

22   Bill.

23            MR. GAEDE:  Good morning.

24            MR. HUMMEL:  And from Young Conaway Stargatt &

25   Taylor, we have Melanie Sharp.

```
 1                    MS. SHARP:  Good morning.

 2                    MR. HUMMEL:  I'm not sure if he's in the room,

 3      but we have Jim Higgins.  I think so.  And we also have

 4      Michelle Ovanesian.  That's it from our side.  Oh, Michelle

 5      is here.

 6                    THE COURT:  All right.  Thank you, Mr. Hummel.

 7                    Mr. Wilks.

 8                    MR. WOLF:  My name is David Wilks.  I'm with

 9      Wilks Lukoff & Bracegirdle.  This is Matthew Wolf.

10                    MR. WOLF:  Good morning.

11                    MR. WILKS:  He's with the firm called Arnold &

12      Porter.  Also from that firm is Daniel Reisner.

13                    MR. REISNER:  Good morning.

14                    MR. WILKS:  Also in the room is John Molenda.

15      He's from Steptoe & Johnson.  Thank you.

16                    Thanks, Your Honor.

17                    THE COURT:  All right.  So do you or any member

18      of your immediate family such as spouse, child, parent, or

19      sibling know any of the attorneys or law firms who have just

20      stood up or been named?

21                    No response.

22                    Have you or someone in your family had any

23      business dealings with or been employed by any of these

24      attorneys or law firms?

25                    No response.
```

1                So the companies that I've mentioned, have you

2      or someone close to you ever been employed by Amgen, Inc.

3      Amgen Manufacturing Limited, Amgen, U.S.A., Inc., Sanofi,

4      Sanofi-Aventis U.S. LLC, Aventisub, LLC or Regeneron

5      Pharmaceuticals, Inc.?

6                No response.

7                Have you or, to your knowledge, a family member

8      ever owned stock in any of these companies?

9                No response.

10               Have you or a member of your family ever had a

11     business relationship with any of these companies?

12               No response.

13               Oh, sorry.  Yes, sir.

14               THE JUROR:  Does that include buying insulin

15     from one of the companies?

16               THE COURT:  Well, let's take that as a yes, I

17     take it.  So we'll talk to you about that later.

18               What's your number?

19               THE JUROR:  One.

20               THE COURT:  Have you or a member of your family

21     ever had any experience, good or bad, with any of these

22     companies?

23               THE JUROR:  One again.

24               THE COURT:  Okay.  Do you possess any -- there's

25     no further response.

1          Do you possess any strong positive or negative

2    opinions about any of these companies?

3          THE JUROR:  One again.

4          THE COURT:  All right.  Anybody else?

5          So the potential witnesses in this case include

6    the following, and I don't think any of these people are

7    from Delaware, so you may not know any of these people.  But

8    if you think you do, raise your hand.

9          Scott Boyd.  Robert Bradway.  Michelle Carnahan.

10   Michael Eck.  Simon Jackson.  Randal Ketchem.  Douglas

11   MacDonald.  Christopher Mehlin.  Nicholas Papadopoulos.

12   Gregory Petsko.  Jeffrey Ravetch.  Anthony Rees.  Leonard

13   Schleifer or Nigel Walker.

14         Are you familiar with any of these people?

15         No response.

16         Do you have any experience with the development

17   or manufacture of antibodies?

18         Yes, ma'am.

19         THE JUROR:  Twenty-six.

20         THE COURT:  Anybody else?

21         No response.

22         Have you or someone close to you ever been

23   employed by the United States Patent And Trademark Office?

24         Yes, ma'am.

25         THE JUROR:  Four.

```
 1                    THE COURT:  Anybody else?

 2                    No further response.

 3                    Have you or someone close to you ever applied

 4    for or paid for a United States or foreign patent?

 5                    Okay.  First row.  Number one, I guess I know

 6    you now.

 7                    THE JUROR:  Yes.

 8                    THE JUROR:  Twenty-six.

 9                    THE COURT:  Anybody else?  Number five?

10                    THE JUROR:  Yeah.

11                    THE COURT:  All right.  Anybody else?

12                    No further response.

13                    Have you ever been involved in the development

14    of a new product or process either personally or at work?

15                    Yes, ma'am.

16                    THE JUROR:  Twenty-six.

17                    THE COURT:  Anybody else?

18                    THE JUROR:  That falls under the patent

19    question, I guess.  One.

20                    THE COURT:  All right.  Number one.

21                    All right.  I see no further response.

22                    THE JUROR:  Could you repeat that question for

23    me?

24                    THE COURT:  Yes.  Have you ever been involved in

25    the development of a new product or process either
```

1    personally or at work?

2                    THE JUROR:  No.

3                    THE COURT:  Okay.  Anybody else?

4            No further response.

5            Have you or a family member ever been involved

6    in the dispute about patent rights?

7                    No response.

8            Do you have any strong positive or negative

9    opinions about patents, patent rights, or the United States

10   Patent and Trademark Office?

11                   No response.

12           Do you have any strong positive or negative

13   opinions about the biotechnology or pharmaceutical industry

14   or companies?

15                   Starting in the corner there, yes.

16                   THE JUROR:  Eight.

17                   THE COURT:  And number 1.  And 26.

18                   THE JUROR:  Yes.

19                   THE COURT:  And you, ma'am?

20                   THE JUROR:  4.

21                   THE COURT:  And behind you, sir?

22                   THE JUROR:  27.

23                   THE COURT:  Anybody else?

24                   THE JUROR:  Would you repeat that question?

25                   THE COURT:  Do you have any strong positive or

1    negative opinions about the biotechnology or pharmaceutical

2    industry or companies?

3              No further response.

4              Have you, or to your knowledge a family member

5    ever taken Repatha or Praluent?

6              No response.

7              Do you take any medication that you know is sold

8    by Amgen, sold or made for that matter by Amgen, Sanofi, or

9    Regeneron?

10             Number 1, yes.  And in the back?

11             THE JUROR:  7.

12             THE COURT:  Anybody else?

13             No further response.

14             Have you served on a civil jury within the last

15   15 years?

16             No response.

17             If you are selected to sit as a juror in this

18   case, are you aware of any reason why you would be unable to

19   render a verdict based solely on the evidence presented at

20   trial?

21             Yes, sir, number 1.  Anybody else?

22             If you are selected -- there is no further

23   response.

24             If you are selected to sit as a juror in this

25   case, are you aware of any reason why you would not be able

1    to follow the law as I give it to you?

2                No response.

3                Is there anything such as poor vision,

4    difficulty hearing, or difficulty understanding spoken or

5    written English that would make it difficult for you to

6    serve on this jury?

7                Yes, ma'am.

8                THE JUROR:  Number 23.  And I just sometimes

9    don't hear --

10               THE COURT:  You don't need to explain.  All

11   right.

12               THE JUROR:  Sorry.

13               THE COURT:  That's okay.

14               In the back in the corner.

15               THE JUROR:  22.

16               THE COURT:  You, sir.

17               THE JUROR:  27.

18               THE COURT:  Was there another hand somewhere?  I

19   see no further hands.

20               So here is the last question.  Actually it's not

21   the last question.  Let me ask you about some people who

22   actually do live in Delaware.

23               Do you know Laurie Reed, Michele Coulter, Tonya

24   Jenkins, Diane Janes, Cheryl-Anne Stichter, Alice Lewis,

25   Deborah Manelski, or Bruce Herber?

```
 1                    Yes, ma'am.
 2                    THE JUROR:  Number 18.
 3                    THE COURT:  Anybody else?  Okay.  All right.
 4      And so this is the last question.  Is there anything else
 5      including something you may have remembered in connection
 6      with one of the earlier questions that you think you would
 7      like to tell me about in connection with your possible
 8      service as a juror in this case?
 9                    THE JUROR:  37.
10                    THE COURT:  37.  And behind.
11                    THE JUROR:  18.
12                    THE COURT:  And in the back row.
13                    THE JUROR:  14.
14                    THE COURT:  15.
15                    THE JUROR:  14.
16                    THE COURT:  Thank you.  Was there another hand?
17      Okay.  No further response.
18                    All right.  So I think we're now going to pull
19      some numbers out of a hat and seat some of you over in the
20      jury box.
21                    THE CLERK:   Juror number 26, will you please
22      come forward and take the first seat in the first row of the
23      jury box.
24                    Juror number 5, will you please come forward and
25      take the second seat in the first row of the jury box.
```

1          Juror number 10, will you please come forward

2    and take the third seat in the first row of the jury box.

3          Juror number 6, will you please come forward and

4    take the fourth seat in the first row of the jury box.

5          Juror number 8, will you please come forward and

6    that the fifth seat in the first row of the jury box.

7          Juror number 22, will you please come forward

8    and take the sixth seat in the first row of the jury box.

9          Juror number 24, will you please come forward

10   and take the seventh seat in the first row of the jury box.

11         Juror number 25, will you please come forward

12   and take the first seat in the second row of the jury box.

13         Juror number 27, will you please come forward

14   and take the second seat in the second row of the jury box.

15         Juror number 37, will you please come forward

16   and take the third seat in the second row of the jury box.

17         Juror number 9, will you please come forward and

18   take the fourth seat in the second row of the jury box.

19         Juror number 28, will you please come forward

20   and take the fifth seat in the second row of the jury box.

21         Juror number 23, will you please come forward

22   and take the sixth seat in the second row of the jury box.

23         Juror number 45, will you please come forward

24   and take the seventh seat in the second row of the jury box.

25         THE COURT:  Can I see counsel at side-bar.

```
 1                    (Side-bar discussion.)

 2                    THE COURT:  All right.  Can we have a channel

 3      here for the juror to come and stand next to the court

 4      reporter.  All right.

 5                    MR. WOLF:  Before we begin, Your Honor,

 6      Mr. Wilks.

 7                    MR. WILKS:  So the very first person, number 26,

 8      I'm sort of acquainted with number 26.  I don't know her

 9      well, but I need to disclose her.

10                    THE COURT:  Thanks.

11                    MR. WILKS:  She didn't seem to recognize me.

12                    MR. WOLF:  Which he took personally.

13                    THE CLERK:   Juror number 26, can you please

14      come to side-bar.

15                    THE COURT:  Come a little closer.  What is your

16      name?

17                    THE JUROR:  Eda Montgomery.

18                    THE COURT:  Ms. Montgomery.

19                    THE JUROR:  Yes.

20                    THE COURT:  So you answered a number of

21      questions.  One was that you have some experience with the

22      development or manufacture of antibodies.

23                    THE JUROR:  Right.  I worked in the

24      pharmaceutical industry for my -- almost my entire career,

25      twenty-five years.
```

1          THE COURT:  As a scientist or business person?

2          THE JUROR:  As a scientist.

3          THE COURT:  What's your scientific background?

4          THE JUROR:  I have a Ph.D. in analytical

5    chemistry.

6          THE COURT:  Okay.  And so what kind of things do

7    you do as a scientist in the pharmaceutical industry.

8          THE JUROR:  So I have been part of development

9    and commercializing several new medicines, AIDS, cystic

10   fibrosis, hepatitis C, dry eye disease.

11         THE COURT:  And which company is that that you

12   work for?

13         THE JUROR:  I currently work for Takeda, Shire

14   was purchased by Takeda, DuPont Merck Pharmaceuticals,

15   Bristol Myers Squibb, Vertex Pharmaceuticals, that's it.

16         THE COURT:  And in terms of the particular topic

17   here, antibodies, is that something that you have worked on?

18         THE JUROR:  Yes.

19         THE COURT:  Okay.  Maybe the attorneys want some

20   more questions about that.

21         THE JUROR:  Okay.

22         THE COURT:  So I guess your work probably

23   explains why you or someone near you has applied for a

24   patent.

25         THE JUROR:  Well, actually it was in between

1    when I was working for pharmaceutical companies, I was

2    actually at DuPont electronics department and applied for

3    actually and got two patents there.

4                THE COURT:  Okay.  In the field of electronics?

5                THE JUROR:  In the field of electrochemistry.

6                THE COURT:  Okay.  Was there anything about that

7    experience that gave you any opinions about the patent

8    system?

9                THE JUROR:  It was a generally positive

10   experience.

11               THE COURT:  Okay.  So then you also -- so the

12   question about being involved in development of a new

13   product or process, I guess that's what we have just talked

14   about?

15               THE JUROR:  Yes, I do it every day.

16               THE COURT:  Then you also had -- you have strong

17   positive or negative opinions about biotechnology or

18   pharmaceutical, companies in the pharmaceutical industry.

19               THE JUROR:  I have chosen to make it my career,

20   so it would have to be a positive.

21               THE COURT:  So actually we have got two

22   companies at least based on the description that I gave,

23   they're not quite two peas in a pod, but they're --

24               THE JUROR:  I'm familiar with both.

25               THE COURT:  Right.  So do you have any opinions

1    Amgen versus Sanofi or Regeneron, one is better than the

2    other?

3                THE JUROR:  So I like companies that are

4    innovative and of the two I think Amgen is more innovative.

5    Regeneron was also a company that was more innovative.

6                THE COURT:  So do you think what you have just

7    said, if you were Sanofi, would you not want you on a jury?

8                THE JUROR:  I don't know.  I would listen to the

9    evidence.

10               THE COURT:  So essentially notwithstanding

11   whatever opinions you might have generally as you just said

12   in terms of the specific issue that is at dispute here,

13   you're going to give both sides a completely fair shake?

14               THE JUROR:  Uh-huh.  Yeah.

15               THE COURT:  All right.  Let's start with you

16   because you're going to go first, what would you like to ask

17   her?

18               MR. WOLF:  Nothing, Your Honor.

19               THE COURT:  Do you all want to ask her anything?

20               MR. HUMMEL:  I have no questions.

21               MS. SHARP:  No questions, Your Honor.  Thank

22   you.

23               THE COURT:  Do you mind just going over there

24   with my deputy clerk for a minute.

25               Does this mean we're all happy?

1            MR. WOLF:  Except Mr. Wilks wasn't recognized

2     and he takes it personally.

3            MR. WILKS:  Unforgettable, Your Honor.

4            THE COURT:  Do you want me to ask about that?

5            MR. WILKS:  We both serve on a committee that

6     almost never meets, my favorite one.

7            THE COURT:  All right.  So I'm going to ask you

8     to retake your seat over there.

9            THE JUROR:  Okay.

10            THE COURT:  Thank you.

11            THE CLERK:   Juror number 5, can you please come

12     to side-bar.

13            THE COURT:  So Ms. Behrens, come a little

14     closer.  I take it your brother is a patent lawyer?

15            THE JUROR:  Yes.

16            THE COURT:  Okay.  He worked for me.  Do you

17     know that?

18            THE JUROR:  Yes.

19            THE COURT:  Okay.  Then so in any event, we'll

20     get to that in a minute, but in terms of the schedule.

21            JUROR:  So I work overnight.  I get off at 6:00,

22     supposedly, but I don't always get off at 6:00 and I work

23     over an hour away, so I'm not sure I could get here on time.

24            THE COURT:  The overnight work that you do, what

25     is the company who employs you?

1              THE JUROR:  Keystone Quality Transport.  I'm an

2    EMT.

3              THE COURT:  So they're a big company, aren't

4    they?

5              THE JUROR:  Yeah.

6              THE COURT:  And if you -- presumably they

7    recognize jury service.

8              THE JUROR:  They do, but it's like I tried to

9    get off for it today, and they didn't let me.  Like they

10   gave me like an hour, I could try to get off, but I don't

11   know how well that would work.

12             THE COURT:  But basically your normal hours, is

13   it a twelve-hour shift or eight hours?

14             THE JUROR:  Twelve hours, 6:00 P to 6:00 A.

15             THE COURT:  That probably won't work for jury

16   service unless they would do the right thing which would be

17   to say that they don't expect you to be awake 24 hours a

18   day.  You say you talked to them before coming here today?

19             THE JUROR:  Yeah, I tried to get off, and

20   they're like make sure you actually get called to it.  And

21   then I was like I'm coming.  And they gave me an hour, so I

22   got off at 5:00 today instead of 6:00.

23             THE COURT:  I take it the conversation of what

24   happened if you were actually picked for the jury, you

25   didn't get to that point with them?

1              THE JUROR:  We did not.

2              THE COURT:  And based on what you know -- how

3 long have you worked for them?

4              THE JUROR:  Six months.

5              THE COURT:  Do you have any -- do you have any

6 further information as to what the likelihood is that they

7 would give you, say okay, you don't have to come in because

8 you are busy during the day for jury service?

9              THE JUROR:  I don't know.  I know that they're

10 very understaffed, especially overnights.

11              THE COURT:  All right.  So do you have any

12 questions on that topic?

13              MR. WOLF:  No, Your Honor.

14              THE COURT:  Do you?

15              MR. HUMMEL:  No.

16              THE COURT:  Ms. Behrens, can you go over there

17 for a minute?

18           I don't know, you know, generally companies like

19 that I expect they can do without one less employee, but I'm

20 not entirely sure that they're actually going to give her

21 more than an hour off and I'm probably thinking you want

22 awake jurors for this.

23              MR. WOLF:  Yes, Your Honor.  No objection.

24              MR. WILKS:  No objection.

25              MS. SHARP:  We agree.

```
 1                    THE COURT:  All right.

 2                    Ms. Behrens, we are going to excuse you because

 3      we do need awake jurors and I realize you can't be confident

 4      that your employer is going to give you your time off.

 5      Okay?

 6                    THE JUROR:  Thank you.

 7                    THE COURT:  But if you would just go back and

 8      sit in the audience and wait until we're done.

 9                    THE JUROR:  Thank you.

10                    THE CLERK:   Juror number 42, can you please

11      come to side-bar.

12                    MR. WOLF:  So 42 is replacing 5.

13                    THE COURT:  Yes.

14                    Come a little closer.  What is your name, sir?

15                    THE JUROR:  Paul Williams.

16                    THE COURT:  Mr. Williams, so you said you had a

17      problem with the schedule.  Can you tell me about that.

18                    THE JUROR:  Yes, sir.  I recently started at a

19      new job and taking time away, I have no time off and I get a

20      yearly review, and this affects my yearly review.

21                    THE COURT:  What is your new job.

22                    THE JUROR:  I put fire sprinklers in buildings.

23      I just recently started that.  It's time away.

24                    THE COURT:  What is the company?

25                    THE JUROR:  Bayer Industries.
```

1          THE COURT:  I'm sorry?

2          THE JUROR:  Bayer Industries.

3          THE COURT:  Are they a big company?

4          THE JUROR:  Yeah, they're relatively big.  Yes,

5    we're in the whole State of Delaware.

6          THE COURT:  So most big companies recognize jury

7    service and will let someone take off the days that are

8    necessary to serve on a jury.  Is that not the case for you?

9          THE JUROR:  That is the case, but I don't get

10   compensated for it.  And I have to pay my own rent at my own

11   house.  I have my own house.  So it takes hardship away.

12         THE COURT:  How much do they pay you per day

13   that you work?

14         THE JUROR:  I make $14 an hour.  I don't know

15   how much that comes out to be.

16         THE COURT:  So somewhere over a hundred dollars

17   a day.  It's not quite the same thing, but I believe the

18   jury fee is $50 a day.  And so one of the points of being a

19   citizen is sometimes you have to make a small sacrifice to

20   be on a jury.  Is it something that I can ask you to do, or

21   you think that's just ridiculous?

22         THE JUROR:  It's not ridiculous, but I think I'm

23   relatively young to make some kind of decision that's going

24   to affect the company.  So I don't think I'm in a position

25   in my life where I can make an adequate decision based on --

```
 1    it's not that I'm immature, but there is probably better

 2    candidates than me.

 3                 THE COURT:  I understand what you're saying.  Do

 4    you have any questions?

 5                 MR. WOLF:  No, Your Honor.

 6                 THE COURT:  Do you have any questions?

 7                 MS. SHARP:  No questions.

 8                 THE COURT:  Can you go over there for a minute.

 9    Did I ask you what your name is?

10                 THE JUROR:  Yes, you did.

11                 THE COURT:  Mr. Williams.

12                 THE JUROR:  Yes.

13                 THE COURT:  Can you go over there for a minute.

14                 MR. WOLF:  Your Honor, given his statement that

15    he doesn't feel competent to do this, I don't think we

16    can --

17                 MR. HUMMEL:  We don't feel strongly, Your Honor.

18    I think he can serve.

19                 THE COURT:  All right.  I think he doesn't want

20    to serve.  So I think I'm going to strike him.  Not the best

21    reason in the world.

22                 All right.  So I think you would actually do a

23    fine job if you were a juror, but I'm going to agree with

24    your request that you not serve on this jury.  So I'm going

25    to ask that you go back and sit in the crowd until we're
```

 1    done.  Okay?

 2              THE JUROR:  Okay.  Thank you guys.

 3              THE CLERK:  Juror Number 20, can you please come

 4    forward and take the seventh seat in the first row of the

 5    jury box?

 6              And Juror Number 10, can you please come to

 7    side-bar?

 8              THE COURT:  Hi, ma'am.  Could you tell me --

 9    come a little closer.  Could you tell me your name, please?

10              THE JUROR:  Annette Dangelo.

11              THE COURT:  Ms. Dangelo, I believe you answered

12    one question that the schedule presented a problem.  Can you

13    tell me about that?

14              THE JUROR:  Yeah.  My father-in-law is 92 and

15    just had emergency surgery on Sunday.  My husband is his

16    medical Power of Attorney, and we are in the process of

17    trying to get him into a rehab close to our home so that we

18    can help with the whole situation of -- process of taking

19    care of him.

20              THE COURT:  And you said your father-in-law.  Is

21    your husband involved in trying to make these arrangements?

22              THE JUROR:  Yes, he is as well, of course.  My

23    husband works full time, so he kind of relies on me.  I

24    mean, I work full time, but my schedule is a little bit

25    lenient at work, so I can, you know, run over to the

1    hospital if I need to see him.  When he goes into rehab, go

2    over there, you know, if things happen and --

3                THE COURT:  And is he in the hospital right now?

4                THE JUROR:  Yes, he is.  Yes, he is.

5                THE COURT:  Which hospital?

6                THE JUROR:  He's at Christiana.

7                THE COURT:  And how long is he expected to be

8    there?

9                THE JUROR:  We're trying to -- we met with --

10   the social worker came yesterday, so I think they're trying

11   to get him into rehab sometime this week.  We don't know for

12   sure.  We're in the process of working everything out.

13               THE COURT:  And I take it what you're telling me

14   is, I take it, you don't have a nursing home or that sort of

15   place --

16               THE JUROR:  No.

17               THE COURT:  -- that you have arranged for him to

18   be going to when he's released from the hospital?

19               THE JUROR:  No.  He'll be going back home.

20   He'll be going back home.  We do have -- my husband's sister

21   helps take care of him as well along with my husband and

22   myself.  So we're pretty actively involved in his care.  We

23   don't want him to go to a nursing home.

24               THE COURT:  No, perfectly understandable.

25               THE JUROR:  Yeah.  So --

```
 1                THE COURT:  So I sort of understand your

 2     situation generally.  Is it something that you just can't

 3     serve on this jury, or it would just mean that your husband

 4     and or sister-in-law have to pick up some extra slack?

 5                THE JUROR:  I think it's going to be hard for me

 6     because they do rely on me to help out a lot.  I just think

 7     it's going to be hard just trying to get him the proper -- I

 8     mean, we're trying to get him into a rehab that's close to

 9     us, so that we can be there for him.  And you know, although

10     his sister, you know, helps tremendously, but we don't want

11     the whole burden to fall upon her.  It's very taxing.

12                He suffers from slight dementia as well, so he

13     doesn't -- like yesterday when I was at the hospital, he's

14     like, When did you rearrange the house?  And we're like, No.

15     No.  No, you're in the hospital.  So it's a group effort,

16     I'm going to say.  It's a group effort with his care.

17                THE COURT:  All right.  Do you have any

18     questions?

19                MR. WOLF:  No, Your Honor.

20                THE COURT:  Do you?

21                MR. HUMMEL:  No.

22                THE COURT:  All right.  Can you go over there,

23     please, Ms. Dangelo?

24                MR. WOLF:  Your Honor, we believed her story, I

25     mean, to be blunt.
```

```
 1                THE COURT:  Yes, as well I believe it, too.
 2                MS. SHARP:  She seems concerned about serving,
 3    like it might interfere with her being here.
 4                THE COURT:  Right.  I take it you both agree.
 5    Come on back.
 6                All right.  Ms. Dangelo, I'm going to excuse
 7    you.  I take it at another time you'd be willing to do jury
 8    service.  This is just not --
 9                THE JUROR:  Oh, sure.  The circumstances at this
10    time, he fell.  He fell getting out of bed, and he actually
11    broke his femur.  So they had to put a rod in there.  So
12    he's got a rod, and he's got screws and a plate up here,
13    screws and a plate down here.
14                THE COURT:  All right.  So I'm going to ask that
15    you go back and take a seat in the crowd and stay until
16    we're finished.  Okay?
17                THE JUROR:  Okay.  Thank you very much.  I
18    appreciate it.
19                MR. HUMMEL:  I hope things work out.
20                THE CLERK:  Juror Number 3, will you please come
21    forward and take the first seat in the jury box?  And Juror
22    Number 6, would you please come to side-bar?
23                MR. WOLF:  This is the sixth jury I've picked
24    this year, and I think I've learned more in the jury process
25    about human conditions.
```

```
 1                    THE COURT:  Hi, sir.  What is your name, please?

 2                    THE JUROR:  Ronson Burton.

 3                    THE COURT:  Mr. Burton.

 4                    THE JUROR:  Yes.

 5                    THE COURT:  So I believe that you answered the

 6   question about the schedule.  That was the only question you

 7   answered.

 8                    Can you tell me about that?

 9                    THE JUROR:  I am a school bus contractor and

10   driver, and there's such a shortage throughout the state to

11   be away for that many days.  There's just -- I don't know

12   that there's someone there that can drive the bus.

13                    THE COURT:  So somebody -- there's a company

14   that you work for that --

15                    THE JUROR:  I own the company.

16                    THE COURT:  Ah, okay.

17                    THE JUROR:  Yeah.

18                    THE COURT:  And do you have people who work for

19   you?

20                    THE JUROR:  Yes.

21                    THE COURT:  How many?

22                    THE JUROR:  Two.

23                    THE COURT:  And how many school buses are you

24   responsible for driving?

25                    THE JUROR:  Two.
```

1                    THE COURT:  So --

2                    THE JUROR:  But I -- I'm the main substitute for

3      multiple contractors because there is such a shortage.  And

4      I'm retired, so I stay pretty busy just driving for other

5      people.

6                    THE COURT:  But in other words, the two people

7      you have, they're reliable?

8                    THE JUROR:  Yes.

9                    THE COURT:  Okay.

10                   THE JUROR:  Yes.

11                   THE COURT:  So the other contractors who, if

12     they have a problem, presumably they have sort of a call

13     list of, you know, from A to Z of people because they've got

14     to make the buses run; right?

15                   THE JUROR:  That's correct.

16                   THE COURT:  So barring one of your own drivers,

17     if you were serving on the jury, it would really be some

18     other person's problem, right, not yours?

19                   THE JUROR:  That's correct.  Yes.

20                   THE COURT:  So with that in mind, do you object

21     to serving on the jury?

22                   THE JUROR:  I think there's just a better time

23     for me to serve, I mean, when there's not school in session.

24                   THE COURT:  Okay.

25                   THE JUROR:  I mean, once school is in session, I

1    mean, you just never know what the morning is going to

2    bring.

3            THE COURT:  Okay.  Well, the risk -- you know,

4    we're dealing with snow tomorrow.  A lot of risks of what

5    the morning could bring.  So is there any questions you want

6    to ask?

7            MR. WOLF:  No, Your Honor.

8            THE COURT:  You?

9            MR. HUMMEL:  No, Your Honor.

10            THE COURT:  Can you go over with my Deputy

11    Clerk?

12            THE JUROR:  Sure.

13            THE COURT:  I'm inclined to keep him.

14            MR. WOLF:  Your Honor, I don't disagree.  I

15    mean, you're going to have to weigh all the hardship cases,

16    but --

17            MR. HUMMEL:  Yeah.  I think we should keep him

18    given the --

19            THE COURT:  All right.  Can we bring him back?

20            Sir.  Mr. Burton, I appreciate what you've said,

21    but I think I'm going to keep you in the active sort of jury

22    pool.  I'd ask you to retake your seat.

23            I will assure you that if there is some

24    emergency in your own company, you know, where you can't get

25    a bus driver, we'll give you a number to call, and you can

1    drive the bus to substitute for your own company, but I

2    think not for other companies.  Okay?

3              THE JUROR:  Okay.  Sure.

4              THE COURT:  Thank you very much.

5              THE JUROR:  Thank you.

6              THE CLERK:  Juror Number 8, if you can please

7    come to side-bar.

8              MR. WOLF:  I was just saying we learn so much

9    about the human condition when you do this process.

10             MR. HUMMEL:  Yes.

11             THE CLERK:  Stand in here.  They've got some

12   questions for you.

13             THE COURT:  Good morning.

14             THE JUROR:  Good morning.

15             THE COURT:  What is your name?

16             THE JUROR:  Virginia Chura.

17             THE COURT:  Ms.?

18             THE JUROR:  Chura.  Virginia Chura.

19             THE COURT:  Oh, okay.  So you answered one

20   question yes which was about the schedule.

21             THE JUROR:  Mm-hmm.

22             THE COURT:  Can you tell me about that?

23             THE JUROR:  So when I filled out the

24   questionnaire, I understand that it's not a hardship if

25   you're self employed.  But we have two businesses.  I have

```
 1    to drive up from Lewes.  And I'm looking around the Court

 2    today, from what I understand, it's two pharmaceutical

 3    companies.  I'm going to have to either close my shop or pay

 4    someone to come in, and I'm not -- it doesn't sit well with

 5    me.

 6              Also, this week we've had two close friends be

 7    diagnosed with illnesses, and one of them has to take a

 8    medication that's $10,000 a month.  So I'm not sympathetic

 9    to two pharmaceutical companies battling over who gets a

10    patent.

11              THE COURT:  Okay.  Any questions?

12              MR. WOLF:  No, Your Honor.

13              THE COURT:  Any questions?

14              MR. HUMMEL:  No, Your Honor.

15              MS. SHARP:  No questions.

16              THE COURT:  Can you go over there with my Deputy

17    Clerk, please?

18              MR. WOLF:  I still would suggest --

19              THE COURT:  You agree?

20              MR. HUMMEL:  We agree.

21              THE COURT:  If you agree, just tell me you

22    agree.

23              MR. WOLF:  Okay.

24              MR. HUMMEL:  We were just looking at each other

25    just making sure everyone agrees with us.
```

1              THE COURT:  Yes.  All right.

2              Ma'am, I'm going to excuse you.  Maybe there

3    will be a Sussex County trial that doesn't involve this sort

4    of thing, and you'll be able to serve on that jury.

5              THE JUROR:  I'm more than happy to do that,

6    but --

7              THE COURT:  Okay.  If you can retake your seat

8    until we're done.

9              THE CLERK:  Juror Number 33, will you please

10   come forward and take the fifth seat in the first row of the

11   jury box?  And Juror Number 22, if you can please come to

12   side-bar.

13             THE CLERK:  Just come over here and stand over

14   there.  They've got some questions for you.

15             THE COURT:  Hi.  Come a little closer.

16             THE JUROR:  Yeah.

17             THE COURT:  What is your name?

18             THE JUROR:  Dominic Lombardi.

19             THE COURT:  Mr. Lombardi, I think you answered

20   two questions yes.  Let's start with the second.

21             You said it would be difficult for you to serve

22   on this jury for some reason.  Can you tell me about that?

23             THE JUROR:  The hearing.  I'm deaf out of my

24   left here.

25             THE COURT:  Okay.

1          THE JUROR:  Completely deaf out of my left ear.

2          THE COURT:  All right.  Do you compensate by --

3          THE JUROR:  Reading lips.

4          THE COURT:  -- reading lips?

5          THE JUROR:  Yes, sir.

6          THE COURT:  And in terms of your good ear, do

7 you have -- I mean, do you hear normal conversation or does

8 it --

9          THE JUROR:  Yeah.  Yes, I can.  Some days it's

10 worse than others, so it's kind of hard to explain.

