# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMGEN INC., AMGEN MANUFACTURING LIMITED, and AMGEN USA INC., | ) ) ) |
| Plaintiffs, | ) C.A. No. 1:14-01317-RGA ) (CONSOLIDATED) |
| v. | ) ) |
| SANOFI, SANOFI-AVENTIS U.S. LLC, AVENTISUB LLC, f/d/b/a AVENTIS PHARMACEUTICALS INC., and REGENERON PHARMACEUTICALS, INC., | ) ) ) ) ) ) |
| Defendants. | ) REDACTED - PUBLIC VERSION ) Filed: March 25, 2019 ) ) ) |



**DEFENDANTS' OPENING BRIEF IN SUPPORT OF MOTION UNDER**
**FED. R. CIV. P. 50(B) FOR JUDGMENT AS A MATTER OF LAW**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   LEGAL STANDARD ..................................................................................... 2

III.  BACKGROUND ............................................................................................ 2

IV.   ARGUMENT ................................................................................................. 4

      A.   There Was No Legally Sufficient Evidentiary Basis For a Reasonable
           Jury to Conclude that the Claims Satisfy the Written Description
           Requirement ........................................................................................ 4

           1.   The Evidence is Insufficient to Conclude that the Patents
                Disclose Species that are Representative of the Claimed Genus.... 5

           2.   The Evidence is Insufficient to Conclude that the Patents
                Disclose Structural Features Common to the Members of the
                Genus. ....................................................................................... 9

                a.   Amgen Improperly Focused on the PCSK9 Antigen to
                     Identify "Common Structural Features" of the Claimed
                     Antibodies. ...................................................................... 10

                b.   Amgen Failed to Identify "Common Structural
                     Features" of the Claimed Antibodies. .............................. 12

      B.   There Was No Legally Sufficient Evidentiary Basis For a Reasonable
           Jury to Conclude that the Claims Satisfy the Enablement Requirement. . 13

           1.   The Vast Majority of Antibodies Within the Full Scope of the
                Claims Are Impossible to Make. ............................................... 14

           2.   The *Wands* Factors Establish that Practicing the Full Scope of
                the Claims Requires Undue Experimentation. ........................... 15

                a.   Breadth of the Claims. ..................................................... 15

                b.   Nature of the Invention; State of the Art; Relative Skill
                     of Those in the Art; Predictability of the Art. ................... 16

                c.   Number of Working Examples; Amount of Direction
                     Provided. ......................................................................... 17

    d.    Quantity of Experimentation Needed ............................... 17

    e.    Summary of *Wands* Factors ............................................. 20

V.    CONCLUSION...................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.,*
   759 F.3d 1285 (Fed. Cir. 2014)................................................................................ *passim*

*ALZA Corp. v. Andrx Pharm., LLC,*
   603 F.3d 935 (Fed. Cir. 2010)..........................................................................................18

*Amgen Inc. v. Sanofi,*
   872 F.3d 1367 (Fed. Cir. 2017).............................................................................4, 5, 9, 10

*Ariad Pharms., Inc. v. Eli Lilly & Co.,*
   598 F.3d 1336 (Fed. Cir. 2010) (en banc)................................................................ *passim*

*Centocor Ortho Biotech, Inc. v. Abbott Labs.,*
   636 F.3d 1341 (Fed. Cir. 2011)...........................................................................................5

*Dawson v. Dawson,*
   710 F.3d 1347 (Fed. Cir. 2013).........................................................................................19

*Idenix Pharm. LLC v. Gilead Scis., Inc.,*
   No. 14-846-LPS, 2018 WL 922125 (D. Del. Feb. 16, 2018).............................................14

*Lightning Lube, Inc. v. Witco Corp.,*
   4 F.3d 1153 (3d Cir. 1993)...................................................................................................2

*MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.,*
   687 F.3d 1377 (Fed. Cir. 2012)...................................................................................13, 20

*MorphoSys AG v. Janssen Biotech, Inc.,*
   __ F. Supp. 3d __, No. 16-221-LPS, 2019 WL 337091 (D. Del. Jan. 25, 2019)............. *passim*

*Pannu v. Iolab Corp.,*
   155 F.3d 1344 (Fed. Cir. 1998)............................................................................................2

*Trustees of Boston Univ. v. Everlight Elecs. Co.,*
   896 F.3d 1357 (Fed. Cir. 2018)...................................................................................1, 13, 14

*United States v. Santos-Granados,*
   2008 WL 401378 (D. Ariz. Feb. 12, 2008)..........................................................................4

*In re Wands,*
   858 F.2d 731 (Fed. Cir. 1988)....................................................................................14, 15

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013)......................................................................................16, 18

**Other Authorities**

Fed. R. Civ. P. 50(a)-(b) ...............................................................................................................2

## I.      INTRODUCTION

Defendants move for an order granting judgment as a matter of law (JMOL) because no reasonable jury could conclude from the evidence that the three remaining claims of Amgen's patents (the "Claims") satisfy the written description or enablement requirements of 35 U.S.C. §112.[1] Where a patent functionally claims a genus of antibodies, the specification must describe either *structural* features common to all members of the genus, or representative antibodies that "reflect the *structural* diversity of the claimed genus." *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1301 (Fed. Cir. 2014) (emphasis added). Furthermore, the specification must enable one skilled in the art to practice the "full scope" of the invention without "undue experimentation," and cannot enable what is "physically impossible." *Trustees of Boston Univ. v. Everlight Elecs. Co.*, 896 F.3d 1357, 1362 (Fed. Cir. 2018) ("*Everlight*"). The undisputed evidence here demonstrated that neither requirement is met. Among other things:

- The Claims contain only functional, not structural, limitations; specify at least tens of thousands of different antibodies; and potentially cover millions of different antibodies. A skilled person would have to test antibodies to determine if they fall within the Claims' scope.