11          THE COURT:  Well, and so I wanted to give you --

12 because when we talk to people, we have this white noise

13 machine on.  It makes people think it's much worse than it

14 is.  I mean, we do this for a reason, though.

15          So you're familiar with how trials work?

16          THE JUROR:  Right.

17          THE COURT:  A person gets asked questions.

18          THE JUROR:  Yeah.

19          THE COURT:  They answer it.  It's kind of back

20 and forth.  There will be stuff up on the screen.  You will

21 be asked to look at documents.

22          I mean, based on your own life, would you have

23 trouble with that format?

24          THE JUROR:  No.  I think I'd be all right.

25          THE COURT:  Okay.  All right.  Let me go back to

1    the other question which was about the schedule presented a

2    problem for you.

3                Can you tell me about that?

4                THE JUROR:  Yes.  I live in Millsboro.  It's a

5    two-hour drive for me.  But my boss asked -- he sent a

6    letter asking if I could be excused because I work 60 hours

7    a week, and it's a big loss for me not to be at the shop.

8                THE COURT:  What kind of shop is it?

9                THE JUROR:  It's a welding shop.

10               THE COURT:  Okay.  Sixty hours a week, is that

11   five 12-hour days?

12               THE JUROR:  Yes, sometimes I work seven days.

13   We've been working seven days recently.  We've had big jobs.

14               THE COURT:  How big of a welding operation is

15   it?

16               THE JUROR:  It's a small shop, but we do

17   portable welding out of like -- we have our own trucks, and

18   we go to plants and weld.  We're at Kelly Foods now

19   replacing all the steam lines in the plant.

20               THE COURT:  And so if you serve on the jury,

21   does that mean -- well, so your boss was saying the boss

22   needs you; right?

23               THE JUROR:  Yeah.  He sent me a letter.

24               THE COURT:  Well, let me see the letter for a

25   second.  So how much do you get paid for a 12-hour day?

```
 1                    THE JUROR:  I get paid $25 an hour.

 2                    THE COURT:  So that's like $300 a day?

 3                    THE JUROR:  Double time for overtime.

 4                    THE COURT:  Double time for after --

 5                    THE JUROR:  Forty hours.

 6                    THE COURT:  All right.  So you heard the

 7    schedule that I gave, today, Thursday, Friday.

 8                    THE JUROR:  Right.

 9                    THE COURT:  Monday, for sure.  Tuesday, maybe.

10            So that's five days.  Obviously, $50 a day we

11    give for jury service is not nearly what you make.

12                    THE JUROR:  Yes.

13                    THE COURT:  But is it something that you

14    would -- you know, we expect something of citizens.

15                    THE JUROR:  Yes, I understand.

16                    THE COURT:  So leaving aside your boss, you

17    personally, if you were asked to serve on this jury, would

18    the financial hardship be overwhelming, or would it just be

19    essentially annoying?

20                    THE JUROR:  It would be annoying.  We have a

21    one-year-old son, and we just took in my wife's daughter or

22    my wife's sister.  We are adopting her.  So -- and we just

23    bought a new house.  It's a lot.  We took on a lot, and we

24    just got married, too --

25                    THE COURT:  Well, congratulations.  On that.
```

          1                    THE JUROR:  -- in the last year.

          2                    THE COURT:  So if you were selected to serve on

          3      this jury, notwithstanding what you just told me, would you

          4      think that I was basically being a jerk?

          5                    THE JUROR:  I try not to judge people.

          6                    THE COURT:  Well, strangely enough, that's what

          7      juries do.

          8                    THE JUROR:  Yeah.

          9                    THE COURT:  All right.  Do you have any

         10      questions?

         11                    MR. WOLF:  No, Your Honor.

         12                    THE COURT:  Do you have any questions?

         13                    MR. HUMMEL:  No, Your Honor.

         14                    THE COURT:  Mr. Lombardi, can you go over there

         15      with my Deputy Clerk for a minute?

         16                    MR. WOLF:  So, Your Honor, he seems like an

         17      extremely conscientious young man, someone you would want on

         18      a jury if you were either side.  I leave it to Your Honor on

         19      the hardship issue.

         20                    MR. HUMMEL:  I mean, I agree in the same -- it's

         21      a three, four-day trial.

         22                    THE COURT:  Well, all right.  Bring him back.

         23                    So Mr. Lombardi, you seem to be a very

         24      impressive young man, very conscientious.  And so I think,

         25      notwithstanding the fact that I do understand there's some

1    financial difficulty, I think that you are qualified to

2    serve, and I'm not going to excuse you at this time.  So I'm

3    going to ask you to retake your seat.

4              If you are selected for the jury, you know,

5    you're already here.  So this day doesn't really count this

6    much.  We've got Thursday, Friday, Monday, maybe Tuesday, so

7    we're talking three additional days, four additional days at

8    most.

9              And this may or may not be of any particular use

10   to you, too, but if over Thursday night you want to stay up

11   here as opposed to driving back and forth, we can put you up

12   in a hotel, too.

13             THE JUROR:  I'll have to ask my wife.

14             THE COURT:  Sorry?

15             THE JUROR:  I would have to ask my wife.

16             THE COURT:  Yeah.  You'll have time to do that.

17             All right.  So you can retake your seat.

18             THE JUROR:  Thank you.

19             THE CLERK:  Juror Number 25 --

20             MR. WOLF:  Smart and conscientious.

21             MR. WILKS:  Yes, he is.

22             THE CLERK:  -- could you please come to

23   side-bar?

24             MR. WILKS:  Who is this?

25             MS. SHARP:  Twenty-six.

```
 1                    THE CLERK:  Stand close over here.  They've got

 2    some questions.

 3                    THE JUROR:  Okay.

 4                    THE COURT:  I'm sorry.  Are you Juror Number 25?

 5                    THE JUROR:  Yes.

 6                    THE COURT:  What is your name, please?

 7                    THE JUROR:  Larry Merchant.

 8                    THE COURT:  Is it Merchant?

 9                    THE JUROR:  Merchant.  Merchant.

10                    THE COURT:  So I think you only answered the

11    question one question yes which is about the schedule.  Can

12    you tell me about that?

13                    THE JUROR:  Yeah.  I'm retired.  I have a very

14    fixed income, so I have Social Security.  And I teach --

15    just happen to teach on Tuesday morning and Thursday

16    morning.  If I don't teach, I don't get paid, and it's

17    really a financial burden.

18                    I was -- my wife was sick for 12 years.  We were

19    pretty much wiped out financially.  She passed away.  I

20    retired, kept teaching, because that's the only income I

21    had.  So missing three days teaching is --

22                    THE COURT:  Well, so what time do you teach?

23                    THE JUROR:  8:30 to 10:00.

24                    THE COURT:  So you already missed today; right?

25                    THE JUROR:  Correct.  And I will not --
```

1           THE COURT:  Okay.

2           THE JUROR:  -- not get paid today, Thursday, or

3    next Tuesday.

4           THE COURT:  So how much do you get paid for each

5    day of teaching?

6           THE JUROR:  Oh, jeez.  It's an hour and a half.

7    I think it's $34.

8           THE COURT:  $34.

9           THE JUROR:  No, it's $34 an hour.  It comes out

10   to about $150 for the --

11          THE COURT:  Well, so the jury service, you get

12   $50 a day.  So you'll actually kind of break even, I think.

13          THE JUROR:  Mm-hmm.  Well, that's not what I

14   want to hear, but okay.  I just -- you know, I -- somebody

15   has to cover my classes and --

16          THE COURT:  I'm sorry.  What level do you teach?

17          THE JUROR:  I teach at Del Tech.

18          THE COURT:  So if somebody has to cover your

19   classes presumably that's something that Del Tech

20   administrators are paid handsomely to come up with people to

21   do that sort of thing?

22          THE JUROR:  I guess.

23          THE COURT:  All right.  So if you were -- you

24   seem like a fine juror.  If you were selected to serve, and

25   since I don't think financially it actually will affect you,

1    would you object to serving?

2                THE JUROR:  Is this a medical-based kind of --

3                THE COURT:  It's more of a science based.  There

4    are drugs involved, but the issues in the case don't

5    really -- they relate to science.  I'm not even going to try

6    to explain what they are.  That's the reason why we have

7    attorneys.  But they're not things where you're going to

8    hear about symptoms of a disease or --

9                THE JUROR:  Okay.

10               THE COURT:  -- something like that.

11               THE JUROR:  I would selfishly much rather serve

12   during the summer, but --

13               THE COURT:  Okay.

14               THE JUROR:  -- I'll stop -- other than that,

15   I'll stop whining.

16               THE COURT:  Any questions from you?

17               MR. WOLF:  No.

18               THE COURT:  Any questions from you?

19               MS SHARP:  I do have a question, Your Honor, if

20   I may.  You made reference to a financial burden, and it

21   sounded like maybe you were saying that was related to an

22   illness.

23               Could you --

24               THE JUROR:  My wife was sick for 12 years.  She

25   was bedridden -- wheelchair bound for ten years, bedridden

```
 1    her last two years.  And it was because of -- she had breast

 2    cancer, but that's not what killed her.  It was actually

 3    multiple symptoms from diabetes that basically ate her from

 4    the inside out, and she passed away from that.

 5              MS. SHARP:  I'm sorry, and I didn't mean to pry.

 6    I just wondered if you related that financial experience to

 7    anything that you might hear in this case or the fact that

 8    there are pharmaceutical companies.

 9              THE JUROR:  I mean, quite honestly, it was -- I

10    mean, I'm sorry.  It was just a medical expense and that

11    included multiple hospitalizations as well as countless

12    prescriptions, and you know --

13              MS. SHARP:  I'm sorry.

14              THE JUROR:  Yes.

15              THE COURT:  All right.  So can you go back to

16    your seat there?

17              THE JUROR:  Oh, sure.

18              MR. WOLF:  Did we skip over 24?

19              THE CLERK:  Juror Number 27 --

20              THE COURT:  Because they didn't answer any

21    questions.

22              THE CLERK:  -- could you please come to

23    side-bar?

24              THE CLERK:  This is 27.

25              THE COURT:  Hi, sir.  What's your name, please.
```

 1                    JUROR:  Paul Mullin.

 2                    THE COURT:  Mr. Mullin.

 3                    JUROR:  Yes.

 4                    THE COURT:  I believe you answered two questions

 5      yes.

 6                    JUROR:  Yes, sir.

 7                    THE COURT:  One of them has to do with there was

 8      something, vision, hearing, reading writing.

 9                    JUROR:  It's hearing.  I have ringing in the

10      ears.

11                    THE COURT:  Tinnitus.

12                    JUROR:  Yeah.  So sometimes I don't hear things,

13      they're garbled.  I can hear you now.

14                    THE COURT:  And so the way we'll be when we're

15      actually testifying they won't have this noise machine on.

16      Does this help?

17                    JUROR:  Of course it does.

18                    THE COURT:  Okay.  So the tinnitus, does it come

19      and go?

20                    JUROR:  No.  It's constant.

21                    THE COURT:  And so you're familiar with how

22      trials tend to work, people ask questions from one place,

23      people answer questions from another place, occasionally,

24      and that's the basic format.  Do you -- is that a format

25      that you think would be difficult with the tinnitus?

```
 1              JUROR:  I can be in the same room with my wife
 2    and she'll say something and I'll have to have her repeat it
 3    with no air conditioner, no TV, it just is garbled.
 4              THE COURT:  And that's because of the ringing?
 5              JUROR:  Uh-huh.
 6              THE COURT:  So the testimony in this case is
 7    going to be very complex.  There will be scientific terms
 8    that will have to be explained what they are.  I take it
 9    that probably makes it worse, not better?
10              JUROR:  I have never been in that position, but
11    if there is a lot of big words.
12              THE COURT:  Okay.  Do you have any questions?
13              MR. WOLF:  No, Your Honor.
14              THE COURT:  Do you have any questions?
15              MR. HUMMEL:  I don't.
16              THE COURT:  All right.  Can you go over there --
17    can you go over there for a second?
18              JUROR:  Yes, sir.
19              THE COURT:  I think we should excuse me him.
20              MR. WOLF:  Yes.
21              THE COURT:  I tend to think we should excuse
22    him.
23              MR. HUMMEL:  I tend to think so, also.
24              THE COURT:  Bring him back.
25              Sir, I'm going to excuse you.  I think this is a
```

1   particularly difficult case for somebody with hearing

2   difficulties.  So I think to be fair to the parties, it

3   would be better for us to get someone else to serve in your

4   place.  All right?

5               JUROR:  Yes, sir.

6               THE COURT:  So if you can go and sit back in the

7   audience until we're done.

8               JUROR:  Thank you.

9               THE CLERK:   Juror number 1, can you please come

10  to side-bar.

11              JUROR:  Good morning.

12              THE COURT:  All right.  Good morning, sir.  You

13  may have set a new record for me of answering questions yes.

14              JUROR:  Sorry about that.

15              THE COURT:  That's all right.  What is your

16  name?

17              JUROR:  David Adcock.

18              THE COURT:  Mr. Adcock.  So you seem to know

19  something about the companies involved here and I gather you

20  or someone in your family gets insulin from I'm guessing

21  it's Sanofi.

22              JUROR:  It's me.

23              THE COURT:  Do you have a positive or negative

24  impression of Sanofi?

25              JUROR:  Extremely negative because of the costs.

1    I have been diabetic for twenty-five years and I have

2    watched the price of insulin go out the roof not only for

3    Sanofi, but other pharmaceutical industries.  And I realize

4    that -- I have been in the science field for a while, I

5    understand the cost of R & D and things like that.  I have

6    also seen the lavish parties and giant bonuses on the

7    pharmaceutical side of things from friends and family that

8    work in the industry at the expense of people like me who

9    will pay $600 for a ninety-day supply of insulin.

10                THE COURT:  So does that mean that you dislike

11    Sanofi but kind of are neutral on other pharmaceutical

12    companies, or do you just dislike Sanofi because you know

13    them and you don't know --

14                JUROR:  I have the experience with Sanofi with

15    regard to the insulin and the history of insulin prices at

16    the expense of people like myself or the general public that

17    are dealing with the same illness to stay alive.  The other

18    pharmaceutical industries, I really don't have one way or

19    the other, but I understand that they are -- you know, the

20    celebrations I'll say over the top seem to be quite

21    excessive at the expense of people who are trying to live.

22                THE COURT:  So if you were Sanofi, you would

23    want yourself not to be on this jury?

24                JUROR:  Yes.

25                THE COURT:  Okay.  Can you go over there with my

1    assistant, please.

2              Do you oppose me excusing him for cause?

3              MR. HUMMEL:  I have no objection.  I certainly

4    do not consent.

5              THE COURT:  Okay.  All right.  I take it you

6    would like --

7              MR. WOLF:  Correct, Your Honor.

8              THE COURT:  Can we bring him back.

9              Well, I appreciate your candor.  I think as you

10   can imagine it's not really a good thing to have someone who

11   hates Sanofi on this jury.

12             JUROR:  They made their bed.

13             THE COURT:  Well, we can debate that.  But in

14   any event, I'm going to excuse you, but if you would go and

15   sit back in the audience.  Don't tell anyone else there your

16   feelings about Sanofi.  Okay?

17             JUROR:  That's fine.

18             THE COURT:  Thank you.

19             THE CLERK:   Juror number 15, can you please

20   come to side-bar.

21             THE COURT:  Good morning, ma'am.  What is your

22   name, please?

23             JUROR:  Melinda Hastings.

24             THE COURT:  Ms. Hastings, I believe you answered

25   one question yes which had to do with the schedule.  Can you

1   tell me about that?

2           JUROR:  Yes.  I'm currently serving as the

3   caregiver of my husband.  He had a triple bypass and we're

4   having to watch the medication that he's on for certain

5   things.  And today I've got him with me in the parking

6   garage in the car while I'm here.  And I apologize for that,

7   but normally I would get my daughter, but she's in Mexico

8   for a week, so I had no one to help me.

9           THE COURT:  Okay.

10          MR. WOLF:  No objection.

11          MR. HUMMEL:  No objection.

12          THE COURT:  So I'm going to excuse you.  And

13  what's more, normally I ask people to go and sit in the

14  audience, but you want to go get your husband in the car and

15  drive out of here?

16          JUROR:  If it would be okay.

17          THE COURT:  Yes.

18          JUROR:  Your Honor, thank you so much.

19          THE COURT:  Okay.

20          JUROR:  Thank you all.

21          THE CLERK:   Juror number 21, can you please

22  come to side-bar.

23          Good morning, sir.

24          JUROR:  That's a lot of billable hours here.

25          THE COURT:  So what's your name, please?

1                    JUROR:  My name is Steven Lewandowski.

2                    THE COURT:  Mr. Lewandowski, do you have some

3      familiar with the legal profession?

4                    JUROR:  Engineering consultant.

5                    THE COURT:  So you mentioned that the schedule

6      would be a problem for you.  Can you tell me about that?

7                    JUROR:  Yes.  I'm a licensed professional

8      engineer in the State of Delaware.  I work for a local

9      consulting firm.  I manage a team of about five other

10     engineers and technicians in our Dover office.  We support

11     several municipalities and local utilities including

12     Artesian Water Company, Town of Middletown, Town of

13     Millsboro.  There is a lot going on at work now,

14     particularly construction.  There is construction issues

15     that require my daily attention right now, just the duration

16     of the project and the managing the team that supports the

17     projects and attending to client needs would be problematic

18     at this juncture.

19                    THE COURT:  So do you do most of your work

20     sitting in the Dover office by telephone and e-mail, or are

21     you out at sites or some combination?

22                    JUROR:  A combination.  During construction

23     right now, when we have some projects that I manage and

24     design that are under construction, for example, a water

25     treatment facility, there are problems that come up that

1    require my attention at the site.  Most of my work, though,

2    is from the office, managing the individuals that support

3    the projects.

4              THE COURT:  So is there ever a good time for you

5    to serve on a jury?

6              JUROR:  Right now, no.  When I retire, probably.

7              THE COURT:  Go ahead.

8              JUROR:  Just it's a senior role.  Just a lot of

9    people rely on me, frankly.

10             THE COURT:  And I guess what I'm wondering then,

11   I'm not asking it very well, is normally a person such as

12   yourself is a very good juror, and you know, we want to

13   encourage everyone to do jury service.

14             JUROR:  I understand.

15             THE COURT:  It's part of what goes with

16   citizenship, but we -- I just don't like to excuse people

17   because they're successful and have a lot of

18   responsibilities.

19             JUROR:  I understand.  I understand.

20             THE COURT:  So I guess what I'm wondering is

21   would you think that I had lost my mind if I said hey, I

22   think people can cover for you, you can, I'm sure you work

23   more than eight hours a day already.

24             JUROR:  That is the truth, it's certainly not a

25   forty-hour-a-week job.  Under other circumstances where I

1    didn't have a project under construction right now.  First

2    of all, there is about two people in our Dover office,

3    myself is one of them, that has a senior role, 25 years

4    experience, so projects, there is a situation that came up

5    yesterday, contractor poured a concrete sump in the wrong

6    place for a water treatment plant.  So the client is looking

7    for me today for a solution because there is a contractor

8    waiting for resolution for his mistake.  There is one other

9    person in the office that can support that kind of response

10   to our clients.  He's the division director, but just

11   doesn't have the detailed knowledge that went into

12   preparation of the contract documents, the design drawings

13   and specifications of the drawings, so he can't adequately

14   know all the information that went into the design decisions

15   that are the basis of the contract documents.  It's a tough

16   spot to be in to be absent from the office for work for five

17   days.

18              THE COURT:  So one thing is we're not going to

19   have trial tomorrow and I understand you can't anticipate

20   problems in advance of them occurring, but in terms of sort

21   of having people who are ready to substitute for you,

22   perhaps not with the same degree of knowledge and to the

23   detail, is that too much to ask?

24              JUROR:  It would be -- it is.  It is.

25              THE COURT:  Okay.  Any questions from you?

```
 1                    MR. WOLF:  No, Your Honor.

 2                    THE COURT:  Any questions from you?

 3                    MR. HUMMEL:  No.

 4                    THE COURT:  Mr. Lewandowski, can you go over

 5       there with my assistant for a minute?

 6                    JUROR:  Sure.

 7                    MR. HUMMEL:  He clearly doesn't want to serve,

 8       Your Honor.

 9                    THE COURT:  Okay.

10                    MR. WOLF:  Your Honor, you're right what you

11       said, that he's a juror, if he's -- again.

12                    THE COURT:  Wait a second, so it sounds like

13       both of you recognize he really does not want to be here, so

14       I'm going to excuse him, unless one of you objects.

15                    MR. HUMMEL:  No one objects.

16                    MR. WOLF:  I'm not going to object.

17                    THE COURT:  All right.

18                    JUROR:  Your Honor.

19                    THE COURT:  So it's partly against my better

20       judgment but I am going to excuse you because I think that

21       your feelings that you really don't want to be here are

22       strong enough that it is probably not fair to the parties

23       under the circumstances.  So if you can go back and take

24       your seat and wait until we're finished and then you're

25       excused.  All right?
```

1           JUROR:  Thank you, Your Honor.

2           THE COURT:  All right.

3           THE CLERK:   Juror number 43, will you please

4    come forward and take the second seat in the second row, 43.

5           Number 37, can you please come to side-bar.

6           THE COURT:  Good morning, ma'am.  What is your

7    name, please?

8           JUROR:  Betty Thomas.

9           THE COURT:  Ms. Thomas.

10          JUROR:  Yes.

11          THE COURT:  So I think you answered two

12   questions yes.  Let's deal with the schedule first.  What is

13   your issue?

14          JUROR:  Well, I'm a full-time mom.

15          THE COURT:  A full-time mom.

16          JUROR:  Yes.

17          THE COURT:  Okay.

18          JUROR:  So I stay at home, and we will be up

19   here in the same building, I just looked at the date, I

20   mean, the address and I'll be here the 22nd at 9:00 o'clock,

21   I have to be at court.

22          THE COURT:  Okay.  You have a proceeding in the

23   bankruptcy court?

24          JUROR:  Yes.

25          THE COURT:  I'm sorry, which day?  February

1    22nd?

2                    JUROR:  Yes.

3                    THE COURT:  What is today, the 19th?  So that's

4    Friday at 9:00 a.m.  I don't know enough about bankruptcy to

5    know how long these proceedings last.

6                    MR. WOLF:  They're usually cattle calls.

7                    THE COURT:  Yes.  All right.  So in terms of the

8    proceeding in bankruptcy court, I believe that's something

9    theoretically, they work for me, so I can get that changed

10   if that's necessary.

11                   So other than having that conflict, you were

12   talking about being a full-time mom.  Is that a problem with

13   relation to serving?

14                   JUROR:  I have a two year old, a seven year old

15   and a fourteen year old.  And I stay home and take care of

16   them, so the fourteen year old goes to school, so does the

17   seven year old.

18                   THE COURT:  Where do you live?

19                   JUROR:  I live in Magnolia, Delaware.

20                   THE COURT:  The two year old, who is taking care

21   of that child?

22                   JUROR:  We pay $40 to put her as needed in

23   daycare, so that would get expensive.

24                   THE COURT:  I'm sorry, you said 40 hours as

25   needed?

1          JUROR:  No, $40 a day for daycare.

2          THE COURT:  Sorry.

3          JUROR:  That's as needed.

4          THE COURT:  So basically as needed was today?

5          JUROR:  Yes.

6          THE COURT:  So the jury fee is $50 a day as it

7    happens, or so while it gets expensive and there may be

8    other reasons, I think you actually get recompensed for

9    that.

10         JUROR:  They said they do for the gas and tolls.

11         THE COURT:  The gas and tolls we pay for that,

12   too.

13         JUROR:  And they said the parking, too.

14         THE COURT:  So if -- so your two year old can be

15   covered; right?

16         JUROR:  Yes.  Unless she gets sick.

17         THE COURT:  Well, that's always a risk at this

18   time of year.  So with that in mind, is there a hardship in

19   you serving?

20         JUROR:  Yes.

21         THE COURT:  And I may have missed that, maybe

22   you already said it, what is the hardship?

23         JUROR:  Well, we are going through bankruptcy

24   right now, that's the hardship.  We lost income.  I get

25   disability.  My husband makes 645 every two weeks, so our

1    account is in the negative, so --

2                THE COURT:  But in other words, I think we just

3    kind of gone through or I thought we had that basically

4    you'll break -- financially you will break even in terms of

5    the travel and the daycare expenses.  So I'm not sure that I

6    see the financial -- you are having financial hard times, no

7    doubt, but I don't see this adding to it.

8                JUROR:  No, it doesn't add to it.

9                THE COURT:  All right.  So you also answered the

10   question, I think it was the last question.

11               JUROR:  The only reason I answered that was

12   because I wasn't sure, I didn't want to be lying, it said

13   about patent because I did with Invent Health, I did a

14   patent case.

15               THE COURT:  I'm sorry, you applied for a patent?

16               JUROR:  Yes.  Because I was doing Invent Health

17   for a child safety bracelet, so I didn't know if that

18   pertains.  I just wanted to make sure.

19               THE COURT:  That's a good thing to bring up.

20   When did that happen?

21               JUROR:  This was 2016.  2016.

22               THE COURT:  Did you -- was the patent issued or

23   do you know what happened?

24               JUROR:  I don't know.  I make payments to -- I

25   forgot the people who I make payments to for Invent Health,

1    and because we went through bankruptcy they stopped it so I

2    don't know what's going on now.

3              THE COURT:  So did you -- in connection with

4    this patent, did you have to write things down about what

5    the patent was about?

6              JUROR:  Yes.

7              THE COURT:  Was there -- this invent --

8              JUROR:  They sent me a book that Betty Thomas

9    had invented the child safety bracelet and they did my

10   autobiography and stuff like that and what the bracelet

11   entailed and everything.  There was numbers in there and

12   things.

13             THE COURT:  So somebody else invented it, does

14   that mean you're not going to get the patent, do you think?

15             JUROR:  I'm thinking so.

16             THE COURT:  Is there anything about that

17   particular experience that has made you dislike or like the

18   patent system or is it essentially kind of just neutral?

19             JUROR:  Well, I kind of dislike them because I

20   think that would really help the child sex thing, so I kind

21   of dislike that they didn't get it there so it could be out

22   there because that would help cut down on, you know...

23             THE COURT:  So you think the patent office, or

24   somebody made a mistake in not letting you get the patent?

25             JUROR:  I think so.

 1                    THE COURT:  Do you know who made the mistake?

 2                    JUROR:  No, I'm not sure who made the mistake.

 3      I mean, I don't have any hard feelings.  I don't hate them.

 4                    THE COURT:  Okay.  Do you think there is any

 5      reason why you couldn't judge this case fairly when you

 6      learn more, when you learn more about it, as to who is right

 7      between these two different sets of companies that are

 8      disputing patent issues?

 9                    JUROR:  I don't know because I feel like I would

10      miss -- because -- I don't know if mine was patent.

11                    THE COURT:  That really wouldn't impact what you

12      do; right?

13                    JUROR:  No.

14                    THE COURT:  Do you have any questions?

15                    MR. WOLF:  No, Your Honor.

16                    THE COURT:  Do you have any questions.

17                    MR. HUMMEL:  No.

18                    THE COURT:  All right.  Ma'am, can you go over

19      there for a minute.

20                    JUROR:  Sure.

21                    MR. WOLF:  I don't see any cause.

22                    MR. HUMMEL:  I don't see any cause.

23                    THE COURT:  Okay.

24                    So ma'am, I'm going to ask you to take the seat

25      in the jury box, I guess the seat that you came from.  If

1    you -- the group of fourteen is going to be reduced to eight

2    at some point.  If you are on the jury, I will take care of

3    your bankruptcy proceeding in terms of either getting it

4    rescheduled or possibly even -- we'll do something to take

5    care of it so that you don't lose out on anything.  All

6    right?

7                   JUROR:  Okay.

8                   THE COURT:  Can you retake the seat?

9                   JUROR:  Yes.

10                  THE CLERK:   Juror number 9, can you please come

11   to side-bar.

12                  THE COURT:  Good morning, ma'am.  What is your

13   name, please?

14                  JUROR:  Crystal Collins.

15                  THE COURT:  Ms. Collins, so I think you answered

16   that the schedule presented a problem for you.  Can you tell

17   me about that?

18                  JUROR:  I'm moving on Friday.

19                  THE COURT:  To where?

20                  JUROR:  To Stoney Brook in Claymont.  It's

21   subsidized rental housing.

22                  THE COURT:  Like right off of Philadelphia Pike?

23                  JUROR:  Yes.  So I have to go sign my lease on

24   Friday at two o'clock.  They already gave me another week to

25   this Friday.  So like if I don't go this Friday, I could be

1    like pushed off the list.  And I have to move from where I'm

2    at because we got to sublet my mom's house because she

3    passed away and she had a reverse mortgage.

4            THE COURT:  Is someone else signing on the lease

5    besides you?

6            JUROR:  No.

7            THE COURT:  And Friday at 2:00, the signing

8    takes place in Claymont or something?

9            JUROR:  Uh-huh.

10            THE COURT:  Or I guess at the apartments.  And

11    that's essentially your only problem with serving on the

12    jury?

13            JUROR:  Yeah, pretty much.

14            THE COURT:  Okay.  Do you know whether -- how

15    long it takes for -- do you know if this is a long process

16    signing for the lease, or is everything being done, it's

17    just a question of putting your name on a piece of paper?

18            JUROR:  I have to give her my security deposit

19    and first months rent, that's why I had to wait for this

20    Friday.  She told me to be there at Friday at two o'clock.

21    I don't know how long it's going to take.  I asked her if I

22    could come after work at four o'clock because she said no,

23    they close at 4:30, I'm thinking it takes longer than a half

24    hour.

25            THE COURT:  I think Friday what's important is

1    not necessarily two o'clock in particular?

2                    JUROR:  Yeah.

3                    THE COURT:  I think the way we're going to do

4    this schedule is we could actually get you over there well

5    before four o'clock or some other way to take care to give

6    you time to -- did you drive to get here today?

7                    JUROR:  Today, no, I didn't.  I got dropped off

8    because I didn't feel like being bothered with parking.

9                    THE COURT:  So if you were -- do you have a car?

10                   JUROR:  I do.

11                   THE COURT:  Okay.

12                   JUROR:  I would have to go get my check first,

13   that's why I'm waiting for Friday because I needed the rest

14   of my money.

15                   THE COURT:  They want a bank check.

16                   JUROR:  I have to get money orders, she told me

17   to get two separate money orders, I have to go to my job to

18   pick up my paycheck.

19                   THE COURT:  So basically this is all stuff you

20   have to do on Friday.

21                   JUROR:  Uh-huh.

22                   THE COURT:  Any questions?

23                   MR. WOLF:  No, Your Honor.

24                   THE COURT:  Any questions?

25                   MR. HUMMEL:  No questions.

1              THE COURT:  Ma'am, Ms. Collins, can you go over

2     there for a minute.

3              I thought I was going to save her, but I'm

4     sensing that I'm not.  So bring her back.

5              All right, ma'am.  Even though I have been

6     trying to think of ways that you can do all you need to do

7     on Friday and still serve on the jury, you're starting to

8     get ahead of me on this one, so I'm going to excuse you.

9     Good luck with the move.  If you can take the seat in the

10    back until we're done.  Okay?

11             JUROR:  Okay.  Thanks.

12             THE CLERK:  Juror number 38, can you please come

13    to side-bar.

14             I'll have you stand over here kind of close.

15    They've got some questions.

16             THE JUROR:  Okay.

17             THE COURT:  A little closer.  Hi, ma'am.  What

18    is your name?

19             THE JUROR:  Tammi Toliver.

20             THE COURT:  Ms. Toliver.

21             THE JUROR:  Mm-hmm.

22             THE COURT:  I think you answered that the

23    schedule presented a problem.  Can you tell me about that?

24             THE JUROR:  My main concern was with work.  I

25    work for a small insurance agency, so my workload.

1  Concerned about my work mostly.

2           THE COURT:  Okay.  So when you say "small," how

3  many people work for this agency?