- The 26 disclosed antibodies upon which Amgen relies to show adequate written description have amino acid sequences that are dramatically different from the amino acid sequences of other antibodies known to fall within the scope of the Claims. Amgen's patents thus do not reflect the *structural diversity* of the claimed genus.

- The 26 antibodies also differ dramatically from other antibodies known to fall within the scope of the Claims in terms of the location on PCSK9 where the antibodies bind, the number of PCSK9 amino acid residues to which they bind, and the specific PCSK9 residues to which they bind. Indeed, although the Claims encompass antibodies that bind up to 15 "sweet spot" PCSK9 residues, Amgen's disclosed antibodies only bind up to 8 residues—fewer than Defendants' Praluent, which binds to 12 residues.

- Amgen principally identified common structural features—the "sweet spot" residues—of the relevant *antigen*, PCSK9. No structure-function correlation exists between an antibody's

---

[1] The Claims are 19 and 29 of U.S. Patent No. 8,829,165 ("'165 patent") and 7 of U.S. Patent No. 8,859,741 ("'741 patent"). The undisputed priority date is January 9, 2008, the date on which U.S. App. 61/010,630 was filed ("2008 Application"). *See, e.g.*, 193:4-17.

amino acid sequence and its binding to an antigen (or vice-versa). Any purportedly common structural features of the *antibodies* were either not in the patents as of the priority date or do not distinguish claimed from unclaimed antibodies.

- The vast majority of antibodies within the full scope of the Claims are, according to Amgen's own evidence, impossible to make.

- Making the tens of thousands to millions of antibodies encompassed by the Claims requires undue experimentation because the only way to make new antibodies within the scope of the Claims is either to randomly generate pools of antibodies or to make substitutions to known antibodies, then test every resulting antibody to determine if it binds to the specified PCSK9 residues—a time-consuming, unpredictable, trial-and-error process.

In short, this case exemplifies the kind of overbroad claims that the written description and enablement requirements are designed to prevent. Because no reasonable jury could conclude from the evidence that the Claims satisfy 35 U.S.C. §112, JMOL is warranted.

## II.   LEGAL STANDARD

The Court may "direct the entry of judgment as a matter of law" following a jury verdict if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" who prevailed at trial. Fed. R. Civ. P. 50(a)-(b). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). A party seeking post-trial JMOL "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998).

## III.   BACKGROUND

The Claims are directed to antibodies that bind to various combinations of specified amino acid residues on a target antigen, PCSK9, and thereby block the interaction between PCSK9 and the LDL receptor ("LDLR"). '165 Patent at claims 19, 29; '741 patent at claim 7.

Antibodies are comprised of a string of amino acids, the "building blocks" of antibodies. 184:23-25; Ex. 1 (REM-DDTX1.15). The sequence of amino acids for any particular antibody— *i.e.*, the order of amino acids—is considered the "primary structure" of that antibody. 781:15-24 (Rees); 307:16-20 (Boyd); *see also* 685:25-686:2 (Petsko). The sequence is also the "recipe" or "formula" for making that antibody, 447:15-17; 781:15-782:1; 790:6-8; when Amgen later sought to remake some of the antibodies described in the 2008 Application, it relied on the amino acid sequences of those antibodies, 789:22-790:4; 790:14-19. Amino acid sequence thus constitutes a complete description of an antibody's structure. 447:15-17. Amgen's 2008 Application provides the amino acid sequences for the antibodies that Amgen found. 2008 Application at Figs. 2A-3JJ; 782:9-11.

Because the Claims recite only the purely functional limitation of binding to at least one or two of the 16 recited PCSK9 amino acid residues, their breadth is vast.[2] Based just on the different combinations of PCSK9 residues recited in the Claims, the Claims encompass *at least* tens of thousands of antibodies. For each of Claims 19 and 29 of the '165 patent—encompassing antibodies binding to "at least two" of the 15 listed "sweet spot" PCSK9 residues—a total of 32,752 different combinations of residues could be bound; therefore, each claim covers at least *32,752* antibodies. Claim 7 of the '741 patent—encompassing antibodies binding to at least R237 or D238 (and those binding to any combination of R237 or D238 and the other PCSK9

---

[2] The Claims recite a total of 16 PCSK9 residues, *see* '165 patent at claims 19, 29; '741 patent at claim 7; however, Amgen asserts that only 15 of these residues comprise the "sweet spot." 524:11. Although the Claims facially describe two functions—binding and blocking—the patents' lead inventor, Amgen's Dr. Jackson, admitted that blocking is duplicative of binding: "[a]ny antibodies that were binding" to one or two of the recited amino acid residues of PCSK9 "would be blockers." 534:22-23. The only relevant function, therefore, is binding, which all agree "is a function." 470:10-12 (Eck); *see also* 649:1-9 (Petsko) (acknowledging that "bind[ing] to" the specified residues is a "function[] of the claim").

residues listed in claims 19 and 29 of the '165 patent)—covers at least *49,152* antibodies.[3]

But this is just the tip of the iceberg. Both parties agree that the size of the genus is unknown. 731:12-732:8 (Rees) ("I can't give you a number on what the total is."); 599:6-13 (Jackson) ("I don't know a specific number."). Defendants' expert Dr. Boyd testified that according to the suggestions in the 2008 Application's specification for making additional antibodies—which involve making "[p]referred [s]ubstitutions" to the amino acid sequences of disclosed antibodies—the Claims encompass "at least millions" of antibodies. 219:20-220:14. Amgen's expert Dr. Rees *admitted* that any one of the "millions of antibodies that Dr. Boyd described" could "fall within the claims," but nobody would try this because it would result in "an enormous amount of work making millions ... of antibodies." 733:2-11.