4           THE JUROR:  I'm in person lines, so in personal

5  lines there's five of us.

6           THE COURT:  All right.  And by "personal lines,"

7  are you the one who's actually selling the insurance?

8           THE JUROR:  No.  Businesses come in to our

9  agency, and then it goes to a producer I'm actually

10  servicing.  So when an insured calls in, I'm the one that

11  would take care of their policies, any endorsements, things

12  like that, new quotes if they want me to shop their policy

13  for them or --

14           THE COURT:  So if you're not there on Thursday

15  and Friday, is somebody else going to answer their

16  questions?

17           THE JUROR:  I would hope so.  It was never

18  discussed before I left, that's why I'm worried about it.

19           THE COURT:  Okay.  Well, I would think that,

20  just as if you got the flu, they would be able to cover for

21  a couple days.

22           So do you mind serving on the jury?

23           THE JUROR:  I don't mind, I guess.

24           THE COURT:  Okay.  You're a little nervous about

25  it.

1                    THE JUROR:  Well, I live in Rehoboth, so it's

2     two hours each way for me.

3                    THE COURT:  So if we -- and this may not work

4     out with your family life, but you know, if it helps, we can

5     put you up in a hotel on Thursday night so that it would be

6     two less trips.  Would that help?

7                    THE JUROR:  It could.

8                    THE COURT:  Okay.  So I'd like to keep you on

9     the jury because we don't want to, you know, essentially

10    disqualify people from Sussex County just because it's a

11    long drive.  That's part of the way the Federal Court works

12    with the whole state.

13                   So if I keep you on the jury, you'll give the

14    parties a fair shake.

15                   THE JUROR:  Yes.

16                   THE COURT:  Okay.  Any questions?

17                   MR. WOLF:  No, Your Honor.

18                   THE COURT:  Any questions?

19                   MR. HUMMEL:  No questions, Your Honor.

20                   THE COURT:  Okay.  Can you retake your seat,

21    please?

22                   THE JUROR:  Sure.

23                   THE CLERK:  Okay.  Juror Number 23 --

24                   THE COURT:  Wait.  Wait.  Wait.  Not that seat.

25    That seat.  Sorry, my mistake.  My mistake.

```
 1                    THE CLERK:  And then Juror Number 23, please
 2    come to side-bar.
 3                    (Discussion held off the record:)
 4                    THE COURT:  She's getting her purse or
 5    something.
 6                    THE CLERK:  Stand in here close.
 7                    THE COURT:  All right, ma'am.  Hi.  How are you
 8    doing?
 9                    THE JUROR:  Good.  Great.
10                    THE COURT:  You look happy to be here.
11                    THE JUROR:  Well --
12                    THE COURT:  This is a rarity.
13                    THE JUROR:  Oh.
14                    THE COURT:  What's your name, please?
15                    THE JUROR:  Nancy Lueckel.
16                    THE COURT:  Ms. Lueckel, so you answered the
17    question that there was something, poor vision, difficulty
18    hearing, difficulty speaking or writing English that would
19    make --
20                    THE JUROR:  I have no trouble speaking.  It is
21    -- I was just with -- with the hearing, I just didn't know
22    what kind of acoustics it was going to be.
23                    THE COURT:  Okay.
24                    THE JUROR:  Meaning I just didn't know.
25                    THE COURT:  Well, so normally the courtroom only
```

```
 1   has one person speaking at a time.

 2              THE JUROR:  Mm-hmm.

 3              THE COURT:  They will be looking at you just

 4   like I am.

 5              THE JUROR:  That's --

 6              THE COURT:  As you see on TV, there's somebody

 7   at the podium.  There's somebody on the stand.

 8              THE JUROR:  Yeah.

 9              THE COURT:  There's not this background noise

10   that we use to keep these conversations private.

11              THE JUROR:  Okay.  There's going to be no

12   problem then.  I just didn't want to be -- you know, I

13   didn't want to tell a fib and --

14              THE COURT:  No.

15              THE JUROR:  You know, I just wanted to make sure

16   that that's how it was going to be.

17              THE COURT:  Okay.  Well, then why don't you

18   retake your seat.

19              THE JUROR:  Okay.

20              THE COURT:  So we now have a qualified group of

21   14.  Are you ready to exercise your preemptories which

22   you'll do with my staff passing the list back and forth?

23              MR. WOLF:  Yes, Your Honor.

24              THE COURT:  Mr. Wilks is a pro at this in my

25   courtroom.  I'm sure Ms. Sharp is, too.
```

```
 1                    THE COURT:  We can turn this off.

 2                    (Conference held at side-bar was concluded.)

 3                    THE COURT:  So members of the jury, what's going

 4     to happen now, the 14 of you are going to be reduced to

 5     eight.  There's a process, and you'll see perhaps pieces of

 6     paper going back and forth.

 7                    It takes a few minutes.  I don't really know how

 8     long it will take, but it will take some amount of time.

 9     We'll be kind of quiet.  And then when they've done that,

10     we'll ask six of you to get out.  The eight who are left

11     will be the jury.

12                    All right?

13                    THE CLERK:  Okay.  When I call your number, it

14     means you're free to leave the jury box.

15                    Juror Number 3, you are good to go.

16                    Juror Number 33, you are also free to leave.

17                    Juror Number 24, you can leave.

18                    Juror Number 25, you're good to go.

19                    Juror Number 21 -- oh, sorry, misspoke there.

20     Juror Number 28, you're good to go.

21                    And Juror Number 45, you can also leave.  Okay.

22                    Okay.  Once we get everyone out, I'll reposition

23     you in the box.

24                    Okay.  So Juror Number 26, you're going to

25     remain where you are.
```

 1                     Twenty, you're good.

 2                     Number 6, if you could move down, you're going

 3     to be in the third seat now.

 4                     And Juror Number 22, you're going to be in the

 5     fourth seat.

 6                     Juror Number 43, you're now going to be in the

 7     first seat, so if you can move over one.

 8                     Juror Number 37, you're going to be in the

 9     second seat.

10                     Juror Number 38, you'll be in the third seat.

11                     And Juror Number 23, you'll be in the fourth

12     seat, so...

13                     THE COURT:  All right.  Can we swear the jury,

14     please?

15                     THE CLERK:  Please rise and raise your right

16     hand.  You and each of you do so swear, those of you who

17     swear, and you and each of you do affirm, those of you who

18     affirm, that you will well and truly try the issue joined

19     wherein Amgen, Inc., Amgen Manufacturing Limited, and Amgen

20     U.S.A., Inc. are plaintiffs and Sanofi, Aventisub, LLC,

21     Regeneron Pharmaceuticals, Inc. and Sanofi-Aventis U.S. LLC

22     are defendants, and that you will a true verdict render,

23     according to the evidence, so help you God, those of you who

24     swear, and you do so affirm, those of you who do affirm?

25                     The correct response is I do.

1          THE JURY:  I do.

2          THE COURT:  All right.  Please be seated.  So

3    members of the panel, we now have our jury, so you're

4    excused.  On behalf of the Court and the parties, I do want

5    to thank you for being here.

6          You can see from the number of different people

7    we talked to, the number of people who sat in the chairs

8    that are now not sitting in the chairs under the rules that

9    govern us, we need a lot of people here to get a jury.  So I

10   appreciate all of your time, and I wish you a good day.

11         All right.  You all can leave.

12         All right.  Members of the jury, we're going to

13   take a break in a few minutes so you can call people and

14   tell them what your schedule is going to be here.  And

15   normally that break might be 15 minutes, but if you need

16   more time because we don't have enough phones, we'll take as

17   much time until you're all ready.

18         In the meantime, I do want to just tell you one

19   or two things which is you're only going to be allowed to

20   consider the evidence that's presented in the courtroom.  So

21   don't read anything that you might find on this case, you

22   know, on the Internet or somewhere.  Basically nothing other

23   than what's admitted into evidence through the testimony you

24   hear counts.

25         So I also want to tell you not to do any

1    independent research or investigation on your own on

2    anything that you hear about here and not to communicate

3    with anyone about the case through any means, including

4    phone, email, text messaging, blog, website, or any way of

5    other social networking websites or by any similar

6    technology or social media.

7                     Okay.  So bear that in mind.

8                     Can we take the jury out?

9                     (Jury leaving the courtroom at 11:29 a.m.)

10                    All right.  So we'll take a break in a moment,

11   too, but I just did want to tell you so you could provide

12   your slide that I've looked at this defense trial

13   Exhibit 3193 and -- you can be seated -- and considered that

14   while I think the existence of RN 316 is admissible for

15   written-description-type issues, I don't think the purpose

16   of this letter is for that or this email.  I think the

17   purpose that it is being offered for has something to do

18   with enablement, and I think it is in the catabolic antibody

19   sort of program that I've said we're not going to have

20   testimony about.  So I'm going to not allow defense trial

21   Exhibit 3193 to be shown to the jury or to be admitted into

22   evidence.

23                    And to the extent that there are other things

24   like that, the defendants should follow suit accordingly.

25                    MR. WOLF:  Your Honor, may I be heard briefly?

```
 1                    THE COURT:  Sure.
 2                    MR. WOLF:  First of all, we're preparing a bench
 3       memo to address these issues just so we have the record.
 4       There were certain statements made about what was and was
 5       not disputed that we strongly dispute.  It strikes us as
 6       axiomatic that if they did not possess something in 2012,
 7       they did not possess it in 2008 at the time of filing.
 8                    THE COURT:  But it's not the same thing, you
 9       know --
10                    MR. WOLF:  Can I show you one more document,
11       Your Honor, just to give you an example?
12                    THE COURT:  Sure.
13                    MR. WOLF:  So handing up -- this is Page 2 of
14       Exhibit 3221.  If I may, Your Honor?
15                    THE COURT:  Sure.
16                    MR. WOLF:  It's on the screen.  This is an Amgen
17       internal document from 2012.  It's showing what they
18       characterize themselves as a missing epitope.  That is that
19       central area.  This is exactly -- is the area.  And on the
20       left, you see J16 which is the Pfizer antibody which is
21       directly in the center.
22                    So, in other words, Pfizer had something that
23       Amgen did not, yet they're claiming that they have
24       described, and therefore, are entitled to claims that cover
25       it.  Respectfully, Your Honor, this is exactly the sort of
```

1    evidence we believe the Federal Circuit sent this case back

2    for, at least in part.  And this is a central part of our

3    case.

4              With this kind of evidence excluded, to be

5    candid, we fear that we'll be back here again because this

6    is the kind of thing that the jury should -- they're going

7    to have a witness say, We knew all this in 2008.  And our

8    response is going to be, How could that possibly be the case

9    when you didn't know it in 2012?

10             THE COURT:  So I lost track of -- what did you

11   say is the Pfizer thing?

12             MR. WOLF:  The J16, so on the left --

13             THE COURT:  Okay.

14             MR. WOLF:  -- is a Pfizer antibody.  So Amgen

15   got ahold of Pfizer's antibody after they published it, and

16   they analyzed it and it sits squarely in the middle in

17   what's called the missing epitope.  And there are a series

18   of documents where Amgen acknowledges that they don't have

19   this missing epitope, whereas the other competitors and ours

20   Regeneron's, Pfizer's and Merck's do.  And under the Abbvie

21   case, among others --

22             THE COURT:  Well, you know, so you're going to

23   say that here's some antibodies that fall within the genus;

24   right?

25             MR. WOLF:  Yes, Your Honor.

```
1              THE COURT:  And you know, depending on the
2    response that they make, maybe they'll say something.  You
3    know, it's hard to -- it's hard to know what they're going
4    to say in response.  But at least as far as the written
5    description goes, you know, you've got -- are these things
6    representative or not?  Do they have the appropriate
7    structure or not or structure described?
8              MR. WOLF:  Right.
9              THE COURT:  I don't see how this is helping.
10             MR. WOLF:  Your Honor, if they say it's -- the
11   claim is that the handful of antibodies in the patents are
12   representative of, among other things, the competitor
13   antibodies, and they subsequently have document after
14   document after document saying, We don't have this.  We need
15   this.  We want this.  That suggests, I believe, strongly, in
16   fact, dispositively that it's not representative.  It will
17   reinforce everything -- our experts rely on this.  It
18   contradicts what their experts say.
19             And Your Honor, although it hamstrings me, I
20   will leave this alone for opening.  Obviously, I will follow
21   Your Honor's instructions, but we ask that you at least take
22   an opportunity to look at the bench memo so you can
23   understand whether you find it appropriate for the expert
24   testimony because this really is the centerpiece of our
25   case.
```

```
 1                    THE COURT:  Okay.  All right.  Well, when you
 2      get the bench memo in, I guess I'll read it.  Well, I mean,
 3      I will read it.
 4                    So can we take a recess now?
 5                    MR. WOLF:  Thank you, Your Honor.
 6                    THE CLERK:  All rise.
 7                    MR. WOLF:  Your Honor, in fact, I've just been
 8      handed such bench memo.
 9                    THE COURT:  Well, hand it up.
10                    MR. WOLF:  That was fast work.
11                    THE COURT:  Can we have two copies?
12                    MR. WOLF:  Yes, of course.
13                    (Recess was taken.)
14                    THE COURT:  All right.  So I did read the bench
15      memo.  And it's pretty much impossible to rule on these
16      things in advance of hearing the lead up as to why these
17      things might be relevant.  So, you know, I do think to talk
18      about the catabolic research program should not be in.  But
19      on the other hand, I'm looking at the bullet points in the
20      memo, and when I hear or I see something that says Amgen
21      scientists is the next lab bullet point, it certainly seems
22      to me -- I see the word structure is in it, and talking
23      about some difference between it that if the premise is that
24      this is an antibody within the genus, the fact that it's
25      being described as being different seems like it is
```

1  relevant.

2           But for the most part, you're just going to have

3  to offer these exhibits as you go and people can make

4  objections and I will rule on them.  Lay enough foundation

5  so I can tell what I'm ruling on.

6           MR. WOLF:  So I will tread lightly on opening

7  and we will see where we go with each witness.

8           THE COURT:  So one or two jurors are making

9  phone calls.  By the way, you can all be seated.  Sorry.  As

10  soon as I sit down, even if I don't say be seated, you

11  should sit down.

12           So basically once we get them in, I'll read the

13  opening, or read the jury instructions, play the video.  I

14  think there will be enough time for your opening.

15           MR. WOLF:  Can we take the lunch break, we have

16  not retooled.

17           THE COURT:  We'll do that.

18           MR. WOLF:  Thank you, Your Honor.

19           THE COURT:  Can I just see Mr. Hummel and

20  Mr. Wolf over at side-bar for just a second.  Off the

21  record.

22           (Discussion off the record.)

23           THE COURT:  Okay.  Let's get the jury.

24  Ms. Sharp, you're ready to go -- actually, I don't even

25  know, who is in charge of the video?

1          MR. HUMMEL:  That's a good question.

2          MS. SHARP:  We do.

3          THE COURT:  You're ready to go with it if I cue

4     it?

5          MR. HUMMEL:  Yes.

6          (Jury entering the courtroom at 11:55 a.m.)

7          THE COURT:  All right.  Be seated.  So when you

8     come in, you don't have to wait for me to say be seated.

9     The lawyers, the parties stand out of respect for the

10    function that you serve as being finders of facts.

11         So you have been sworn and in a few minutes I'm

12    going to give you some preliminary instructions to guide you

13    in your participation in this trial.  But the first thing

14    we're going to do is we're going to start the trial with a

15    short video that explains patents and the patenting process

16    to give you some background.  And I would just tell you that

17    this is not specific to this case, so there will be some

18    information that is just background, it has nothing to do

19    with what this actual case is going to be discussing.

20         All right.  Can we play the video, please.  I

21    forget whether we dim the lights a little.

22         MR. HUMMEL:  Yes, Your Honor, I think we would.

23         (Videotape:)

24         Hello.  I'm Jeremy Fogel.  I have been a United

25    States District judge since 1998 and I am now the director

1    of the Federal Judicial Center.

2              As you probably know by now, this is a patent

3    case.  So you may be wondering how can I sit in judgment on

4    a case like this when I'm not entirely sure what a patent

5    is.  We hope to answer that concern with this brief video

6    which will give you some of the background needed to do your

7    job.

8              This case will involve some special issues that

9    the judge and lawyers will explain to you.  But all patent

10   cases involve some basics that you will learn about.  This

11   video will discuss what patents are, why we have them, how

12   people get them, and why there are disputes that require us

13   to call in a jury like you.  We'll also show you what

14   patents look like.

15             The United States Constitution gives Congress

16   the power to pass laws relating to patents.  Article 1,

17   Section 8, clause 8, allows congress to promote the progress

18   of science and useful arts by securing for limited times to

19   authors and inventors the exclusive right to their

20   respective writings and discoveries.

21             A patent then is an official grant by the United

22   States government that gives its owner certain rights to an

23   invention.  Those include the right to stop others from

24   making, using, selling or offering for sale the invention

25   that is claimed in the patent.

1          A patent lasts for a specific period of time,

2     usually twenty years from the date the application is filed

3     by the inventor.  But because it takes an average three

4     years for the Patent and Trademark Office to act on the

5     application, the effective life of a patent is closer to

6     seventeen years.

7          A patent represents a bargain made between the

8     government and the inventor.  In return for the right to

9     prevent others from using the invention, the inventor must

10    enhance the public knowledge, what we sometimes call the

11    state of the art, by adding something new and useful to it.

12    A famous example is Thomas Edison's invention of a light

13    bulb.  Harnessing electric for illumination transformed

14    society and led to many other important breakthroughs.

15    During the lifetime of the patent, its disclosure may

16    inspire new inventions and after it expires, the invention

17    is free for anyone to use.

18         It is this combination of something new and

19    valuable to the public that justifies granting time limited

20    patent protection to the inventor.  A patent is in many ways

21    like a deed to a piece of property.  It grants the owner the

22    right to keep people off the property or to charge them a

23    fee like rent for using it.

24         And just as a deed indicates boundaries defining

25    the landowner's property, a patent claim defines the

1    patentee's domain.

2            The patent system works because the inventor is

3    required to describe the invention in clear and specific

4    terms so that the public knows what the boundaries of the

5    invention are.  Once a patent is issued by the government,

6    it becomes available for public inspection.  In that way,

7    anyone who learns of the patent can read it and understand

8    exactly what the inventor invented and the limits of the

9    patent set forth in the claims.

10            Now that we understand what a patent is, let's

11    take a closer look at the term invention.  An invention is a

12    new way of solving a problem, or a useful new machine,

13    manufacturer or composition of matter.  The patent process

14    begins in the mind of the inventor, and in particular when

15    the invention is formulated in the mind of the inventor.

16    Patent lawyers call this conception.

17            This is when the idea occurs to the inventor

18    clearly enough that he or she can write it down and explain

19    it to someone.  To qualify for a patent, the invention needs

20    to be new and useful.  Also, it must not be obvious to one

21    of ordinary skill in the field.  If the inventor believes

22    these requirements are met, he or she will prepare an

23    application for filing with the Patent and Trademark Office

24    whose headquarters are in Alexandria, Virginia, just outside

25    of Washington DC.  The Patent and Trademark Office, often

1    called the PTO, is the agency of the federal government

2    whose job it is to examine patent applications to make sure

3    they were in proper form and complied with the requirements

4    of the law.

5            The inventor can prepare an application for

6    filing with the PTO, but usually it is drafted by a patent

7    attorney or a patent agent who specializes in what is called

8    prosecuting patent applications, that is the process by

9    which they are evaluated.  The attorney or agent works with

10   the inventor to be sure the invention is described and

11   claimed in a way that complies with the law and the

12   regulations of the PTO.  98 percent of patent applications

13   are made online using the PTO's electronic filing system,

14   although a few paper applications are still made.

15           When the PTO receives the inventor's

16   application, it is first checked to see if it is complete

17   and complies with all the PTO's application requirements.

18   It is assigned to a patent examiner, a staff person with a

19   background in the field or art the invention falls within to

20   evaluate the application and decide whether a patent can be

21   granted.

22           You have been given a sample patent to refer to

23   as you watch this video, so you already have a sense of what

24   a patent looks like.  But now let's take a closer look at

25   the three main parts of the patent.  To begin with there are

1    some basic identifying information on the first page.  This

2    material is highlighted in your handout.  On the upper right

3    side of the page is the number assigned to the patent by the

4    PTO.  And on the left side is a title that describes the

5    invention and the names of the inventors and sometimes the

6    company for whom they assigned the patent.  Also on the left

7    is the date when the patent application is filed.  And back

8    on the right is the date when the patent was issued.  There

9    also is more detailed information on the first page,

10   including a list of numbers following the caption field of

11   search.  These numbers identify previously issued patents

12   the examiner looked at or searched to make sure the

13   applicant's claimed invention really is something new, not

14   obvious, and thus, patentable.

15          Also listed on the first page are what we call

16   references.  That is previous patents or articles that

17   describe the technology or prior art known at the time the

18   application was filed.  It may seem strange to you that we

19   call this preexisting technology prior art, even though it

20   has nothing to do with artists.  We use the word art in its

21   historical sense to include inventions and other subject

22   matter reasonably related to the claimed invention.  We also

23   refer to the latest technology as state of the art and we

24   say of someone who can understand or apply the technology

25   that he or she is skilled in the art.

1            The second major part of the patent is what we

2    call the specification or written description.  As is the

3    case in your sample, it is usually the longest part of the

4    patent.  It includes an abstract which is a brief summary of

5    the invention; a background section that describes the

6    nature of the problem the invention is supposed to solve;

7    one or more drawings called figures that illustrate various

8    aspects of the application; and a detailed description of

9    one or more embodiments of the invention.  An embodiment is

10   a specific device or method that uses the invention such as

11   a particular form of light bulb.

12           The third and most important part of the patent

13   is the claims.  These are the numbered paragraphs that

14   appear at the end.  The claims are what give the public

15   notice of the boundaries of the invention.  They are similar

16   to the description of property you may have seen in the

17   deed, referring to precise measurements taken on the ground.

18   The judge will instruct you further on how any technical or

19   ambiguous terms in the patent claims should be understood.

20           Now that we have discussed the main part of the

21   patent, let's look at how the PTO processes patent

22   applications, what we referred to earlier as prosecution of

23   the patent application.  This process begins when the

24   inventor's application arrives at the PTO.  There it

25   receives a filing date.  Under the American Invents Act of

1    2011, filing dates will determine who was awarded the patent

2    if there are competing valid applications.

3                            In 2012, the PTO received nearly

4    600,000 patent applications and issued more than 270,000

5    patents.  After determining that the application is

6    complete, the receiving branch also decides what field of

7    technology an application relates to and assigns it to the

8    appropriate examining group.

9                            In order to make that decision, the

10   patent examiner usually looks at patents that have been

11   issued previously in the same or closely-related fields of

12   art.  The examiner has computer databases that contain

13   information used to accomplish this task.

14                           Another part of the job is to decide

15   if the inventor's description of the invention is complete

16   and clear enough to meet the requirements for a patent,

17   including the requirement that the description enable

18   someone of ordinary skill in the field to actually make and

19   use it.

20                           However, because the job of examining

21   so many applications is challenging, the law requires the

22   applicant to tell the examiner whatever he or she knows

23   about the prior art that might be important to the

24   examiner's decision on whether to allow the patent.  We call

25   this the applicant's duty of candor.

1              One way the applicant can satisfy this

2      duty is by bringing pertinent prior art to the attention of

3      the examiner, either in the original application or in other

4      submissions called information disclosure statements.

5              In this way, the decisions of the examiner are

6      based on both the information provided by the applicant and

7      on the information the examiner finds during his or her

8      prior art search.

9              Sometimes the examiner concludes that

10     the application meets all the requirements we've discussed

11     and allows the patent to issue at this first stage.  But

12     more frequently, the examiner will reject the application as

13     deficient in some respect.  This decision will be

14     communicated by the examiner in what is called an office

15     action, which is a preliminary notice to the applicant of

16     what the examiner finds insufficient or unpatentable.

17             So, for example, the examiner may reject certain

18     claims as being unpatentable because a journal article

19     written and published by another person prior to the

20     effective filing date of the patent application disclosed

21     what the applicant was currently claiming.  At that point,

22     the applicant prepares a written response either agreeing or

23     disagreeing with the examiner.  An applicant who agrees with

24     the examiner can suggest amendments to the application

25     designed to overcome the examiner's rejection.

1              Alternatively, an applicant who

2    disagrees with the examiner's office action can explain the

3    reasons for the disagreement.  This exchange of office

4    actions and responses goes on until the examiner issues a

5    final office action which may reject or allow some or all of

6    the applicant's claims.  The overall process is referred to

7    as the prosecution history of the application.

8              The written incoming and out going

9    correspondence between the PTO examiner and the applicant is

10   also called the file wrapper.  In the past, these file

11   wrappers were all in paper form as were the submitted

12   applications.

13             Now, they are most often electronic

14   and may occasionally be paper as well.  Most patent

15   applications filed on or after November 29th, 2000, are

16   published by the PTO 18 months after the inventor has filed

17   his or her application so that the public may inspect it.

18   Once a final PTO office action has occurred and one or more

19   claims have been allowed, the applicant is required to pay

20   an issuance fee, and the patent is printed.

21             Then on the date shown on the upper

22   right-hand corner of the first page of the patent, it is

23   issued by the PTO and the inventor receives all the rights

24   of a patent.  That date is highlighted on your sample.

25             Once a patent has issued, the

1    inventor, or the person, or company the inventor has

2    assigned a patent to can enforce the patent against anyone

3    who uses the invention without permission.  Sometimes in a

4    Court case, you are also asked to decide about validity.

5    That is, whether the patent should have been allowed at all

6    by the PTO.

7                     A party accused of infringement is

8    entitled to challenge whether the asserted patent claims are

9    sufficiently new or non-obvious in light of the prior art or

10   whether other requirements of patentability have been met.

11   In other words, a defense to an infringement lawsuit is that

12   the patent in question is invalid.

13                    You may wonder why it is that you

14   would be asked to consider such things when the patent has

15   already been reviewed by a government examiner.  There are

16   several reasons for this.

17                    First, there may be facts or arguments

18   that the examiner did not consider such as prior art that

19   was not located by the PTO or provided by the applicant.  In

20   addition, there is, of course, the possibility that mistakes

21   were made or important information overlooked.  Examiners

22   have a lot of work to do and no process is perfect.

23                    Also, unlike a Court proceeding,

24   prosecution of a patent application takes place without

25   input from people who might later be accused of

1   infringement.  So it is important that we provide a chance

2   for someone who is accused of infringement to challenge the

3   patent in Court.

4           In deciding validity, it is your job to decide

5   the facts of the case.  The judge will instruct you about

6   the law which may include the meaning of certain words or

7   phrases contained in the patent.

8                   So it is your primary duty as jurors

9   to resolve any factual disputes, and in some cases such as

10  validity to apply the law to those facts.  To prove

11  invalidity, the alleged infringer must persuade you by what

12  is called clear and convincing evidence that the patent is

13  invalid.  The judge in your case will explain these and

14  other terms and provide additional specific instructions at

15  the appropriate time.

16                  Good luck with your task, and thank

17  you for your service.

18                  (Conclusion of video.)

19          THE COURT:  All right.  Let's hit the light and

20  put that on.

21          So I have the following preliminary

22  instructions.  As I've mentioned, during the jury selection,

23  this is a civil case for patent infringement that arises

24  under the patent laws of the United States.  The plaintiffs

25  are three companies that I will call plaintiff or Amgen, and

1    the defendants are four companies that I will call

2    defendants or Sanofi and Regeneron.

3            Amgen is a company that's engaged in the

4    development, marketing and sale of drugs known as biologics

5    which are used to treat and cure serious diseases and

6    illnesses.

7            Defendants are also engaged in the development,

8    marketing, and sale of drugs known as biologics used to

9    treat serious diseases and illnesses.  Both plaintiffs and

10   defendants have developed FDA-approved monoclonal antibody

11   products that lower LDL or bad cholesterol.

12           Amgen's product is called Repatha or evolocumab.

13   Defendant's product is called Praluent or alirocumab.

14           Plaintiff is the owner of two United States

15   patents that are at issue in this case.  U.S. Patent Number

16   8,829,165 which I will refer to and I think the parties will

17   as the '165 patent.  And U.S. Patent Number 8,859,741 which

18   I will refer to as the '741 patent.

19           If I talk about the patents together, I will

20   call them the patents-in-suit.  Copies of these patents will

21   be given to you during the course of the trial.

22           And so a patent case generally involves two

23   steps.  The first step is determining whether the accused

24   product or method falls within the scope of the patent

25   claims.  That is, does the accused product or method

1    infringe the patent claims?

2            The second step is determining whether the

3    patent is valid.  In this case, the parties agree that the

4    accused product Praluent infringes claim 7, 15, 19 and 29 of

5    the '165 patent, and claim 7 of the '741 patent if the

6    patent claims are valid.  Defendants contend that the

7    asserted claims, the five that I just mentioned, are

8    invalid.  Their legal argument, which you're going to hear

9    more about and it's going to the primary subject of the

10   testimony is two particular defenses.  One of which is

11   called or often referred to as lack of sufficient written

12   description and the other of which is generally referred to

13   as lack of enablement.

14           The parties will talk about that, I'm sure,

15   during their opening statements, but the main thing other

16   than just giving you the labels of these two is they are the

17   only two issues in this case that you're going to be asked

18   to decide.

19           So I mentioned this is a civil case.  Defendants

20   have the burden of proving that the patents-in-suit are

21   invalid by clear and convincing evidence.  Clear and

22   convincing evidence is evidence that provides an abiding

23   conviction that the truth of a factual contention is highly

24   probable.

25           It will be your duty to find what the facts are

1    from the evidence as presented at trial.  You and you alone

2    are the judges of the facts.  You will have to apply those

3    facts to the law as I will instruct you at the close of

4    evidence.

5            You must follow the law whether you agree with

6    it or not.  As I've said, you are the judges of the facts.

7    I will decide which rules of law apply to this case.

8            Nothing I say or do during the course of the

9    trial is intended to indicate what your verdict should be.

10   The evidence from which you will find the facts will consist

11   of the testimony of witnesses, and documents, and perhaps

12   other things that are admitted into evidence.

13           In addition, the evidence may include certain

14   facts as agreed to by the parties or as I instruct you.

15   Certain things are not evidence.  Statements, arguments, and

16   questions by lawyers are not evidence.  Objections to

17   questions are not evidence.  Lawyers have an obligation to

18   their clients to make an objection when they believe

19   testimony or exhibits that are being offered into evidence

20   are not admissible under the rules of evidence.

21           You should not be influenced by a lawyer's

22   objection or by my ruling on the objection.  If I sustain or

23   uphold the objection and find the matter is not admissible,

24   you should ignore the question or other item of evidence.

25   If I overrule the objection and allow the matter into

1    evidence, you should consider the testimony or other item of

2    evidence as you would any other evidence.

3         If I instruct you during the trial that some

4    item of evidence is admitted for a limited purpose, you must

5    follow that instruction and consider the evidence for that

6    purpose only.  If this does occur during the trial, I will

7    try to clarify this for you at the time.

8         You should not consider testimony of documents

9    that I have excluded and that are not admitted into

10   evidence.  Anything you see or hear outside the courtroom is

11   not evidence and must be disregarded.  You are to decide

12   this case solely on the evidence presented here in the

13   courtroom.  During trial, you will be shown charts and

14   probably animations to help illustrate the testimony of the

15   witnesses.  These illustrative exhibits which are called

16   demonstrative exhibits are not admitted into evidence and

17   should not be considered as evidence.

18        There are two kinds of evidence, direct and

19   circumstantial.  Direct evidence is direct proof of a fact

20   such as testimony of an eyewitness.  Circumstantial evidence

21   is proof of facts from which you may infer or conclude that

22   other facts exist.  I will give you further instructions on

23   these as well as other matters at the end of the case, but

24   have in mind that you may consider both kinds of evidence.

25        In judging the facts, it will be up to you to

1    decide which witnesses to believe, which witnesses not to

2    believe, and how much of any witness' testimony to accept or

3    reject.  I will give you some guidelines for determining the

4    credibility of witnesses at the end of the case.