## IV.   ARGUMENT

### A.   There Was No Legally Sufficient Evidentiary Basis For a Reasonable Jury to Conclude that the Claims Satisfy the Written Description Requirement

The written description requirement ensures "that the inventor actually invented the invention claimed." *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1373 (Fed. Cir. 2017) (quoting *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)). It ensures that "the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field as described in the patent specification." *Ariad*, 598 F.3d at 1353-54. The risk of inadequate written description is "especially acute with genus claims that," as here, "use functional language to define the boundaries of a claimed genus." *Id.* at 1349. Such claims "may simply claim a desired result ... without describing species that achieve that result," constituting an impermissible "attempt[] to preempt the future before it has arrived." *Id.*

---

[3] Mathematical computations underlying these numbers are set forth in the Appendix. Courts routinely take judicial notice of such computations. *See, e.g., United States v. Santos-Granados*, 2008 WL 401378, at *3 n.3 (D. Ariz. Feb. 12, 2008).

at 1349, 1353; *see also AbbVie*, 759 F.3d at 1301 (observing that "[f]unctionally defined genus claims can be inherently vulnerable to invalidity challenge for lack of written description support"). The Federal Circuit has repeatedly granted JMOL on written description grounds when confronting functionally defined genus claims to antibodies. *See, e.g., Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1344 (Fed. Cir. 2011); *Ariad*, 598 F.3d at 1340.

Where "a patent claims a genus using functional language to define a desired result," the patent specification must "show[] that the applicant has invented species sufficient to support a claim to the functionally-defined genus." *AbbVie*, 759 F.3d at 1299. "To provide th[e] 'precise definition' for a claim to a genus, a patentee must disclose [1] 'a representative number of species falling within the scope of the genus or [2] structural features common to the members of the genus so that one of skill in the art can "visualize or recognize" the members of the genus.'" *Amgen*, 872 F.3d at 1373 (quoting *Ariad*, 598 F.3d at 1350). And in the antibody context, the patentee "must adequately describe representative antibodies to reflect the *structural diversity* of the claimed genus"—and, specifically, "describe some species representative of antibodies that are *structurally similar* to" infringing antibodies. *AbbVie*, 759 F.3d at 1301 (emphases added).

### 1.   The Evidence is Insufficient to Conclude that the Patents Disclose Species that are Representative of the Claimed Genus.

To satisfy the "representative species" test, a patentee must "show that [it] has truly invented the *genus, i.e.*, that [it] has conceived and described sufficient representative species encompassing *the breadth of the genus*." *Id.* at 1300 (emphases added). Amgen asserts that it has disclosed 26 antibodies (the "Amgen Antibodies") in its 2008 Application that are covered by its Claims. 598:6-9.[4] But a comparison of the 26 Amgen Antibodies to other antibodies that

---

[4] Although Amgen invokes 26 antibodies (a fact that Defendants do not dispute here), the 2008 Application discloses only *two* antibodies—21B12 and 31H4—that were definitively shown to bind to the specified PCSK9 residues (via x-ray crystallography) and that thus definitively fall

indisputably fall within the scope of the Claims demonstrates that the 2008 Application, as a matter of law, simply does not disclose "sufficient representative species" encompassing the vast breadth and variability of the full scope of Amgen's functionally claimed genus.

Amgen's competitors—Defendants, Merck, and Pfizer—each discovered such antibodies; they are Praluent, 1D05, AX132, and J16 (together, the "Competitor Antibodies"). It is undisputed that the Competitor Antibodies are within the Claims' scope and that the 2008 Application does not disclose them. 151:5-8; 191:10-192:12; 546:23-24. And whether one considers structure or function, the undisputed evidence demonstrates that the 26 Amgen Antibodies, as a matter of law, are not representative of the Competitor Antibodies—or, *a fortiori*, the tens of thousands to millions of other antibodies falling within Amgen's Claims.

*First* and foremost, the structures of the Amgen Antibodies are materially different from the structures of the Competitor Antibodies and thus do not "reflect the structural diversity of the claimed genus," as required. *AbbVie*, 759 F.3d at 1301. Defendants' experts testified that the Amgen Antibodies are not representative of the Competitor Antibodies given the vast differences in the antibodies' "primary structure"—their amino acid sequences. 236:8-10 (Boyd); 423:11-424:2 (Eck); *see AbbVie*, 759 F.3d at 1300-01 (assessing representativeness by comparing amino acid sequences); pp. 3, *supra*. Specifically, Dr. Boyd compared the amino acid sequences of the heavy chain CDR3 segments of each of the 26 Amgen Antibodies to the amino acid sequences of the heavy chain CDR3 segments of each of the four Competitor Antibodies. 230:23-234:4, 234:17-236:10; *see* Ex. 2 (REM-DDTX1.38-REM-DDTX1.39). It is undisputed that an antibody's heavy chain CDR3 segment is "the most important region of the antibody for

---

within the scope of the Claims. For the remaining 24 antibodies, Amgen relied on data derived after the priority date or from other methods that do not definitively establish whether an antibody falls within the scope of the Claims. *See* 303:7-18, 328:3-13; *see also* Rule 59 motion at 14-20 (noting that Amgen was improperly permitted to rely on data not in 2008 Application).

determining binding." 782:21-783:3 (Rees). Based on his comparisons, Dr. Boyd concluded that the Amgen Antibodies "[a]re not representative," because "[t]hey don't look anything like the competitor antibodies in terms of their sequences." 236:4-10.

Amgen *did not dispute this fact* or even present *any* of its own structural comparisons. On the contrary, Amgen's expert, Dr. Rees, *admitted* that the Competitor Antibody amino acid sequences "are also completely different one from another" and acknowledged "the [sequence] differences between all of the antibodies." 768:12-20. Amgen thus *concedes* that its patents do not describe "some species representative of antibodies that are structurally similar to" infringing antibodies—specifically, the Competitor Antibodies. *AbbVie*, 759 F.3d at 1301. For this reason alone—the failure to "reflect the structural diversity of the genus"—the Amgen Antibodies are "not representative of the full variety or scope of the genus." *Id.* at 1300-01; *see also id.* (holding that *two hundred* disclosed antibodies are not representative of functional genus).