5         Now, a few words about your conduct as jurors.

6    First, for purposes of communicating with the Court, there

7    is a foreperson and the jury foreperson by custom of this

8    Court is the juror seated in the first chair in the first

9    row.  That is you closest to the door leading to the jury

10   room.

11        The proceedings during trial will be transcribed

12   by court reporters who are the two individuals sitting

13   closest to you, but you should not assume that you will have

14   trial transcripts available to you during your

15   deliberations.  You must rely on your own memory of what

16   testimony was presented and how credible that testimony was.

17        If you wish, you may take notes in the binders

18   or folders that we will provide to help you remember what

19   witnesses said.  If you do take notes, please keep them to

20   yourself until the end of trial when you and your fellow

21   jurors go to the jury room to decide the case.

22        Here are some other specific points to keep in

23   mind about note taking.

24        One, it is permitted, but it is not required.

25        Two, if you do take notes, please make sure that

1    note taking does not distract you from your tasks as jurors.

2              You must listen to all the testimony of each

3    witness.  You also need to decide whether and how much to

4    believe each witness.  This will require you to watch the

5    appearance, behavior, manner of each witness while he or she

6    is testifying.  You cannot write down everything that is

7    said and there is always a fear that a juror will focus so

8    much on note taking that he or she will miss the opportunity

9    to make important observations.

10             Three, your notes are memory aids.  They are not

11   evidence.  Notes are not a record or written transcript of

12   the trial.  Whether or not you take notes, you will need to

13   rely on your own memory of what was said.  Notes are only to

14   assist your memory.  You should not be overly influenced by

15   notes.

16             We also ask you to wear your juror

17   identification tag where people can see them so persons

18   involved in the case don't accidentally engage you in

19   conversation.  You can see, there are a lot of people

20   involved in the case.  Even if it is innocent conversation,

21   it might draw into question your impartiality.  So please

22   make sure people can identify you as jurors.

23             Normally after this, the trial will begin.  In

24   that regard, the attorneys have two opportunities to talk to

25   you during the trial.  The first opportunity is the opening

1   statement which is the next thing that we'll do.  During the

2   opening statements, the attorneys may outline what evidence

3   they expect to introduce during the trial.

4            As I've already instructed however, what the

5   lawyers say is not evidence.  It will be up to you to

6   determine whether the evidence, that is, the testimony of

7   witnesses and the admitted documents, supports what the

8   lawyers say in their opening statements.

9            Second, after all the evidence is in and I have

10  instructed you on the law, the lawyers will offer closing

11  arguments to summarize and interpret the evidence for you

12  and to tie the evidence to their case.  You will then retire

13  to the jury room to deliberate on your verdict.

14           So we're actually going to take our lunch break

15  now a little bit earlier than usual.  But the opening

16  statements, they are not something that is good to

17  interrupt, so we'll do them when we come back for lunch.

18           Can we take the jury out, please.

19           (Jury leaving the courtroom at 12:25 p.m.)

20           THE COURT:  So you can be seated.

21           So I did take out a reference in that last

22  instruction to the fact that you might make transition

23  statements, but you can do that as I told you at the

24  pretrial conference.

25           And then Mr. Wolf, how long do you expect your

1    opening to be, roughly?

2              MR. WOLF:  I knew that was coming.  Thirty to

3    thirty-five minutes, Your Honor.

4              THE COURT:  And yours, Mr. Hummel?

5              MR. HUMMEL:  I would like to keep it to that,

6    but knowing how I talk, probably forty-five minutes.

7              THE COURT:  So basically, so what I expect is

8    Mr. Wolf will go, then you'll go, then probably -- so we'll

9    go to -- you know, I would like to go to probably at least

10   3:15 before we take a break.  So whoever your first witness

11   is should be ready.

12             MR. WOLF:  So Your Honor, we have our first two

13   witnesses are both the corporate reps, five-ish minutes by

14   Your Honor's order.  So my guess is either one or both of

15   them will take us to a natural break point.

16             THE COURT:  Anything else right now?

17             MR. HUMMEL:  Your Honor, what time do you plan

18   on ending today?

19             THE COURT:  I'm sorry, the question is what time

20   do I plan on ending today?

21             MR. HUMMEL:  Yes.

22             THE COURT:  Five o'clock.

23             MR. HUMMEL:  Okay.

24             MR. WOLF:  Our third witness is going to be a

25   relatively long one.  Whatever Your Honor thinks, it's

1    unlikely we will finish him.

2              THE COURT:  If it were something that you finish

3    direct of your witness at say 4:50, I would say just stop,

4    but assuming -- but if you're still going, we'll just stop

5    at roughly 5:00 or when I sense you're transitioning from

6    one point to the next.  And, in fact, if we get -- if your

7    witnesses is going and, you know, it's 4:55 or 4:57, or

8    something and you know you're going to be switching to

9    something, feel free to say this would be a good point and I

10   won't embarrass you.

11             MR. WOLF:  Very good, Your Honor.

12             THE COURT:  Anything else?

13             MR. WOLF:  No, Your Honor.

14             MR. HUMMEL:  No, Your Honor.

15             THE COURT:  We'll be in recess until roughly

16   twenty-five after 1:00.

17             (A brief recess was taken.)

18             THE COURT:  All right.  Let's get the jury.

19             (Jury entering the courtroom at 1:26 p.m.)

20             THE COURT:  All right.  Members of the jury,

21   welcome back.  Everyone, you may be seated.

22             And Mr. Wolf.

23             MR. WOLF:  Thank you, Your Honor.

24             Good afternoon.  My name is Matt Wolf.  I am

25   from Washington D.C.  I think we're going to get just about

1    as much snow down there as you're going to get up here,

2    which is why we have tomorrow off.  I proudly represent two

3    companies working together, a partnership, Regeneron and

4    Sanofi.  And this is a case about the treatment for bad

5    cholesterol, that LDL stuff that you want the number to be

6    as low as possible when you go into your doctor's office.

7    Just looking at the relative ages of the jury, some of us

8    may be more worried about that than some of you.

9           By the early 2000's, the problem of LDL

10   cholesterol was pretty well-known and the treatments for it

11   were becoming pretty well-known.  Scientists around the

12   world were getting their arms around how to deal with this

13   problem.

14          And if you think about the problem, it's really

15   two different related problems.  One is the body making too

16   much LDL cholesterol, the other is the body not getting rid

17   of the stuff fast enough.  You might have heard of statins,

18   Lipitor, that's dealing with the first part of the problem,

19   the first solution to high bad cholesterol.  It tries to

20   limit the production of bad cholesterol in the first place.

21   And statins work well for many people, but not for everyone.

22   And it doesn't work at all for some folks.  And for those

23   folks the scientific community said let's start thinking

24   about the other part, the other issue, the other problem,

25   and that is why is the body not taking LDL cholesterol out

1    fast enough.

2                    And by about 2007 or 2008, and I'm about to show

3    you how all this works, scientists realized that there may

4    be a way to get the LDL cholesterol out of the body faster

5    involving antibodies.  And when the scientists figured this

6    out, a whole bunch of different pharmaceutical companies got

7    to work trying to make those antibodies.  One of those

8    companies was Amgen.  And in 2008, they filed a patent on a

9    handful of those antibodies that work.  And those antibodies

10   as we'll show in a minute had a particular way of solving

11   the problem.

12                   But there were other companies like my client,

13   Regeneron and Sanofi, and folks like Merck and Pfizer who

14   you might have heard of as well, who also were pursuing

15   antibodies, also were trying to figure out how to solve the

16   problem.  And they, too, came up with their own antibodies

17   very different than the antibodies that Amgen invented, and

18   they all proceeded on pace.  But then something happened in

19   2013.  Amgen filed new patent claims.  You heard in the

20   video, a claim is like an invention.  These patents here,

21   two of them, they actually contain 53 different inventions,

22   each one called a claim.  Amgen filed for new patent claims

23   and we're only going to be talking about five of the 53 in

24   there in this case.

25                   They said not only do we get credit for the

1    antibodies we invented, we get credit, we get title --

2    remember in the video they talked about patent being a deed

3    to land.  We get to put a fence around every antibody that

4    does its job, including antibodies we didn't invent,

5    including antibodies that my clients and Pfizer and Merck,

6    including those antibodies, we're going to take credit for

7    those.  And we're going to say we have a right to exclude,

8    to monopolize, we're going to claim a patent to work we

9    didn't do.

10          And that's why you're here.  You're here to

11   decide whether what I'm telling you is right or not.  You're

12   here to decide whether five of the 53 inventions in those

13   patents are invalid, should never have issued.  Why?  For

14   two different reasons.  One, because the inventors didn't

15   possess the full scope of the invention.  Legalese, what

16   does that mean?  We're going to show you that inventors

17   invented this, but then claimed that.  They said we know we

18   possess these antibodies, but we're going to try to keep

19   everybody else from making all the other ones that do the

20   same thing, but with very different antibodies.  That's

21   problem one.  And that's against the patent law, and His

22   Honor will instruct you at the end of the case.

23          Problem two is not only do you need to possess

24   an invention in order to get a patent on it, not only do you

25   need to know what you invented, you also have to teach

1    others how to make and use it.  And it kind of goes without

2    saying that if you didn't invent something, you can't teach

3    someone how to make or use what you didn't invent.  Those

4    are the two reasons, that's what this case is about.  That's

5    all this case is about is those two reasons, why they can

6    keep 48, but five of them have to go.  Five of them aren't

7    fair.  They're not right.  They're overbroad.

8              Enough talking, let's look at some pictures.

9              This is a bloodstream.  That's an artery.  And

10   of course the role of an artery is to bring oxygen to your

11   muscles.  When LDL cholesterol builds up in the walls of the

12   arteries, it limits the ability of blood to get to those

13   muscles to bring oxygen to those muscles.  And that can make

14   you feel slow and lethargic, not so great.

15             Even worse, clots can form and completely

16   occlude, block off the artery.  And if that artery is the

17   one feeding your brain and it gets blocked, you have a

18   stroke.  If that artery is the one feeding the muscle

19   itself, not coming from the heart, but going to the heart,

20   the oxygen that actually keeps the heart pumping, if that

21   gets blocked, you have a heart attack.  That's what LDL

22   cholesterol can do.  That's why we need to treat it.  Leads

23   to strokes, heart attacks, or just feeling crummy.

24             So my clients, Regeneron and Sanofi have

25   developed Praluent.  Praluent is an antibody that treats

1    this problem.  It's on the market today.  Your doctor may

2    prescribe it for you.

3              How does it work?  When I learned this, this was

4    so cool.  So this is what we're looking at is a liver cell.

5    That kind of bumpy line in the middle is a liver cell.

6    North of it, top of it outside the liver cell in the

7    bloodstream, below it is inside the liver cell.  And that

8    basketball looking thing in the top is a molecule of LDL

9    cholesterol.

10             The way the body usually deals with LDL

11    cholesterol, keeps it in balance is as follows:  That purple

12    mushroom looking thing is an LDL receptor.  And it catches,

13    like Velcro, it catches LDL cholesterol.  And when it does

14    that, it drags it into the liver cell.  It drags it into the

15    liver cell where the liver cell does its work.  It destroys

16    the LDL cholesterol.  And then this is the part that really

17    matters.  That LDL receptor can then return to the wall of

18    the liver cell to go grab the next basketball, to go grab

19    the next molecule of LDL cholesterol.  The cycle goes like a

20    garbage truck working through your neighborhood week after

21    week after week.  If it's doing its job, your LDL

22    cholesterol stays in the range it should be, not too high,

23    not too low.

24             Now we're going to introduce the villain of the

25    piece, the bad guy.  The good news about this lawsuit, there

1    are no bad guys at these tables.  Everybody is working hard

2    to make better medicine.  The bad guy is that thing called

3    PCSK9.  And PCSK9 is a molecule, is a protein that can

4    attach to that LDL receptor.

5            And see that purple area, I should have showed

6    it to you before, that's where the rubber meets the road.

7    That's called the EGF domain target, it matches -- we'll

8    talk about that term -- up to the LDL cholesterol.  It

9    binds.  Now, PCSK9 is natural.  It's human.  It's in every

10   one of us all the time.  But what happens when you have too

11   much of it or it's too aggressive?  It binds to the LDL

12   receptor.  So far looks the same, doesn't it?  But when

13   PCSK9 is attached to that purple mushroom, to the LDL

14   receptor, not only does the LDL cholesterol get destroyed,

15   but so does the receptor.  There is nothing to recycle back

16   to the surface of the liver cell.  So one more garbage truck

17   is taken off the streets and this goes over and over and

18   over again.  And this PCSK9 results in the destruction of

19   those purple LDL receptors.  There are too few of those.

20   LDL cholesterol builds up and you end up with high

21   cholesterol.  You could end up with a stroke and heart

22   attack.

23            What do we do about that?  Antibodies.

24   Antibodies are things in your body that fight, that attack

25   what are called antigens.  You can have an antibody to the

1    flu, you can have antibodies to the rabies, that's why you

2    get the rabies shot to develop antibodies to rabies.  That's

3    why you get the flu shot.

4              What that does is it attaches to the molecule,

5    and in this case, you can have antibodies, Praluent,

6    Repatha, that attach to the PCSK9 and act like a physical

7    block, literally physically prevent the PCSK9 from attaching

8    to the LDL receptor.  You introduce the antibody into the

9    bloodstream, it attaches to PCSK9, and now that purple

10   mushroom, the LDL receptor enters the liver cell with no

11   PCSK9 attached to it.  You know what that means?  The

12   molecule is destroyed, but the receptor isn't.  And the

13   receptor can return to the surface.  Cool.  That's what

14   those antibodies that we're talking about in this case do.

15   Less LDL cholesterol remains in the bloodstream.

16             So I said that a lot of work had been done up

17   until the 2000s.  Let's talk about this.  In 1975,

18   scientists determined the connection between high

19   cholesterol and LDL receptors.  That's when they figure out

20   there is a link between having high cholesterol and those

21   receptors.  In 2001, scientists became aware of PCSK9.  And

22   in 2006, scientists suggested using antibodies to block

23   PCSK9.  And that was like the starter's gun.  Bang.  Now the

24   pharmaceutical companies say we have an idea.  If we can

25   develop antibodies to do what the scientists say, we can

1    block the PCSK9, we can prevent the destruction of the LDL

2    receptors.  We can lower your cholesterol.

3              These were some of the participants at the

4    starting gate.  These are the folks that I mentioned before.

5    There is Amgen.  There is Sanofi, Regeneron, Pfizer and

6    Merck, all of them develop antibodies to block PCSK9.

7              This is a picture of the patent application that

8    Amgen filed in 2008.  This is going to be a very important

9    date.  January 9, 2008, everybody agrees is the critical

10   date for deciding whether or not this patent is valid.  The

11   question is in the document as it existed on that date, did

12   they describe, did they possess everything they then claimed

13   five years later that resulted in these patents, everything

14   that they said we can prevent other people from doing.  So

15   it's a little confusing.  Right?  Because the patents issued

16   in 2013, '14, but the date we care about is 2008.

17             So in 2008, you're going to be asked, did the

18   inventors know everything that they claimed to know later

19   on.  Did they teach everything they claimed to teach later

20   on.  And I submit to you the answer is going to be pretty

21   clearly no.

22             So here is a picture of depiction of the four

23   antibodies made by my clients, by Merck and Pfizer.  And

24   let's talk for a minute about what antibodies are.

25   Antibodies are typically depicted as having a Y shape.  Now

1    it's not a perfect Y shape in nature, you're going to see

2    this in documents, in reality it actually moves, it's not a

3    fixed shape and can bounce around, but roughly speaking it's

4    a Y shape and it's symmetrical, there is a left side and

5    right side of each antibody.

6              By the way, these are antibodies to PCSK9.  I

7    mentioned flu and rabies before.  At this level they look

8    exactly the same.  Totally different antibodies, exactly the

9    same Y shape.  There is a left and right side symmetrical.

10   And inside when you go inside the Y, this is what they're

11   actually made of, amino acids.  Now, some of these names you

12   may recognize.  Tryptophan, that's the stuff that makes you

13   sleepy on Thanksgiving afternoon.

14             I think a couple of these are in Red Bull,

15   although I'm not entirely sure I remember from the

16   ingredients menu.  I'm not sure if I want to.

17             But this collection of amino acids in a

18   particular order in a particular way is what decides what

19   antibody it is.  Just taking these amino acids, you can make

20   an antibody to PCSK9, to flu, to rabies, to anything you

21   want.  Just how you collect them, what order they're in,

22   what the consistency is.  They're specifically the recipes

23   of a cake.

24             And every amino acid has the same ingredients,

25   but every different amino acid has a very different order,

1    very different structure.  And just a little bit of a change

2    in an amino acid in an amino acid sequence in the

3    composition of the antibody, even a little change can make a

4    huge difference.

5            So as I said, the four companies were at the

6    starting line.  They were all making their antibodies.

7    Eventually, they all did make antibodies.

8            This is the two antibodies most clearly

9    described in Amgen's patent in 2008.  Now, it's a little

10   confusing.  You're going to see this picture a lot in this

11   case.  This and this are two separate antibodies.  And

12   really what they are -- let me go here.  It's just that part

13   of an antibody.

14           So when you see depictions in this case of the

15   connection between PCSK9 and an antibody, imagine that this,

16   and then there's another here, and then the Y goes up there.

17   Does that make sense?

18           This is one stalk of the Y.  Remember, they're

19   symmetrical, so I only need to show you one.  But the

20   important thing to remember from this picture or to think

21   about is in here, that's the part of PCSK9 that latches on

22   to the LDL receptor.  That's where the work gets done.  It's

23   called the EGFa region.  The closer you are to the center of

24   EGFa region, the more clearly you can block.

25           Amgen didn't know how to build antibodies that

1   hit in the middle.  This is one antibody.  This is another.

2   Those are the two that are the primary ones in the patent.

3   Notice one's to the left, one's to the right.  Most of them

4   leave this, and you'll hear the term sweet spot.  It's kind

5   of misleading.  I don't think we should really use it in

6   this case.  But if you hear the sweet spot, the term, what

7   that's referring to is that purple area wherein the body the

8   PCSK9 hits the LDL receptor.  And the point of this is only

9   a simple one.  Amgen invented antibodies that worked, but

10  that didn't hit the sweet spot square, not even close.

11  Here's a picture of what I was talking about.  That's that

12  sweet spot right there.  And you see that's the part that

13  goes on the LDL receptor that bonds to the LDL receptor.

14  That's the part you want to jam the antibody in, so those

15  two things can't get together, so the receptor isn't

16  destroyed.

17          Well, here's the interesting part.  There, we

18  see Amgen's two.  All the other competitors managed to

19  invent different antibodies that actually did cover the

20  sweet spot.  So the -- whereas, Amgen was left and right.

21  Sanofi and Regeneron, Merck and Pfizer all got it right.

22  They got it right in the middle.  They covered the sweet

23  spot.

24          Some of them almost entirely.  Some of them just

25  leaving a little bit out, but all of them much better than

1    Amgen did.

2            Here's an example of ours.  That's Praluent

3    sitting right on top of the sweet spot, unlike Amgen.  So

4    why does this matter?  Isn't it good to have lots of

5    different antibodies?  Yeah.

6            But in 2013-2014, Amgen said, we are entitled to

7    a patent that covers far more than what we invented.  And

8    this is one of the claims.  Remember, there were five

9    claims, five inventions, and they're all basically the same.

10   They're very similar at least.

11           We're going to focus on this just for purposes

12   of my opening, but we will be talking about them all during

13   the course of the trial.  And it's a lot of scientific

14   language, but it can be broken down as follows:  A

15   pharmaceutical composition comprising an isolated monoclonal

16   antibody.  So they're saying we've invented an antibody

17   wherein the antibody binds to at least two of the following

18   residues, and then it gives a list of 15 different residues.

19           Now, what's a residue?  A residue are all of the

20   different amino acids in the sweet spot.  So they say we

21   claim to have invented every antibody, every single one that

22   touches two of the 15.  It can touch three.  We've invented

23   it.  Five, we've invented.  All 15, that's ours.  We

24   invented it.  That's what they're saying there, even though

25   the evidence will show they didn't.

1          And then it has to do one more thing.  It has to

2     block the binding of PCSK9 to LDLR.  So they tell the world

3     with this patent that we're entitled to exclude that.  We've

4     invented that.  We possessed every single antibody that

5     anybody could ever hear of that anybody ever has heard of

6     that anybody ever will hear of that touches a little piece

7     of the sweet spot, and it prevents PCSK9.  Even though we,

8     Amgen, Amgen unlike America, unlike Pfizer, unlike my

9     clients didn't actually do that.

10          So what they effectively did -- remember, in the

11     video, you heard a patent is like a deed to a house or a

12     piece of property.  What they did is, despite the fact that

13     they only invented a few antibodies, they built a fence

14     around lots and lots of antibodies they never thought of

15     they never invented, including ours, and Merck's, and

16     Pfizer's, and then thousands and perhaps millions of more,

17     many of which haven't been invented, yet many of which

18     scientists are still looking for.  But they say they get a

19     patent on it because of the couple they invented back in

20     2008.

21          That first thing is what fails the written

22     description test.  When you hear His Honor talk about

23     written description, just think about it as follow.  Did I

24     get a patent that equals what I invented?  If the claim of

25     the patent -- remember, we're only talking about five.  If

1    the claim of the patent is broader than what I actually

2    invented, what I actually possess, then the claim is no

3    good.  That's what the law says.

4           It's like if you buy a piece of property for an

5    acre, and the deed is for ten acres.  What the law says is

6    you've got to give up the deed.  Now, you can keep any deeds

7    you have on the one acre, but you don't get the ten because

8    you didn't pay for it.  You didn't invent it.

9           Second issue, you're not just required to have

10   invented it, you have to make and use each other's to make

11   and use it, otherwise, what's the point of a patent system.

12   So the when the patent expires, other people can do what you

13   did.

14          And as I said before, it goes without saying

15   that if they didn't actually invent all of those antibodies,

16   they couldn't have taught people how to make and use all

17   those antibodies.  In fact, what they did is they told

18   people how to make and use the few that are unpatented.

19          So I mentioned five.  These are the five claims

20   in the patent that we're here for.  Claims seven, 15, 19, 29

21   of the '165 patent.  That's half that big stack Mr. Hummel

22   has in front of him, and claim 7 of the '741 patent.  That's

23   one claim.

24          Now, I want to make it clear to you, again, we

25   say those five claims are invalid, but we're not here to ask

1    you about claims 1 through 6, for example, of the '165

2    patent.  They can keep those.  They've earned those.  Fine.

3            Those are unfairly broad.  The ones on your

4    screen, the ones you're here to decide on, those are

5    unfairly broad.  And what that means is they're invalid.

6            So why are you here?  You say why are you

7    sitting in the box?  Well, because patents are a deal.

8    They're a deal between inventors, on one hand, and all of us

9    on the other.  They're a deal between the American people

10   and an inventor.  And when someone like us comes along and

11   says the deal was broken, you got more than you gave.  It's

12   an unfair bargain.  It's a jury that decides whether we're

13   right or not.  It's you that decides, not the Patent Office,

14   not the judge, no one else.  It's a jury that's here to

15   decide.

16           So that's why you're here.  In fact, you know

17   who said you should be here?  The United States Constitution

18   actually says it's your job to decide whether Amgen held up

19   its end of the bargain or whether it broke it.  And so it's

20   time to take those five claims of the patent back.  We're

21   going to prove to you by clear and convincing evidence -- by

22   much more than clear and convincing evidence that they did

23   break the deal as to these five claims.

24           We're going to do that through four witnesses,

25   although two of them are going to be very brief.  We're

1    going to introduce you in a few minutes to Len Schleifer.

2    Dr. Len Schleifer who's the founder of Regeneron.  He's also

3    a scientist.  He's also a medical doctor.  He's done more in

4    the last five minutes than I've done in my entire life.

5    We're going to talk to him, meet him and learn a little bit

6    about Regeneron.

7            Then we're going to hear from Michelle Carnahan

8    who's a senior executive at Sanofi.  She's going to talk

9    about her role and the cool stuff she does to bring these

10   medicines to the world to make the world a better place.

11   Then we're going to get to the folks that really are going

12   to decide this case.

13           You're going to hear from Dr. Scott Boyd who's

14   going to have a very interesting accent.  I had never heard

15   a Manitoban accent until I got involved in this case.  I

16   couldn't place it.  Any way, tell me what you think after

17   the trial.

18           Dr. Boyd is one of the world's leading experts

19   in this science.  He's out at Stanford and he's going to

20   come to explain to you how broad the claims are, how broad

21   the invention they say they're entitled to in the patents

22   versus the work they actually did.  He's going to explain to

23   you why the patents are invalid.

24           Then you're going to hear from Dr. Michael Eck

25   who's at Harvard and the Dana-Farber Cancer Institute.  He's

1    going to explain from a slightly different angle why those

2    patents, however thick they seem to be, teach you how to

3    make a couple antibodies, not the millions, perhaps more,

4    perhaps less.  We don't know, and that's part of the

5    problem.  And certainly not the antibodies my client made

6    and Merck and Pfizer makes, he's going to explain to you why

7    that is.

8              Ladies and gentlemen, I can't thank you enough.

9    I join my friend, Mr. Hummel, I'm sure, in saying we know

10   this is an imposition, but it's important for our clients.

11   It's important for science for you guys to be here.

12             We really looking forward to talking to you over

13   the next couple days.  Thanks, and we'll talk soon.

14             THE COURT:  Mr. Hummel.

15             MR. HUMMEL:  Good afternoon, ladies and

16   gentlemen.  I have tried many cases, and it's often the case

17   that the battle lines are very clear, and the issues are

18   very clear.

19             And when I listened to Mr. Wolf's opening, I was

20   a little surprised because the issues that you're here to

21   decide are actually very narrow and very clear.  And the

22   issues that you're not here to decide are also very clear.

23             You heard in the patent video about how the

24   Patent Office examines an application to see whether the

25   applicant actually invented the thing that's claimed in the

1     patent.  And you are not being asked in this case to decide

2     whether Amgen invented the patents that are covered by the

3     claims in these patents, the antibodies.  They did.  That's

4     not the issue.

5            This man here standing at the end -- sitting at

6     the end is Dr. Simon Jackson.  Dr. Simon Jackson is the lead

7     inventor in these patents.  Dr. Jackson and his team of

8     Amgen scientists spent two years investigating, as I will

9     show you in a few minutes, how to block the PCSK9 that

10    Mr. Wolf talked about from causing the LDL receptors, as you

11    saw, to be destroyed, and therefore, not allow them to

12    reduce our cholesterol in our bodies.

13           There is no doubt that he invented those classes

14    of antibodies.  New classes of antibodies.  And I'm going to

15    take you through some of the facts that Dr. Jackson will

16    show you when he takes the stand.

17           The only issue that you're being asked to decide

18    is whether these patents, these two patents here contain

19    enough written description to allow scientists to understand

20    what was invented and to allow scientists to make those

21    antibodies.  These patents cover all of the antibodies that

22    Mr. Wolf put up on the screen.  There's no dispute about

23    that.

24           And the question before you and the evidence you

25    will see over the course of the next three days is:  Is

1    there enough in these patents to tell the scientists what

2    was invented and how to make them?  And that is the sole

3    issue in this trial, not who invented.

4             It's traditional at the beginning of a trial to

5    introduce ourselves.  I'm not sure I even said what my name

6    was when I got up here.

7             My name is Keith Hummel.  I have the honor of

8    representing Dr. Jackson, the inventor of these breakthrough

9    inventions, and his team who's not here, and Amgen.  There

10   he is.  The CEO of Amgen is in the audience.  He's in the

11   second row because he's very tall, and he didn't want to

12   block the view of some other folks.

13            At counsel table, there are a number of lawyers

14   you're going to see at this podium over the course of the

15   next few days.  There's Mr. Gaede, Bill Gaede, Sarah

16   Johnson.  Sorry, Columbia.  Sorry.  Chris Mead, Melanie

17   Sharp, and Lauren Moskowitz.

18            All of these people are going to help during the

19   course of this trial.  Over in the corner there, you might

20   be wondering who that fellow is.  His name is Richard Serp.

21   He's in charge of making sure that our graphics, the ones

22   that we show you, operate well.

23            And when they all go -- everything goes well and

24   according to plan, it's his credit.  And when something goes

25   wrong, as it inevitably will, it's going to be my fault.

1    But I'd like to return to what I originally wanted to say to

2    you.

3         And the first thing is before I heard Mr. Wolf's

4    opening and the first thing is we want to thank you for

5    being here.  We know it's a hardship.  We know you have to

6    take time away from your busy day and your lives to come

7    here and listen to us talk.

8         And we're going to talk about some very complex

9    scientific terms.  You may have gathered that from

10   Mr. Wolf's discussion with you.  We're going to do our best

11   in the course of this trial to simplify things as much as we

12   possibly can.  To the extent we're not able to do that, I

13   apologize in advance.  These are very, very difficult

14   concepts.

15        As I just said, we have a very different view of

16   this case.  In our view, this is a case about Dr. Jackson

17   and his team and Amgen's invention.  They brought something

18   new to the science of lowering cholesterol that did not

19   exist before.  They invented an entirely new class of

20   antibodies that can be made into medications that can be

21   used to lower cholesterol.

22        And we only claimed in these patents that

23   they're a class of antibodies.  Other people are free to

24   come up with any other types of solutions to the problem.

25   They just can't use ours.  And ours are adequately described

1    in a narrow fashion in the patents that are issued in this

2    case which I'm going to take you through in a few minutes.

3              But you saw Mr. Wolf's depictions of antibodies.

4    This is what an antibody actually looks like.  This is what

5    a PCSK9 antibody looks like.  When I say PCSK9 antibody, I

6    mean the antibodies that Amgen invented that block PCSK9

7    from doing something bad.

8              This is, obviously, a giant-sized antibody.  I

9    think one of our experts will tell you that if you had these

10   at the right size, something like a billion of them would

11   fit on the head of a pin.  Antibodies circulate in all of

12   our bodies, and what they do is they attack foreign

13   substances.  They attack things that do bad things to us,

14   and they remove them from the body.  And they remove them

15   from the body, that's their function.

16             And what Amgen did, what Dr. Jackson did, what

17   his team did, what his scientists did over the course of

18   several years is figure out how to take this, neutralize

19   this out of your bodies so that it could allow your body to

20   lower its cholesterol naturally.

21             We're not saying that we invented the idea of

22   lowering cholesterol.  We're not.  What we are claiming, and

23   what is in these patents is a very narrow invention.  It is

24   an invention that says take an antibody, find PCSK9, and

25   bind it in this spot which we'll call the sweet spot, which

1    I'll talk about a little bit more and explain in a little

2    bit about what the evidence will show.

3           These are the antibodies that Dr. Jackson and

4    his team came up with.  They were made into a medication.

5    Repatha, this is Amgen's medication.  And this is a

6    medication that has the potential to help millions of people

7    with high cholesterol lower their cholesterol when other

8    methods don't work.

9           The video and Mr. Wolf talk about the patent

10   bargain.  The patent bargain.  The patent bargain is an

11   inventor gets an invention as we did, and in return has to

12   tell the world about that invention, and that's what these

13   patents do.  Amgen disclosed to the world how it went about

14   inventing these PCSK9 antibodies and how to make them, and

15   that's what the case is all about.

16          These patents are essentially the textbook or

17   the handbook on how to make these particular type of

18   antibodies.

19          Now, I want to make another thing clear which I

20   think was clear from the video.  Amgen as the patentholder

21   does not have any obligation to prove that these patents are

22   valid.  I do not have a burden to prove they're valid

23   because the patent office issued them.  The patent office

24   found that these were inventions that deserved a patent.

25   They have the right to challenge the patents, absolutely,

1    that's what this proceeding is all about.  But they have a

2    burden, they have a heavy burden to prove that the patents

3    are invalid.

4            The judge instructed you in his initial remarks,

5    in order to find a patent invalid, Sanofi or Regeneron have

6    to demonstrate to you, have to present to you facts that

7    show that there is clear and convincing evidence that the

8    patents are not valid, and here that they lack written

9    description and that they don't tell the scientists how to

10   make these antibodies.