*Second*, as to function, the Amgen Antibodies are materially different from the Competitor Antibodies in three separate ways: (1) the location on PCSK9 where the antibodies bind, (2) the number of PCSK9 residues to which the antibodies bind, and (3) the particular PCSK9 residues to which the antibodies bind. The relevant evidence is undisputed.

Regarding location, none of the 26 Amgen Antibodies is an EGFa mimic, which is "a kind of antibody that binds to PCSK9 ... that basically s[i]t[s] right on top of PCSK9, the same way that the EGFa part of the LDL receptor d[oes] ... [and] interact[s] with PCSK9 with its antibody loops in a way that mimics some of the structure of the LDL receptor EGFa domain itself." 206:17-207:21.[5] Defendants' expert testified that although the Claims "cover EGFa mimic type antibodies," Amgen "never identified an antibody like that" in its disclosure. 332:7-

---

[5] The "EGFa domain" is the portion of the LDL receptor to which PCSK9 binds. 206:20-24.

11.  By contrast, the Competitor Antibodies *do* include such antibodies.  *See* 207:24-210:4 (describing Pfizer and Merck antibodies as "EGFa mimics").  Amgen disputed none of this.

Regarding the number of PCSK9 residues to which the claimed antibodies bind, it is undisputed that *all* of the Competitor Antibodies bind to *at least* 11 of the "sweet spot" PCSK9 residues specified in the Claims.  *See* Ex. 3 (REM-DDTX1.40); 300:19-22.  But it is equally undisputed that *not one* Amgen Antibody binds to at least 9 "sweet spot" residues.  *See* Ex. 3; 236:17-240:14; 300:24-301:3; 301:16-21 (Dr. Boyd testifying that these differences render the Amgen Antibodies unrepresentative of the Competitor Antibodies).  After repeatedly dodging the question, Dr. Jackson ultimately conceded that, although the Claims encompass antibodies that bind up to 15 "sweet spot" amino acids, "we don't have an antibody in the patent that we know binds 15 amino acids"—or, he added, 14, 13, 12, or 11 amino acids.  535:18-537:12; 608:10-12.  And yet, Dr. Jackson insisted that "if someone tomorrow for the first time in history invents" an antibody binding to 15 amino acids, it would infringe the Claims.  535:23-536:7.

The implications of these admissions are staggering.  First, they demonstrate that the Claims encompass *entire categories* of antibodies not disclosed in the specification—categories that *include the infringing product, Praluent*.  Amgen has claimed antibodies that bind to up to 15 "sweet spot" PCSK9 residues (including Praluent, which binds to 12 residues), but concedes that it only described antibodies that bind up to 8 such residues.  This is a blatant example of "the scope of the right to exclude ... overreach[ing] the scope of the inventor's contribution to the field of art as described in the patent specification."  *Ariad*, 598 F.3d at 1353-54.  Second, by admitting that "if someone tomorrow for the first time in history invents" an antibody that binds to 15 residues, that antibody would infringe the Claims, Dr. Jackson has confirmed beyond all doubt that Amgen is "attempt[ing] to preempt the future before it has arrived."  *Id.* at 1353.

Regarding the particular PCSK9 residues to which the antibodies bind (as opposed to the number), the evidence is likewise legally deficient. Of the 15 "sweet spot" residues identified in the Claims, there are *three*—C378, S372, and C375—to which *not one* Amgen Antibody binds. By stark contrast, *all four* of the Competitor Antibodies bind to C378, three bind to S372, and three bind to C375. Ex. 3, 420:12-14; 421:1-5.[6] Again, the evidence demonstrates that Amgen has not "described sufficient representative species encompassing *the breadth of the genus*" that it has claimed. *AbbVie*, 759 F.3d at 1300 (emphasis added). By failing to describe antibodies that bind to a number of the residues comprising its vaunted, 15-residue "sweet spot" on PCSK9, Amgen has not "actually invented the invention claimed." *Amgen*, 872 F.3d at 1373.

Finally, it bears emphasizing that all of the foregoing differences concern the material distinctions between just the disclosed Amgen Antibodies and *four* antibodies within the scope of the Claims—the Competitor Antibodies. But as noted, there are *tens of thousands to millions* of antibodies within the scope of the Claims. *See* pp. 3-4, *supra*. If the four Competitor Antibodies are any indication, were those millions of additional antibodies ever discovered, they would also likely be sufficiently different from the Amgen Antibodies so as to further underscore the non-representativeness of the handful of disclosed species as compared to the genus claimed.

## 2. The Evidence is Insufficient to Conclude that the Patents Disclose Structural Features Common to the Members of the Genus.

The "common structural features" test requires a patentee to disclose "structural features common to the members of the genus" such that "one of skill in the art can 'visualize or

---

[6] Amgen's expert also provided another example of a different type of antibody specified by the Claims that nobody can visualize based on the 2008 Application: Dr. Petsko thought "it should be possible to make "bridging" antibodies that bind to two residues on opposite sides ... of the sweet spot region like this, if the antibody had a kind of curved structure that missed this stuff in the middle." 692:1-693:20. But such an antibody, if possible to make, would be unlike any of the 26 Amgen Antibodies, because it would need to have the "curved structure" required to hit residues on either side of the "sweet spot" but miss the middle. 692:1-693:15.

recognize' the members of the genus." *Ariad*, 598 F.3d at 1350. Defendants' experts testified that the Claims fail this test. Dr. Eck concluded that he could not "find ... anywhere in the patent where they're pointing to a structural element that makes things inside or outside the claims." 470:13-16; *see also* 440:17-23. Dr. Boyd reached the same conclusion. 306:22-307:10. Amgen's evidence does not support a contrary determination.