11           And the standard, as His Honor read was clear

12   and convincing evidence is evidence that produces an abiding

13   conviction that the truth of a fact is highly probable.

14           And when looking at the evidence over the course

15   of the next several days, I ask that you keep that standard

16   in mind.

17           Now, because they have the burden of proof, even

18   though Amgen is the plaintiff in this case, they have the

19   burden of proof because they go first because they have the

20   burden of proving that our patents are invalid.  And so

21   you're going to hear all the witnesses that Mr. Wolf put on

22   the screen first.  Then you're going to hear from our

23   witnesses.  And I ask you, because there is always two sides

24   of the story, to keep an open mind as you're listening to

25   the evidence that Sanofi and Regeneron witnesses tell you

1    about.  Because our side of the story I'm convinced is going

2    to be more compelling to you, and to show that they are not

3    going to be able to meet their burden.

4         The way our press -- I'm going to give you a

5    little preview now of how our evidence is going to come in

6    when we finally get a chance to tell our story.

7         The first thing we're going to do is introduce

8    you a bit to Amgen.  You might not be familiar with Amgen.

9    Mr. Bradway is going to be our first witness.  Mr. Bradway

10   is going to explain how Amgen was founded forty years ago to

11   use cutting edge biotechnology to come up with leading edge

12   medicine, and bring them to patients.  Its mission is to

13   help patients through new medications and these are some of

14   the medications in the various areas including Repatha that

15   Amgen has brought to the U.S. market.

16        Now, then the second witness is going to be

17   Dr. Jackson.  Dr. Jackson is going to explain to you how he

18   and his team solved one of the problems of how to reduce

19   high cholesterol.

20        I have a video, also.  Mine is a little bit

21   simpler.  But I want to remind you of what the body does to

22   reduce cholesterol.  And this is something that was

23   absolutely known, absolutely known when Dr. Jackson

24   undertook his experimentation.  What happens is the LDL,

25   which in my picture looks like a baseball is captured much

1    like Velcro as Mr. Wolf said, and then brought into a liver

2    cell, our liver cells, the LDL is released, destroyed and

3    the LDL receptor goes back to the surface and that LDL

4    receptor can continue to do that over its lifecycle.

5           It was also known in the literature that PCSK9,

6    this is a PCSK9, this is a model of PCSK9, it's at the same

7    scale as the model of the antibodies.  It was known that

8    PCSK9 had some impact on the body's ability to reduce

9    cholesterol, but it was not known how.  It was not known

10   whether PCSK9 somehow destroyed the LDL receptors or

11   operated in some other fashion.

12          And Dr. Jackson and his team set out to figure

13   out is there a way, is there a way that we can prevent using

14   biotechnology, that we can prevent PCSK9 from doing whatever

15   it's doing to harm the LDL receptors.

16          And what they did is they did research.  And

17   what they determined was that PCSK9 did its damage by

18   attaching directly to the LDL receptors.  And this is what

19   we know about that mechanism now.  PCSK9 and the LDL attach

20   to the receptor, brought into the liver cell, destroyed.

21   The LDL receptor cannot go back to the surface, cannot catch

22   anymore LDL, and so as a result, you have less receptors,

23   and you have more cholesterol.

24          Once they figured out that there was a

25   connection between PCSK9 and the LDL receptor, Dr. Jackson

1    and his team thought can we come up with an antibody that

2    will attach itself to PCSK9 so that the PCSK9 cannot attach

3    to the LDL receptor?  Can we neutralize the naturally

4    occurring PCSK9 in your bodies?

5            They did not know whether they could make

6    antibodies that would attach to PCSK9.  They didn't know if

7    when they attached, if they made antibodies that attached to

8    PCSK9, whether that would prevent PCSK9 from attaching to

9    the receptors, the LDL receptors, and they didn't know if

10   that would prevent PCSK9 from harming or destroying the LDL

11   receptors.  I don't know if that was known at the time.  And

12   Dr. Jackson will describe his research plan which resulted

13   in determining that certain antibodies, classes of

14   antibodies, when they attach to PCSK9 in a certain spot

15   would prevent PCSK9 from attaching to LDL -- LDL receptors.

16   And that spot was the sweet spot.  And that's the pink area,

17   the small pink area on the PCSK9.

18           And Amgen's invention at the end of the day are

19   classes of antibodies that attach, bind to the sweet spot

20   and block PCSK9 from attaching to the receptors.  Those are

21   the narrow classes of inventions that Amgen and Dr. Jackson

22   came up with.

23           Not only do they describe in the patent this

24   process, but they also mapped the LDL -- they mapped the

25   sweet spot.  The sweet spot as you can see here consist of

1    fifteen separate little bits.  The little bits are amino

2    acids.  In the course of this trial, you'll also hear them

3    referred to as residue.  And these will become important

4    when we turn to the actual plans.  This is just a picture of

5    this.  These are the antibodies which show the area, this

6    one happens to be one particular antibody which is named

7    21B12, which shows the area that binds to the sweet spot.

8            Dr. Jackson is going to show you in the course

9    of telling you about the story where all the data that his

10   team came up with is disclosed in the patent.  Where the

11   experiments are.  What the experiments are.  New experiments

12   that they designed.  The data generated from it.  It's all

13   in these patents.  And the patent doesn't just consist of

14   this is one patent and that's the other patent.  The patent

15   consist not only of page after page of figures, page after

16   page of texts, but also a CD with test data.  All of this

17   information was made public as a result of the patent

18   bargain you heard about.

19           Now, I want to talk about the patent claims

20   here.  There are five patent claims that you are being asked

21   to consider.  You'll be asked to consider five separate

22   patent claims.  And the claims here define the narrow class

23   of invention.  Narrow class of antibodies.  Not all

24   antibodies, but narrow classes of antibodies.

25           I want to start with claim 7.  Claim 7 requires

1    three things.  You'll see the common theme throughout these

2    patent claims.  They require an isolated monoclonal

3    antibody.  They require an antibody.  They require that the

4    antibody bind to at least one of the residues that we saw on

5    the PCSK9 sweet spot.  Here it's D238.  And they require

6    that once there is binding to D238, that the PCSK9 cannot

7    bind to the LDLR, which is the LDLR receptor on the surface.

8            The patent also discloses where D238 is, and

9    that's where it is on the sweet spot.  One of my residues.

10   I lost my PCSK9.  It's about over here.

11           If you look at patent claim 15, patent claim 15

12   has the same structure as claim 7, except it doesn't require

13   a binding to D238, it requires binding to V380.  These two

14   claims are what you might hear referred to during the course

15   of this trial as a single residue claim, because they

16   require binding to at least one residue.  And one of the

17   things that you'll hear during the course of this trial is

18   that the PCSK9 antibodies that are the subject of these

19   inventions work if only one of the residues of the sweet

20   spot is bound.  The reason this requires, these claims

21   require a binding to one spot is because one spot is enough.

22   That will prevent PCSK9 from binding.

23           There is one claim at issue of the '741 patent,

24   that's claim 7.  Claim 7 is also a single residue claim.  It

25   requires binding to at least residue 227, residue 238.

1     There are two other claims at issue in this case, I'm going

2     to start going back to the '165 patent with claim 19.

3               Claim 19 and the other patent, claim 29, require

4     binding to at least two of the residues on the sweet spot.

5     And the reason that some claims require one and some claims

6     require two is because they reflect Amgen's invention of the

7     fact that just those binding sites, either one or two,

8     completely block PCSK9 from attaching to the LDLR receptor.

9     That was their invention, and claimed in these patents.

10    Which two residues?  It doesn't matter for these claims.

11    Any two residues is enough.  And you'll see it binds to at

12    least two residues.

13              Claim 29, which is not advancing -- Richie,

14    could you advance it for me?

15              See, there we go.  That was my fault.

16              Claim 29 adds some additional requirements.

17    Claim 29 requires that the antibody be put in a

18    pharmaceutical composition.  What does that mean?  It means

19    it has to be put in a form that can be administered to

20    patients.  And it also requires the blocking of PCSK9 to

21    LDLR but at least 80 percent, and you heard testimony about

22    percentages from Amgen's experts during the course of this

23    trial.  That's it.  Those are the patent claims.

24              The patent claims require essentially an

25    antibody that binds to PCSK9 and blocks PCSK9.

1           Now, the two specific issues that we talked

2      about before that you're being asked to decide are do these

3      patents have sufficient written description of the

4      inventions which I just described through the patents, and

5      do they allow someone, a scientist, to make them, to make

6      the full scope of what's claimed in those narrow claims.

7           The patents have to be viewed from the

8      perspective of someone called the person of ordinary skill

9      in the art.  It's a mouthful, but it's a term that applies

10     in patent law.  And the person of ordinary skill in the art

11     depends on whatever the subject matter is.  Here, the

12     subject matter are monoclonal antibodies.  And the parties

13     generally agree on the definition of who a person of

14     ordinary skill in the art is.  It is a person who has an

15     M.D. or a Ph.D. in one of the scientific fields that I have

16     listed on this slide.  And it also requires that person to

17     have two years of experience in the field.  This is someone

18     who approaches this patent when they read these -- this

19     patent, comes with a knowledge of the field.  Comes with a

20     knowledge of how to make antibodies.  And they are allowed

21     when reading this patent, a person of ordinary skill in the

22     art is allowed to bring their knowledge to these patents to

23     determine whether it provides enough written description of

24     the patent and tells them how to make it.

25           Because we have to look at this, and you're

1    asked to look at this patent through the eyes of someone who

2    is one of ordinary skill in the art, which I certainly am

3    not, Amgen has asked two world renowned experts to come in,

4    look at these patents, and provide their opinions to them.

5    And you're going to hear from both of them.  I'm going to

6    introduce you to them extraordinarily briefly.  I listed the

7    impressive credentials of Dr. Petsko.  Dr. Petsko is in the

8    courtroom.  I ask him to stand up.  I have spoken to

9    Mr. Petsko, I believe you find him to be an excellent

10   teacher.  He is going to focus on the written description

11   requirement and provide his opinions of after looking at the

12   patent, whether he believes that the ordinary person of

13   skill in the art, looking at these patents, and all the data

14   that's in these patents, would that person understand that

15   the written description requirement was met.  And we'll talk

16   about that in a few minutes.

17          The second expert is Dr. Tony Rees.  Dr. Rees is

18   also in the courtroom.  Ask him to stand up.  Dr. Rees has

19   equally impressive credentials.  We can judge which one has

20   more than the other, I'm just going to call it a tie at this

21   point.  Dr. Rees is going to testify principally about the

22   issue of enablement.

23          Now, in the last bit of time I have to talk, I'm

24   going to touch upon both enablement and the written

25   description requirement.  Because Mr. Wolf was jumbling them

1    all up, but I would like to give you a little clearer

2    picture of what the evidence, at least as we present it is

3    going to show.

4              Enablement.  This is the actual test.  The

5    patent must teach a person of ordinary skill how to make and

6    use the full scope of the claimed invention without undue

7    experimentation.  One of the key issues in this case is

8    going to be what is undue experimentation.  The person of

9    skill in the art when trying to make these antibodies is

10   allowed to experiment, is allow to use the methods, the

11   scientific methods that he knows about or she knows about

12   and that are described in this patent to try to make

13   antibodies that fall within the scope of the claim.  And

14   they don't have too succeed every single time.  You can do

15   some experimentation.

16             Dr. Rees is going to explain to you that when

17   you look at what's in this patent, after all the description

18   that Dr. Jackson and his team put into this patent, he's

19   going to tell you that the patent describes a road map,

20   gives a person of ordinary skill in the art a way to make

21   the patented antibodies, to make the antibodies that are

22   covered by the five claims we looked at a little bit

23   earlier.  And it's not my job to try to explain these five

24   to you.  I would not do it justice, these five steps.  But

25   he will tell you that given the state of the art back at

1    that magic date, 2008, that a person of ordinary skill in

2    the art looking at various parts of the patent, you'll see

3    it here, and Dr. Rees will take you through it, will be able

4    to make antibodies that fall within the scope of the claim.

5            And he will tell you that the person of skill in

6    the art could make every antibody, every antibody that fell

7    within the scope of the claims, including the antibodies

8    that Mr. Wolf put up there from Regeneron, from Pfizer, from

9    Merck.  I think I got the right companies.

10            What Dr. Rees is also going to tell you

11    something very important.  That the person of skill in the

12    art reading these patents is not going to have to do a

13    number of things that Dr. Jackson and his team did.  They

14    are not going to have to figure out whether you can find --

15    whether you can generate antibodies that attach to PCSK9.

16    We know we can because the patent describes them.  They are

17    not going to have to figure out whether those antibodies

18    will block because the patent tells them that they will.

19            They won't have to tell, determine that where

20    the sweet spot is, this part, because the patent describes

21    the sweet spot.  In fact, the antibodies are the antibodies

22    that bind to that sweet spot.  And the patent -- the person

23    of ordinary skill in the art making these antibodies will

24    have the benefit of examples in the patent, in this patent,

25    of antibodies that have already been made.  And there are

1    actually 26 examples of patents of antibodies that are in

2    this patent.

3                 After you hear Dr. Rees' testimony, I believe

4    you will come to the conclusion that Sanofi and Regeneron

5    cannot meet their burden of proving by clear and convincing

6    evidence that the patent claims we just looked at are not

7    enabled.           The other issue is written description.  I

8    don't believe I heard Mr. Wolf describe what the actual

9    standard is for written description.  The written

10   description requirement, as I put on the screen, can be met

11   in one of two ways.  The patent can describe representative

12   examples of the patented antibodies.  The words you will

13   hear throughout this trial are representative species.

14                 A species is a type of antibody within

15   the patented claim.  So if you think of the -- you heard the

16   word genus.  You'll hear all these types of patents, all

17   these antibodies fall within a claim.  A species is one of

18   them.

19                 And the question is:  Does this patent

20   provide enough representative examples that one of skill in

21   the art will understand that Dr. Jackson and his team had

22   full possession of what's covered by the patents?  Do those

23   26 examples represent the full scope of those claims?

24                 Dr. Petsko, the other one.  The other

25   way you can satisfy the written description claim is through

1    common structural features.  Does the patent describe common

2    structural features of the patented antibodies so that one

3    can -- one of skill in the art can visualize the full scope

4    of the claim?  This is the legal test.  These are the tests

5    that have to be applied.

6                    And Dr. Petsko is going to be the

7    person that describes to you his opinion that the written

8    description requirement is more than met.  And Dr. Petsko's

9    opinion on this is going to be in two parts.

10                   The first is -- this is a picture of

11   the two antibodies that Mr. Wolf put up.  This is an

12   antibody you'll hear a lot about called 21B12.  This is an

13   antibody called 31H4.  This is a part of PCSK9.  And this is

14   a part of the sweet spot here.  And this part here, that's a

15   part of the LDL receptor.

16                   These are just parts.  And I don't

17   expect anyone to remember this.  There's no quiz on it.

18   This will be put up many times, and the experts will go

19   through it very, very carefully.  What I want you to take

20   away from this is that there are two examples here in the

21   patent which Dr. Petsko will say by themselves are

22   representative of all the PCSK9, the narrow class of PCSK9

23   antibodies that are covered by our patents.  And that a

24   person of ordinary skill in the art would understand from

25   these two examples, all by themselves, all by themselves

1    what the full scope of the patented antibodies are, the

2    narrow classes, what they are,

3              Just by looking at these two.

4              Dr. Petsko will also explain to you

5    that there are 24 other examples, twenty-four in the patent

6    which are described in the list form.  They're described in

7    text.  They're described by sequence ID.  This is the string

8    of amino acids that Mr. Wolf was talking about.

9              26 examples exist in this patent.  And Dr.

10   Petsko's opinion is going to be that that 26 is enough to

11   tell the skilled antibody scientists what these patented

12   antibodies look like, the full scope.

13              Now, the second thing I said you can

14   do to satisfy the written description requirement is to

15   describe common structural features.  This is an alternative

16   test.  The written description test can be satisfied all by

17   itself by showing representative species.

18              But if they don't, for some reason you

19   are convinced that there aren't enough representative

20   species, the test can also be met by showing that there are

21   common structural features amongst the antibodies that are

22   covered by the patents.  Again, these narrow classes.

23              And Dr. Petsko is going to explain to you that

24   the sweet spot has a certain unique shape, as you can see,

25   and also certain unique chemical properties.  The chemical

1     properties are depicted on the right side of the screen.

2                         And Dr. Petsko will explain to you

3     that there is what he calls a greasy patch, and then charged

4     or polar patches.  And what Dr. Petsko will say to you is

5     that the person of ordinary skill in the art reading the

6     patent, bringing the knowledge that they have about antibody

7     science and reading all the information will understand that

8     in order for an antibody to bind to this particular part of

9     PCSK9 or parts of it, they have to share common structural

10    features.  And that the antibody scientist armed with this

11    information is able to visualize, visualize what the full

12    scope of the antibodies are.

13                         Final point, the other way in which

14    you can show there was sort of a sub test of how you can

15    show common structural features is to show something called

16    a structure function correlation.  Structure function

17    correlation.  It took me a long time to understand what that

18    was all about.       Dr. Petsko will testify about the

19    structure function correlation.  And what I've done here is

20    I've put up on the screen as Dr. Petsko will Figure 20A.

21    And Dr.  Petsko will also put up this colored version of

22    20A.

23                         And the colored version -- color

24    version does not appear in the patent.  The colored version

25    shows the antibodies.  These two, again, 21B12, 31H4, these

1    guys, parts of it.  It shows the PCSK9, and it shows a part

2    of the LDL receptors.

3                    And what this diagram, Dr. Petsko will

4    tell you, shows the person of ordinary skill in the art is

5    that any binding to the sweet spot, either one of these, if

6    you bind to the sweet spot, you will block PCSK9 from

7    binding to the LDLR receptor.  So the structure shown here

8    will have the function of blocking.

9                    And if you remember, that's what the

10   patents require, an antibody that has a structure, that

11   binds, that ends up blocking, and then lowering our

12   cholesterol.

13          I realize that there's a fair amount of

14   technical stuff in what I just told you, but I thought it

15   was important for me to go through systematically to hear

16   what our experts are going to tell you as we analyze and ask

17   you to analyze these five patents.

18                    I want to conclude by saying, one of

19   the same things I started with, that is Dr. Jackson and his

20   team in these inventions came up with something entirely

21   new, a brand new way to treat cholesterol.  The Patent

22   Office gave them patents and gave them the claims that are

23   at issue in this case.  Those claims are presumed to be

24   valid.  They have the obligation of proving to you that

25   they're not valid for these two particular reasons.

1                    The types of innovation that Dr.

2     Jackson and his team and Amgen's management that allowed

3     them to pursue it are precisely, precisely the type of

4     innovations that the founding fathers wanted us to have when

5     they put into the Constitution protection for patents.

6     These are precisely the types of innovations that have to be

7     protected.  And that's why I believe when you hear all the

8     evidence from all of the experts, you will conclude that Dr.

9     Jackson and Amgen have adequately described in these patents

10    -- they've adequately described through all of the

11    information, through all of the figures, through all the

12    data, through all of the writing, through the CD with

13    additional information, what they invented.

14                    Thank you for your time.

15                THE COURT:  Thank you, Mr. Hummel.

16                All right.  Mr. Wolf.

17                MR. WOLF:  Thank you, Your Honor.  Your Honor,

18    at this time, we call our first witness, Dr. Leonard

19    Schleifer.  Sorry, Len.

20                THE CLERK:  Do you prefer to swear or affirm?

21                THE WITNESS:  Swear.

22                THE CLERK:  Please state and spell your full

23    name for the record.

24                THE WITNESS:  It's Leonard L-E-O-N-A-R-D.

25    Steven, S-T-E-V-E-N.  Schleifer, S-C-H-L-E-I-F as in Frank

1    E-R.

2              THE CLERK:  Do you solemnly swear that the

3    testimony you are about to give to the Court and the jury in

4    the case now pending will be the truth, the whole truth, and

5    nothing but the truth so help you God.

6              THE WITNESS:  I do.

7              THE CLERK:  Thank you.

8              DIRECT EXAMINATION.

9    BY MR. WOLF:

10   Q.    Good afternoon.

11   A.    Good afternoon.

12   Q.    Could you introduce yourself to the jury?

13   A.    I am Len Schleifer, founder, and president, and CEO

14   of Regeneron.

15   Q.    Before you were founder, president and CEO of

16   Regeneron, what were you?

17   A.    Still Len Schleifer, but I was a board-trained

18   neurologist, board certified serving on the faculty of

19   Cornell Medical School.

20   Q.    And are you married?

21   A.    I am.

22   Q.    Do you have any kids?

23   A.    I do.  I have two wonderful boys.  One is

24   intellectually disabled, but he's a great kid.  And my other

25   great son is a federal prosecutor.

1    Q.    So you said you were a physician.  Give us a little

2    bit of a sense of your education.

3    A.    Sure.  I grew up in New York City, was a product of

4    the New York City school system, was interested in sports,

5    hanging around the school yard, played some chest.  Went on

6    to Cornell University.  Came from a middle-class family, so

7    I rushed out of school to save tuition.  Got out in three

8    years, and then I went to the University of Virginia where I

9    studied for seven years to earn both a medical degree and a

10   Ph.D.

11   Q.    And are you a licensed physician?

12   A.    I am.  I spent four years after my seven years

13   becoming a fully trained and board-certified neurologist.

14   Q.    Do you still treat patients?

15   A.    Occasionally, a family member, but I sort of gave

16   that up back in the '90s.

17   Q.    Seems wise.  So what did you do when you stopped

18   treating patients?

19   A.    Well, when I was on the faculty at Cornell, I had

20   gotten an Ph.D. in pharmacology and interested in

21   discovering and developing new drugs.  I was very interested

22   in coming up with drugs to treat neurologic diseases,

23   Alzheimer's Disease, Parkinson's Disease, Lou Gehrig's

24   Disease.  And I started a lab, and I went about my business.

25   I won a few grants and some awards, but realized maybe the

1   best place to do this was at a drug company.

2   Q.     So did you find, found -- what's the right verb for

3   that?  Did you found a drug company?

4   A.     Well, first I looked to see if there were any around

5   that I could go to work for that were interested in this,

6   and then I decided to start one of my own.  I had an

7   extensive entrepreneurial youth with a snow shoveling,

8   bagging groceries, delivering drugs.  So that was -- seemed

9   like starting a business didn't seem like it would be that

10  hard.

11            And so I talked to my advisors, my Ph.D. mentor,

12  Dr. Gilman, and he said, "It is the stupidest idea I ever

13  heard.  Get back in the lab and do something worthwhile."

14  But I was persistent and founded Regeneron.

15  Q.     Is there anything unusual about the folks that helped

16  you find Regeneron?

17  A.     Well, I had a lot of great help.  My mentor, Al

18  Gilman was a Nobel prize winning scientist.  And after he

19  tried to convince me not to do this, he said, "Well, let's

20  do it the right way.  Let's get real scientists involved."

21            And he helped me recruit Drs. Brown, Goldstein,

22  two Nobel Laureates actually in the LDL cholesterol field.

23  Dr. Shooter, Dr. Kornberg, another Nobel lawyer, and helped

24  us recruit Dr. Papadopoulos, who's been my partner at

25  Regeneron for nearly 30 years.

1    Q.    So Dr. Brown and Goldstein you just mentioned, you

2    said they were in the LDL field.  What specifically did they

3    do?

4    A.    They actually discovered that LDL receptor that you

5    heard about.

6    Q.    So they discovered the LDL receptor and then became

7    part of your company?

8    A.    Yeah.  I don't think one led to the other.  They

9    discovered the LDL receptor.  They got the Nobel prize, and

10   Dr. Gilman convinced them to join up with me.

11   Q.    Is there anything in your mind that distinguishes

12   Regeneron from maybe some of the other pharmaceutical

13   companies the jury might be familiar with?

14   A.    Well, we had this notion that if you're going to

15   start and build a pharmaceutical company, it ought to be

16   started and built by scientists and physicians.  And we were

17   going to do that from top to bottom.  We were -- if we were

18   going to discover drugs, make a difference in patients'

19   lives, do this in a high quality way.

20            We thought the people who should be in charge

21   should be scientists and the physicians.  So to this day,

22   we're one of the -- now one of the largest biotechnology

23   companies in the world, but we still have a majority of a

24   Board of Directors that are members of the National Academy

25   of Sciences, including two Nobel lawyers, and physicians and

1    scientists.  And the company's led by myself as well as Dr.

2    Papadopoulos, both M.D., Ph.D.'s.

3    Q.    So with that, what products have you brought to

4    market or are working on currently that this jury might be

5    familiar with?

6    A.    Well, during the first 25 years, none.  People like

7    to think we're an overnight success, but it was 25 years of

8    exploration, experimentation, failures.  But we stuck with

9    it, and now we've got seven drugs that are approved.  Some

10   of you may know people, perhaps your parents or

11   grandparents.  We have the leading drug to treat retinal

12   diseases, blinding diseases, diabetic eye diseases known as

13   Ilea.

14         We have a very important drug known as Dupixent

15   which we think is bending the ark of allergic disease.  It

16   it's approved to treat very bad eczema.  It's approved to

17   treat asthma, and we're studying it in lots of other

18   allergic diseases.  And more recently, we had a very

19   important drug that was approved that's in this new field of

20   immune oncology, and it treats people who have advanced skin

21   cancer.  And it's done some miraculous things.

22   Q.    And the jury's already heard a little bit about

23   Praluent.  Can you tell us a bit about that?

24   A.    Sure.  Praluent was a natural for us because we had

25   Brown and Goldstein on the Board of Directors who were

1    telling us to work in this field.  We had Roy Vagelos who

2    was a chairman who discovered the first statin medical when

3    he was head of research at Merck.  And so getting into this

4    field seemed quite natural, and we did.

5    Q.    And when did Praluent come on the market?

6    A.    Praluent came on the market.  It was the first one

7    approved in this space, and it's about three years ago.  I

8    think it was 2015.

9    Q.    Now, you're not sitting alone at counsel table.  We

10   also see your colleague from Sanofi.  Can you explain why

11   there are two of you here today?

12   A.    Sure.  So back in 2007, we had lot of ideas.  We were

13   a little bit too big for our britches in the sense that we

14   had lots of ideas, but not enough money to pursue them.  So

15   we thought what we should do is try and interest a large

16   established company like Sanofi who could bring not only

17   financial resources, but some development resources and

18   commercialization capabilities around the globe.  And so we

19   offered, we'll say, Okay.  Let's strike a bargain.  We'll

20   give you some of the upside of our molecule, and you help

21   us, and you pay for us, and we've been partners.

22   Q.    And when did that partnership start?

23   A.    Back in 2007.

24             MR. WOLF:  Thank you, Your Honor.  Pass the

25   witness.

```
 1              THE COURT:  Okay.  Thank you.

 2   BY MS. COLUMBIA:

 3   Q.      Good afternoon, Dr. Schleifer.

 4   A.      Good afternoon.

 5   Q.      Nice to see you again.

 6   A.      Nice to see you.

 7   Q.      You're very proud of Regeneron, aren't you --

 8   A.      I am.

 9   Q.      -- and of those products that you mentioned for

10   asthma and eye treatment and eczema and so forth?

11   A.      Yes, that's true.  I'm very proud.

12   Q.      And you would agree with me that the decision for the

13   jury in this case is limited to the decision of whether the

14   Amgen patents are valid; correct?

15   A.      I think that's what the judge is going to say.  It's

16   up to him, not up to me.

17   Q.      Okay.  Now, you gave an interview about a month ago

18   to the publication called Statin?

19   A.      I believe so.

20   Q.      And in that interview, you said the following,

21   correct, our founding father said it was so important for

22   the fiber and growth of this nation that they put right into

23   the Constitution and monopoly for limited part of time --

24              MR. WOLF:  Your Honor, we had extensive motion

25   in limine practice on their behalf about this very issue,
```

 1    and now they're trotting on their own motion.

 2             THE COURT:  Okay.  So it's irrelevant.

 3    Sustained.

 4             MS. COLUMBIA:  No further questions, Your Honor.

 5             THE COURT:  All right.

 6             MR. WOLF:  Nothing, Your Honor.  May I approach

 7    briefly?  I just want to hand something to Your Honor about

 8    this.

 9             THE COURT:  Okay.  Dr. Schleifer, you may step

10    down.

11             MS. COLUMBIA:  May we have a copy, Mr. Wolf?

12             MR. WOLF:  Just pursuant to those motions, Your

13    Honor, here's a proffer just for presentation purposes, Your

14    Honor.

15             THE COURT:  Oh, okay.

16             MR. WOLF:  Thank you.

17             THE COURT:  All right.  Go ahead.

18             MR. WILKS:  Thank you, Your Honor.  The

19    defendants call Michelle Carnahan.

20             MR. WILKS:  Ms. Carnahan is an executive at

21    Sanofi.  She'll tell you a bit about the company and what it

22    does.

23             Thanks, Your Honor.

24             THE CLERK:  Please place your left hand on the

25    Bible and raise your right hand.  Please state and spell

1    your full name for the record.

2                THE WITNESS:  Michelle M-I-C-H-E-L-L-E.  Lynn,

3    L-Y-N-N.  Carnahan, C-A-R-N-A-H-A-N.

4                THE CLERK:  Do you solemnly swear that the

5    testimony you're about to give to the Court and the jury in

6    the case now pending will be the truth, the whole truth, and

7    nothing but the truth so help you God?

8                THE WITNESS:  I do.

9                THE CLERK:  Thank you.

10               DIRECT EXAMINATION

11   BY MR. WILKS:

12   Q.    Good afternoon, Ms. Carnahan.

13   A.    Good afternoon.

14   Q.    Tell us who you are and what you do for a living.

15   A.    So my name is Michelle Carnahan.  I've work in

16   pharmaceuticals for about 26 years.  I was a colleague right

17   out of undergraduate, and I've been at Sanofi over in

18   Bridgewater, New Jersey for the last 14 months.  Prior to

19   that, I spent about 26 years in Eli Lilly & Company.

20   Q.    What do you do at Sanofi?

21   A.    So at Sanofi I'm the head of primary care business

22   unit.  What that entails is really our diabetes business,

23   our cardiovascular business and then what we call our

24   established products business.  So we have medicines for

25   joint and knee pain, we have medicines that are for kidney

1    disease so we're kind of cross the gamut in the primary care

2    medicines that we offer.

3    Q.    You're the head of all the primary care?

4    A.    I'm the head of that for North America.

5    Q.    That sounds like a big job.  Give us an idea of what

6    your job entails?

7    A.    What my job entails is really making sure that

8    patients can get access to medicine.  So be it through

9    scientific dissemination, be it through sales and marketing,

10   be it through the access and working with payers across the

11   system, my job is to make sure that medicines are invented

12   can actually get to the patient.  My other job is to really

13   help and understand what needs to be developed in the future

14   so where are we going in the future, what are the needed

15   opportunities with patients today, focused on the North

16   American population.

17   Q.    And give us an idea of what sort of company Sanofi is

18   now that we know what you do there?

19   A.    Sanofi is a worldwide innovative pharmaceutical

20   company.  And what that means is it innovates in research

21   and development.  It manufactures and then it commercializes

22   the medicines across the globe.  We have everything from

23   primary care medicine really for kind of breadths of

24   population all the way to specialty cancer medication,

25   rheumatoid arthritis medication and we have a division that

1    looks at rare diseases really understanding diseases that

2    only impact thousands of people.  We have a strong rare

3    disease tradition.  Additionally we have a consumer health

4    division that you probably picked up one of those products

5    in a CVS or a Walgreen's from time to time.

6    Q.    You mentioned that Sanofi is an innovative company.

7    Do you have any experience at all in drug development?

8    A.    You can't do this kind of work from the time you're

9    kind of in your early twenties and not get an understanding

10   of how drugs are developed.  So I like to say, I can take

11   drug development and really put it in simple terms maybe

12   because I'm not Dr. Schleifer who has got the big brain and

13   discovers these things.  I always liken it to I have a

14   sixteen year old who loves baseball.  And I always liken it

15   to kind of baseball because there is so much that goes into

16   getting that hit.  If you're a mom sitting behind home plate

17   you realize it.  There is so much that goes into hitting the

18   bat at the right speed, hitting the ball in the right place,

19   holding the bat in the right position, it's so many things

20   in the right position, so what happens, failure happens a

21   lot.  When you think about pharma, R & D, research and

22   development, ideas that come into research, there are

23   thousands of them.  There are ideas that Dr. Schleifer had,

24   Dr. Jackson had, there are thousands of ideas.  99 percent

25   of them fail.  99 percent of all of these ideas fail and

1    never make a medicine for anyone.  And that's really what

2    happens in the R of R & D.