> **a.  Amgen Improperly Focused on the PCSK9 Antigen to Identify "Common Structural Features" of the Claimed Antibodies.**

Amgen's experts principally identified structural features not of the claimed *antibodies*— for example, amino acid sequence—but of the claimed *antigen*, PCSK9. This should come as no surprise, for the 2008 Application defines and describes the "sweet spot" residues on PCSK9 (the antigen), not the "sweet spot" residues on the claimed antibodies themselves as the law requires. Thus, when asked (on direct) to identify the "common structural feature" of the claimed antibodies, Dr. Rees phrased his answer in terms of the so-called "sweet spot"—the residues *on PCSK9* where the claimed antibodies bind. Specifically, he stated that "the common structural feature is that antibodies that bind *across the sweet spot* must have complementary features that enable them to bind *across that sweet spot*." 772:18-23 (emphases added). Likewise, Dr. Petsko testified on direct that "if you know the *structure of the sweet spot* like this, you ... would know that antibodies that have a shape that's complimentary to the *structure of the sweet spot* ... will bind." 645:4-9 (emphases added). But these assertions simply attempt to "claim antibodies by describing something that is not the invention, i.e., the antigen." *Amgen*, 872 F.3d at 1378.

Dr. Rees's testimony in particular underscores the legal deficiency of Amgen's position. Despite asserting that "antibodies that bind across the sweet spot ... must have complementary features that enable them to bind across that sweet spot," 772:18-21, Dr. Rees never identified what those "complementary features" of the antibodies are—except that they supposedly "must"

be in service to the common function of binding to the "sweet spot." In other words, according to Dr. Rees, the common *structure* is the common *function*, in that all antibodies that bind in the desired way must share whatever degree of structure that allows them to bind in that way. That is simultaneously circular and incompatible with the reality that function and structure are not synonymous. Moreover, Dr. Rees's circular, conclusory assertion does not allow a skilled artisan to "distinguish the genus from other materials," *Ariad*, 598 F.3d at 1350, because he does not actually identify a structural feature common to the claimed antibodies.

Amgen's attempt to demonstrate that "the art has established a correlation between structure and function," *id.*, also comes up short, because the evidence only supports the opposite conclusion: there is no known correlation between an antibody's structure (*i.e.*, amino acid sequence) and its function (*i.e.*, binding properties). Dr. Rees admitted that knowing "the amino acid sequence of an antibody" does not "tell you the property of where it binds." 797:22-25. Likewise, Dr. Petsko acknowledged that "antibodies with different amino acids sequences"—*i.e.*, different structures—"certainly can" "perform the same functions," 637:23-638:1, 639:5-8, and that one cannot "write down a sequence" "from the function." 699:14-17; *see also* 309:5-11 (Dr. Boyd testifying that "[t]here's no way to make that sort of a link between the sequence ... and binding, just from knowing the sequence itself"). In short, the uncontroverted evidence demonstrated what Judge Stark recently observed in *MorphoSys AG v. Janssen Biotech, Inc.*, ___ F. Supp. 3d ___, No. 16-221-LPS, 2019 WL 337091 (D. Del. Jan. 25, 2019): "an antibody's sequence cannot be used to predict its binding properties." *Id.* at *7. And because of this "undisputed lack of a known relationship between an antibody's structure (its sequence) and its function (its binding properties), the only reasonable conclusion is that the specification does not

sufficiently disclose structural features common to the members of the genus." *Id.* at *8.[7]

**b.    Amgen Failed to Identify "Common Structural Features" of the Claimed Antibodies.**

When it came time to identify structural features common to the claimed *antibodies—i.e.*, what the "common structural features" test actually requires—Amgen's evidence was tellingly meager and equally insufficient.   The alleged "common structural features" that Amgen identified (1) relied on information unavailable to the skilled artisan as of the priority date, and (2) did not distinguish the claimed antibodies "from other materials." *Ariad*, 598 F.3d at 1350.

In showing that Amgen did not satisfy the "common structural features" test, Defendants' experts concluded that there are no common structural features between, *inter alia*, 1A12 and the Competitor Antibodies.   *See* pp. 10, *supra*.   Dr. Rees responded by relying on one-to-one comparisons between the crystal structures of 1A12 and the Competitor Antibodies.   787:23-789:18; Ex. 4 (PDXR25.38-.39).   But Dr. Rees admitted that those crystal structures were not available to a skilled artisan as of the January 2008 priority date.   788:13-789:14.   And "without access to the crystal structure data," Dr. Rees conceded, "of course you can't … generate images of this sort." *Id.*[8]   The structural features identified by Dr. Rees are thus "not properly considered." *MorphoSys*, 2019 WL 337091, at *8.   Indeed, *MorphoSys* is directly on point.   That case likewise involved functional genus claims to antibodies where the only "common structural

---

[7] Amgen also argued that there is a structure-function correlation because antibodies that *bind* to the "sweet spot" necessarily *block* the PCSK9/LDLR interaction.   632:15-21; *see also* 629:14-21. But Amgen is simply describing two *functions*. *See* 649:1-9 (Dr. Petsko describing "bind[ing] to the sweet spot" as a "function[] of the claim").   Merely asserting (at most) a function-function correlation does not provide a structure-function correlation.

[8] Even if the 1A12 crystal structure data had been disclosed in the 2008 Application, Dr. Rees would not have been able to carry out his analysis because the crystal structure data for the Competitor Antibodies was not yet available, nor was anything known about the Competitor Antibodies in the prior art.   788:8-18 (Praluent), 789:5-18 (1D05, AX132, J16).   And even Dr. Rees's own testimony would only support commonality between one of the Amgen Antibodies (1A12) and the Competitor Antibodies, not the entire genus. *See Ariad*, 598 F.3d at 1350.