3              In the D, the development part of R & D, it's

4    really where we test the medicines to understand is this one

5    slightly more efficacious here than another one?  Does this

6    side effect come on at a rate that isn't acceptable to a

7    placebo population?  At that point in time even when drugs

8    get to this point in time they have well north of 50 percent

9    failure rate.  So the opportunities of just getting

10   everything right in a drug to get it to manufacturing to get

11   it to me, it's huge.

12   Q.    How many base hits does Sanofi have, how many

13   products on the market does Sanofi have?

14   A.    So Sanofi has had a fair number of base hits in my

15   division alone.  We probably have fourteen or fifteen

16   products and then outside of that whether it's in consumer

17   health or some of our rare disease, we probably have

18   fourteen or fifteen more on the market, so they have had a

19   fair amount of base hits over the years, several years.

20   Q.    So we heard Dr. Schleifer talk about Regeneron's view

21   of the partnership with Sanofi.  Tell us from Sanofi's side,

22   why Regeneron?

23   A.    You know, I think kind of why Regeneron was if you go

24   back to that 2007 date, and it's hard to admit that I was

25   functioning in this industry without really understanding

1    what the opportunities that were there, the antibody work

2    and the oncology work that Dr. Schleifer and the team was

3    doing at Regeneron was very cutting edge.

4            The other thing that the Regeneron team had

5    going for them is they were a very small nimble

6    organization, so in some ways when you look for a partner in

7    business, it's very similar to looking for your life

8    partner.  You find out how can you compliment each other.

9    One person can bring one thing, the other person something

10   else.  You have to get along, also.  But that I think is

11   what the appeal was in the Regeneron/Sanofi, each brought

12   different skill sets to the table, but in the end kind of

13   brought those together so one and one equal three, not a one

14   and one equal two.

15   Q.    How is it going?  How would you characterize Sanofi's

16   relationship or partnership with Regeneron?

17   A.    Yeah, you know, I would say fantastic.  And I would

18   measure that partnership on a couple of things.  Right.  The

19   first one is like can you get along, right, and what's it

20   like getting along.  And I think that's really good from

21   Dr. Schleifer to kind of my team, we're very focused on what

22   each party brings and how we bring those things together to

23   make things to improve things.  But I think the real proof

24   is kind of in the pudding.  We talked about that 99 percent

25   and having to get everything right to get that, to get that

1   homer.  They brought four drugs to market, drugs treating

2   things like rheumatoid arthritis, asthma, cancer as Len

3   talked about, but even also equally important Praulent that

4   we're here to talk about today which is a fantastic

5   medication for those who have out-of-control LDL.

6               So I think where you really measure it is the

7   kids are doing well in this partnership and I think bringing

8   value to the market overall.

9   Q.    Successful partnership?

10  A.    Successful partnership, check.

11              MR. WOLF:  Your Honor, thank you.  Nothing

12  further.

13              THE COURT:  Thank you, Mr. Wolf.

14  Cross-examination.

15                    CROSS-EXAMINATION

16  BY MS. COLUMBIA:

17  Q.    Good afternoon, Ms. Carnahan.

18  A.    Good afternoon.

19  Q.    Just a couple of questions.  You joined Sanofi if I

20  heard you correctly in January of 2018?

21  A.    That's correct.

22  Q.    So you were not there in 2007 when this partnership

23  formed; correct?

24  A.    No, I was not.

25  Q.    And you were not involved in the decision that Sanofi

1   made to partner with Regeneron for this development of

2   Praluent; correct?

3   A.      Not in 2011.

4   Q.      In fact, you weren't there for the next ten years or

5   eleven years; correct?

6   A.      January 2018.

7   Q.      So all that you just testified about, the partnership

8   and the children, you didn't have the children; correct?

9   A.      I think I'm probably raising the children, that's

10  probably fair.

11  Q.      Okay.  Fair enough.  But in January of 2008, the time

12  that this jury will need to consider for this case about

13  Amgen's patents, you were actually the head of human

14  resources for a completely different company; isn't that

15  true?

16  A.      I was, that's correct.

17              MS. COLUMBIA:  No further questions.

18              THE COURT:  Any redirect?

19              MR. WOLF:  No, Your Honor.

20              THE COURT:  All right.  Ms. Carnahan, please

21  watch your step.

22              MR. WOLF:  Your Honor, at this time, Mr. Reisner

23  was going to call Dr. Boyd.  I just question timing.  It's

24  going to be a significant witness.

25              THE COURT:  Why don't we get -- why don't we get

1    -- all right.  We'll take a break.  We'll take a

2    fifteen-minute break there.

3                    (Jury leaving the courtroom at 3:00 p.m.)

4                    THE COURT:  All right.  We'll be in recess for

5    fifteen minutes.

6                    (A brief recess was taken.)

7                    THE COURT:  All right.  Read to go?

8                    MR. GAEDE:  We have a responsive bench brief by

9    any chance.

10                   THE COURT:  Sure.

11                   MR. GAEDE:  Thank you.

12                   THE COURT:  All right.  Now we're ready to go?

13                   MR. WOLF:  We are, Your Honor.

14                   THE COURT:  All right.  Let's get the jury.

15                   MR. WOLF:  Who is the timekeeper at the bell?

16                   THE COURT:  We are.

17                   MR. WOLF:  So we have to be nice to you.

18                   THE COURT:  But you're encouraged to keep your

19   own time because while close calls cannot be disputed, if

20   we're off by an hour or something, I will consider that.

21                   MR. WOLF:  NFL replay rules apply?

22                   THE COURT:  Something like that, yeah.  And we

23   should be able to give you where you stand, you know, before

24   we start on Thursday.

25                   MR. WOLF:  Right.

```
 1                    (Jury entering the courtroom at 3:17 p.m.)

 2                    THE COURT:  All right.  Members of the jury,

 3     welcome back.

 4                    Mr. Reisner, you may proceed.  Everyone else,

 5     you may be seated.

 6                    MR. REISNER:  Your Honor, we call Dr. Scott

 7     Boyd.

 8                    THE COURT:  All right.

 9                    THE CLERK:   Please state and spell your full

10     name for the record, please.

11                    THE WITNESS:  Scott Dexter Boyd, S-C-O-T-T,

12     D-E-X-T-E-R, B-O-Y-D.

13                    Scott Dexter Boyd, Ph.D., was examined and

14     testified as follows:

15                    MR. WOLF:  Your Honor, may I approach with the

16     binders?

17                    THE COURT:  Yes.

18                    MR. WOLF:  Would you like copies?

19                    THE COURT:  I would.

20                        DIRECT EXAMINATION

21     BY MR. REISNER:

22     Q.    Good afternoon.  My name is Dan Reisner.  And I'm

23     here to represent Sanofi, Regeneron.

24                    Dr. Boyd, can you tell us where you're from

25     originally?
```

1  A.      I'm originally from Winnipeg in Canada.

2  Q.      What were you asked to do for this case?

3  A.      I was asked to evaluate the validity of certain

4  claims of Amgen's patents related to this cholesterol

5  lowering antibodies.

6  Q.      And do you have any slides for us today?

7  A.      I do.

8  Q.      What did you conclude?

9  A.      Well, I concluded that the patent claims that I

10  evaluated, they were invalid because they didn't satisfy the

11  written description requirement and were not enabled.

12  Q.      Are have you ever testified before at trial?

13  A.      No, this is the first time.

14  Q.      What is your current position?

15  A.      Well, I'm an associate professor in the department of

16  pathology at Stanford University.  And there I run an

17  immunology lab studying the immune system.

18  Q.      What undergraduate degrees do you have?

19  A.      I started studying chemistry and biochemistry at the

20  University of Manitoba where I'm from in Canada.  When I got

21  that degree I was awarded a Rhodes Scholarship, so I went to

22  study at Oxford University as a Rhodes Scholar.  I did an

23  English literature degree there.  That was for a bit of

24  variety in my education because I knew I was going to come

25  to the United States after that to study medicine to do

1    biological research with my Ph.D. and M.D. studies.

2    Q.    Where did you get your graduate degrees?

3    A.    I studied at Harvard Medical School and I got my

4    Ph.D. in biology.

5    Q.    What field did you work in after getting your

6    degrees?

7    A.    I did clinical residency and fellowship in pathology.

8    And I was focusing on research in the immune system studying

9    immunology as we call it.

10   Q.    What is immunology?

11   A.    Immunology is the study of the immune system which

12   are the cells and the products that they produce in your

13   body to help protect you from things like viruses and

14   bacteria.  And things like antibodies are a very key part of

15   the immune system.

16   Q.    How many years have you been working in immunology?

17   A.    I first started working in immunology in medical

18   school.  That was back in 1995 or so.  That was when I was

19   at Harvard Medical School working with a researcher, Eileen

20   Sharp.  We were studying mice that had genes altered that

21   affected their immune systems.  We studied the antibodies

22   these mice made in addition to other aspects.  And I have

23   been working in immunology my whole time at Stanford and

24   that's what my whole lab is focused on researching now.

25   Q.    When did you get your first experience making and

1    testing antibodies?

2    A.    Well, as I mentioned, part of the work that I was

3    doing during medical school was studying mice that had

4    altered immune systems.  And we studied the antibodies in

5    those mice.  That was in the mid '90s, sort of '95, in that

6    range.

7    Q.    Do you have any teaching responsibilities at

8    Stanford?

9    A.    I do.  So I teach the graduate students in immunology

10   and I teach the residents in the pathology department.  And

11   I also teach medical students about the immune system.

12   Q.    Do you have any responsibilities for lab work?

13   A.    I do.  So I spend most of my time directing a

14   research lab and we study human immune responses in

15   particular to things like why do some people respond better

16   to the influenza vaccine than others?  Why are some

17   protected?  There is a problem because older people

18   sometimes don't have a good response to the vaccine and

19   they're not as defended against the influence of the virus.

20        We also study some diseases that are caused by a

21   misfunctioning immune system like peanut allergies which is

22   become pretty common sort of immunological disorder.  And

23   all these things have antibodies as key parts of how they

24   work.

25   Q.    Dr. Boyd, if you could talk to the jury so they could

1    hear you better when I'm asking you questions.  And what I

2    would like to ask you next is do you write articles for

3    scientific publications?

4    A.    Yes, I do.  We publish papers on immune system

5    research and a lot about antibodies.

6    Q.    And does any of that work involve comparing one type

7    of antibody to another?

8    A.    Yes.  That's a key part of the kind of research work

9    that we do, we study what kind of antibody response one

10   person makes compared to another person and we try to study

11   which antibodies are the ones that are actually most

12   protective, or in the case of immunological diseases like

13   peanut allergy which antibodies are the ones that actually

14   cause those harmful diseases in that case in the case where

15   the immune system is misfunctioning.

16   Q.    Are you familiar with the methods of making and

17   testing antibodies that are described in Amgen's patents?

18   A.    Yes.  Those are methods that have been around for

19   quite a while.  I was familiar with them when I was in

20   medical school and have been since we have been applying

21   some methods like that in my own lab as well as a lot of

22   other methods for studying the immune system.

23   Q.    Do you have experience yourself using the types of

24   known methods for making and testing antibodies that are

25   described in Amgen's patents?

1    A.    I do.  For some of them, I have done them in my lab.

2    There are other ones that I'm familiar with just from

3    knowing about them in the scientific literature and there

4    are also, they're basically methods that have been around

5    for a number of years.  Some of them are just standard parts

6    of understanding immunology.

7             MR. REISNER:  Your Honor, we moved to qualify

8    Dr. Boyd as an antibody expert.

9             MR. HUMMEL:  No objection.

10            THE COURT:  All right.  You may proceed.

11   BY MR. REISNER:

12   Q.    Let's talk a little bit about the science in this

13   case before we talk about the patents and start going

14   through some of our graphics.  Can you tell the jury what

15   kind of drug this case is about?

16   A.    Yes.  So this case is about drugs that are actually

17   antibodies.  So they're examples of the kind of molecules

18   that your immune system makes to protect you against viruses

19   and others things, but they're special ones that target

20   other proteins.  So these antibodies that we're talking

21   about, they're special ones that help to lower the

22   cholesterol that you have in your blood.  We'll explain how

23   that works.

24   Q.    Why do you need to lower cholesterol in the blood?

25   A.    So here if you look at the slide, you can see that

1     this is an artery or a blood vessel.  This is the kind of

2     blood vessel that would feed blood to your brain or to the

3     muscle of your heart to allow it to pump.  If you have too

4     high a cholesterol, especially the bad cholesterol that we

5     call LDL cholesterol that bad cholesterol can build up in

6     the walls of the blood vessels.  If it happens enough, you

7     get something called a clot form and a blood vessel can be

8     blocked completely.  If that happens in a blood vessel that

9     feeds your brain, that's when you have a stroke.  If it's

10    one of the ones that feeds the heart, that's what causes a

11    heart attack.  This is something that causes strokes and

12    heart disease, very negative health problems.

13    Q.     Do Sanofi and Regeneron make a drug that lowers

14    cholesterol?

15    A.     Yes, they do.  They make the drug called Praluent.

16    Q.     What organ in the body helps remove this bad

17    cholesterol?

18    A.     Yes.  So that's the liver.  The liver has the job of

19    pulling cholesterol out of the blood.

20    Q.     Let's zoom in on a liver cell.  And if you could tell

21    us what we're seeing here now?

22    A.     Sure.  So that, you see the liver is up in the left

23    and we zoom in on a cell, now we're zooming in even more,

24    we're looking at the membrane of the cell, that's across the

25    screen.  Below that, that's inside the liver cell.  Above

1    it, that's outside in the bloodstream.

2    Q.    Let's look at how a healthy person's liver removes

3    cholesterol from the bloodstream.  Tell us what the brown

4    basketball shaped objects are?

5    A.    Yes.  So that's a way of showing what the bad

6    cholesterol looks like.  That's the LDL cholesterol.

7    Q.    And the purple mushrooms?

8    A.    So those are the LDL receptors that are on the

9    surface of the liver cell.  Those are the ones that can

10   catch the LDL cholesterol and deal with it as we see.

11   Q.    Maybe you can describe what we're seeing now in this

12   animation?

13   A.    Sure.  So here you see the LDL receptor catches the

14   cholesterol.  It then moves inside the cell, so it takes the

15   cholesterol out of the blood.  Once it's inside the liver

16   cell, then the liver cell can break down the cholesterol and

17   it can reuse it for other purposes.  The key thing here is

18   you'll notice the LDL receptor, the purple mushroom thing is

19   still there, now it's going to go back up to the cell

20   membrane.  That means that it can then pull more cholesterol

21   out of the blood.  This is the situation you have when your

22   cholesterol level is appropriately low.

23   Q.    Now, let's look at what can happen in a person who

24   has high cholesterol, an unhealthy person.

25   A.    Yes.  So in this one, you can see this is sort of the

1    villain of the piece or the bad guy, that's this other

2    protein that's inside the body, it's called PCSK9.  It's

3    part of the way this whole system is regulated.  But the key

4    thing to learn from this is PCSK9, it binds to the LDL

5    receptor or the purple mushroom.  You'll see that happen in

6    the next animation.  There it goes.

7             So now PCSK9 gets attached itself or it's bound

8    to the LDL receptor and you see it dig in that little part

9    of itself which is colored purple, that's the area where

10   those two things interact.

11            Now, from this point, the LDL receptor will

12   catch the cholesterol out of the blood as before it's going

13   to go into the liver cell, but watch what happens this time,

14   because PCSK9 was there, both the cholesterol and the LDL

15   receptor get destroyed.  So it can't go back to the cell

16   membrane.  And so at that point, you know, if you have too

17   much PCSK9, you start to have fewer and fewer LDL receptors

18   on the cell surface and then the cholesterol in the blood

19   gets too high.  So basically having PCSK9 causes you to have

20   high cholesterol.

21   Q.    Now that we have seen both the healthy person and an

22   unhealthy person, let's take a look at what happens with a

23   person with high cholesterol takes Praluent.

24   A.    Yes.  Here we see those same characters before, we

25   have the bad cholesterol which is the yellowish basketball

1    thing, the LDL receptor is the purple mushroom, PCSK9 is

2    those little yellow we see on the side.  When the person

3    takes the Praluent antibody drug or an antibody drug that

4    targets PCSK9, watch what happens.  The antibodies which are

5    those Y shape things, they come in and through the tips of

6    the Y, they bind to PCSK9.  Now they're stuck to it.  When

7    PCSK9 tries to interact with the LDL receptor, you'll see

8    that it can't anymore.  It's going to bounce off.  So that's

9    called blocking.  The antibody has actually blocked PCSK9

10   from binding to the LDL receptor.

11        When that happens, now the LDL receptor is free

12   to catch the cholesterol like it did before, take it inside

13   the cell where the cholesterol can be broken down, and this

14   time, the LDL receptor is preserved, PCSK9 wasn't able to

15   destroy it.  So it goes back to the cell membrane and it can

16   continue the cycle so it can pull more cholesterol out.

17        So what you can see is because the antibody was

18   there, the LDL receptors are preserved or saved, and as a

19   result, they can pull the cholesterol out of the blood.  And

20   the antibodies do that by interfering with PCSK9.  That's

21   the overall story.  If you had the antibody, your blood

22   cholesterol gets lower.

23   Q.    You said Praluent is an antibody drug.  Let's take a

24   look.

25   A.    Yes.

1    Q.      Why did you depict this as a Y shape?

2    A.      So the Y shape is really roughly the shape that

3    antibodies have in the body.  They're made of -- they are a

4    kind of molecule called proteins.  You'll see in the case of

5    antibodies they have two main big parts you should

6    recognize, one is they have a long chain which we call the

7    heavy chain, and they have a shorter one stuck to that as

8    well which is called the light chain.  The antibody has two

9    halves and they are both symmetric, each has a heavy chain

10   and a light chain.

11   Q.      Which of the two chains is generally more important

12   for binding?

13   A.      If you had the pick it's usually the heavy chain.

14   That's the one that has more of the responsibility for

15   determining what target the antibody is going to bind to.

16   Q.      Now, can we look inside an antibody and see what it's

17   made of?

18   A.      Yes.  Okay.  So here you see more of the detail.

19   This is still a graphic, but it gives you more of the

20   information.  So you can see now that both the heavy chain,

21   which is the long one, and the light chain which is the

22   shorter one, they're actually basically made up of beads on

23   a string, little units attached to each other all in a

24   string.  And think sort of weave back and forth.  The

25   building blocks are those little beads.  Those are called

1    amino acids, and there's 20 different kinds.  They're just

2    sort of units joined together to make a protein like an

3    antibody.

4    Q.     Now, on the right, you've got, I guess you call

5    these, beads, those 20 circles with letters on them.  What

6    do the letters represent?

7    A.     That's right.  So those are the 20 different kinds of

8    amino acids that are in human proteins.  They each have a

9    name for the kind like lysines or alanines, but it just says

10   what kind of building block it is.

11   Q.     Are each of those 20 letters different?

12   A.     They are.

13   Q.     Now, does it matter which amino acids you use to make

14   an antibody and what order you put them in, or can you just

15   string these beads together however you want?

16   A.     No, it matters very much.  So the key thing to know

17   here is that it's -- you know which amino acid you have and

18   what order you string them together in that's what's going

19   to determine what the antibody will bind.  So the -- you

20   know, the building blocks in the order that you string them

21   together, that determines the target of the antibody.

22   Q.     Can you remind us again what the Praluent antibody

23   binds to?

24   A.     Sure.  So like we saw in the earlier animation, the

25   Praluent antibody, it targets PCSK9 which is that protein

1    that causes you to have too high cholesterol.  There it is.

2    Q.    Let's take a look inside PCSK9.  Tell us what we see.

3    A.    Yeah.  So this is an interesting thing is that PCSK9,

4    it's also a protein, so it's also made of strings of amino

5    acids joined all together.  It's just in different order of

6    amino acids and different forms.  That's why it's a

7    different protein of antibodies.  They're made out of the

8    same sort of building blocks.

9    Q.    Now, what part of the antibody is most involved in

10   binding to a target like PCSK9?

11   A.    Sure.  So it's really the tips of the Y that are the

12   key part that's going to bind to the target, and you see

13   there's sort of shaded more in purple there.  And in

14   particular, when you look at the string of amino acids at

15   the tips of the Y, there are three loops in the heavy chain.

16   And there are three loops in the light chain.  Those are the

17   most important part of the antibody in terms of telling you

18   what it's going to bind to.

19             They're the ones where, you know, you can

20   consider a lot of the rest of the antibodies.  It's really

21   more like a scaffold or a structure that holds these key

22   loops in the right place.  So the loops are where all the

23   action is.  That's what makes one antibody different from

24   another one.

25   Q.    Let's take a look at the heavy chain.  Can you

1    describe what we're seeing here at the three different

2    string of beads at the tip of the heavy chain?

3    A.    Yes.  So those are the three loops that I talked

4    about.  In the heavy chain tip, you can see that we just

5    number them CDR1, CDR2, CDR3.  CDR is

6    complementarity-determining region.  That's just another way

7    of saying these are the loops that are going to determine

8    what the antibody will bind to.  So that's the complementary

9    determining region.  What is the target?  What is this going

10   to bind to?

11          So there are three loops on the heavy chain tip,

12   and then we'll also see there are three loops on the light

13   chain tip.  And they sort of come together in space, so

14   they're actually close together often.  But they're the ones

15   where it differs between two entities.  Those antibodies are

16   likely to bind to different targets.

17   Q.    So if we just look at one side of the Y shape, I see

18   six CDRs, three in the heavy, and three in the light chains.

19   Which of those six are generally the most important for

20   determining whether and -- where an antibody binds?

21   A.    Yeah.  So this is also a really important point is if

22   you had to pick the one loop, which is the most important of

23   all, it's the CDR3 of the heavy chain.  That's the one that

24   is the most difference between different antibodies.  It's

25   the most diverse.  And basically that's -- you know, that's

1    part of the way that the immune system is able to protect

2    against a huge range of different viruses or bacterias

3    because we have antibodies that have very different loop

4    sequences, especially the CDR3.  So the CDR3 is sort of the

5    one that has the dominant effect often times in antibodies.

6    Q.    And now let's watch an antibody such as Praluent bind

7    to PCSK9.  If you can explain to us what we're seeing.

8    A.    Sure.  Okay.  So here it comes and it binds to PCSK9.

9    So what you see is that the amino acids or the building

10   blocks that are in those loops at the tip Y, they interact

11   or they come close to the amino acids that are in the target

12   protein, and they interact in very specific and particular

13   ways.

14        Two different antibodies can bind in completely

15   different ways to the target.  They can be shifted over into

16   a position.  They can form different kinds of interactions

17   with those amino acids that are at the tip.  So there will

18   be a lot more details about that later, but that's the basic

19   principle.

20   Q.    Now, I'd like to step through a timeline that you

21   prepared with some of the relevant scientific background.

22   I'm going to turn to DDTX1.20.  What happened in 1975?

23   A.    So that's really some of the earliest science where

24   -- where academic researchers, university researchers

25   figured out there was a relationship between the LDL

1    receptor which was the purple mushroom -- we talked about

2    that in that early animation -- and cholesterol levels in

3    the blood.  So that research was done sort of in the

4    mid-'70s.  It was done by Researchers Brown and Goldstein

5    who were at University of Texas Southwestern.  That's where

6    that kind of discovery was made.

7    Q.    Is that the same Brown and Goldstein we heard about

8    earlier?

9    A.    It is.  They are the ones that were part of

10   Regeneron.

11   Q.    Part of Regeneron years later?

12   A.    That's right.

13   Q.    Now, did Amgen do this work in 1975 that you just

14   described?

15   A.    No, that was done by university researchers.  That

16   had nothing to do with Amgen as a company.

17   Q.    What happened in 2001?

18   A.    So that's -- 2001 is when the gene for the PCSK9

19   proteins -- so the gene that encodes it, that's when it was

20   discovered.

21   Q.    And did Amgen do that?

22   A.    No, that was done by a different company called

23   Millennium, so it had no relationship to Amgen.

24   Q.    And what happened in 2006?

25   A.    Right.  So after the discovery of the gene for PCSK9,

1    at that time nobody really knew what it did at all.

2    University researchers were studying that PCSK9 gene and the

3    protein that it makes, and they began to learn that it was

4    involved in regulating cholesterol.  And I think there's a

5    key study that happened in 2006 that was published where

6    scientists again at academic center or university at UT

7    Southwestern, they showed that PCSK9 is involved in

8    regulating cholesterol.  And they suggested in their paper

9    that you could devise or obtain the antibodies to PCSK9 to

10    block its function.

11            So just like we showed in the animation, that's

12    where that concept was first put into the public literature

13    by university researchers, not by any company.

14    Q.    And did Amgen do that work that you're describing in

15    2006 in these publications?

16    A.    No.  It was university researchers at University of

17    Texas Southwestern.

18    Q.    And was all of this work that you described from 1975

19    through 2006 publicly available?

20    A.    It was.  It was described in published papers that

21    were in the scientific literature that anyone could read.

22    So it was available to all.

23    Q.    Now, based on all this research that you just

24    described, did any companies find a PCSK9 antibody to treat

25    high cholesterol?

1    A.    Yes, several companies did.

2    Q.    And did any companies find PCSK9 antibodies that fall

3    within the scope of Amgen's claims?

4    A.    Yes, several companies did.  Because the claims that

5    are at issue that we're talking about in the Amgen patent,

6    they're written broadly so that they could cover a whole

7    bunch of different antibodies, very large numbers, and could

8    cover the antibodies made by competitors.

9    Q.    We're on demonstrative DDTX1.21.  Could you explain

10   what we see here, Dr. Boyd?

11   A.    Yes, so this is just listing the antibodies made by

12   Amgen's competitors.  So there's the one made by Sanofi and

13   Regeneron, Praluent.  There's two of them that are made by

14   Merck which is called 1D05 and AX132, you can see.  And then

15   there's one made by Pfizer which is called J16.

16   Q.    And are each of these competitor antibodies covered

17   by the disputed claims in Amgen's patents?

18   A.    They are, because the disputed claims are written

19   broadly so that they would catch, or they would cover a very

20   large number of antibodies, and including these ones made by

21   the competitors.

22   Q.    Have you had a chance to carefully review Amgen's

23   patents?

24   A.    Yes, I have.

25   Q.    And do Amgen's patents, the patents that are at issue

1    in this case, describe any of these four antibodies?

2    A.    No, they don't at all.  If you look for the

3    sequences, those antibodies -- you know, the amino acids and

4    what order they are, if you look for any other information

5    about those antibodies made by Regeneron, Merck, and Pfizer

6    in the Amgen patent applications, you don't find them at

7    all.

8    Q.    Now, do think of any of these antibodies, Praluent,

9    1D05 AX132, and J16 have similar structures to the

10   antibodies that are described in Amgen's patents?

11   A.    No, they don't.  If you look at the tips of the Y in

12   those antibodies, they're completely different from the ones

13   that Amgen described and invented themselves.

14   Q.    Now, let's talk about Amgen's patent application and

15   their claims.

16   A.    Sure.

17   Q.    If we could call up DTX-3075.  This is Amgen's 2008

18   patent application.

19          MR. REISNER:  Your Honor, this is the patent

20   application that's at issue.

21          THE COURT:  All right.  And your number is DTX

22   3075?

23          MR. REISNER:  That's right.  That doesn't mean

24   we'll have 3,000 exhibits to show.

25          THE COURT:  Okay.  Well, I take it it's admitted

1   without objection.

2              MR. HUMMEL:  That's correct.

3              (Exhibit DTX-3075 was admitted into evidence.)

4   BY MR. REISNER:

5   Q.    And Dr. Boyd, when did Amgen file the patent

6   application, DTX-3075?

7   A.    So this -- this application, it's filed on a key date

8   which is January 9th, 2008.

9   Q.    Is that the magic date that we heard?

10  A.    It is.  That's -- that's the date that we really have

11  to remember in considering the patent claims that we're

12  talking about.

13  Q.    So can we refer to this application as the

14  January 2008 patent application?

15  A.    Sure.

16  Q.    And the patent number for that, the application

17  number for that is 61/010630?

18  A.    Yes.

19  Q.    Let's talk about now the claims that are in dispute

20  in this case.  Can you tell the jury what these numbered

21  paragraphs are?

22  A.    Yes.  So these are sections from the patents where

23  each of them is containing a claim or something that the

24  writers of the patent say that they invented.

25  Q.    Now, if I refer from now on to the claims or Amgen's

1    claims, can we agree that we're not talking about all the

2    claims in these two patents, all 53 claims, we're just

3    talking about the disputed claim 7 of the '741 and 7, 15, 19

4    and 29 of the '165 patent?

5    A.    Yes, it's just those five.

6    Q.    Let's take a closer look at one of those claims.

7    We'll look at Claim 29 from the '165 patent.  Is Claim 29

8    fairly similar to the other four claims for the purposes of

9    your opinions?

10   A.    Yes, it is.  It's written in the same way.

11   Q.    Now, we've underlined here isolated monoclonal

12   antibody with red underline.  What does that mean?

13   A.    So that's just a way of saying a pure antibody or

14   sort of one kind of antibody.  We call that a monoclonal

15   antibody.  It's basically just saying one kind.

16   Q.    And you see that there are two requirements in two

17   different colors.  One refers to binds and one refers to

18   blocks?

19   A.    Yes.

20   Q.    I want to ask you about both of these.  Let's start

21   with the antibody binds requirement.

22              What does that mean?

23   A.    So the patent claim is written to say that the

24   inventors are saying the invented antibodies that bind to at

25   least two of the following residues, and then they list a

1    series of amino acids.  Those are amino acids and PCSK9.

2    They're not talking about the antibody sequence itself.

3    Q.    What is the difference between residue and amino

4    acid?

5    A.    You just call it a residue if it's incorporated in

6    the protein, but it's really the same thing as the amino

7    acid.

8    Q.    All right.  And those sort of codes like S153, I154

9    that we see in Claim 29, what does that mean?

10   A.    Yes.  That's just a shorthand way of saying what kind

11   of amino acid is it, and what's its position in a string of

12   bonds strung together.  So when it says S153, that's saying

13   amino acid kind of series.  It happens to be the 153rd

14   position in a string of beads.  So it just tells you exactly

15   what amino acid you're talking about.

16   Q.    Now, can you explain what you're trying to show here

17   with this animation?

18   A.    Yes.  So this is showing a PCSK9 protein, and we're

19   looking down on it.  And those are the amino acids that are

20   listed in that claim.  They're laid out in that patch that's

21   colored purple.  So it's the same ones.

22         Each one of them is corresponding to the one of

23   amino acid in that -- listed in that patent claim.  These

24   are -- PCSK9 is a protein that we all have in our bodies.

25   And that patch, it has a significance.  It's sort of a fact

1   of nature that happens to be where the LDL receptor binds to

2   PCSK9 where the purple mushroom contacts the PCSK9 protein.

3   So this patch of amino acids, it's not something that

4   anybody invented.  It just happens to be with the way humans

5   evolved, we evolved so that LDL receptor binds to PCSK9 in

6   that part of it.  So it's -- yeah, it's sort of a fact of

7   nature.  It's something that all humans have inside.

8   Q.    But why did Amgen choose these particular amino acids

9   on PCSK9 as the target for antibodies to bind?

10  A.    So Amgen's scientists have done experiments which we

11  call protein crystallography.  It's a kind of experiment you

12  can do.  And academic researchers had also done experiments

13  like that that showed that PCSK9 binds to the LDL receptor

14  using that patch on the surface.  So because the idea that

15  antibody discovery for these drugs was we want to block the

16  LDL receptors from binding to PCSK9.  The idea was, well,

17  why don't we bind the antibody to the area where the LDL

18  receptor would normally stay.  That's where the target was

19  in a sense, but it made use of that sort of fact of nature,

20  this patch of amino acids where the LDL receptor would

21  normally sit.