12

feature" that the patentee identified was based on a comparison of a disclosed antibody to a post-priority-date antibody. Judge Stark found that the identified structural feature "was not properly considered because it relie[d] on knowledge that a POSA did not have at the priority date of the patents—namely, [the infringing product]'s amino acid sequence and the knowledge that [the infringing product] binds to [the target protein]." *Id.* So too here. Amgen cannot, *ex post*, look to post-priority-date evidence to identify common structural features; it must find them in the 2008 Application and show how they distinguish claimed antibodies from unclaimed antibodies.

The same flaw, and more, dooms Amgen's other attempt to demonstrate structural features common to the antibodies—its evidence regarding the so-called "greasy patch" on the claimed antibodies. 645:20-647:9. As Dr. Eck testified without contradiction, the alleged "greasy patch" is not described in the 2008 Application. *See* 455:14-15. In addition, the uncontroverted evidence showed that "almost all antibodies have a greasy spot on their tips." 804:16-19; 309:16-310:1. Consequently, this feature does not permit a skilled person to "distinguish the genus from other materials." *Ariad*, 598 F.3d at 1350.

## B. There Was No Legally Sufficient Evidentiary Basis For a Reasonable Jury to Conclude that the Claims Satisfy the Enablement Requirement.

Enablement "serves the dual function … of ensuring adequate disclosure of the claimed invention and of preventing claims broader than the disclosed invention." *MagSil Corp. v. Hitachi Glob. Storage Techs., Inc.*, 687 F.3d 1377, 1380-81 (Fed. Cir. 2012). "To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Id.* at 1380. Thus, "a patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *Id.* at 1381. Enablement "is a question of law," *id.*, and courts have not hesitated to find non-enablement as a matter of law. *See Everlight*, 896 F.3d at 1358 (reversing

denial of JMOL of non-enablement); *Idenix Pharm. LLC v. Gilead Scis., Inc.*, No. 14-846-LPS, 2018 WL 922125 (D. Del. Feb. 16, 2018) (granting JMOL of non-enablement). Here, JMOL that the Claims are not enabled is warranted for two independent reasons. First, the vast majority of antibodies within the full scope of the Claims are impossible to make. Second, the *Wands* factors demonstrate that practicing the full scope of the Claims requires undue experimentation.[9]

### 1.     The Vast Majority of Antibodies Within the Full Scope of the Claims Are Impossible to Make.

The Federal Circuit has held that claims are not enabled when embodiments within the scope of the claims are "impossible" to make. *Everlight*, 896 F.3d at 1364. Thus, in *Everlight*, the Federal Circuit held that the asserted claims were not enabled because they were drafted to cover six enumerated permutations, but one of those embodiments was "impossible" to make. *Id.* Here, Amgen itself asserts that there are only "a small number of antibodies" that can be made that are within the scope of the Claims. 731:16-17. Amgen therefore concedes that the vast majority of antibodies within the scope of the claims—at least tens of thousands if not millions— are impossible to make because, according to Amgen, the claims cover "a small number of antibodies," not much more than the 30 known antibodies. 731:8-732:8.

Amgen's own witnesses agreed there are antibodies specified by the claims that are impossible to make. For example, when asked about making "bridging" antibodies, Dr. Rees testified that he does not "believe [such an antibody] would exist." 796:21. Similarly, when asked whether Amgen ever invented an antibody that binds to *only* D238, Amgen's lead inventor Jackson testified that "[a]n antibody wouldn't bind if it's just binding with one amino acid residue, it wouldn't have the binding strength." 540:7-21. Yet Amgen's Claims indisputably

---

[9] The two asserted claims (claims 7 and 15 of the '165 patent) that the jury found invalid for lack of written description are also invalid for lack of enablement for the reasons discussed herein.

cover "bridging" antibodies, as well as antibodies that bind to only one "sweet spot" residue on PCSK9.

Accepting Amgen's assertion that no more antibodies could be found even after limitless research, only 0.09% of the claimed embodiments could ever be made—the other *99.9%* of the claimed embodiments are impossible to make *by Amgen's own admission*.[10] The circumstances here are thus far more egregious than in *Everlight*, where one "impossible" embodiment out of six was sufficient to find the claims not enabled. Amgen's Claims specify *tens of thousands*, if not *millions*, of antibodies, virtually *all* of which Amgen admits are impossible to make. For this reason alone, the Claims are not enabled.

      2.      **The *Wands* Factors Establish that Practicing the Full Scope of the Claims Requires Undue Experimentation.**

To determine whether a patent requires "undue experimentation" in order to practice the "full scope" of the claimed invention, thereby demonstrating non-enablement, courts commonly evaluate the *Wands* factors. *See, e.g.*, *MorphoSys*, 2019 WL 337091, at *12 (citing cases); *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988). Here, the *Wands* factors point ineluctably toward undue experimentation, requiring a conclusion of non-enablement.

      a.      **Breadth of the Claims.**

The Claims are purely functional and encompass an immense number of antibodies: every antibody in the universe (of which there are "at least 10 to the 15th power," according to Dr. Boyd's unrebutted testimony, 223:17-18) that binds to at least one or two of 15 recited "sweet spot" PCSK9 residues. The Claims specify *at least* tens of thousands of different antibodies and, according to Dr. Boyd, encompass potentially millions. Amgen's expert Dr.

---

[10] The 0.09% is derived from 30 (the known antibodies) divided by 32,752 (the number of possible combinations of residues that could be bound for claims 19 and 29 of the '165 patent).

Rees agreed that any one of "the millions of antibodies that Dr. Boyd described" could "fall within the claims." *See* 733:2-11; 219:20-220:14 pp. 4, *supra*. Unquestionably, then, "each claim covers a very large number of antibodies." *MorphoSys*, 2019 WL 337091, at *10.