22  Q.    Now, does having knowledge of where these 15 amino

23  acids are on PCSK9 help an antibody scientist make new

24  antibodies that bind to some portion of that purple patch?

25  A.    Right.  So that's -- the answer to that is no, and

1    the reason comes down to how you actually make antibodies.

2    So no one could sit down and say, I think I'll design an

3    antibody.  I'm going to write out the amino acid sequence.

4    And I want one that binds right up in the top part of the

5    purple patch, or I want one that's going to bind over on the

6    left.

7         The way you actually obtain antibodies is by a

8    sort of trial-and-error random process.  You have to either

9    immunize a mouse or look for antibodies in a big pool of

10   diverse ones.  You don't know what's there to begin with.

11   You pull out ones that could be candidates of the kind that

12   you want.

13        And after that, you have to study them in a lot

14   of detail.  So knowing that purple patch, that doesn't help

15   you when you immunize the mouse.  You're basically doing the

16   same experiment any way.  You then have to fish through all

17   the antibodies that you find and hope that you get ones that

18   are going to be targeting the areas that you are interested

19   in.  But it doesn't change the way that you would actually

20   obtain the antibodies in the first place, if that makes

21   sense.

22   Q.    Now, the claim language spends a lot of time on

23   what's in PCSK9.  Does the claim actually cover this purple

24   patch on PCSK9?

25   A.    No, it doesn't.  That purple patch is just something

1    that's in humans.  It's a fact of nature, as I said.

2    Q.    So if the claims don't cover PCSK9 or that specific

3    patch on PCSK9, why do they mention it at all?

4    A.    Well, so the claims, they're saying we claim we've

5    invented monoclonal antibodies, but the whole rest of the

6    description is saying, and we bind to this area of PCSK9.

7    So the claim is telling you a lot more about PCSK9 then it

8    is about the antibodies themselves.

9           If you look for details of the antibodies in

10   that claim, you don't see anything.  It just says any

11   antibody so long as it binds to -- you know, in this one, it

12   says at least two of those amino acids on PCSK9 and blocks

13   the binding to the LDL receptor.  That's what we say we have

14   invented.  So it doesn't narrow it down, it says any

15   antibody that would meet those criteria.

16   Q.    Tell us what this animation that you prepared is

17   intended to show.

18   A.    Sure.  So this is showing that area which Amgen has

19   referred to as the sweet spot or the binding patch on the

20   PCSK9 protein.  The claims refer to an isolated monoclonal

21   antibody, but all the rest is vague.  It just says that it

22   has to bind to the part of those amino acids that are in

23   purple, and it has to block the interaction with the LDL

24   receptor.  So that's what that's showing.

25   Q.    So just to be real clear for the rest of us who

1    aren't antibody scientists, are the claims directed to that

2    Y-shaped thing on the left, or the yellow and purple, or

3    magenta shape on the right?

4    A.    The claims are saying we invented antibodies, but the

5    language that's in the claim is describing PCSK9, and the

6    areas where the antibody would bind.  That's how it's

7    written.

8    Q.    And we're at DDTX1.26 for the record.

9          Now, the claims have this Claim 29, and the

10   other claims have amino acids sequences for PCSK9 in the

11   claim.  My question now to you is:  Do Amgen's claims tell

12   you what the amino acid sequences are in the antibody?

13   A.    No, they don't.  It just says an isolated monoclonal

14   antibody.  That's all we read about the antibody there.

15   Q.    Now, if we look at the language in blue blocks, the

16   binding of PCSK9 -- it's a little far away, if you can read

17   it -- to LDLR language.  What does that mean?

18   A.    Yeah.  So that's saying that when the antibody is

19   bound to PCSK9, it should block the LDL receptor from

20   binding to PCSK9, just as we saw in the earlier animation

21   where it bounced off.  If the antibody is there, the LDL

22   receptor can't bind anymore.

23         So I think we show that in an illustration here.

24   That's it.

25   Q.    So just remind us here what the purple mushroom shape

1    on the left is.

2    A.    That's the LDL receptor that pulls the cholesterol

3    out of the blood.

4    Q.    And on the right, the Y and the yellow, what is that?

5    A.    So that's the antibody that's now bound to PCSK9

6    that would otherwise cause the LDL receptor to be destroyed.

7    Q.    And what happens when PCSK9 comes into contact with

8    the receptor?

9    A.    So this is showing when the antibody is there, it

10   blocks that interaction.  So the LDL receptor is preserved

11   or saved, and PCSK9 is thwarted in its attempt to destroy

12   it.

13   Q.    Does the claim tell you which antibodies satisfy

14   these two requirements, the binding and the blocking

15   requirements?

16   A.    No.  It doesn't say what those antibodies are.  It

17   just says any antibody that has those characteristics.

18   Q.    Is it possible to write a claim so that an antibody

19   scientist can read the claim and know exactly what

20   antibodies satisfy that claim?

21   A.    Yes, you can.  People can choose to write a claim in

22   a patent application where they say, We claim the following

23   antibody and they list the amino acid where they have a

24   chain in the light chain.  When they do -- that's like

25   giving the exact recipe for making that antibody.  So if you

1    have the amino acid sequence of the antibody, you can make

2    it yourself and it's unambiguous.

3            Here, the way this claim is written it says just

4    any antibody as long as it does the following.  You don't

5    really know what those antibodies would look like.

6    Q.    Do Amgen claims specify specific antibodies by

7    telling us what their amino acid sequences are?

8    A.    No.  These claims, the five that are at issue,

9    they're all in this form that says any antibody so long as

10    it does the following.  And it gives that sort of criteria.

11    So you don't find the amino acid sequence or the antibody or

12    the recipe for it there, you just learn about what the

13    antibody won't do or will do.

14    Q.    We just talked about the claims.  Now, I'd like to

15    talk about the other part of the patent which we call the

16    specification, the text that comes before the claims.

17    A.    Yes.

18    Q.    Does the specification describe any of the antibodies

19    that Amgen did invent?

20    A.    Yes, it does.  So it describes some antibodies that

21    the Amgen scientists discovered and then did experiments on.

22    So it describes the ones that they did invent.

23    Q.    So let's go back to the January 9, 2008 patent

24    application, DDTX-3075 at Page 555.  And what does this

25    show?

1    A.    So this is one figure from the Amgen patent that

2    we're talking about, and this is one of the places where

3    they do actually give the amino acid sequence of the -- one

4    of the antibodies that they did discover.  So here you will

5    see there's a section that says amino acid sequence of heavy

6    chain, that's that second block of text.  That's the order

7    and the kind of amino acids to make that heavy chain.

8            And then below that, there's another one that

9    says in the fourth block of text, amino acid sequence of

10   light chain variable region.  So that's the light chain and

11   the shorter one that's stuck to the side of the heavy chain.

12   So with this information, the recipe for that particular

13   antibody has been provided.

14   Q.    And does that antibody have a name that Amgen gave

15   it?

16   A.    Yeah.  This is the one that's called 21B12 that you

17   heard about.  It's one of the Amgen antibodies that they did

18   invent.

19   Q.    And does 21B12 have any relationship to the drug

20   Repatha?

21   A.    Yes.  That's the monoclonal antibody that went into

22   the drug Repatha.  That's sort of the key ingredient in the

23   drug Repatha that Amgen sells.

24   Q.    Can an antibody scientist look at that string of

25   letters that are printed on that page and from that

1    information make the Repatha antibody?

2    A.      They can because that sequence of amino acid has been

3    given.  You can actually -- it's like the recipe.  You know,

4    you can make that antibody in your lab yourself if you had

5    that information.

6    Q.      Now, if an antibody scientist only had the claim

7    language that we were just looking at, but didn't have this

8    amino acid sequence information, could that person make

9    Repatha?

10   A.      No.  You wouldn't know what the sequence of amino

11   acids is in that case.  So you wouldn't have the recipe for

12   making that particular one.

13   Q.      Did Amgen include in its patent application amino

14   acid sequences or the recipe for all of the antibodies that

15   its claims cover?

16   A.      No, and that's a really key point is that the way

17   those claims are written, they can cover a huge number of

18   antibodies.  They don't really specify, you know, exactly

19   which ones.  So it could be a very large number.  They do

20   provide the recipe or the amino acid sequences for a few

21   dozen or a couple dozen antibodies that they did invent, but

22   they didn't provide the recipes for all the rest that could

23   fit within the scope of the claims the way they were

24   written.

25   Q.      Now, we talked about the magic date before,

1    January 8th -- January 9, 2008, a date which Amgen filed the

2    patent application that we're talking about.  Can you

3    explain to the jury why that date is important, Dr. Boyd?

4    A.    Yes.  So that key date, that's what's called priority

5    date.  That's when the inventors are basically saying, We

6    have everything we need.  We're in possession of the full

7    scope of what we're claiming in our invention.  We can -- we

8    can describe it, and we can teach it to others through the

9    full scope, not just some examples, but the full thing that

10   they're actually claiming with the way the claims are

11   written.

12   Q.    Do you know if Amgen continued to investigate PCSK9

13   antibodies after January 9th, 2008?

14   A.    Yes, they did.

15   Q.    And how do you know this?

16              MR. HUMMEL:  Your Honor, objection.

17              THE COURT:  And the basis?

18              MR. HUMMEL:  Sorry?

19              THE COURT:  What's the basis?

20              MR. HUMMEL:  This is the issue we discussed this

21   morning, Your Honor.

22              THE COURT:  Is this relevance?

23              MR. HUMMEL:  It's relevance.  It's subject to

24   the MIL.

25              THE COURT:  All right.  Overruled.

1          THE WITNESS:  Okay.  I've seen several kinds of

2    information.  One source is internal emails from Amgen

3    scientists within the company writing to each other.  And

4    some of those emails they say, Our competitors have

5    identified a kind of antibody EGFa mimic is one of the terms

6    that they use.

7          THE COURT:  Sorry, I misunderstood what the

8    question is.  I'm sorry.

9          The objection is sustained.  Strike that answer.

10   Ask another question.

11         MR. REISNER:  Your Honor, may I approach?

12         THE COURT:  No, ask another question.

13   BY MR. REISNER:

14   Q.    Dr. Boyd, have you heard the term EGFa mimic?

15   A.    Yes, I have.

16   Q.    I'd like to ask you to explain what an EGFa mimic is.

17   And I think it might be helpful if we could do that with the

18   aid of a sketch pad, if you wouldn't mind?

19   A.    Sure.

20         MR. REISNER:  Your Honor, may I have permission

21   to bring the sketch pad over?

22         THE COURT:  Sure.  I don't care.

23         MR. REISNER:  And may Dr. Boyd leave the witness

24   box so he can illustrate?

25         THE COURT:  That's fine.  Yeah.

1        MR. REISNER:  Thank you.  Is this okay, Your

2   Honor?

3        THE COURT:  The problem is then counsel can't

4   see it, and I can't see it.  So that's not so good.  Usually

5   people have larger pads and they move a little further back.

6        MR. HUMMEL:  That's not going to work.

7        MR. WOLF:  Maybe you should do it in that corner

8   over there.

9        THE COURT:  Can you move a little further away

10   from the jury.  It's going to have to be turned so the jury

11   can see it.

12        MR. REISNER:  Sorry, Your Honor.  Is that okay?

13        THE COURT:  Who is doing the drawing here?

14        MR. REISNER:  Dr. Boyd.

15        THE COURT:  So I'm not sure what you're doing.

16        MR. REISNER:  I'll ask the witness from here.

17   BY MR. REISNER:

18   Q.    Dr. Boyd, can you explain what an EGFa mimic is?

19   A.    Sure.  So an EGFa mimic is a kind of antibody that

20   binds to PCSK9.  So I can draw roughly PCSK9 protein looks

21   something like this.  Now, if you remember, PCSK9 it had the

22   LDL receptor that bound to it.  That's the -- that's how it

23   was going to destroy the LDL receptor.  So the part of the

24   LDL receptor that binds to PCSK9 is the portion that we call

25   the EGF A domain.  That's a part of the LDL receptor.  This

1    is basically where it sits on PCSK9 in my sketch here.

2              So there were some public scientific literature

3    published in 2011 from some researchers that showed that

4    they had identified an antibody that basically sat right on

5    top of PCSK9, the same way that the EGFa part of the LDL

6    receptor did.  And not only did it sit in the same area, it

7    also interacted with PCSK9 with its antibody loops in a way

8    that mimics some of the structure of the LDL receptor EGFa

9    domain itself, that was basically the term for that kind of

10   antibody was one that sits here, this is an antibody, and

11   it's EGFa mimic.

12   Q.    Do each of the disputed claims of Amgen's patents

13   cover EGFa mimic antibodies?

14   A.    Yes.  The reason an EGFa mimic antibody because it's

15   sitting on the area where this LDL receptor would be

16   binding, this is what we call the sweet spot or this purple

17   patch we keep seeing on PCSK9.  Because the antibody is

18   sitting in the same place that the LDL receptor does, it's

19   basically mimicking that EGFa part of the receptor.  It's

20   sort of mimicking or imitating the structure of that part of

21   the LDL receptor.  And this is something that was not in

22   Amgen, this was a science test at a different company.

23              MR. HUMMEL:  Objection, Your Honor.

24              THE COURT:  I'm going to overrule the objection.

25              THE WITNESS:  So this was in the public

1    scientific literature, scientists at Merck described this

2    antibody and showed exactly how it bound to PCSK9.  And they

3    called it an EGFa mimic antibody.

4    Q.    What antibody is that that you're referring to?  Is

5    that a name?

6    A.    Yes, that's the one called 1D05.  You may have seen

7    it in that list of the four antibodies that we had from

8    competitors in the other slide.

9    Q.    So is 1D05 one of the antibodies that is covered by

10   Amgen's claims?

11   A.    It is.  And so the key aspect there is because this

12   EGFa mimic is sitting on that purple batch in the sweet

13   spot, that's what the Amgen patent claims are saying.  They

14   say we invented antibodies that bind to this purple area.

15   So they say -- so, therefore, we invented this antibody that

16   was discovered at Merck by this other scientist.

17   Q.    Now, we talked a few minutes ago about the Amgen

18   antibody 21B12, or Rapatha.  Is 21B12 within the scope of

19   Amgen's claims?

20   A.    I can show if you'll pardon my sketching.  The 21B12

21   antibody, and I think you may see some models of this later

22   or some other illustrations, it basically sits over here.

23   This is an Amgen antibody, one that they called 21B12, and

24   it sits here sort of on the left-hand side.  It interacts

25   with some of those purple patch amino acids here, but it's

1    not sitting right in the center.

2    Q.    Are you familiar with another Amgen antibody, 31H4?

3    A.    Yes.

4    Q.    Is 31H4 described in Amgen's January 2008 patent

5    application?

6    A.    Yes.  31H4 is one of the antibodies that Amgen did

7    invent.  And it basically binds over here, and interacts

8    with sort of the right-hand side of this general area.  So

9    I'll label that 31H4.  And so you can see that it also, it

10   contacts some of those purple patch or the sweet spot

11   portions on the surface of PCSK9.  But it does so in a

12   different way.  It's not an EGFa mimic antibody either.

13   Q.    Is 31H4 within the scope of Amgen's claims?

14   A.    It is.  Because those claims say any antibody that

15   contacts those sweet spots or those residues that are the

16   purple patch on PCSK9, and that blocks the binding of the

17   LDL receptor, so basically the claims would cover any

18   antibody that meets those criteria, 31H4 would fit in that.

19   Q.    Does Amgen's January 2008 patent application describe

20   even a single EGFa mimic antibody?

21   A.    No, they don't, at all.

22   Q.    Do any other companies have EGFa mimic antibodies?

23   A.    Yes.  There is another one which was invented at

24   Pfizer which is one of the ones we showed on the list of

25   four antibodies from the competitors.  That J16 antibody,

1  that's also one those EGFa mimics that sit in this middle

2  area and sit over the area where the EGFa part of the LDL

3  receptor would bind to PCSK9.  That's also in the category

4  where the Amgen doesn't have an example or doesn't have a

5  representative.

6  Q.    Now, you just testified that Amgen's claims cover

7  these EGFa mimic antibodies and that Amgen's patent does not

8  describe a single EGFa mimic antibody.  Did you consider

9  that fact in forming your opinion that Amgen's disputed

10 claims fail to satisfy the written description requirement?

11 A.    Yes, I did.

12 Q.    Why is this relevant to written description?

13 A.    Well, so the written description requirement says

14 that you have to describe, you have to be in possession of

15 the full scope of the things that you're claiming.  So you

16 can't just have well, it's saying that you have to have

17 examples of all the kinds of things that would fit within

18 the scopes of your claims as you have written them.  And in

19 this case, we know there are these EGFa mimic antibody

20 types.  Amgen had no representative or example of those,

21 therefore, they didn't satisfy that way of looking at the

22 written description requirement for their claim to be valid.

23 Q.    Were there any Amgen documents that you considered

24 that confirm your opinion that Amgen's claims are invalid

25 for covering EGFa mimics which its January 2008 patent

1    application fails to describe?

2           MR. HUMMEL:  Objection.  This is in direct

3    violation of the order.

4           THE COURT:  All right.  So you're going to have

5    to rephrase the question for me to even possibly be able to

6    rule on this.  Can you make it a little simpler?

7           MR. REISNER:  Sure, Your Honor.

8    BY MR. REISNER:

9    Q.    Were there any documents from Amgen that you

10   considered which confirm your opinion that you just gave

11   that Amgen's claims fail to satisfy the written description

12   requirement?

13   A.    Yes.  As part of this case, I have seen internal

14   Amgen emails --

15          MR. HUMMEL:  Your Honor, I renew my objection.

16   The question is innocuous, but the answer is going to

17   elicit --

18          THE COURT:  All right.  Come over to side-bar.

19          (Side-bar discussion:)

20          THE COURT:  All right.  So what are we doing

21   here?

22          MR. HUMMEL:  I'm going to have Mr. Gaede address

23   this issue if that's okay with you, Your Honor.

24          THE COURT:  That's fine.

25          MR. GAEDE:  Your Honor, as the law that we have

1    provided to you multiple times --

2                 THE COURT:  You have to speak a little louder.

3                 MR. GAEDE:  Your Honor, as the law says we do

4    not have the obligation to describe every physical

5    embodiment in the specification.  That is black letter law

6    and it's actually in the jury instructions.

7                 THE COURT:  Well, so you may not have an

8    obligation, but the fact that you don't, doesn't that kind

9    of go into the mix here?

10               MR. GAEDE:  No.  The question is, is does the

11   antibody, the subsequent one, does that antibody represent a

12   subgenus or somehow it shows that the genus is not

13   representative.  The absence of an antibody does not, in

14   fact the written description requirement does not require

15   that every single species actually be described and the

16   absence of something, the question is, does the actual

17   antibody itself represent part of the subgenus if you will

18   that is not described in the specification.  I'm deeply

19   concerned right now because during the opening they talked

20   about the Amgen possesses actually and the jury right now is

21   being misled into thinking that we have to describe every

22   single antibody in that patent, that's just not the case

23   under the law.

24               THE COURT:  No.  I'm not sure what you want me

25   to do here because the answer is going to be what?

1          MR. REISNER:  Amgen documents that demonstrate

2    that Amgen itself was aware of that EGFa mimics were a

3    separate category of antibodies which they failed to have

4    their claims cover them.  It's not just one, it's a category

5    of them.

6          MR. GAEDE:  The Amgen documents don't say

7    anything about that we didn't think that claims covered

8    them, it comes from the catabolic program and was part of

9    the engineering effort in the catabolic program in the

10   documents that I showed you this morning that have the word

11   catabolic in them.

12         MR. WOLF:  Your Honor, if fact there is a

13   broader program that has to do with catabolic has nothing do

14   with the case doesn't mean that the interim step, they said

15   in order to do catabolic we should have an EGFa mimic, other

16   people have it, we don't, we should figure out if we could

17   get this done.  That has nothing to do with catabolic.  This

18   is a smoke screen.  And the case we cited to says

19   specifically if you're going to sue somebody, you better

20   make sure you describe the subgenus.  I'm using Mr. Gaedes'

21   words, you better make sure you described the subgenus that

22   the accused product fits in.  This EGFa mimics this middle

23   binder, that's the whole point.  The subgenus that we fit

24   in, they didn't have it in 2008, they didn't even have it in

25   2012.

1          MR. GAEDE:  They can make those points without

2     going into the subjective discussion of documents in another

3     research program, and that's the problem here is it's

4     turning the objective inquiry into the four corners of the

5     patent by a person of ordinary skill in the art into whether

6     the inventor four or five years later in another research

7     program thinks that some example, not that he thinks it's

8     missing, but they're using it for that subsequent state of

9     the art program, that somehow is now being turned into the

10    wrong test.  We're judging it by an inventor of a subsequent

11    research program, not by a person of ordinary skill in the

12    art judged by the four corners of the patent.

13         MR. HUMMEL:  Your Honor, the fact of these

14    extra -- these after acquired closed priority date and

15    today, your ruling says they can introduce them, they have

16    done that, that was the whole purpose of the examination

17    about Merck.  The research project objection in the motion

18    in limine ruling was explicit that that whole research

19    product was out.  These documents come from it.

20         MR. WOLF:  Can I make one more point?  I'm

21    snatching defeat from the jaws of victory.  I'm going to lay

22    my cards on the table.  When I get Dr. Jackson on the stand,

23    I'm going to ask the question as a lead inventor, the named

24    inventor of the patent, did you have in your head the EGFa

25    mimics at the time of the patent?  If he says no, great we

1    win, if he says yes, we have documents to impeach him with.

2            THE COURT:  I think what he had in his head

3    doesn't actually matter.

4            MR. WOLF:  As a person of ordinary skill, why

5    would it not matter that he did not possess, the patent

6    doesn't show, which is the next question if he says yes,

7    where in the patent --

8            THE COURT:  We can deal with that question

9    perhaps later.  But right now, I'm going to sustain the

10   objection.  Because I think that the point here is how many

11   different members of the genus there are, and if you think

12   it is an objective test, and so the expert you have is

13   perfectly good about saying why things that are in the mimic

14   zone are not the same structure or not represented by the

15   things that are on the right and the left, right, so why

16   don't we go there.

17           MR. REISNER:  Okay.

18           MR. HUMMEL:  Thank you, Your Honor.

19           (End of side-bar.)

20           MR. REISNER:  Your Honor, can we mark this as

21   Demonstrative Exhibit 2?

22           THE COURT:  Sure.

23           MR. REISNER:  If you want to just write it.

24   BY MR. REISNER:

25   Q.    Dr. Boyd, you can take your seat again.  Thank you.

1    A.      Sure.

2    Q.      I would like to turn now to the patent law questions

3    that we need to address.

4            Dr. Boyd, do you know what a person of ordinary

5    skill in the art means?

6    A.      Yes.  So that's the sort of audience that the patent

7    was written for.  It's in this case because it has to do

8    with antibody science, we say that a person who is an

9    ordinary skill in the art, or a person of ordinary skill in

10   the art is someone who has an M.D. or Ph.D. in an area

11   that's related to the subject matter, so immunology, cell

12   biology, biochemist or biophysics or other related fields or

13   has worked for two years after their graduate degree in

14   biology, biochemistry in the industry or postdoctoral

15   studies studying products of complex proteins and

16   antibodies.

17   Q.      Dr. Boyd, when you formed your opinions in this case

18   which you have expressed already and continue to express,

19   did you do so from the perspective of a person of ordinary

20   skill in the art?

21   A.      Yes, I did.

22   Q.      What dates did you use for evaluating the knowledge

23   of a person of ordinary skill in the art?

24   A.      There I used the key date for the apparent

25   application we're talking about, which is January 9th, 2008.

1  Q.      What is your understanding of the written description

2  requirement?

3  A.      Right.  So the written description requirement is

4  where you have to set, did the inventor have really

5  possession of the full scope of the things that they're

6  claiming in their patent application, did they describe them

7  that they had the full scope.

8  Q.      Why is it important for someone getting a patent to

9  show they invented the full scope of the claim?

10  A.      Well, it means they really have what they said that

11  they invented.  They have to describe it fully and properly.

12  Q.      Now, this gets a little technical.  I'm going to ask

13  you if you have an understanding of whether there is a test

14  to determine whether -- a further explanation of this

15  written description requirement that applies to claims

16  directed to antibodies?

17  A.      Yes.  So there is two kind of key tests.  The first

18  you can satisfy the written description requirement is do

19  you have representative examples in your patent description

20  or in the specification that cover the full scope of the

21  claims of the thing you're saying that you invented.

22  Q.      And what did you conclude?

23  A.      I said that this was not met because they were not

24  representatives of all defensive antibodies that would fit

25  within the scope of the claims that were written.

1   Q.     And for the second test, the common structural

2   features, what did you conclude?

3   A.     That test you're saying have the inventors described

4   common structural features that basically tell you the full

5   scope of the claims and distinguish the things that are in

6   the things they invented from those that are outside what

7   they invented.  So I found that this was not satisfied

8   either.

9   Q.     Now before we talk about these two tests, I want to

10  ask you some questions about the size of the claims.  How

11  many antibodies could be covered by Amgen's claims?

12  A.     Well, I think because the way the claims are written,

13  they basically say any antibody that binds the follow

14  residues on PCSK9 surface and blocks the LDL receptor, it

15  could be a very large number.  It could potentially be

16  millions.

17  Q.     Let's go back to the patent application, DTX 3075.

18  And go to page 25 and 26.  If we combine a table from those

19  two pages, table 1.  What does this show, Dr. Boyd?

20  A.     Yes.  So this is a table that the Amgen inventors put

21  into their patent application where they say we're claiming

22  a lot of antibodies, we're giving the amino acid sequences

23  for some, but we're also saying we invented any ones where

24  we started with any of the ones we provided and you replace

25  particular amino acids with other ones so you get a

1    different sequence.  They're saying if you follow the rules

2    in this table any time there is an alanine in the amino acid

3    that we do list in the patent application, you can replace

4    it with the following of the three, if it's alanine, you can

5    replace it with leucine and isoleucine, we're saying we also

6    invented that one.  This gives the rules for generating

7    additional antibody sequences from the ones that were

8    actually provided explicitly in the patent application.

9    Q.    So what exactly does substitution mean in terms of

10   the letters that we have been talking about?

11   A.    That says when you're making an antibody, you can

12   replace one amino acid with a different one.  There is a way

13   that you can do that in a laboratory.  But it results in you

14   make a different antibody with a different sequence if you

15   do that, so it's replacing one amino acid.  You could also

16   do substitutions where you replace more than one amino acid

17   at the same time and you get additional sequences.

18   Q.    Did you take these substitutions that Amgen's patent

19   application suggest into account when calculated the

20   possible size of the claim?

21   A.    Yes, I did.  So following the rules in this table in

22   Amgen's own application, if you calculate how many different

23   antibodies sequences can you get by applying these

24   substitutions, even if you only replace two amino acids at a

25   time according to the rules they give there, for one

1    antibody, just the heavy chain of the ones that they do

2    actually list completely, if you follow those rules you can

3    get around 97,000 different new antibodies sequences from

4    it.  So basically they're saying the number of antibodies

5    that we say we have invented is this huge number, 97,000.

6    It's just starting from one of the ones that they actually

7    provide.

8    Q.    And if you apply the same logic from the patent?

9    A.    If you look at the other 26 that Amgen list in their

10   patent explicitly and do the same kind of substitutions,

11   with one, you got 97,000, if you do that to the others, you

12   get more and it would easily be millions.  That's why I say

13   the number of antibodies that would be within the scope of

14   the claims is at least millions according to the rules that

15   Amgen themselves provided in the patent.

16   Q.    Now, if you actually were able to make all these

17   substitutions and come up with millions of antibodies, would

18   you know just by making the antibodies that they fall in the

19   scope of the claim?

20   A.    No, you wouldn't.  That's also a really important

21   point, is that any time you change an amino acid in an

22   antibody, you're not sure, is it going to behave the same

23   way the starting one did.  Small changes have an affect on

24   how the antibody binds, even things like is it stably going

25   to fold up like it usually would, so you would have to test

1   each of those antibody sequences one by one to see if they

2   have the property that you would hope they would.

3   Q.     So I take it it's possible for different antibodies

4   to bind to PCSK9?

5   A.     Yes, that's right.

6   Q.     Is it possible for more than one antibody to bind to

7   the same location on PCSK9, maybe not at the exact same

8   time, but at a different time?

9   A.     Yes, it's true.  So you could have one antibody bind

10  to a particular area on the surface of PCSK9.  You could

11  have a completely different antibody that bound in an

12  overlapping region on the surface of PCSK9 and the important

13  thing is they could do it in quite different ways when you

14  get down to looking at the details of how the antibody loops

15  interact with the PCSK9 surface.  You could have antibodies

16  that bind to the same area, but they still might do it quit

17  differently.

18  Q.     We heard before how PCSK9 is very small relative to

19  our world.  Is PCSK9 considered to be big in the world of

20  molecules or small?

21  A.     Well, in general, if you look at, you know, all the

22  molecules that there are, PCSK9 is a protein, it's a

23  reasonably sized one.  I think over 600 amino acids in it.

24  Q.     Can scientists make antibody molecules that are much

25  smaller than PCSK9?

1  A.      Yes.  That's one of the interesting things is the

2  target of an antibody can be something that's even very

3  tiny.  So it's something that you can look for antibodies

4  and find them that recognize even very small molecules.

5  Q.      We would like to look at Defendant's Exhibit 3047.

6            MR. HUMMEL:  No objection.

7            THE COURT:  Admitted without objection.

8            (Defendant's Exhibit No. 3047 admitted into

9  evidence.)

10  BY MR. REISNER:

11  Q.      Dr. Boyd, is Dr. Gregory Petsko one of the authors of

12  this publication?

13  A.      Yes, that's right.  He's listed second from the end

14  there.

15  Q.      Is that one of Amgen's experts in this case?

16  A.      That's right.

17  Q.      What's the big takeaway picture from Dr. Petsko's

18  article?

19  A.      So this article which was published in 2005, it

20  describes antibodies that bind to a very small molecule.

21  The molecule is cocaine.  You compare how big is cocaine

22  compared to PCSK9, it's hundreds of times smaller.  It's

23  really about the size of two amino acids, in that range, so

24  it's relatively tiny.  In this paper, Dr. Petsko and his

25  co-authors, they describe two different kinds of antibodies

1    that bind even to such a tiny target in completely different

2    ways.  And the authors in that paper, they go on to sort of

3    summarize and say this shows how remarkable flexible

4    antibodies are that you can get different antibodies to

5    recognize such a tiny thing in completely different manners.

6              So that's -- it's well-known that you could have

7    many different antibodies recognizing a large target like a

8    protein, but even for a tiny one like cocaine, that's

9    possible.  So that would be a sort of main point that the

10   authors convey in this paper.

11   Q.    How many different possible antibodies are there in

12   the entire universe?

13   A.    That's a huge number.  And that has to do with the

14   way that the immune system generates antibodies.  So there

15   is a lot of randomness in how the immune system puts

16   together the genes that tell you what are the amino acids in

17   antibody sequence.  That's an important part in how the

18   immune system works.  People have estimated the number of

19   antibodies there could be at least 10 to the 15th power.

20   That's like saying a million times a billion, that big a

21   number.  That's something that's very helpful to us in terms

22   of how our immune system functions, because if your immune

23   system was very predictable and always gave the same type of

24   antibodies to influenza, to viruses, pretty quickly the

25   viruses would work around it or they would figure out the

1    predictable patterns, but thankfully the immune system is

2    very good at generating a huge diversity of different

3    antibodies, the viruses can't work around them, they get

4    caught by new ones that hadn't been expected previously.

5    Q.    You mentioned the number 10 to 15 the possible number

6    of antibodies that will be in the universe.  What does that

7    look like as a number?

8    A.    If you imagine a million dollars, for each one of

9    those dollars you replaced it with a billion dollars, that's

10   how huge it would be.  Like a million times a billion, an

11   enormous number.  That's probably an underestimate to be

12   honest.