### b. Nature of the Invention; State of the Art; Relative Skill of Those in the Art; Predictability of the Art.

There is no serious dispute that as of the 2008 priority date, generating antibodies to bind to a particular location on an antigen protein was highly unpredictable, because even the most highly skilled person could not determine an antibody's function (*i.e.*, where it will bind) from its structure (*i.e.*, its amino acid sequence), or vice-versa. *See* pp. 11-12, *supra*; *cf. AbbVie*, 759 F.3d at 1301 (characterizing antibody development as "highly unpredictable"); *MorphoSys*, 2019 WL 337091, at *12 (observing that a skilled person "would not be able to predict the function of these antibodies from their sequences"). And it is undisputed that making changes to amino acid sequence—even through conservative substitutions that are less likely to change antibody function than non-conservative substitutions, *see* 388:21-389:2—can still result in changes to function that cannot be predicted *ex ante*. *See* 638:8-9 (Dr. Petsko testifying that "small changes in sequence can make big changes in structure and in some cases function"); 388:21-389:8 (Amgen co-inventor Dr. Mehlin testifying that "sometimes what you think is a conservative mutation is not conservative at all ... in terms of the protein function"); *see also* 688:21-689:4 (Petsko); 220:19-221:1 (Boyd); *cf. Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1385 (Fed. Cir. 2013) (finding no enablement because "even minor alterations to the [disclosed] molecule could impact its [functional] properties"). The inability of even the most skilled person to predict antibody structure from function, or vice-versa, is precisely why Dr. Rees conceded that to determine if generated antibodies fall within the scope of the Claims, "you'd have to test" all such antibodies to see if any of them bound to the specified PCSK9 residues. 779:5-14.

### c.    Number of Working Examples; Amount of Direction Provided.

The 2008 Application discloses, at most, 26 antibodies.  Furthermore, those 26 examples are "largely unhelpful," because they "do not teach a POSA how to predict from an antibody's sequence whether it will bind to" the specified PCSK9 residues.  *MorphoSys*, 2019 WL 337091, at *12; *see also* 765:15-16, 797:22-25.  And neither the specification nor the examples "improve a POSA's ability to discover any of the countless antibodies within the scope of the claims."  *Id.*; *see* 779:5-14 (Rees admitting that "you'd have to test" antibodies to know whether they fall within the scope of the Claims).  Instead, as set forth below, to make and use the "full scope" of the Claims, a skilled person "would have to do essentially the same amount of work as the inventors," *id.*—namely, engaging in the trial-and-error processes of either generating millions of antibodies or engaging in the equally unpredictable process of changing antibody structure (and thus function) by substituting amino acids, both of which require testing to determine if the resulting antibodies fall within the scope of the Claims.

### d.    Quantity of Experimentation Needed

The quantity of experimentation required to make and use the full scope of the Claims is vast.  As Dr. Rees acknowledged, a skilled artisan cannot just "take an antibody and convert it into a different antibody just by doing some computer design."  795:17-20.  Instead, to make new antibodies within the scope of the Claims, a skilled artisan must either (1) randomly generate pools of antibodies, *see* 329:16-24, or (2) make substitutions to known antibodies, *see* 219:10-16; then, in either case, the artisan must test those resulting antibodies to determine whether they satisfy the functional limitation of binding to specified PCSK9 residues.  These approaches demand an extraordinary amount of experimentation.  As Dr. Rees conceded, testing "millions" of antibodies is "an enormous amount of work" and not "practical"; indeed, no "antibody scientist"—even one possessing exceptional skill in the art—"would even contemplate doing

that." 733:7-11; 780:1-3, 781:10-14; *see MorphoSys*, 2019 WL 337091, at *12 (explaining that "obtaining antibodies within the claims" would "require substantial time and effort").

Under the first approach, thousands if not millions of antibodies are randomly generated using transgenic mice or phage display libraries. *See id.* at *10. This technique is highly unpredictable, for it is impossible to ensure that one has generated an antibody that will bind to a particular location on an antigen (like the specified PCSK9 residues) without testing every antibody that is randomly generated. *See* 329:2-13. Even then, there is no chance of success if the desired antibody was never made in the random generation. 329:10-24. As Dr. Boyd explained, this "trial and error" approach "rel[ies] on fishing in randomized pools of antibodies and hoping you get the kinds of ones you're interested in." 329:16-24. That is precisely why Amgen's competitors "came up with antibodies that are quite different from the ones that Amgen found"—because "everybody was rolling the dice and they got different ones." 330:5-10. This "trial and error" approach—which directs a skilled artisan to start over and make and test new antibodies—is the antithesis of an enabling disclosure. *See Wyeth*, 720 F.3d at 1385 (no enablement where "practicing the full scope of the claims would require synthesizing and screening each of at least tens of thousands of compounds"); *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 941 (Fed. Cir. 2010) (no enablement where POSA "would have been required to engage in an iterative, trial-and-error process to practice the claimed invention").

Amgen did not (and could not) seriously dispute the foregoing. At most, Dr. Rees asserted that by following the "roadmap" in the specification—which he acknowledged requires "[g]enerat[ing] [a] pool of antibodies" by immunizing mice, 739:15-18—one is "certain to make all of the claim's antibodies including the defendant's examples." 762:18-19. But that does not alter the fact that the amount of trial-and-error experimentation necessary to produce the "full

scope" of the genus is extraordinary, not least because a skilled person would have to not only "make all" of the antibodies, but *test all* of them as well. Further, it is undisputed that Amgen had possession of this "roadmap" as early as August 2007, yet it *still* never identified antibodies within the full scope of its Claims, including the Competitor Antibodies. 501:2-514:18; 546:23-24; 791:1-7; 327:1-328:2. And Amgen admitted that to re-make its own disclosed antibodies, it "wouldn't have been very practical" to use its "roadmap" to do so. 790:4-19. Likewise, when Dr. Petsko was asked whether it was possible to have a "bridging" antibody—an antibody that binds to residues on the far sides of the "sweet spot" but none in the middle—he acknowledged that such an antibody would be covered by the Claims and that "it should be possible to make antibodies" with that feature. 692:1-693:20. But instead of looking to Amgen's so-called "roadmap" as a means for making such antibodies—as one might expect if the specification enabled the full scope of the Claims—Dr. Petsko testified that "one might be able to conceive a research plan that would allow you to do that." 694:23-695:4. *Cf. Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013) (noting that a "research plan" is insufficient to establish enablement).