13   Q.    If you wanted to know if any one of those antibodies

14   fall within the scope of Amgen's claims, how would you do

15   that?

16   A.    You just wouldn't know.  So that's another point in

17   terms of the science that is important to understand is that

18   an antibody scientist, even the most skilled looking at an

19   antibody sequence by itself, they can't tell you what it's

20   going to bind to.  You can't predict if you just see the

21   sequence by itself, and someone asked you what's this

22   antibody going to bind to, that's not a solved problem.  So

23   the way that people find antibodies is they fish in diverse

24   pools of them by immunizing the mouse and having the mouse's

25   immune system respond to the target, then they have to

1    recovered those antibodies that the mouse made.  At that

2    point you don't know what you're going to get.  It's like a

3    fishing expedition.  You have a big pool of potential ones,

4    you have to test them and see if they're the kind of

5    antibody that you wanted to find.

6    Q.    You mentioned that mother nature's systems for making

7    the antibody, the immune system generates them randomly.

8    Why is it random?  Why can't it be a more careful design

9    process?

10   A.    I think it's something that is probably there that

11   way because in evolution that was helpful and protective to

12   us.  If the antibodies were always predictable, then the

13   viruses and bacteria could figure out a way to get around

14   them.  The bacteria that would be stopped by them would not

15   be able to infect you, but ones that found a way around

16   would, and you would have no defense.  Therefore the immune

17   system generates a lot of diversity.  That's how your immune

18   system protects.  That is quite an amazing aspect.

19   Q.    Once you have found an antibody by making them

20   randomly and getting one that you like, can you determine

21   the amino acid sequence?

22   A.    Yes, you can.

23   Q.    Once you write down that amino acid sequence from the

24   antibody you found, if you want somebody else to make that

25   antibody, do they have to go back and make random antibodies

1    and hope they get that, or can they use the code that's

2    written down, the letters?

3    A.      Yeah, if you tell someone what the amino acid

4    sequence is of the heavy chain and light chain of an

5    antibody, you have basically give them the recipe for it.

6    They can make it easily in their own laboratory.

7    Q.      On the other hand if you tell someone, I want an

8    antibody that binds here, how does a person go and get that

9    antibody if they don't have a sequence?

10   A.      In that case the person would have to resort to

11   standard methods that people have used for many years now, I

12   want to find an antibody against this target, it could be

13   PCSK9, I'm going to immunize a mouse with it, have the

14   mouse's immune system respond to that target protein,

15   pulling the antibody making cells out of the mouse, so you

16   have the pure kind of antibodies to study them one by one,

17   does this one bind to the target, does it bind in the area

18   I'm interested in, so it's an unpredictable process.

19   Q.      Let's say your mouse made a bunch of antibodies and

20   among them there were no EGFa mimic antibodies.  What would

21   you do if you wanted one?

22   A.      Well, you would be out of luck.  You would have to

23   try to make some other antibodies some other way or repeat

24   the process over and over potentially.  If you didn't have

25   any EGFa mimic antibodies in the ones you obtained, then

1    that's it, you're stopped there, you have to do other

2    experiments to try to find some.

3    Q.    Let's go back to the test that we were talking about.

4    We'll start with the representative species test.  Can you

5    explain to the jury what the representative species test is

6    in common terms?

7    A.    Yeah.  So that's something you have to provide,

8    representative species or representative examples that cover

9    the full scope of the things that you're trying to claim in

10   your patent application.  So, yeah, if there are kinds of

11   examples that fit the claims where you didn't have a

12   representative example, then you haven't met that

13   requirement.

14   Q.    So what did you do to conclude that the antibodies in

15   Amgen's patent are not representative of all the claimed

16   antibodies?

17   A.    Well, I can see that there were lot of different

18   differences between the antibodies that were generated that

19   were published in the public scientific literature against

20   that 1D05 antibody, that EGFa mimic that we talked about

21   that were not represented in the ones that Amgen listed in

22   their patent application.  And there were lots of other

23   differences between the other antibodies made by the

24   competitor companies where there was no representative of

25   them in the ones that the Amgen scientists described in

1    their patent.

2    Q.    And 1D05 was made by whom?

3    A.    1D05 is made by Merck.

4    Q.    And when you were at the sketch pad and you drew

5    where the Pfizer antibody and the Merck antibody bound to

6    PCSK9, sort of in the middle, we didn't talk about the

7    Praluent antibody.  Where does the Praluent antibody bind to

8    PCSK9?

9    A.    Overall, the Praluent antibody also binds serving

10   that middle area between the 21B12 and the 31H4 to the two

11   Amgen ones on the left-hand side and the right-hand side.

12   So it's also in that kind of middle region.

13   Q.    Does Amgen's January 2008 patent application have any

14   antibodies that bind in ways similar to the Praluent

15   antibody?

16   A.    No, none.

17   Q.    Now, if Amgen's patent, in fact, had antibodies that

18   were similar to two or three of the competitor antibodies,

19   but not all four, would that affect your conclusion as to

20   whether or not the claims are valid?

21   A.    No.  It wouldn't affect conclusions because they have

22   to have representative species or examples of all the ones

23   that the competitors generate.  So if they have an example

24   of one, but there's another one that they don't have a

25   representative example of, then they haven't met the

1    requirement for that claim.

2    Q.    And when you're referring to the competitors'

3    antibodies, are you talking specifically about the ones that

4    are within the scope of Amgen's claims?

5    A.    Yes.

6    Q.    Now, how did you go about comparing the antibodies

7    that are actually in Amgen's January 2008 patent application

8    to the competitor antibodies?

9    A.    So I looked at them several ways.  One of the things

10   I did is I compared the amino acid sequence of the Amgen

11   antibody that they described in their patent compared to the

12   ones that were made by the other companies.  I also looked

13   at how does each of those antibodies bind to PCSK9?  Which

14   areas do they bind to?  And what amino acids of PCSK9 did it

15   target?

16   Q.    Why did you compare the amino acid sequences?

17   A.    Well, that is the recipe for making the antibody.  So

18   if the two antibodies have a different amino acid sequence,

19   then they may bind their target -- well, they may bind

20   completely different targets, or they bind the same target

21   in a different place, or they may bind the same target in a

22   different way in a sort of overlapping area.  But basically,

23   if the amino acid sequences are different, then the

24   antibodies could be different as well.

25   Q.    How did you go about comparing amino acid sequences

1  of the antibody in Amgen's patent application to the

2  competitor antibodies?

3  A.    Well, so I looked at the sequences of the heavy chain

4  and the light chain amino acids, and I particularly focused

5  on the parts that are involved in binding to the target.  So

6  I look at those loops that I saw at the tip of the

7  antibodies the CDR1, 2 and 3 of the heavy and light chain.

8  That was one of the methods.  Then I also looked at how does

9  each of the antibodies from the competitors bind PCSK9

10  compared to the Amgen antibodies.

11 Q.    Let's take a look at the animation that we have and

12 that focus on the amino acid sequence comparison.  What did

13 we see there?

14 A.    Yeah.  So there we're seeing those three loops that

15 we talked about before.  So you see it's the tip of the

16 heavy chain is up there sort of on the right hand upper

17 part.  And we're zoomed in on the tip.

18        And then the three loops of the light chain are

19 in the lower part.  So the heavy chain loop, we just sort of

20 unfolded it, and we're going to spread it out.  So we are

21 going to look at it in more detail.

22 Q.    And which of the 3 CDRs of the heavy chain loop just

23 came out from the magnified look on the Praluent antibody?

24 A.    So that was the one that's usually the most important

25 loop for determining the binding target of the antibody.

1   That's the CDR3 of the heavy chain.  That's the one that

2   sort of has the -- often the biggest influence on what the

3   antibody will bind to.

4   Q.    We're at DDTX1.37.  Also, tell us what we're seeing

5   here.

6   A.    Yeah.  So here on the left-hand side, this is

7   basically the sequence of the Regeneron Praluent antibody,

8   and there's a little highlighted CDR3 that I'm going to zoom

9   in on.  And on the right-hand side is the Amgen antibody

10  Repatha.  That's that highlighted strip there.  That's the

11  CDR3 of the heavy chain of the Amgen Repatha antibody.  So

12  we're going to pull that one, also, and line it up with the

13  Praluent CDR3.

14          Okay.

15  Q.    So could you tell us what you've done here at the

16  bottom --

17  A.    Sure.

18  Q.    -- of DDTX1.38?

19  A.    Yes.  So here, those are the amino acids and the

20  order that they're in.  Those two antibodies in their CDR3

21  loop of the heavy chain.  So in the case of Praluent, you

22  can see it's that D, S, N, W, G, N, F, D, L.  Those are just

23  different the amino acids in their correct order in the

24  CDR3.

25          Below that is the Repatha antibody.  One thing

1    you notice right away is that it's shorter than the Praluent

2    one.  So you see there's some dashes in there.  That's

3    because the Praluent one is only six amino acids long.  So

4    to try to line them up the way that antibody scientists look

5    at them is that you -- you can use a computer algorithm to

6    line them up to each other and find the best match.  To do

7    that, if one is shorter than the other, you have to

8    introduce spaces.  So that automatically tells you from the

9    outset, well, they're not the same.  They're not even the

10   same length.

11   Q.    And did you use standard methods for making this

12   comparison?

13   A.    Yes, I did.  There's some standard computer programs

14   and methods you can use to do this kind of sequence

15   alignment is what it's called.

16   Q.    So can you step through these letters here?  For the

17   record, the Praluent HC  CDR3, it says D, S, N, W, G, N, F,

18   D, L.  Did I get that right?

19   A.    Yes.

20   Q.    And why did you make them all blue?

21   A.    That was just to show that that's what the sequence

22   is in the Praluent or the Regeneron antibody CDR3.

23   Q.    And Repatha, HC CDR3 that I see is G, Y, G -- M, D,

24   V.  Did I read that right?

25   A.    Yes.

1    Q.    And why are some of the circles there red and some

2    blue for Repatha?

3    A.    Right.  So just to make it easy to see, I colored the

4    ones that match in blue, and the ones that don't match in

5    red.  So you can see that they're really -- there's only one

6    that really matches, and you get alignment of these two

7    sequences.  So an antibody scientist looking at this would

8    say, they're nothing alike.  That's just -- there's only one

9    match of all of the ones that we're looking at, so they're

10   completely different.

11   Q.    And if other portions of the antibody Praluent and

12   Repatha, you know, the other portions of the Y shape we

13   talked about, if they were similar, but the HC CDR3 portions

14   are different, would that affect your conclusion as to

15   whether or not these two antibodies, Praluent and Repatha,

16   are similar?

17   A.    No, it wouldn't affect my conclusion because this

18   CDR3 loop on the heavy chain, that's often the one that's

19   the most important for determining what the antibody is

20   going to bind to.  So even if there were some similarities

21   elsewhere, the difference in this key loop would actually be

22   important to say they're not the same antibody.

23   Q.    Is the Repatha antibody representative of the

24   Praluent antibody based on this amino acid sequence

25   information?

1    A.      No, not at all.

2    Q.      Does DDTX1.38 accurately reflect the opinions you've

3    just expressed the comparison between Repatha and Praluent?

4    A.      Yeah, that's an example from those two antibodies

5    that we're talking about.

6              MR. REISNER:  Your Honor, I'd like to move

7    DDTX1.38 into evidence reflecting the expert's opinion.

8              MR. HUMMEL:  Your Honor, I object.  It's a

9    demonstrative.

10             THE COURT:  All right.  I'm going to sustain the

11   objection.

12             MR. REISNER:  May we have it marked for

13   identification for purposes of the record?

14             THE COURT:  I think you already said what it is,

15   but if you want to mark it some more, go ahead.

16             MR. REISNER:  Thank you.

17   BY MR. REISNER:

18   Q.      Did you do a further comparison of the antibodies

19   that are in Amgen's January 2008 patent application with all

20   the competitor antibodies?

21   A.      Yes, I did.  So I compared the ones that Amgen listed

22   in their patent application.  I compared them in terms of a

23   CDR3 loops for the heavy chain and the light chain, and also

24   the full length of the antibody heavy chain and light chain

25   arms.  And although I should say that that includes a lot of

1    framework regions that are not the key antibody binding

2    groups.  And I summarize my conclusions after that.

3    Q.    Okay.  What was your basis for saying that each of

4    the competitor antibodies, the Praluent, Merck's 1D05,

5    Merck's AX132 and Pfizer's J16 are not similar, not

6    structurally similar to any of the 26 Amgen antibodies

7    listed there?

8    A.    Right.  So here when I was comparing the CDR3 of the

9    heavy chains, something that people who work in antibody

10   science would know is that if you compare the CDR3 of two

11   different antibodies, you wouldn't even start to think that

12   they might bind to the same target in the same way unless

13   the CDR3 starts to get at least close to 80 percent

14   identical or maybe higher than that.

15           Even if they were more similar than that, it

16   still wouldn't prove that they bind through the same target

17   with the same way.  You wouldn't even have it on your radar

18   unless they got to that 80-percent number.  So for all of

19   these comparisons of all the Amgen compared to all the

20   competitor ones with the heavy chain CDR3, none of them met

21   that sort of generous threshold.

22   Q.    And where did you get the sequences from for the 26

23   Amgen antibodies?

24   A.    Those are the ones that were listed in the Amgen

25   patents, the ones that they do actually give the sequence

1      for.

2      Q.      Are these the 26 Amgen antibodies that Amgen has said

3      fall within the scope of the claims?

4      A.      Yes.

5      Q.      Now, with respect to this amino acid sequence

6      comparison, what have you concluded in terms of whether the

7      Amgen antibodies are representative of the competitor

8      antibodies?

9      A.      Well, I conclude they're not representative.  They

10     don't look anything like the competitor antibodies in terms

11     of their sequences.

12     Q.      And have you also compared the entire CDR -- strike

13     that question.

14             You mentioned before that you also did an

15     analysis of where the competitor antibodies bind to PCSK9

16     and compared to Amgen's antibodies.

17     A.      Yes.

18     Q.      I'd like you to explain this chart to the jury.  It's

19     DDTX1.40.

20     A.      Sure.  So this is a chart where I'm showing that for

21     each of the antibodies, so the Amgen ones that were listed

22     in the orange column and then the competitors' antibodies

23     that were listed in the blue columns on the right, which of

24     the amino acid on PCSK9 in that purple patch, which of these

25     amino acids do each of those antibodies contact.  Okay.

1          Here is a laser pointer.  Well, I can say that
2    the -- that purple set of rows you see down there on the
3    left-hand side, those are the amino acids on PCSK9 that make
4    up that purple patch.  We're going to fill in this table for
5    each of the antibodies, the Amgen ones and their
6    competitors.  And we're going to fill them in.

7          Okay.  Great.  So these are the PCSK9 amino
8    acids that we saw that made up that purple patch on the
9    surface of PCSK9.  And this table we're going to fill in for
10   each of the antibodies, the Amgen ones here, and then for
11   the competitor antibodies, the four of them here, which of
12   the amino acids on PCSK9 do they contact or bind to?

13         So on the table fill in, you will see it allows
14   us to compare which amino acids are contacted by which of
15   those antibodies.

16   Q.    How do you select the Amgen antibodies that you have
17   in the beige middle portion of the chart?  I'll read them,
18   21B12, 31H4, 1A12, 3B6, 9C9, 9H6, 17C2, 23B5, 25A7, and
19   30A4.

20   A.    Yeah.  So I listed these ones because if you look at
21   the antibodies that Amgen lists in their patent, they don't
22   have all kinds of experiments that they had done for all of
23   them.  These are the ones where they actually have the most
24   information that allows you to actually tell what amino
25   acids on PCSK9 each of those antibodies would be binding or

1    contacting to.

2              The data comes from a couple different kinds of

3    experiments, but that's the basic principle.  And it's the

4    same for the competitor antibodies.  These are ones we knew

5    from experimental data which amino acids on PCSK9 they bind

6    to.

7    Q.    Okay.  Let's take a look at how you filled in the

8    boxes for the Amgen antibodies.

9    A.    Sure.  So --

10   Q.    Can you explain what we're seeing here?  What are the

11   blue and white boxes?

12   A.    Yes.  So where the box is filled in, that means that

13   that antibody contacts that amino acid on PCSK9.  So for the

14   21B12 antibody from Amgen that we talked about, that one

15   makes contact with this amino acid on PCSK9.  This one, this

16   one.  So those are the ones that are filled in.

17             So you can see it makes a particular pattern of

18   which amino acids are contacted or bound.

19   Q.    And what type of data was relied on for preparing

20   this table?

21   A.    So the data for this comes from two kinds of

22   experimental methods that we will discuss further.  One of

23   them is called protein crystallography.  That's where you

24   actually get sort of a snapshot or an image of what the

25   antibody actually looks like bound to the antigen or the

1    target.  There's also data here from experiments where you

2    make changes in the antigen, and you see if those make the

3    antibody no longer to be able to bind.

4             Those are called mutagenesis experiments, and

5    you will hear more about them, I'm sure.  But this is

6    summarizing those kind of data.  And I should say, because

7    I'm not a protein crystallographer, I made use of or was

8    helped with this interpretation by Dr. Eck, who's the other

9    expert witness on the Regeneron side interpreting the

10   crystal structure of data for these antibodies.

11   Q.    Now, do Amgen experts also have opinions on where

12   these antibodies bind to the amino acid on PCSK9?

13   A.    Yes, they do.  And those are reflected in this table,

14   also.

15   Q.    I want to ask you about that.  So when they're -- if

16   there were any disagreements between Amgen's experts and you

17   and Dr. Eck, how did you resolve them for purposes of

18   filling in this chart?

19   A.    For the purpose of this chart, areas where there's a

20   little asterisk, you see there's a couple there, those are

21   where there's some question or disagreement potentially.

22   But this is giving credit to the Amgen expert, so giving

23   them the benefit of the doubt when there was any question

24   about it.

25   Q.    Now, let's take a look at the right side of the

1    chart, the competitor antibody, and tell us what we see

2    here.

3    A.      Right.  So that's filling in the chart just the same

4    way we did for the Amgen ones, seeing where each of the

5    competitor antibodies binds, which of the amino acids on

6    PCSK9 does it contact?  So you can see the pattern is very

7    different.  These competitor antibodies, they contact a lot

8    of the residues that are in the PCSK9 sweet spot or the

9    purple patch, and they do so in a way that's different from

10   all the Amgen antibodies.

11   Q.      So what can you conclude from this chart about the

12   Amgen antibodies and the competitor antibodies?

13   A.      Well, I ask:  Are any the Amgen antibodies

14   representative of the competitor antibodies?  And the answer

15   to that was clearly no based on this kind of analysis.

16   Q.      Let's talk now about the second test for analyzing

17   whether an antibody claim satisfies the written description

18   requirement.

19              MR. WOLF:  Mr. Reisner wasn't here when we

20   talked about scheduling.  I didn't know if you wanted to --

21   because he's moving -- it's up to Your Honor.

22              THE COURT:  How much longer do you expect to be?

23              MR. REISNER:  I won't be able to finish by 5:00,

24   Your Honor.

25              THE COURT:  All right.  We'll call it a day.

1   All right.

2           So members of the jury, we're done for the day.

3   There is no trial tomorrow.  Hopefully, having made a

4   precaution for snow, it won't snow.  But in any event, even

5   if it turns out to snow, but somewhere else, there's no

6   trial tomorrow.

7           One, I want to remind you of two things between

8   now and Thursday, which is don't talk to anyone about the

9   case.  Don't talk to each other about the case.  Don't let

10  anyone talk to you about the case.  Don't communicate about

11  it by telephone, or over the Internet, or face to face.

12  It's important that there be no -- and this includes -- I

13  think I said don't talk to each other.  This is important to

14  make sure you're not influenced in any way, and that you

15  keep an open mind until you get to deliberations.

16          And the second thing is don't do any research.

17  This is not like you're in school, and you get an A plus if

18  you do extra homework.  The only thing that's fair is that

19  everything you learn about this case, you learn sitting here

20  in Court with your fellow jurors.  So don't go on the

21  Internet deciding you want to look up some extra stuff about

22  antibodies.  There is no extra credit.  And in fact, it will

23  just mess things up.  So don't do that.

24          Then, the final thing is that I expect to start

25  on Thursday at 9:30, so make sure that you get here in time

1    to be ready to go before then.  Because if one of you is

2    late, we've got to wait for everybody, or everybody has to

3    wait for you.

4              All right.  So thank you very much.  Have a

5    nice -- well, see you on Thursday.

6              Can we take the jury out?

7              (Jury leaving the courtroom at 4:52 p.m.)

8              THE COURT:  All right.  Dr. Boyd, you can step

9    down.  All right.  Watch your step.

10             Everyone else, you can sit down.  Is there

11   anything you want to talk about right now?

12             MR. WOLF:  No, Your Honor.  You have the

13   documents we continue to fight over, and Mr. Reisner was

14   trying to lay a foundation, obviously, but not successfully.

15   I just want to emphasize what I think we said in our bench

16   memo which is as to both issues that the struggle of Amgen

17   to come up with these, we think is relevant to 2008, but

18   we've made our point.

19             THE COURT:  Okay.  All right.  Anything from you

20   all?

21             MR. HUMMEL:  Your Honor, just one thing.  I was

22   told that we have copies of the patents for the jurors.  I

23   know that during your preliminary instructions, you

24   mentioned to the jurors that they would get copies of the

25   patent.

1            THE COURT:  I think one would be enough.

2            MR. HUMMEL:  Because they're big, yeah.

3            THE COURT:  Yeah.  So, I mean, they will have

4    one when they're deliberating, but I think actually for the

5    time being, it makes no sense to give them something that is

6    too big to comfortably hold.  So you will be putting up on

7    the screen whenever you want to use it.

8            Does somebody have a different idea?

9            MR. WOLF:  Your Honor, the only thing I would

10   say this may be a distinction lost on the jury, but there is

11   about a hundred pages that were added to the patent after

12   January 2008.  So to the extent anyone is actually trying to

13   compare the specification to the claims, the patent is the

14   wrong thing to go to.

15           THE COURT:  Oh, and of course, I'm sorry.  You

16   know, Mr. Hummel, I think I misunderstood, or I'm having a

17   brain freeze.  You weren't talking about the patent

18   application, you were talking about the patent itself?

19           MR. HUMMEL:  I'm talking about the patent

20   itself, Your Honor.  Yes.

21           MR. WOLF:  Which is --

22           THE COURT:  Well, so I take it what Mr. Wolf's

23   point is that the patent itself has this extra hundred

24   pages, and they certainly need the patent claims.  What do

25   you have to say about the extra hundred pages?

```
 1            MR. HUMMEL:  Yeah.  The extra hundred pages is
 2   also relevant, Your Honor, to the issue of enablement.  We
 3   can have a discussion about this, but the entire patent, as
 4   I understand it, in the last trial went back to the jury,
 5   and it absolutely should go back to the jury when they have
 6   their deliberations.  I was just simply raising the issue of
 7   whether we wanted to give them the patents today.
 8            THE COURT:  Well, right.  So I think we're too
 9   late for that.
10            MR. HUMMEL:  Yes, but there's always tomorrow.
11            THE COURT:  But the question is for enablement
12   is not whether the --
13            MR. WOLF:  There is a complicated use of issue
14   because that extra data is actually part of a catabolic
15   program that they've been so precipitous about --
16            MR. HUMMEL:  No, that's not true, Your Honor.
17   That was not part of the catabolic program.
18            MR. WOLF:  There's dispute as to whether it's
19   part of the catabolic program.
20            MR. HUMMEL:  The proffered material, as I
21   understand it, was added in February of 2008, which is like
22   a month.
23            THE COURT:  Well, so the hundred pages, so we've
24   got the application in January of 2008.  Essentially the
25   specification of the actual patent application includes the
```

1  2008 description more or less verbatim, and then has a

2  hundred pages more of other stuff?

3         MR. WOLF:  Yes, Your Honor.  I mean in short,

4  yes.

5         MR. HUMMEL:  Your Honor, this is a joint

6  unobjected to exhibit, so I'm not sure.

7         THE COURT:  So that's all nice.  I'm just trying

8  to understand what's going on here.

9         MR. HUMMEL:  Right.

10         THE COURT:  And the question I asked that Sanofi

11  quickly said yes to, was the answer yes?

12         MR. HUMMEL:  I can't remember the answer -- the

13  question now.

14         THE COURT:  Well, so you've got the provisional

15  application, whatever it is, the January 2008 application.

16  It has some kind of written description.

17         Does that written description get then -- is

18  that basically verbatim in the actual patent application

19  here, plus then there's extra material?

20         MR. HUMMEL:  That's correct.  That's correct.

21         MR. GAEDE:  Additional examples, Your Honor.

22         THE COURT:  All right.  And is the question

23  here:  Does the description in 2008 enable these claims, or

24  is the question, does what appears -- and I'm kind of

25  thinking it's probably not -- but what appears in the later

1    application, does that enable the claims?

2              MR. GAEDE:  I think as your MIL Order said it

3    accurately, that the subsequent specification because you

4    divided it between the -- I think it's the six antibodies,

5    if I recall exactly, Your Honor.  And you said that that can

6    be relevant to, and it is relevant to under the law

7    potentially to enablement, assuming that the representative

8    references being made --

9              THE COURT:  And the reference being the inherent

10   thing or what?

11             MR. GAEDE:  No, that the data in the patent in

12   that fourth provisional is relevant to the issue of

13   enablement, further confirming enablement.

14             Inherent issue is a little bit different.

15   Inherency is for you have an antibody that is described in

16   the previous application leading up to January 9th, 2008,

17   and there's a property of it that is inherent that is

18   elucidated later.

19             So we're not using, for example, the new

20   antibodies that were identified in the fourth provisional

21   which follows January 2008.  We're not using those.

22             THE COURT:  So, wait.  You're using terminology

23   I don't think I've ever heard before.

24             MR. GAEDE:  Okay.

25             THE COURT:  Fourth provisional?

1          MS SHARP:  Sorry, let me explain it.  There's a

2    first -- yeah, there's a first provisional, second

3    provisional, third provisional.  Those are the three

4    provisionals that culminate their part of the January 9th,

5    2008 date we're all talking about.

6          THE COURT:  Okay.  All right.

7          MR. GAEDE:  And then there was a fourth

8    provisional that was the six antibodies that they wanted to

9    move MIL to exclude.  There was a fourth provisional and

10   then a utility application was filed.  Okay.

11         THE COURT:  The utility application being now

12   like in 2014 or --

13         MR. GAEDE:  No.  No.  No.  No, in August of

14   2008, and so everything claims priority back.  And the

15   question for purposes of written description and enablement,

16   though, is whether the provisionals one, two, and three

17   provide the written description and enablement support for

18   the claims.

19         THE COURT:  And so why does material that's

20   added later -- just remind me, why is that?

21         MR. GAEDE:  It can be relevant to enablement.

22   As you said here in your Order, this ruling does not prevent

23   plaintiffs from presenting evidence of the six antibodies

24   for other purposes such as enablement to support an argument

25   that the later disclosure of these six antibodies has

1    adequate written support or illuminate the state of the art

2    as of the priority date.

3              THE COURT:  So --

4              MR. GAEDE:  And also, the prov four discloses

5    inherent data of some antibodies identified in the earlier

6    ones.

7              THE COURT:  Well, no.  No.  I think I'm okay

8    with the inherent --

9              MR. GAEDE:  Yeah.

10             THE COURT:  -- disclosure.

11             MR. GAEDE:  Okay.

12             THE COURT:  But I think what I was talking about

13   when -- I think what I was talking about when I said later

14   that something that came after could throw light on

15   enablement, that's different than saying it's the enabling

16   disclosure.

17             MR. GAEDE:  Yes, Your Honor.  I fully agree that

18   the enablement disclosure here is judged by prov one, two

19   and three up to January 2008.

20             THE COURT:  All right.  All right.  Good, then

21   we're --

22             MR. GAEDE:  But I would --

23             THE COURT:  You and I are on the same page.

24             MR. GAEDE:  You are.  Of course, the prov, the

25   roadmap that you heard Mr. Hummel talk about, that was

1    described in the first group up to January 2008.  That, of

2    course, paves the way for the provs four and antibodies.

3                MR. WOLF:  Your Honor, just for the record and

4    perhaps just to salvage my credibility, Dr. Rees' report,

5    their expert, Paragraph 339, Ultimately 8A3 and 11F1, which

6    are two of the antibodies in the four4th provisional.

7                THE COURT:  Two of the 26?

8                MR. WOLF:  Two of the six that were excluded

9    were taken forward as the best candidates for further

10   catabolic antibody work.  So I believe my statement was

11   accurate when I said that that fourth provisional was tied

12   into a catabolic program.

13               THE COURT:  Okay.  And I recall vaguely that

14   someone said what you said wasn't true, but I can't tell

15   who's right about these things.  But I understand why you

16   want the record to reflect that.

17               All right.  So is there anything else?

18               MR. WOLF:  No, Your Honor.

19               MR. GAEDE:  No, Your Honor.

20               THE COURT:  All right.  Well, so let's meet

21   Thursday morning at 9:00 o'clock to -- actually, if it's not

22   too much trouble, why don't we meet Thursday morning at

23   8:30.  If it turns out that you've worked things out mostly

24   between yourselves and you'd rather not be here at 8:30, you

25   know send me an email or something.  Tell me when you would

1    like to see me.

2            I'm kind of hoping you won't pick 8:30, but if

3    you think you need an hour, I will give you the hour.  And

4    that doesn't count against your time.

5            MR. WOLF:  Very good, Your Honor.  Does that

6    include ongoing discussions of the --

7            THE COURT:  It includes whatever it is you want

8    to talk about that seems the most important to try to

9    resolve before we get the jury in here.

10           MR. WOLF:  Very good, Your Honor.

11           MR. GAEDE:  Can I ask one other housekeeping

12   issue.  So we're not looking for a charging conference at

13   8:30 Thursday morning, but if the Court has any thoughts

14   about a charging conference, giving we revised the schedule,

15   when that would be appropriate?

16           THE COURT:  I think the right time might be

17   Friday when we finish the evidence, because I haven't

18   counted it up exactly, but I think you probably used up

19   three-and-a-half hours today, so I think if we don't run

20   into problems of one kind or another, we should be finishing

21   Friday at four clock or something like that.  And I think

22   it's the case I will have draft final jury instructions and

23   verdict form to hand out Thursday morning.  But that will be

24   probably a bad idea on my part, but it will give you plenty

25   of time to look at it and contemplate what I have handed

1    out.

2              But I -- it just seems to me that would be

3    plenty, because there isn't that much that's in dispute,

4    Mr. Wolf said that the other day, I agree with him.

5              Actually, though, I say that, there was some --

6    somebody one side or the other, someone filed something

7    about some jury instruction concern last week and I struck

8    it.  Is that something you all are talking about to each

9    other?

10              MR. WOLF:  We're going to be.  There are issues

11   that have arisen today that touch on the same issue.  We'll

12   glomerate that into one discussion point and bring it

13   forward collectively.

14              THE COURT:  All right.  Well, we will

15   nevertheless get you the documents, you might as well

16   resolve or at least know what I'm thinking about the things

17   that are in what you already submitted.  Okay.  And so do I

18   understand from what you said, Mr. Wolf, that the document

19   that I wouldn't let Mr. Reisner go into, you're going to try

20   again on Thursday?

21              MR. WOLF:  Yes, Your Honor.

22              THE COURT:  Okay.

23              MR. WOLF:  I bump my head against the wall as

24   many times as it takes.

25              THE COURT:  And in terms of -- and what are you

1    going to do differently this time, if you know, that might

2    get a different result?

3                MR. WOLF:  Your Honor, given that the witness is

4    about ten feet to my right, I prefer not to go into too much

5    detail, but the point is the question is what would one of

6    ordinary skill have understood to be in the application

7    given that they wrote the application.

8                THE COURT:  Okay.  All right.  Well, I guess you

9    have the time to think about it.  We'll be in recess.

10   Hopefully -- well, we'll see you on Thursday morning.  As I

11   said, I'll be here at 8:30, but if you send me an e-mail

12   saying you would like to see me later, I won't complain.

13                (Court was recessed at 5:04 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25