The second approach—making substitutions in the amino acid sequences of disclosed antibodies—yields the same conclusion. The 2008 Application provides a table of "preferred" substitutions that can be made to known antibodies to generate additional antibodies purportedly within the Claims' scope. 218:16-219:7. But as Dr. Boyd testified, undertaking these Amgen-directed substitutions would quickly result in "easily ... millions" of potential antibodies—far more than the tens of thousands of antibodies the Claims specify simply by listing the combinations of residues to which they bind. 349:3-12; *see also* 350:13-22 (explaining that if other suggestions in the patent were followed, "you would get an astronomically large number" of different antibodies); '165 patent at [0216]. Amgen did not dispute this; its own expert agreed

that any one of "the millions of antibodies that Dr. Boyd described" could "fall within the claims," but "you'd have to test" to determine if they fall within the Claims' scope.  733:2-11; *see* 778:23-779:14.  And as noted, making even conservative changes to amino acid sequence can have unpredictable effects on binding properties.  *See* p. 16, *supra*.

Finally, vast experimentation would be required to determine which antibodies are within the scope of the Claims and which are impossible to make.  As noted, based on Amgen's own evidence, 99.9% of the claimed embodiments are impossible to make, thus rendering the claims non-enabled.  *See* pp. 14-15, *supra*.  But even if some, or most, of the 99.9% of undisclosed embodiments are in fact possible to make and are merely *unknown*, it remains that the only way for a skilled person to *find* these unknown embodiments is to undertake the "time-consuming," "trial-and-error" process of making and testing untold millions of antibodies.  *MorphoSys*, 2019 WL 337091, at *14.  As Amgen concedes, that task is such "an enormous amount of work" that no "antibody scientist would even contemplate doing" it.  733:7-11, 781:10-14.

### e.    Summary of *Wands* Factors

Application of the foregoing *Wands* factors compels the conclusion that, as a matter of law, making and using the "full scope" of the Claims requires "undue experimentation," defeating enablement.  *MagSil*, 687 F.3d at 1380-81.  "Where, as here, the claims recite functional limitations that cover countless embodiments in an unpredictable field," and "a POSA could not determine a new composition's functional properties solely from its structure," the specification must do more than place a POSA at 'a starting point ... for further research' and instruct them to 'engage in an iterative, trial-and-error process.'"  *MorphoSys*, 2019 WL 337091, at *12 (quoting *ALZA*, 603 F.3d at 941).  Yet "that is essentially what the patents here do."  *Id.*

## V.    CONCLUSION

For the foregoing reasons, the Court should grant JMOL for Defendants.

Dated: March 18, 2019

Respectfully submitted,

WILKS, LUKOFF & BRACEGIRDLE, LLC

/s/ Scott B. Czerwonka
David E. Wilks (Bar No. 2793)
Scott B. Czerwonka (Bar No. 4844)
Wilks, Lukoff & Bracegirdle, LLC
Lancaster Pike, Suite 200
Wilmington, DE 19805
Telephone: (302) 225-0850
Facsimile: (302) 225-0851
dwilks@wlblaw.com
sczerwonka@wlblaw.com

ARNOLD & PORTER KAYE SCHOLER LLP

Matthew M. Wolf
Anne W. Pearlman
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001
matthew.wolf@arnoldporter.com
anne.pearlman@arnoldporter.com

David K. Barr
Daniel L. Reisner
Victoria L. Reines
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019-9710
david.barr@arnoldporter.com
daniel.reisner@arnoldporter.com
victoria.reines@arnoldporter.com

STEPTOE & JOHNSON LLP

John Josef Molenda
Vishal Chandra Gupta
1114 Avenue of the Americas
New York, NY  10036
(212) 378-7540
jmolenda@steptoe.com
vgupta@steptoe.com

21

KIRKLAND & ELLIS LLP

Paul D. Clement
George W. Hicks, Jr.
655 Fifteenth Street, N.W.
Washington, DC  20005
(202) 879-5000

*Attorneys for Regeneron Pharmaceuticals,
Inc., Sanofi, Sanofi-Aventis U.S. LLC,
Aventisub LLC*

## APPENDIX

**Claims 19 and 29 of the '165 patent:**

An antibody could satisfy the claim by binding to residues S153 and I154; or to S153 and P155; or to S153, I154, and P155; and so forth.  There are two possibilities for each residue (bound or unbound) and 15 PCSK9 residues recited in each of these claims, therefore the total is equal to a 15-digit binary number:

$$2^{15} = 32{,}768 \text{ total combinations}$$

There are 15 combinations where only one residue is bound, and one combination where zero residues are bound.

$$15 + 1 = 16$$

These combinations do not meet the claim.  Limiting the claim to combinations where "at least two" residues are bound removes these 16 combinations:

$$32{,}768 - 16 = 32{,}752$$

**Claim 7 of the '741 patent:**

Possible combinations that would meet this claim include but are not limited to R237; D238; R237 and D238; R237 and S153; or D238 and P155; and so forth.

Excluding R237 and D238, there are 14 other PCSK9 residues recited in the Claims, therefore the total number of combinations bound to zero or more of these residues is equal to a 14-digit binary number:

$$2^{14} = 16{,}384$$

To meet claim 7, an antibody can bind to (1) only R237, (2) only D238 or (3) both R237 and D238.  For each of these three possibilities, there are 16,384 combinations of PCSK9 residues that could be bound.

Together, this would be 49,152 combinations:

$$3 \times 2^{14} = 49{,}152$$