```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE


AMGEN INC., and AMGEN        :
MANUFACTURING, LIMITED,      : C.A. No. 14-1317-RGA
and AMGEN USA INC.,          :
            Plaintiffs,      :
v.                           :
                             :
SANOFI, SANOFI-AVENTIS       :
U.S. LLC, AVENTISUB LLC      :
LLC, f/d/b/a AVENTIS         :
PHARMACEUTICALS INC,         :
and REGENERON                :
PHARMACEUTiCALS, INC.,       :
            Defendants.      :


                   Thursday, June 6, 2019
                   2:00 p.m.


                   844 King Street
                   Wilmington, Delaware


BEFORE:   THE HONORABLE RICHARD G. ANDREWS
          United States District Court Judge
```

```
APPEARANCES:


     YOUNG CONAWAY STARGATT & TAYLOR
     BY:  MELANIE SHARP, ESQ.

               -and-

     CRAVATH SWAIN & MOORE
     BY:  DAVID GREENWALD, ESQ.
     BY:  GEOFFREY G. HU, ESQ.
     BY:  LAUREN MOSKOWITZ, ESQ.


               -and-

     MONTGOMERY WILL & EMERY
     BY:  SARAH CHAPIN COLUMBIA, ESQ.

               -and-

     LONDON & MEAD
     BY:  CHRISTOPHER B. MEAD, ESQ.

               Counsel for the Plaintiffs



     WILKS, LUKOFF & BRACEGIRDLE, LLC
     BY:  DAVID E. WILKS, ESQ.
     BY:  SCOTT B. CZERWONKA, ESQ.

               -and-

     ARNOLD & PORTER KAYE SCHOLER LLP
     BY:  MATTHEW M. WOLF, ESQ.
     BY:  PAUL I. MARGULIES, ESQ.
     BY:  DEBORAH FISHMAN, ESQ.

               -and-

     STEPTOE & JOHNSON
     BY:  VISHAL C. GUPTA, ESQ.

               Counsel for the Defendants
```

```
 1                    THE COURT:  Good afternoon,
 2      everyone.  Please be seated.
 3                    This is the permanent injunction
 4      hearing in Amgen vs. Sanofi, Civil Action
 5      Number 14-1317.
 6                    I have read the briefing on the
 7      motion for the permanent injunction, and I did
 8      read three declarations, two from Dr. Stein,
 9      one from Dr. Eckel, who I understand to be the
10      two witnesses today.  So I'm ready to begin.
11      Is somebody from the plaintiff going to call a
12      witness?
13                    MS. SHARP:  Your Honor, did you
14      want any introductions?
15                    THE COURT:  That's all right, I
16      know the people, at least I know you and
17      Ms. Columbia.  Ms. Columbia is so reputable
18      that she sent me a form letter asking for
19      comment on someone from the Fellow of American
20      College and Trial Lawyers, and when I called
21      her back, she recused herself and wouldn't talk
22      to me.  But I'm not holding that against her.
23                    MS. COLUMBIA:  Thank you, your
24      Honor.
```

```
 1                    MS. SHARP:  Your Honor, may I
 2      flag an evidentiary issue that relates to
 3      adverse event reports?  We filed a motion, and
 4      I just wish to hand up copies of that motion.
 5                    THE COURT:  Okay.
 6                    MR. WOLF:  When would you like
 7      our response, your Honor?  It was filed about
 8      an hour ago.
 9                    THE COURT:  Why don't we take
10      care of the witnesses who are here, because I
11      had to postpone something else until after you
12      all finished.  So I'm sure you could figure out
13      something between yourselves.  Talk to each
14      other.  As you said, it was filed about an hour
15      ago.  Let's get on with our witnesses.
16                    MR. WOLF:  Dr. Eckel has blood
17      sugar issues.  Can he have permission to bring
18      juice to the stand?
19                    THE COURT:  Of course.
20                    MS. MOSKOWITZ:  Your Honor, good
21      afternoon.  One moment about the next witness
22      or the first witness.
23                    THE COURT:  This is Dr. Stein,
24      correct?
```

```
1              MS. MOSKOWITZ:  Correct, your
2    Honor.  Again, Lauren Moskowitz on behalf of
3    Amgen.
4              THE COURT:  I remember.
5              MS. MOSKOWITZ:  Dr. Stein has a
6    series of slides that he's going to be
7    testifying this morning.  Defendants have
8    objected to a few of those slides as
9    purportedly outside the scope of his prior
10   opinions.  We really hoped not to have this
11   discussion with your Honor, and we've withdrawn
12   our similar objection for Dr. Eckel.  But to
13   avoid disrupting the witness's testimony, I'm
14   prepared to address why they are not outside
15   the scope of his declaration or prior opinions
16   in this case.
17             MR. WOLF:  Your Honor, what we
18   would propose, especially in light of your
19   Honor's schedule, is if we are greatly offended
20   by what they do during the course of cross, we
21   will file something, either a motion to strike
22   or a motion to supplement or whatever the case
23   may be, but we don't need to do it in real
24   time, if that's your Honor's pleasure.
```

```
1                    THE COURT:  That would be my
2       preference, but thank you for bringing it up.
3                    MR. GREENWALD:  Good afternoon,
4       your Honor, David Greenwald for Amgen.  If we
5       may approach to provide the Court with hard
6       copies of the materials we'll be using during
7       Dr. Stein's examination.
8                    THE COURT:  Okay.
9                    MR. GREENWALD:  To save some
10      time, if Dr. Stein could also come up and take
11      the witness stand.
12                   EVAN ALBERT STEIN, M.D., Ph.D.,
13          after having been first duly sworn, was
14          examined and testified as follows:
15                   MR. GREENWALD:  Your Honor,
16      Amgen's first witness will be Dr. Stein.
17      Dr. Stein is an expert in the study and
18      treatment of cholesterol disorders and
19      activity.  He's been engaged in for the past 45
20      years as an active researcher in the area of
21      PCSK9 antibodies.  He served as investigator on
22      the phase I and phase II clinical trials of
23      both Praluent and Repatha.
24                   Dr. Stein also testified at the
```

1   prior hearing before Judge Robinson with

2   respect to the public interest and will do so

3   again today.

4                              - - -

5                    DIRECT EXAMINATION

6   BY MR. GREENWALD:

7       Q.   So Dr. Stein, since submitting your

8   reply declaration in this matter, have you

9   become aware that the FDA approved an updated

10  label for Praluent?

11      A.   I have.

12      Q.   As a physician, is there a part of the

13  drug label to which you pay particular

14  attention?

15      A.   There is, and that's the section

16  entitled indications and usage which outline

17  the patients that the drug should be used for.

18      Q.   In your opening declaration, you

19  compared Praluent's now former label against

20  the indications in Repatha's current.  I'd now

21  like to place before you a side-by-side

22  comparison of Repatha's label, the indication

23  section of Repatha's label on the left, and on

24  the right, the indications section of the

```
 1        current updated label for Praluent.
 2                    My first question about that,
 3        Dr. Stein, is just who are the patients for
 4        whom Repatha and Praluent are approved to
 5        treat?
 6            A.   Well, for the first two bullet points
 7        as you'll see which are identical for both
 8        Praluent and Repatha for the same patient
 9        population.  First bullet point is adults with
10        established cardiovascular disease, and the
11        second one is in adults with primary
12        hyperlipidemia.  And in addition, Repatha also
13        has a third indication, and that's for a rare
14        group of patients with inherited high
15        cholesterol.
16            Q.   Let's focus today on the first common
17        shared indication, for patients with
18        established cardiovascular disease.  What is
19        established cardiovascular disease and what is
20        its cause?
21            A.   The underlying disorder in all the
22        cardiovascular disease that we're going to be
23        discussing is called atherosclerosis, or it's a
24        collection initially started mostly by LDL or
```

```
 1    bad cholesterol entering the wall of the artery
 2    creating an inflammatory response and building
 3    up what we call an atherosclerotic plaque, what
 4    people would commonly call plaque in one of the
 5    arteries to the heart which would result in
 6    heart attacks; bypass surgery; angina; to the
 7    brain, stroke; and to the legs, peripheral
 8    vascular disease.
 9        Q.   So patients with established
10    cardiovascular disease are patients who have
11    previously suffered such events?
12        A.   Correct.
13        Q.   Now, turning back to the comparison,
14    are there any patients with established
15    cardiovascular disease for whom Praluent but
16    not Repatha is approved?
17        A.   No.
18        Q.   According to the indications section,
19    what are the conditions whose risk in patients
20    with established cardiovascular disease Repatha
21    is now approved to reduce?
22        A.   So for Repatha, it is approved to
23    reduce the risk, in other words, the symptoms
24    or complications in patients with established
```

1   cardiovascular disease, a heart attack,

2   myocardial infarction or stroke or coronary

3   revascularization.

4       Q.   What data is this risk reduction

5   indication from Repatha based on?

6       A.   Well, it's based on a big outcome trial

7   which compared in patients with established

8   cardiovascular disease the benefit of Repatha,

9   a trial called Fourier, versus a placebo group

10   of patients all previously treated with statins

11   to show a reduction in a combined endpoint

12   which we call MACE that is a combination of

13   major adverse cardiovascular events.

14       Q.   And just to be clear, what reduction

15   did the Fourier trial show in MACE?

16       A.   Achieved a 15 percent reduction in that

17   endpoint.

18       Q.   Let's focus on the Praluent label on

19   the right.  What are the conditions whose risks

20   in patients with established cardiovascular

21   disease Praluent is now approved to reduce?

22       A.   It is also approved to reduce the risk

23   of heart attacks or myocardial infarction and

24   stroke, and instead of coronary

1    revascularization, it's unstable angina

2    requiring hospitalization.

3        Q.   What data provided the basis for this

4    risk reduction?

5        A.   This came from another large

6    cardiovascular outcome trial in a different

7    group of patients who entered not with

8    established coronary disease, but something

9    called established coronary disease but at an

10   earlier stage called acute coronary syndrome,

11   and also showed a 15 percent identical

12   reduction in the risk of major adverse

13   cardiovascular events.

14       Q.   What were the non-fatal MACE events

15   that made up, as you put it, the primary

16   endpoint in Odyssey?

17       A.   It is myocardial infarction, stroke,

18   unstable angina, and coronary

19   revascularization.

20       Q.   Did each of those four non-fatal events

21   occur with similar frequency in Odyssey?

22       A.   No.  If we take, for example, the

23   patients in the placebo arm of the Odyssey, so

24   these are patients treated only with statins

1    but not with Praluent, you can see that

2    unstable angina comprised only 0.6 percent of

3    the patients, and the major cause of

4    cardiovascular events were heart attack,

5    coronary revasc, and stroke.

6        Q.   How does the very small incidence of

7    unstable angina as compared to the incidence of

8    the other three major events square with your

9    own experience as a physician?

10       A.   This is fairly typical of what we would

11   see in clinical practice.

12       Q.   Now, let's return to the labels.  What

13   language do they currently share?

14       A.   Well, everything outlined in green here

15   would be identical.  I think the wording is

16   virtually identical.

17       Q.   What language in the risk reduction

18   indications currently differs?

19       A.   The coronary revascularization in the

20   Repatha label and unstable angina requiring

21   hospitalization in the Praluent label.

22       Q.   And what about anything else?

23       A.   And the homozygote indication for

24   Repatha.

1    Q.   So we've talked a bit about unstable

2    angina.  Let's talk some more.  What is

3    unstable angina?

4    A.   Well, unstable angina and heart attacks

5    form what are called acute coronary syndrome,

6    which is a medical emergency of the patient

7    presenting to usually the emergency room with

8    new onset chest pain.  Both have the same

9    underlying cause, which is cholesterol, plaque,

10   which I indicated is called atherosclerosis in

11   the coronary artery.  Both present with chest

12   pain.  They have the same initial pathology and

13   that is the interruption of blood supply to

14   heart muscle, although this is only a temporary

15   acute coronory symptom in unstable angina, but

16   in a heart attack, you actually get muscle

17   death.

18            And then in the long-term

19   treatment, to prevent further events in these

20   patients, they both have the same preventive

21   treatment of which one of the most important is

22   to reduce the LDL or bad cholesterol to try to

23   treat the underlying cause of these symptoms.

24   Q.   What's the physiological relationship

1    between the two forms of ACS?

2        A.   So in the graphic now shown, we see a

3    cross section of an artery, and you can see

4    that they start off very similarly with both

5    having atherosclerotic plaque, that's

6    cholesterol plaque inside of the yellow.  And

7    in patients who have a heart attack, that

8    plaque usually ruptures and you get a blood

9    clot forming.

10              Then if you go down to the

11   figures at the bottom there, you'll see that

12   the size of the heart attack is determined by

13   where it occurs in the coronary artery and

14   determines how large the amount of heart muscle

15   damage will be or the size of the infarction.

16              In unstable angina, there's no

17   associated heart muscle death, and the patients

18   usually are at lower risk because the most

19   serious of these conditions is obviously having

20   a heart attack.

21       Q.   What does the fragmented yellow arrow

22   on the top attempt to show or signify?

23       A.   That just shows that many patients who

24   have unstable angina can also progress in the

```
1   future to having a heart attack, and are, in

2   fact, usually kept in the hospital, overnight

3   in the hospital and longer to make sure they

4   don't progress to a heart attack.

5         Q.   Now, how are unstable angina and heart

6   attack differentiated when a patient with chest

7   pain comes into the emergency room and receives

8   an initial diagnosis of acute coronary

9   syndrome?

10        A.   Because they both present with new

11  onset chest pain and often very similar or

12  overlapping changes in electrocardiogram, we

13  rely on a biomarker, a protein in the blood, an

14  enzyme in the blood that is released when heart

15  muscle dies, and it releases a specific protein

16  which enters the bloodstream.  And we've been

17  able now to develop methods to detect these

18  proteins which mostly these days are called

19  troponins, with the most sensitive we can

20  detect, we can determine that the patient has

21  had a heart attack and not unstable angina.

22               So the first thing you want to do

23  is exclude whether that patient has had a heart

24  attack, then you end up, after you have been
```

able to exclude that by one of these biomarker tests, that the patient now has unstable angina.  And as we've been able to increase the biomarker sensitivity, our ability to detect smaller and smaller amounts of heart damage through these tests, in fact, the incidence of unstable angina is quite significantly decreasing over the number of years.

Q.  So in light of the identical cause and pathology of unstable angina and heart attack as you've explained, is there any patient at risk of unstable angina who is not also at risk of a heart attack?

A.  Every patient with established cardiovascular disease is at risk of unstable angina, risk of a heart attack, risk of coronary revascularization.

Q.  What is the effect of reducing the patient's risk of a heart attack on the patient's risk of unstable angina?

A.  As we indicated, if you're lowering LDL and you're treating the underlying disease, you should be able to reduce the risk of any complications resulting from that

1    atherosclerotic plaque.

2         Q.   Just to make sure your testimony is

3    clear, is there any patient at risk of a heart

4    attack that is not at risk of unstable angina

5    in the future?

6         A.   No.

7         Q.   Is there any patient who you would

8    treat to reduce their risk of unstable angina

9    but not their risk of heart attack, too?

10        A.   No, you obviously treat -- you treat

11   the underlying disease with the ultimate goal

12   of reducing all complications from the

13   atherosclerotic plaque.

14        Q.   So were there observed differences in

15   Fourier and Odyssey with respect to the

16   unstable angina endpoint as each trial defined

17   those endpoints?

18        A.   There were.

19        Q.   And what were some of the factors that

20   in your opinion generated those differences?

21        A.   Well, firstly, it's improper and not

22   scientific to do cross-trial comparisons in

23   totally different patient populations, even

24   with the same drug, let alone different drugs.

1    And that's because there are different

2    inclusion criteria, different stages of the

3    disease that you've entered patients into one

4    trial versus another trial.

5              In addition, because these trials

6    are done in thousands of centers across the

7    world, there are different methods used to

8    exclude the heart attack diagnosis.  In other

9    words, some of the -- in both of these trials,

10   some of the sites were still using older

11   methods called CK&B, whereas the majority were

12   using troponin but of a different generation of

13   sensitivity.  Then thirdly, there's a totally

14   different definition of unstable angina in one

15   trial versus the other.

16        Q.   And by definition, you mean different

17   adjudication criteria?

18        A.   Yeah, there were different criteria for

19   what was considered unstable angina in one

20   trial and totally different criteria in the

21   other.

22        Q.   So using the next slide to illustrate

23   your testimony, please explain the differences

24   between those adjudication criteria as set

1   forth in PTX 9970 and PTX 7155.

2       A.   Well, Odyssey used a very tight

3   criteria, so in addition to chest pain and

4   exclusion of a heart attack by a negative

5   biomarker, the patients had to have both a

6   coronary obstruction and concurrent EKG

7   changes.  So this was a very tight definition

8   of unstable angina to make sure that those

9   patients had unstable angina.

10          In Fourier, they also had to have

11  chest pain and a negative biomarker, but they

12  could have coronary obstruction or they could

13  have an EKG change or they could have inducible

14  myocardial ischemia.  And because of this much

15  broader definition, it now classified far more

16  patients, and between the two studies, it was

17  roughly three and a half times more patients

18  that were classified as having unstable angina

19  in Fourier than there were in Odyssey.

20      Q.   How did the breadth of the definition

21  or the breadth of the adjudication criteria for

22  unstable angina in Fourier affect the data that

23  Fourier generated for that?

24      A.   Well , recalling that all these

```
 1    patients had established cardiovascular disease
 2    to get into the trials, so many already had
 3    coronary obstruction and there were EKG changes
 4    and induced myocardial ischemia, the broader
 5    criteria would result, in my opinion, in more
 6    patients who may not have had chest pain due to
 7    a recent change, coronary obstruction plus EKG
 8    changes, for example.  So they could have had
 9    gastritis, they could have had other parameters
10    that were creating false positives or noise in
11    both the placebo and the treatment, and that as
12    LDL cholesterol lowering does not affect these
13    non-coronary events, as they wouldn't have been
14    expected to, gastritis and so on, that this
15    could have drowned out a lot of the signal of
16    unstable angina reduction.
17         Q.  So we've been talking about the
18    indications that Praluent received.  Let's talk
19    now about the indications Sanofi asked the FDA
20    for.  Are you aware of those?
21         A.  I've read them, yes.
22         Q.  What indications, showing PTX 7368, did
23    Sanofi seek relating solely to the prevention
24    of death?
```

```
 1        A.   They asked, as you can see in the
 2   second bullet point highlighted in yellow, they
 3   asked for a reduction in the risk of all-cause
 4   mortality in patients with established
 5   cardiovascular disease.  The third bullet
 6   point, they asked for a reduction in the risk
 7   of coronary heart death and cardiovascular
 8   mortality in patients whose LDL cholesterol was
 9   above a certain cut point, 100 milligrams per
10   deciliter.
11        Q.   Just so the record is clear, reading
12   it, it's coronary heart disease death, not just
13   coronary heart disease?
14        A.   Oh, you're right.
15        Q.   Did the FDA approve either of these?
16        A.   No.
17        Q.   Under their current labels, is either
18   Praluent or Repatha approved to prevent any
19   form of death?
20        A.   No, as we saw previously.
21        Q.   Does any of the mortality data that
22   Odyssey generated occur anywhere in the
23   current, updated Praluent label?
24        A.   It does.  It appears in the rest of the
```

1    package insert, in table 2, which I believe is

2    on page 12 of the package insert where here

3    highlighted is the mortality endpoint with the

4    disclaimer that this is not statistically

5    significant because of the prespecified method

6    to control for a statistical type of error.

7        Q.   Based on your review of some very

8    recently produced correspondence between Sanofi

9    and the FDA, do you know how that bold

10   parenthetical disclaimer came to appear?

11       A.   I can only go by the documentation that

12   I've read which is a summary provided by Sanofi

13   after -- I presume after their meeting, where

14   there was some concern.  And here in yellow is

15   highlighted the concern regarding the all-cause

16   mortality data, and that the FDA said that,

17   they report here that the concern that the

18   all-cause mortality data as shown in the data

19   may imply a superiority claim when statistical

20   significance was not demonstrated.

21       Q.   What is a superiority claim, as you

22   understand that term?

23       A.   To me that would indicate that one drug

24   was superior or better than the other drug.

1      Q.   Do you understand Dr. Eckel to be

2   making a superiority claim in this case?

3      A.   I do.

4      Q.   What as set forth in Plaintiff's

5   Exhibit 10055 is the FDA's general position

6   regarding superiority claims?

7      A.   The FDA has had a long-standing correct

8   approach to this, because otherwise there would

9   be claims that aren't across the same patient

10   population in the same trials, and there they

11   require if you want a superiority claim, that

12   you need to conduct a trial where you take both

13   drugs and you do a head-to-head comparison in

14   the same patient population with the same

15   endpoints in a blinded matter so that you can

16   demonstrate that identically head-to-head one

17   drug is superior to the other drug.

18      Q.   Has such a trial ever been performed

19   with Praluent and Repatha?

20      A.   Never.

21      Q.   Are you aware that in April, Sanofi and

22   the FDA also communicated with each other

23   concerning the FDA's proposed inclusion of a

24   limitation of use in the label?

1      A.   I am.

2      Q.   Tell us about that.

3      A.   Sanofi introduced a new dose about a

4  year ago to treat patients once a month instead

5  of every two weeks, and that dose was a 300

6  milligram dose.  In addition to their current

7  75 and 150 milligram dose every two weeks, this

8  was a monthly dose.  And in discussions that

9  appear from what I can see here is that the FDA

10  wanted the disclaimer that this drug or this

11  dose had not been studied in the outcomes

12  trial, and therefore, it has a disclaimer which

13  says has not been studied in a cardiovascular

14  outcomes trial.

15      Q.   How, as reflected in PTX 10150, did

16  Sanofi respond?

17      A.   Sanofi responded with outlining that

18  after reviewing a large number of prior LDL

19  lowering trials with statins, and in addition

20  to both Fourier and Odyssey, that their

21  conclusion was that drugs that produced similar

22  effects on LDL cholesterol will have similar

23  effects on cardiovascular risk.  And I agree

24  with that statement.

1        Q.   Dr. Stein, do Repatha and Praluent have

2    lowering effect on LDL cholesterol?

3        A.   Absolutely.  At equivalent doses, they

4    lower cholesterol identically, roughly 60

5    percent.

6        Q.   Do Repatha and Praluent differ in their

7    ability to block binding of PCSK9 to their sole

8    common -- excuse me, block binding of their

9    sole common target PCSK9 to the LDL receptor's

10   so-called sweet spot?

11       A.   No, they bind very similarly to PCSK9

12   and inhibit PCSK9 to the same extent and for

13   the same duration when given in equivalent

14   doses at equivalent frequencies.

15       Q.   Do they differ meaningfully in their

16   ability to reduce any measurable

17   pharmacological parameter?

18       A.   No study has shown any difference in

19   their ability to lower cholesterol, LDL good

20   cholesterol, or any other biomarker in any of

21   the trials.

22       Q.   So applying the principle that Sanofi

23   states here, that drugs that produce similar

24   effects on LDL cholesterol have similar effects

1    on cardiovascular risk, would you expect

2    Praluent and Repatha to differ in their ability

3    to reduce any cardiovascular outcome, be it

4    cardiovascular death, all-cause death, or

5    unstable angina?

6        A.  No.

7        Q.  So in sum, has anything you've learned

8    since submitting your reply declaration in mid

9    April, including the subsequent release of

10   Praluent's updated label, caused you to change

11   any of your opinions you've expressed in your

12   two declarations?

13       A.  No, I think they've supported and

14   reinforced my conclusions.

15              MR. GREENWALD:  Thank you.

16              THE COURT:  Cross?

17              MR. WOLF:  Thank you, your Honor.

18   Your Honor, may we approach with the

19   depositions and the exhibit binder?

20              THE COURT:  Sure.

21

22

23                  - - -

24              CROSS-EXAMINATION

```
 1    BY MR. WOLF:
 2         Q.   Dr. Stein, we will try to use the
 3    screen and not the binder, but just in case.
 4         A.   Okay.
 5         Q.   Good afternoon, Dr. Stein.
 6         A.   Good afternoon.
 7         Q.   We have not met.  My name is Matt Wolf;
 8    I'm an attorney for the defendants in this
 9    case.
10              I want to begin by getting a
11    sense of how you fit into the competitive
12    milieu here.  You are named as a co-inventor on
13    certain patent applications assigned to Amgen
14    related to the very technology in this case,
15    right?
16         A.   Co-inventor in the homozygote
17    population.
18         Q.   So that's a yes?
19         A.   Yes.
20         Q.   And you worked with Amgen employees on
21    those inventions, right?
22         A.   I did.
23         Q.   And you also helped design certain of
24    the clinical trials for Amgen's Repatha; is
```

1    that right?

2         A.   Just as I did for Regeneron and Sanofi.

3         Q.   So that's a yes?

4         A.   For both, yes.

5         Q.   And you were part of other Amgen

6    studies on Repatha, as well, correct?

7         A.   Correct.

8         Q.   Now, you are also the CEO and chief

9    medical officer of a company called, is it

10   L-I-B- or LIB Therapeutics?

11        A.   LIB Therapeutics.

12        Q.   And LIB Therapeutics is currently

13   developing a compound called LIB 3; is that

14   right?

15        A.   No.

16        Q.   What's it called?

17        A.   LIB 003.

18        Q.   LIB 003, I apologize for leaving out

19   the zeros.

20                   At your deposition last fall,

21   your testimony kind of minimized the importance

22   of this compound to your opinions in this case,

23   didn't it?

24        A.   No.

```
 1         Q.   You don't remember suggesting that
 2    LIB 003 wasn't an alternative LDL-C lowering
 3    therapy, and that it was at an early phase?
 4         A.   I indicated clearly that it was a PCSK9
 5    or LDL lowering drug that was at a very early
 6    stage of development.
 7         Q.   LIB 003 is a PCSK9 inhibitor, right?
 8         A.   Correct.  It's not a monoclonal
 9    antibody.
10         Q.   It's a competitor of monoclonal
11    antibodies, right?
12         A.   Still got many, many years to go to see
13    if it survives even getting to getting
14    approval.
15         Q.   Just last week at the European
16    Atherosclerosis Society, you personally
17    presented a phase 2 study for LIB 003, a
18    product that would be in direct competition
19    with my client's product, right?
20         A.   If it ever got to approval, but most
21    drugs in phase 2 do not get to approval.
22         Q.   But the reason you were at that meeting
23    and the reason you were speaking to the
24    community was because you hoped it would be
```

1   approved, you hoped it would be a product,

2   right?

3       A.   No, I was presenting results from small

4   initial dose-ranging phase 2 trial.

5       Q.   But you engaged in back and forths

6   about the potential pricing of LIB 003 compared

7   to my client's product, right?

8       A.   No.  Somebody asked me what the price

9   was and I said I have no idea because I'm not

10  developing the drug to any price at that time.

11      Q.   Didn't you talk about costs of goods

12  sold and comparative pricing and marketing?

13  You don't recall talking to investors and other

14  scientists about that?

15      A.   I did not talk to any investors.

16  During the question and answer after my

17  presentation, as for everybody's presentation

18  at that session, people asked me and I said I

19  assume that it could be -- that cost of goods

20  would be similar, and I have no idea what the

21  pricing would be.  I'm not a business

22  development person, I'm a clinical scientist

23  developing an alternative therapy.

24      Q.   Did you or did you not say that the

1     production of LIB 003 is, quote, probably going

2     to be competitive or lower than a monoclonal

3     antibody like my client's product that's

4     seeking to be taken from the market in this

5     proceeding?

6          A.   Yes, that's what I believe it will be.

7     I have no idea if it will be, but I believe

8     that maybe.

9          Q.   It would be to your advantage, your

10     personal advantage as the CEO or -- let me get

11     your title right -- as the, yeah, CEO and chief

12     medical officer of LIB Therapeutics for my

13     client's product to be taken from the market,

14     wouldn't it?

15          A.   No.

16          Q.   Let's talk about the Odyssey trial.

17     The results of the Odyssey trial were published

18     in the <u>New England Journal of Medicine</u>, right?

19          A.   Yes.

20          Q.   And I'm sure his Honor doesn't quite

21     have memorized the names of all these trials.

22     The Odyssey trial was of my client's product,

23     right?

24          A.   Correct.

Q.   And it was a placebo study, Praluent
versus a placebo, right?

A.   On top of statins in patients with
acute coronary syndromes, correct.

Q.   Let's call up DTX 3200 and look at the
top of the first page.  This is alirocumab,
that's Praluent, right?

A.   Yes.

Q.   And cardiovascular outcomes after acute
coronary syndrome.  This was the release of the
Odyssey study to the public; is that fair?

A.   No, it had previously been released
approximately a year earlier in a scientific
meeting.

Q.   Fair enough.

A.   This is the first publication of that
data.

Q.   I take your correction.  This was the
blast, the public blast, the publication; blast
is kind of a colloquial term.  This is when the
world, not just those in that smaller
community, found out about the Praluent Odyssey
data; is that fair?

A.   I believe that this would be -- I think

```
1    that the world found out at the time that they
2    presented it at a large, international meeting,
3    and that this was when all of the finer details
4    were published.
5         Q.   Fair enough.  Let's get the date on the
6    right-hand side, if we could scroll down a
7    little bit, we see the date, November 7, 2018;
8    is that right?
9         A.   Correct.
10        Q.   Let's go to table 2 where we have the
11   study results.  We see death from any cause,
12   the bullet just above other endpoints.  Do you
13   see that?
14        A.   I do.
15        Q.   And that's the results of the Odyssey
16   study, and we see for alirocumab, my client's
17   product, 334 people died; in the placebo arm,
18   392 people died; then we see the hazard ratio
19   of .85.  In simple terms, 15 percent fewer
20   people died when taking my client's product
21   than taking a placebo, right?
22        A.   That's what the study showed.
23        Q.   And specifically, if we were to look at
24   the subgroup of patients with particularly bad
```

1    LDL cholesterol, that of 100 milligrams per

2    deciliter or more, there was, in fact, a 29

3    percent reduction in mortality.  Do you recall

4    that?

5         A.   I do know the post-hoc, the subsequent

6    subgroup analysis selected for patients who

7    have the highest risk and who will have the

8    most LDL reduction, not related to anything

9    other than the LDL reduction, and those

10   patients with higher LDL cholesterol are at

11   higher risk and get more LDL reductions, and I

12   would certainly anticipate that this study

13   would show that.

14        Q.   You have no reason to dispute -- I

15   mean, I can pull out a document if you want,

16   but it was about 30 percent, 29 percent to be

17   exact?

18        A.   Yeah, it's been known now for close to

19   30 years that if you take patients with very

20   high cholesterol levels and you lower their LDL

21   cholesterol 60 percent and the LDL starts at

22   150, you will get 60 percent of 150, you will

23   get twice as much LDL reduction as you get in

24   patients with LDLs of 75.  And that we know the

```
 1      mathematical relationship over 200,000 patients
 2      that have developed, that for every 40 points
 3      in reduction in LDL cholesterol, you'll get
 4      roughly 20 to 22 percent reduction in
 5      cardiovascular events.  So it's not rocket
 6      science to know that if you lower LDL twice as
 7      much by selecting a group that has higher LDL
 8      than a group of lower, that you will get
 9      additional benefit.
10          Q.   Dr. Stein, I appreciate that answer,
11      but I am on the clock and we are very
12      constrained, so if you can do your best to
13      answer what I ask.
14               This may have been the dumbest
15      question I have asked in court, but you don't
16      dispute that mortality is an important
17      consideration for patients and doctors, right?
18          A.   I think in subgroup analysis, it
19      depends on the validity of that mortality.  I
20      think transient mortality that we see,
21      ultimately mortality, in addition, I think it's
22      important, obviously depends on the age at
23      which you die, and the events that you have.  I
24      believe that for many patients, a stroke is
```

```
 1    probably at a certain age as much of a

 2    consideration as mortality.  But mortality

 3    ultimately is our goal in keeping patients

 4    alive longer.

 5        Q.   I think I understand your answer.  You

 6    would agree that doctors and patients care

 7    quite a bit if a drug is less likely to kill

 8    them than something else, right?

 9        A.   They would like to take a drug that

10    saves them, not kills them.

11        Q.   Right.  Now, let's turn to the 2017

12    Fourier trial of Repatha.  This is DTX 4138.

13    So we see a similar New England Journal of

14    Medicine article, and this is dated May 4,

15    2017, right?

16        A.   Right.

17        Q.   And this is the study releasing the

18    plaintiffs in this case, their Repatha drug and

19    the results of that study, correct?

20        A.   In a totally different patient

21    population, correct.

22        Q.   Let's turn to table 2 of this study.

23    And we see middle of the page, if we look at

24    death from any cause, can you tell us how many
```

```
1    people died in the Repatha arm of the study,

2    death from any cause?

3         A.   There was no significant

4    difference between --

5         Q.   Can you just tell me what the number

6    is?

7         A.   444 and 426.

8         Q.   So more people died taking Repatha than

9    taking a placebo; is that right?

10        A.   There was no statistically significant

11   difference.

12                  THE COURT:  Doctor, this is a

13   whole lot better if you just answer your

14   questions.  I understand what he's doing.  You

15   don't need to --

16                  THE WITNESS:  Thank you, your

17   Honor.  Yes.

18   BY MR. WOLF:

19        Q.   So more patients died on the Repatha

20   arm of the study than the placebo as opposed to

21   the Odyssey study where more people died on the

22   placebo arm rather than Praluent, right?

23        A.   Correct.

24        Q.   In any event, you agree that the
```

1   Fourier trial did not demonstrate a mortality
2   benefit for Repatha, right?
3      A.   Correct.
4      Q.   And no study has demonstrated any
5   mortality benefit for Repatha, right?
6      A.   Correct.
7      Q.   And you would agree in the Odyssey
8   study of Praluent, there was a trend in
9   reduction of death from cardiovascular causes,
10  right?
11     A.   I agree that there was a trend that
12  didn't reach statistical significance.
13     Q.   Now, that's opposed to Fourier where
14  there was no trend on cardiovascular death,
15  right?
16     A.   Correct.
17     Q.   And unlike in Odyssey, in Fourier, when
18  you looked beyond the first year of the study,
19  the trend of cardiovascular deaths in Repatha
20  look even worse, right?
21     A.   In these two different studies, what
22  you're saying is published in the publications.
23     Q.   So in other words, that delta we saw
24  for Repatha where a few people more died on

```
 1    Repatha than on placebo, that actually gets
 2    worse over time for Repatha, right?
 3         A.   Well, those are post-hoc subgroup
 4    analyses, and they, as I say, different trials,
 5    and they will show different results as we've
 6    seen over the last 30 years of similar lipid
 7    lowering trials in the same drug even at the
 8    same dose in a different patient population.
 9         Q.   Now, Dr. Stein, you've mentioned a few
10    times in the last few minutes that you didn't
11    find the data statistically significant, and I
12    believe in your declaration, you talked about
13    the statistical hierarchy, right?
14         A.   Correct.
15         Q.   In Fourier, stroke did not meet the
16    statistical hierarchy, correct?
17         A.   Correct.  Anything after the negative
18    cardiovascular death did not reach the
19    statistical hierarchy.
20         Q.   And specifically, myocardial infarction
21    did not meet the statistical hierarchy,
22    correct?
23         A.   Correct.  It was part of the primary
24    endpoint which reached statistical
```

1    significance, but individually, in a secondary

2    analysis on each individual component, because

3    it falls under the first negative statistical

4    value, now people have stopped and are cutting

5    off, and anything after that is merely

6    hypothesis generating or something that remains

7    to be proven, but is not proven.

8         Q.   So I hear you, but despite the fact

9    that myocardial infarction and stroke did not

10   meet the statistical hierarchy in the Fourier

11   study, you personally authored and published

12   articles discussing those very same results,

13   right?

14        A.   I did, and I indicated in my deposition

15   that I should have not included that or I

16   should have indicated that they were nominal or

17   hypothesis generating.

18        Q.   And that's important, because in your

19   article where you talk about myocardial

20   infarction and stroke with regard to Repatha

21   and the Fourier study, you didn't even mention

22   that they failed the statistical hierarchy,

23   right?  You just talked about the results.

24        A.   It was a review article, and I admitted

1    that that was an admission that should not have

2    been there.

3         Q.   But you published them anyway?

4         A.   I picked that up after I published it.

5         Q.   Now, a product's label is approved by

6    the FDA, right?

7         A.   Agreed.

8         Q.   And it outlines instructions for

9    physicians on how the drug should be used, the

10   appropriate patient population, dosing,

11   results, et cetera, right?

12        A.   Correct.

13        Q.   Now, during your direct testimony, you

14   compared the indications of Repatha and

15   Praluent labels, right?

16        A.   I did.

17        Q.   At the injunction hearing in 2016, you

18   also compared the Repatha and Praluent labels.

19   Do you recall that?

20        A.   I do.

21        Q.   But in the 2016 hearing, you didn't

22   just talk about indications, you also talked

23   about clinical studies, right?

24        A.   I believe so.

```
1          Q.   Maybe it will refresh your
2     recollection.  Can we just call up -- we've
3     compiled a few of your slides from the 2016
4     hearing.  You didn't just show the Court in
5     that hearing the indications, but you also
6     talked about dosage and you showed clinical
7     results, right?
8          A.   Correct.
9          Q.   But you didn't show the clinical
10    studies section of the label today in your
11    direct, did you?
12         A.   No.
13         Q.   And you would agree that the clinical
14    studies section of a label is very important,
15    right?
16         A.   I mean, for clinicians, if they read
17    it, the 12, 15 pages that follow the
18    indications, which in my experience is very
19    seldom done, it provides you a background and a
20    summary of selected clinical studies that the
21    sponsor will negotiate to have included with
22    the FDA to provide some supportive, additional
23    information should physicians want to read it.
24         Q.   The clinical studies section of
```

 1    labeling discusses those clinical studies that

 2    facilitate an understanding of how to use the

 3    drug safely and effectively, right?

 4         A.   To an extent, yes.

 5         Q.   Well, in fact, it must do that

 6    according to the FDA, right?

 7         A.   Correct.

 8         Q.   You're not here to suggest to the court

 9    that the clinical sections of FDA labels are

10    somehow unimportant or not significant to what

11    doctors think about a product, are you?

12         A.   No, I think that what is included in

13    there is what the FDA and the sponsor believes

14    is important for clinicians who want to learn

15    more about the drug, its use, and background.

16         Q.   So let's turn to DTX 4449.  This is the

17    label approved just recently for Praluent; is

18    that right?

19         A.   Correct.

20              MR. WOLF:  And your Honor, I

21    believe parts of this were shown but I don't

22    believe the whole document was admitted, so we

23    would move 4449.

24              THE COURT:  Sure.

1    BY MR. WOLF:

2         Q.   If we turn to 4449.4, if we can look in

3    the lower left-hand box.  We see there at the

4    bottom all-cause mortality, right?

5         A.   Yes, we've shown this previously.

6         Q.   And you would agree -- we can take that

7    down -- that the all-cause mortality data that

8    we looked at in the New England Journal of

9    Medicine article was allowed and approved by

10   the FDA to appear in my client's label, right?

11        A.   With a disclaimer that it was not

12   statistically significant.

13        Q.   And that data appears in its European

14   drug label, correct?

15        A.   I believe so.

16        Q.   And it appears in articles in the

17   American Journal of Cardiology, right?

18   American College of Cardiology, right?

19        A.   Correct.

20        Q.   And in the publication call

21   Circulation, right?

22        A.   I believe so.

23        Q.   And you would agree with me that the

24   New England Journal of Medicine, the Journal of

1      the American College of Cardiology, and

2      Circulation are three highly regarded peer

3      review journals, right?

4          A.   They are.

5          Q.   And the mortality data we just looked

6      at has been published in all of those places,

7      right?

8          A.   All with the similar disclaimer that

9      these are not statistically significant because

10     of other potential reasons.

11         Q.   What you call the trends today, but not

12     yet a trend that arises to specific statistical

13     significance.

14                   MR. GREENWALD:   Objection.

15                   THE WITNESS:   That was a trend in

16     cardiovascular death, not in all-cause

17     mortality.

18     BY MR. WOLF:

19         Q.   Cardiovascular deaths are really

20     important, right?  That's primarily what we're

21     treating with these drugs, isn't it?

22         A.   So that is a trend, that's not what

23     you've just shown me or commented on repeatedly

24     as being published in numerous journals.

```
 1          Q.   The studies also showed a 12 percent
 2    reduction in deaths caused by cardiovascular
 3    events, right?
 4          A.   That was not statistically significant
 5    or did not even approach statistical
 6    significance.
 7          Q.   I understand that, but you were
 8    quibbling with me about 15 versus 12.  I want
 9    for the record you agree that my client's
10    Odyssey study show, just focusing now on
11    cardiovascular not all causes, a 12 percent
12    improvement in cardiovascular mortality, right?
13          A.   It showed a non-statistical trend that
14    you are interpreting as a 12 percent reduction
15    because it had a ratio of .88.  But the
16    confidence limits are much wider than that,
17    which if you look at the 95 percent confidence
18    limits, in other words, how confident are we
19    around your statement, that could go to an
20    increase I believe of 12 or 11 percent or down
21    to as low as somewhere around 8 something
22    percent.
23          Q.   Let's move to unstable angina.
24    According to its FDA label, Praluent is
```

1    indicated to reduce the risk of myocardial

2    infarction, stroke, and unstable angina, right?

3        A.   Correct.

4        Q.   Repatha is not indicated to reduce the

5    risk of unstable angina, right?

6        A.   It is not in the label to reduce the

7    risk, it is in the -- so that is not an

8    indication to treat patients with unstable

9    angina, it is all the same for patients with

10   established cardiovascular disease to reduce

11   the risk of the symptom or the complication of

12   unstable angina.

13       Q.   I understand that's your reasoning.

14   But I just want to know as a factual matter, my

15   client's product is indicated for unstable

16   angina, plaintiff's are not, right?

17       A.   No.  It's indicated to reduce the risk

18   of unstable angina.  It is not indicated for

19   the treatment of unstable angina.  The

20   indications of patients with established

21   cardiovascular disease, and that's a

22   misinterpretation, incorrect interpretation of

23   what the indications are.

24       Q.   The Fourier study didn't show material

1    improvement in unstable angina with the use of

2    Repatha, correct?

3        A.  Correct.

4        Q.  You spent, I think I counted, I may be

5    off one or two, 14 slides suggesting there was

6    no distinction between the FDA approved

7    indications on the Praluent and Repatha labels,

8    but just so we're clear, in Fourier, there were

9    separate endpoints for myocardial infarction

10   and unstable angina, correct?

11       A.  Correct.

12       Q.  And Repatha reduced myocardial

13   infarction but not unstable angina in Fourier,

14   correct?

15       A.  Correct, in totally different patient

16   populations, as we discussed before, and as the

17   FDA clearly states that doing cross-trial

18   comparisons in different patient populations

19   without head-to-head comparisons of the same

20   drugs does not imply superiority of one versus

21   the other.

22       Q.  But you'll agree with me, Doctor, won't

23   you, that in Fourier, the same criteria was

24   used to compare Repatha and the placebo

```
 1    populations, right?

 2         A.   Same criteria for what?

 3         Q.   Unstable angina, the adjudication of

 4    unstable angina.  Repatha versus placebo was

 5    the same criteria?

 6         A.   No, I think we went over that in great

 7    detail, that there were substantial differences

 8    in the criteria for classifying unstable angina

 9    in the one trial versus unstable angina in the

10    other.

11         Q.   I understand.  Listen to my question

12    carefully and I'll try to rephrase it carefully

13    because I may have misstated it.

14              Staying within the world of

15    Fourier, when we're comparing the angina

16    results for Repatha to the placebo arm, the

17    same criteria, the same definitions were used

18    there, Repatha versus placebo, right?

19         A.   Each study had its own clearly defined

20    criteria for unstable angina, and those same

21    criteria were used for comparing the placebo

22    group to the active group, which I think is

23    what you're trying to get at.

24         Q.   Yes.   Internally consistent criteria
```

1    within each study?

2         A.   Correct.

3         Q.   And using internally consistent

4    criteria, Repatha failed to show improvement

5    vis-à-vis angina; Praluent did show improvement

6    vis-à-vis angina, correct?

7         A.   Unstable angina.

8         Q.   Yes.  Correct?

9         A.   Correct, and I think I've covered that

10   in some detail.

11        Q.   If I go to my doctor and my only

12   symptom is unstable angina, my doctor adheres

13   to label, he will prescribe Praluent, not

14   Repatha, correct?

15        A.   No.  You're misinterpreting the label,

16   once again.  It is not being -- the indication

17   is not for treatment of unstable angina, it's

18   for reducing the risk of unstable angina in

19   patients with established coronary disease.

20   And if you come to see me with established

21   coronary disease, I'm not treating for the 0.6

22   percent of the chance of unstable angina, I'm

23   treating your underlying disease in the

24   anticipation that if I treat the underlying

```
 1    disease, I will reduce all causes, all
 2    subsequent complications of the underlying
 3    atherosclerotic plaque.  And, in fact, unstable
 4    angina would be one that I would expect even
 5    though it is the -- not to minimize that
 6    unstable angina is not a serious condition, but
 7    it is the rarest as you can see of all of those
 8    complications, and, in fact, probably the least
 9    serious, because having a heart attack or a
10    stroke which constitute the majority of those
11    outcomes are going to be prevented.  Nobody
12    treats and says I'm going to treat this patient
13    for unstable angina, and in fact, if you
14    look --
15         Q.  Doctor --
16         A.  Can I finish?
17                   THE COURT:  Go ahead.
18                   THE WITNESS:  So if you have a
19    look at Odyssey, so the entry criteria were
20    acute coronary syndrome, 15 percent of the
21    patients who entered into the Odyssey trial
22    entered because they had unstable angina.  If
23    you look at the outcome of Odyssey, it was 4
24    percent, roughly, of all of the cardiovascular
```

```
 1    events that occurred in Odyssey were unstable
 2    angina.  So the patients who entered for
 3    unstable angina were at greater risk for having
 4    a heart attack or revascularization or stroke.
 5    BY MR. WOLF:
 6         Q.  Despite all of that supposition,
 7    despite all of those syllogisms, you agree with
 8    me that in Fourier, Repatha was no better than
 9    a placebo when dealing with unstable angina,
10    right?
11         A.  Correct.
12         Q.  Within the clinical trials of Repatha
13    and Praluent, when we say Repatha lowers LDL-C
14    60 percent, that's an average, right?
15         A.  Yeah, when we talk about that, it's an
16    average, the same as we would for Praluent.
17         Q.  Right.  There's individual variability,
18    right?
19         A.  Correct, as is in everything.
20         Q.  And within Fourier, 53 patients
21    receiving Repatha had no apparent reduction in
22    LDL cholesterol whatsoever, right?
23         A.  Correct.
24         Q.  So all patients don't respond to
```

```
 1        Repatha in the same way, right?

 2            A.   No.

 3            Q.   You agree with me?

 4            A.   No, I don't.  Because there are many

 5        reasons that these patients who are all in the

 6        trial, out of 27,000 patients and 13,000 taking

 7        Repatha, they were all being treated with

 8        statins.  And an effective dose of statin, the

 9        one that we recommend for people, what we call

10        high-intensity statins, lower LDL cholesterol

11        roughly 50 percent; in fact, greater than 50

12        percent.  When you add a PCSK9 inhibitor, you

13        get an additional 60 percent reduction.

14                    Out of those patients who, I

15        don't recall how many, but 50 patients out of

16        13,000 who received the drug who had no

17        reduction could quite easily and more than

18        likely stopped their statin.  And if you stop

19        your statin and you were having 50 percent

20        reduction, the drug that lowered you another 50

21        percent now appears to be totally non- --

22            Q.   So Doctor, is it your testimony that

23        every individual reacts to Repatha in the same

24        way?
```

1    A.   No.   There's a variability in their

2    response, but I've yet to see any patient where

3    either Repatha or Praluent when the drug is

4    given and everything underlying that, the

5    baseline is stable, that there has been no

6    response to the drug.

7    Q.   When an adverse -- you know what an

8    adverse event report is, Doctor?

9    A.   I do.

10   Q.   You've seen the adverse event reports

11   in this case?

12   A.   I have.

13   Q.   And Dr. Eckel has analyzed them; is

14   that right?

15   A.   I don't think Dr. Eckel has analyzed

16   the hundreds of thousands of adverse reports

17   that have come through personally.

18   Q.   You agree there are adverse event

19   reports in this record that show that some

20   patients didn't respond to Repatha but did

21   respond to Praluent, right?

22            MR. GREENWALD:  Your Honor, just

23   for the record we'd like to lodge our objection

24   as stated in the memo this morning.

1              THE COURT:  Okay, it's lodged.

2   BY MR. WOLF:

3      Q.   You agree that there are patients that

4   have responded to Praluent that didn't respond

5   to Repatha, right?

6      A.   I would agree that there are reports,

7   adverse event reports, that are poorly

8   documented that indicate that there are

9   patients who responded to Repatha who didn't

10   respond to Praluent, and those who responded to

11   Praluent that didn't respond to Repatha.  And

12   then when the most compelling of those reports

13   have been evaluated and we have been able to

14   actually get medical records and see the

15   transcripts or what was actually being done,

16   none of those hold water.

17      Q.   You just reject them all out of hand?

18      A.   No, the data is there.  There's clear

19   data from at least three or four of the people

20   who were actually, who has presented at a

21   national meeting on the lack of response who

22   failed, failed in a national meeting to

23   disclose a response on Repatha that was

24   actually better.

```
 1          Q.  I'm sorry --

 2                    THE COURT:  Is this Dr. Doyle

 3     you're speaking of?

 4                    THE WITNESS:  Yes.

 5                    MR. WOLF:  And we'll hear from

 6     him, your Honor.

 7     BY MR. WOLF:

 8          Q.  Dr. Stein, you would at least agree

 9     with me there are about 40 cases just in this

10     record of patients who experienced side effects

11     of tolerability issues on Repatha but not on

12     Praluent, right?

13          A.  Well, again, I don't see any data where

14     those patients were treated in a blinded manner

15     where one patient was given and then equally

16     followed up, well-documented.  So they are, to

17     me, they are anecdotal reports which is to a

18     great extent what we see in nearly all the

19     adverse event reporting, there are very brief

20     documents, a few lines, and often with very

21     little data, if any, that one could actually

22     make a good, solid judgment.

23          Q.  Doctor, at what point do anecdotes and

24     trends become sufficiently of concern to you
```

1    that you as a doctor take note?

2         A.   When I see them scientifically

3    evaluated, when I see the actual underlying

4    data.  Because I believe a doctor's experience,

5    I see that in my patient referrals, when I have

6    patients who are referred who don't respond to

7    a statin, and I just question them and they

8    weren't taking the statin.  I see patients who

9    have side effects, and when you go through

10   it -- I've had patients who have had shoulder

11   surgery because they used to have problems with

12   statins, and two years later, they say, this

13   wasn't related to the statin.

14        Q.   Is it your testimony that this Court

15   should disregard trends and anecdotes until

16   there's a double blind study?

17        A.   I think until there's documented

18   evidence that any report has got valid data

19   that one has checked the medical records, that

20   one has looked in carefully to see whether that

21   was specifically related.  In some of the

22   others, the ones that have been investigated

23   intensely, which I assume were the best

24   documented that could be found, the

```
 1    non-response to Repatha was an anecdotal
 2    referral from the patient.  The physician who
 3    then filed that report had never treated the
 4    patient with Repatha, did not have
 5    documentation from prior records that the
 6    patient received Repatha, and found that
 7    Praluent didn't reduce the LDL cholesterol in
 8    that patient, and termed her patient as a hypo-
 9    responder, meaning no response.
10         Q.   Maybe I'm not going to get a line from
11    you.  But you would agree with me at least that
12    the Court can rely on the data, the studies,
13    the trends from the New England Journal of
14    Medicine, right?  That's something the Court
15    can rely on in making its decisions; don't you
16    agree with me?
17         A.   In terms of adverse event reporting?
18         Q.   In terms of mortality, for example.
19         A.   I think the Court can rely on that
20    particular subset with that particular drug
21    that those are the results of that.  I would
22    take dispute with the non-cardiovascular
23    mortality, which is what is the only way of
24    getting to the total mortality reduction where
```

1    you have a drug that lowers LDL cholesterol in

2    patients who are there because they have a high

3    risk of cardiovascular disease, and you'll end

4    up with twice as much benefit from non-heart

5    disease, death, for all causes, the wonder

6    drug, that is a completely out of line with 30

7    years of previous science and clinical trials.

8         Q.   Dr. Stein, last topic.  You're aware

9    that Repatha is not as flexible in dosing as

10   that permitted for Praluent?

11        A.   I'm not sure what you mean by flexible.

12   I believe that it's not as effective in its

13   dosing.

14        Q.   You are aware --

15        A.   -- as the dosing of Repatha or the 150

16   milligram dose of Praluent.

17        Q.   You're aware that Praluent is permitted

18   to be given in lower -- it has a higher dose

19   and a 75 milligram dose, correct?

20        A.   Correct, these are doses that work

21   roughly the same in terms of LDL cholesterol

22   reduction at one week, but the effect of the 75

23   milligram is worn off to a greater extent, in

24   fact, 25 percent lower by the second week, and

1    that's the difference in the two doses.

2         Q.   It's your position that we can send

3    cholesterol as low as we want to, that there's

4    no risk of very low cholesterol, right?

5         A.   No.

6         Q.   That's not your position?

7         A.   My position is that depending on the

8    mechanism by which you reduce cholesterol, LDL

9    cholesterol.  If we were to destroy production,

10   for example, with certain drugs that we do of

11   entire cholesterol production and prevent them

12   from being transported through the bloodstream,

13   and when we transport it through the

14   bloodstream, it has no other role --

15        Q.   Can I just stop you, Dr. Stein?  I just

16   want a simple answer.  You would agree with me

17   that the American College of Cardiology

18   recommends the option to deintensify the

19   reduction of cholesterol with cholesterol

20   lowering drugs, right?

21        A.   No, in the previous guidelines, it said

22   that -- these were statin related guidelines or

23   statin, not PCSK9 related, and this was the

24   last time we were in court, that if the LDL

dropped below 40, that they should deintensify

the statin, and the evidence they put in there

was zero.

    Q.  Long-term safety of low levels of LDL-C

remains unknown, right?

    A.  We do know --

    Q.  Yes or no?

    A.  We do -- no, that's not true.

    Q.  Can we pull up Exhibit --

    A.  We know that the long-term levels of

very low LDL cholesterol results in additional

cardiovascular benefit.  So what we're doing by

denying patients getting low LDL cholesterols

by a safe and effective method which increases

delivery of cholesterol to cells but reduces it

in the bloodstream by enhancing clearance of

bad cholesterol and getting that cholesterol

delivered.

    Q.  Are you familiar with Exhibit 3578,

Guidelines on Management of Blood Cholesterol?

    A.  I am.

    Q.  And you're aware that it says,

"Long-term safety of such low levels of LDL-C

remains unknown," correct?

1    A.   It says that.  It also says that below

2    25, you should have a discussion with your

3    patient.

4    Q.   Right.

5    A.   It doesn't say that you should now back

6    titrate or increase cholesterol or reduce your

7    benefit.  There's no back titration, so I think

8    you were wrong in saying that there was.

9    Q.   How many different dose levels did you

10   have in your phase 2 trials you just announced

11   last week?

12   A.   Three.

13            MR. WOLF:  No further questions.

14            THE COURT:  Mr. Greenwald, before

15   you ask any questions.

16            So on the question of low levels

17   of LDL cholesterol and some talk about the

18   effects are unknown, has there been any what

19   you would consider scientific evidence to

20   suggest that below a certain level, it's

21   harmful to patients?

22            THE WITNESS:  No, your Honor.

23   That's a very good question, and it's a

24   question I'm facing 40 years and we've gone

1    from LDL cholesterols and down, every time

2    we've gone lower and lower, there have been

3    people who have basically raised the specter

4    that they're going to cause harm.  Now, if one

5    understands the role of LDL in the bloodstream

6    is to transport cholesterol through the

7    bloodstream, I made the analogy in the last one

8    being like a super tank transporting oil from

9    site of production, say the Middle East, and

10   delivering it to the rest of the world.

11              So the only role of that super

12   tank is to go through the ocean, and the only

13   effect that it can have is it if it doesn't get

14   cleared in that properly, it will now cause

15   damage along the way, environmental damage.

16   And LDL cholesterol is causative in causing

17   atherosclerotic disease.  For all of the drugs

18   that we've been shown to be safe and effective

19   in reducing heart disease, which include

20   statins, even though they work by different

21   mechanisms, even old drugs, all result in up

22   regulation of clearance of LDL cholesterol, and

23   PCSK9s are by far the most effective and were

24   actually found, there are patients who inherit

```
1     no PCSK9 whose LDLs run at 15 life-long.  And

2     they are good examples of college education, of

3     no infertility, two children, there's a

4     well-known patient with this who is a fitness

5     instructor.  So long-term, there's no

6     reduction.  And in fact, with patients with a

7     half a gene defect in PCSK9 who are found to

8     have an 80 percent lifelong reduction in

9     cardiovascular risk.  That was one of the key

10    publications that led us to develop these

11    treatments.

12            So by enhancing the clearance, we

13    are not decreasing the production of

14    cholesterol and we're not preventing it from

15    getting to cells, we've only made our ability

16    to clear it.  It would be like building new

17    ports and getting super tankers clear so that

18    they spend little time in the ocean where they

19    could cause damage.

20            Now, in the very low LDL

21    cholesterol patients, and the studies

22    especially in the Fourier study where they did

23    a post hoc analysis, but they looked at on-

24    treatment LDL cholesterol and risk of heart
```

1    disease, and that was a straight line continuum

2    all the way down to the lowest LDL cholesterol

3    we could measure.

4              So we do know that if you stopped

5    a patient at 25 instead of getting say to 10,

6    and we know that there's going to be harm

7    because that patient will now be exposed to

8    greater risk.  So based on all of the evidence

9    that I know today, and I have no idea of what

10   theoretical side effects because nobody has

11   ever been able to state what these potential

12   theoretical side effects may be in very low

13   patients, I know that those patients who are at

14   very high risk for heart disease will actually

15   be harmed if I was now to back titrate and let

16   their LDL cholesterol levels go up another 20

17   points, because that would be equivalent to

18   another 12 percent increase in risk of heart

19   disease over the next two, three years.

20             So I would rather treat my

21   patients based on the solid evidence that we

22   have that lower is better rather than say,

23   well, in 50, I'm not going to do that, but in

24   15 years if you're alive and haven't had

1    multiple heart attacks again, there may be some

2    unknown risk.

3              THE COURT:  All right.  I have

4    another question, which is do you know why in

5    both the Fourier and the Odyssey studies, if

6    you look at them, there was, at some secondary

7    endpoint, there was unstable angina, right?

8              THE WITNESS:  Correct.

9              THE COURT:  Why was that an

10   endpoint that the designers of the study wanted

11   to measure?

12             THE WITNESS:  Why did they differ

13   in their measurement or why did they want to

14   measure it?

15             THE COURT:  I'm not asking you to

16   compare the two studies with each other, but if

17   you were doing the Fourier study, why would the

18   designers want to measure the unstable angina

19   as a secondary endpoint?

20             THE WITNESS:  Because it could be

21   one of the complications of the atherosclerotic

22   plaque.  If that plaque grows, you may develop

23   stable angina, which you come in and you say

24   every time I exercise I'm getting chest pain or

1    getting short of breath.  You'll come in, and

2    it's not a medical emergency, you'll do an

3    angiogram and you'll be treated probably with

4    an angioplasty or a stent.  Or if you've got

5    multi-vessel disease, you might have bypass

6    surgery.

7             So unstable angina is just one of

8    the symptoms.  So you want to make sure, if

9    you're reducing that plaque, that you're

10   preventing all the complications.  And

11   depending on what that study is, more bypass

12   surgery in one study, more difference in

13   angioplasty, at least in unstable angina in the

14   other, difference in myocardial infarction and

15   heart attacks, difference in revascularization.

16            THE COURT:  So is it the case

17   that having the studies show that you can

18   reduce unstable angina has value independent of

19   the rest of the study?

20            THE WITNESS:  No, it's part of

21   that conglomerate.  As you can see, the

22   approval is for what we define as MACE, any

23   major adverse coronary event.  That includes --

24   we now include stroke in that, as well, even

1    though it's not in the coronary artery,

2    obviously, but 30 years ago when we started, we

3    didn't believe there was any relationship

4    between LDL cholesterol and stroke, but the

5    first big statin study showed a reduction, even

6    though --

7                    THE COURT:  No need to go in

8    that.

9                    THE WITNESS:  So stroke is now

10   included as one of those endpoints, and it's a

11   very important endpoint for patients.  So the

12   LDL reductions reduce stroke, bypass surgery,

13   heart attacks, unstable angina, stable angina,

14   coronary revascularization.  Those are all

15   potential complications of the same underlying

16   process, which is what our target of therapy

17   is, to lower LDL cholesterol.

18                    THE COURT:  Thank you.  Sorry,

19   Mr. Greenwald.  Go ahead.

20                    MR. GREENWALD:  No, don't

21   apologize.

22                         -  -  -

23               REDIRECT EXAMINATION

24   BY MR. GREENWALD:

1      Q.   In the course of responding to Judge

2  Andrews' question, you referred to a graph.

3  I'd like to put that up so the Court can see it

4  and you can provide any additional explanation

5  you think may be appropriate.   PTX 7175 and

6  turn to figure 3B.   It's hard to read on the

7  screen, the copy on the monitor, as well.   But

8  is it the graph to which you were alluding,

9  Dr. Stein?

10      A.   Correct.

11      Q.   And what, just very briefly, what does

12  it show?

13      A.   This is a graph from the Fourier study

14  which looked at the risk of heart disease or

15  events, primary and secondary events in

16  patients related to their own treatment, their

17  LDL cholesterols, during the trial.   What you

18  can see here, we can expand that, push it up a

19  little bit so we can see.   There you go.   Here,

20  this is in millimoles, and to convert from

21  millimoles, you multiply roughly by 40 to get

22  to units that we use, which is milligrams per

23  deciliter.   But this was in a European journal

24  and it's millimoles.   So .5 millimole would be

1   20, one millimole would be 40.

2              So you can see here there are

3   160, and you go down to -- this is now down to

4   roughly 10.  You can see that there's virtually

5   a straight line, and the secondary endpoint,

6   which was I think myocardial infarction,

7   stroke, and cardiovascular death.  And that the

8   straight line, there's a continuum that the

9   lower your cholesterol was in this trial.

10             So we know that, for example, the

11  difference between when we said 25 would be an

12  LDL of say 47.5 here, that there's still

13  additional benefit.  And we know from those

14  trials that there was no safety issues in those

15  patients, but they did have benefit.

16             So I, based on the evidence that

17  I have, I would want my patients to get that

18  additional benefit rather than telling him I'm

19  not giving you that benefit just in case in ten

20  year's time we identify something we know

21  nothing about now.

22      Q.   Thank you.  And I believe you also were

23  asked by Mr. Wolf about that potential claimed

24  value of the 75 milligram dosage form in

```
1    protecting against future unknown risks of very
2    low LDL, whatever those might be.  I'd like you
3    to turn to what's in evidence as JTX 521, which
4    is a now former label of Repatha, and I'd like
5    you to turn to page 5 of 6 and ask you to see
6    that there was, in the former label, a
7    discussion under the heading Low LDL-C Levels.
8    And do you see that the last sentence of
9    paragraph reads, "Although adverse consequences
10   of very low LDL cholesterol were not identified
11   in these trials, the long-term effects of very
12   low levels of LDL cholesterol induced by
13   Repatha are unknown."  Do you see that?
14        A.   I do.  That was in the previous label.
15        Q.   What does the label say today?
16        A.   That has been removed by the Food and
17   Drug Administration.  It's no longer in the
18   label.  So the FDA is comfortable.
19        Q.   During Mr. Wolf's cross-examination, he
20   alluded to the fact that the all-cause death
21   data has been published in the New England
22   Journal of Medicine.  I'd like to take you to
23   Plaintiff's Exhibit 7336, and turn to page 2 to
24   start.  Do you recognize page 2?
```

1     A.   I do.

2     Q.   What is it briefly?

3     A.   This is from Greg Schwartz, who is the

4   first author, the primary author of the

5   article, writing after the New England -- from

6   the New England Journal to Greg Schwartz

7   reporting the peer review of the original

8   submission of the publication.

9     Q.   Let's go to one of several of the

10  comments the peer reviewers gave.  Let's turn

11  to page 4, please, and the fourth full

12  paragraph B.  Richie, could you blow that up

13  and highlight it, please?  No, two paragraphs

14  up.  This is the second reviewer.  Could you

15  read what the second reviewer, second anonymous

16  reviewer, an independent reviewer, said when

17  provided with the original manuscript of the

18  paper which claimed that Praluent reduced

19  death?

20    A.   Yes, it says in the text of the

21  manuscript, "No statement should be made

22  indicating that there was a significant benefit

23  of alirocumab," that's Praluent, "for all-cause

24  death or for any of the nonhierarchical

```
 1    endpoints.  The discussion section should not
 2    include commentary predicated on the idea that
 3    the trial shows a significant benefit on
 4    all-cause death.  The results of all-cause
 5    death should not even be included in the
 6    abstract, nor should the concluding portions of
 7    the abstract or the discussion mention a
 8    benefit on all-cause death."
 9         Q.   You've reviewed the published version
10    of this article, haven't you?
11         A.   I've reviewed the publication.  I have.
12         Q.   Were those comments faithfully
13    implemented by the authors?
14         A.   They were.
15         Q.   Now let's turn to PTX 10150, which was
16    a document you talked about during your direct
17    exam, but on a completely different subject,
18    Mr. Wolf raised the issue of the request for
19    approval of an indication for a reduction of
20    death in patients whose baseline level was more
21    than 100 mgs per deciliter.  I'd like to turn
22    to that page and focus not on the section we
23    were reading before, but on the FDA's other
24    comments.  If you could blow up the section
```

1    that says -- yeah, that section.  And this is

2    too much to read, but essentially what appears

3    here?  If you could summarize.

4        A.   It appears here is what FDA is saying

5    this is not a valid reason for approving the

6    subgroup, and then gives its reasons, four main

7    reasons for not doing this, which are very

8    similar to what I've given in my deposition,

9    without seeing this.  One is that it's

10   essentially a post-hoc analysis.

11              Secondly, there's a lack of trend

12   across sub-groups.  In other words, when they

13   looked at these subgroups, they also looked at

14   the sub-groups that had LDL cholesterols below

15   80 in the study and those between 80 and 100.

16   Those sub-groups just didn't fit.  The groups

17   with the LDLs below 80 actually had a better

18   reduction than those groups in the 80 to 100

19   group.  So it's just out of sequence and

20   demonstrates the problem with the post-hoc

21   analysis, and they're cherry-picking the one

22   that you really like.

23       Q.   Let's pause there.  It's come up

24   several times both in your testimony on cross

```
 1    and here in response to the last question,
 2    post-hoc analysis.  Say what you mean by that
 3    and what's the problem?
 4         A.   In trials where we have thousands of
 5    patients and we have many, many and they cost
 6    millions of dollars, there's a long history of
 7    trying to look and search through that data to
 8    find some advantage or some potential benefit
 9    so that you can keep running statistical
10    analysis over and over and over in different
11    sub-groups and find different kind of P value.
12    Once you find the so-called magical P value,
13    that indicates that it's now statistically
14    significant.  If you do 100 and our P value is
15    0.5, 20 of those out of 100 will just be
16    statistical errors.  So we set lower and lower
17    values.
18                   Now, this has led to enormous
19    misuse over the years, and there has misleading
20    information, some of which has been harmful and
21    I will be happy to go into that if you would be
22    interested.  And it is what we call "search and
23    ye shall find," where you torture the data
24    until it confesses.
```

```
1          Q.   During his cross-examination of you,
2     Mr. Wolf performed an analysis of sorts where
3     he asked you to compare the risk of mortality
4     seen in Repatha with the risk of mortality --
5     I'm sorry, reduction in risk of mortality
6     observed in Odyssey.  Would it be fair to
7     describe that as a post-hoc analysis?
8          A.   Well, you can't compare one study to
9     another.
10         Q.   Putting that aside, it's post-hoc,
11    right?
12         A.   It's post-hoc.
13         Q.   If one were to engage in a post-hoc
14    analysis, if one were to credit a cross-trial
15    comparison, and I understand you are saying one
16    should not, what would such a post-hoc,
17    cross-trial comparison show about the
18    respective effects of Praluent and Repatha on
19    the risk of heart attack?
20         A.   Well, it would show that, in fact, the
21    reduction, if we use those numbers, was 29
22    percent reduction I believe in the heart
23    attacks with Repatha versus I think the 13 or
24    14 percent reduction in Praluent.  But that
```

1      would be an unfair comparison, because I don't

2      believe that those drugs are any different, and

3      that the effect on LDL is the driving cause for

4      reducing and attacking the underlying disease.

5      And so I believe that would be just as unfair

6      as doing it the other way around.

7           Q.   Just very briefly, the outside of your

8      testimony on cross, you referred to your

9      ongoing work on the LIB 003 compound.  If by

10     some chance years from now that drug should get

11     approved, do you agree it would compete with

12     Repatha, too?

13          A.   Absolutely.

14               MR. GREENWALD:  Thank you.

15               MR. WOLF:  One question, your

16     Honor?

17               THE COURT:  Sure.

18                    - - -

19               RECROSS-EXAMINATION

20     BY MR. WOLF:

21          Q.   At your deposition and today, you

22     offered the following testimony.  The question

23     was, "Do you agree with me that Praluent

24     reduces the incidence of death from

```
 1    cardiovascular causes?"  And you answered at
 2    your deposition and in substance the same
 3    today, "I agree.  I agree with what's on there,
 4    yeah, that there's a trend towards reduction in
 5    death."
 6              One question for you.  If that
 7    trend is established, were to be established to
 8    a degree of statistical significance, you would
 9    agree that it would be bad medical practice to
10    take Praluent out of the hands of patients and
11    doctors, right?
12       A.   Theoretically, anything would be
13    possible, but that hasn't been established.
14              MR. WOLF:  No further questions,
15    your Honor.
16              THE COURT:  All right, thank you,
17    Dr. Stein.  Watch your step.
18              THE WITNESS:  Thank you, your
19    Honor.
20              THE COURT:  So I guess Dr. Eckel
21    is here.  I take it you imagine testimony for
22    him for roughly the same amount of time, and
23    that's all we have today, correct?
24              MR. WOLF:  That's correct, your
```

```
1     Honor.  I had prepared some opening remarks,
2     but I assume you don't want to hear them.
3                    THE COURT:  I think at this
4     point, probably not.
5                    Why don't we take a short break,
6     you can get organized, and then I'll be back to
7     hear Dr. Eckel.
8                    MR. WOLF:  Thank you, your Honor.
9                    (A brief recess was taken.)
10                   THE COURT:  All right, let's go.
11                   MR. WILKS:  Good afternoon, your
12    Honor.
13                   THE COURT:  Hi, Mr. Wilks.  I
14    looked out earlier and didn't see you.
15                   MR. WILKS:  I had a high school
16    graduation to attend this afternoon.
17                   THE COURT:  That's a much better
18    thing to be doing than this.
19                   I'm sorry, I didn't hear your
20    sterling introduction.
21                   MS. FISHMAN:  Oh, my sterling
22    introduction, good afternoon, your Honor, my
23    name is Deborah Fishman; I don't believe we've
24    had the pleasure of meeting.
```

```
1                    THE COURT:  No, Mr. Wilks wasn't
2       introducing you.
3                    MR. WILKS:  Your Honor, it gives
4       me great please to introduce Deborah Fishman
5       from the Arnold Porter firm.
6                    THE COURT:  Hi, Ms. Fishman.  You
7       may proceed.
8                    MS. FISHMAN:  Your Honor, the
9       defendant calls its first witness, Dr. Robert
10      Eckel, to the stand.
11                   ROBERT H. ECKEL, M.D.,
12          after having been first duly sworn, was
13          examined and testified as follows:
14                        - - -
15                   DIRECT EXAMINATION
16      BY MS. FISHMAN:
17         Q.  You have a binder up there for your
18      convenience?
19         A.  I do, yes.
20         Q.  Good afternoon, Dr. Eckel.  Could you
21      please introduce yourself for the record?
22         A.  First I'd like to assure the Court that
23      my blood glucose is excellent at 160 milligrams
24      per deciliter, so I do not intend to drink any
```

1    sugar-containing beverages during my testimony.

2              I'm Dr. Robert H. Eckel.  I've

3    been at the University of Colorado Medical

4    School now for nearly 40 years.  I have a

5    career that's based in administration and

6    clinical activities and in research, and I've

7    been elected and granted and given a Boettcher

8    Chair in Atherosclerosis, and that's what we're

9    talking about here, atherosclerosis.  And

10   ultimately I'm director at the lipid clinic at

11   the University of Colorado Hospital, so, in

12   fact, I do see high-risk patients in terms of

13   cholesterol and other lipids and cardiovascular

14   disease.

15             I also have a basic science

16   appointment and I have some history of having

17   opportunities with professional organizations

18   that I think are listed on this slide.

19       Q.   Just to be clear, for how long have you

20   been a practicing physician treating patients?

21       A.   Well, I graduated from medical school

22   in 1973, so I guess I was licensed at that

23   point, so for 45 years plus.

24       Q.   Now, you filed a declaration in this

1     matter on April 7, 2019, correct?

2          A.   I'm having a little trouble hearing

3     you.

4          Q.   Oh, okay.

5          A.   That's better.

6          Q.   That's not usually a problem I'm

7     accused of.

8                    So you filed a declaration in

9     this matter April 7, 2019, correct?

10         A.   I did, yes.

11         Q.   Now, Dr. Eckel, as the Court noted at

12    the beginning, Judge Andrews has a copy of your

13    declaration, but I'd like to briefly discuss

14    with you a summary of your opinions, then some

15    recent developments that have happened since

16    you submitted your declaration.  Does that

17    sound all right?

18         A.   That's fine.

19         Q.   So first of all, Dr. Eckel, could you

20    briefly summarize for the Court why you're here

21    today, what opinions you've offered in this

22    matter?

23         A.   Right, there are three basic points.

24    The first is differential responsiveness.  In

1   other words, patients who have had an adverse

2   effect to Repatha but not to Praluent or

3   ultimately a different response in the terms of

4   LDL cholesterol lowering to Repatha and not to

5   Praluent.  By the way, that can occur the other

6   way, too.  So these are adverse event reports,

7   difference in response that the physicians

8   report.

9                Secondly, I think the evidence

10  brought forth by the Odyssey Outcomes trial

11  provides some new evidence that in patients

12  with acute coronary syndrome, that there are

13  benefits that have not been seen historically

14  with other trials.

15               And thirdly, and most important

16  thing to me, we have a dosage option, we have

17  flexibility in dosing.

18      Q.   Have you prepared a slide to summarize

19  your opinion?

20      A.   Yes, it's right before us now.

21      Q.   There it is.  And so taking these one

22  at a time, you mentioned what you call

23  differential responders, people who -- patients

24  for whom Repatha was not effective or not well

        1    tolerated but can tolerate Praluent.  Doctor,

        2    what would happen with those patients if

        3    Praluent were removed from the market?

        4        A.  Well, if a patient was unresponsive to

        5    Repatha or in fact had an adverse consequence

        6    of Repatha therapy, ultimately, there would be

        7    an unmet medical need if Praluent were no

        8    longer on the market.  So this is a concern to

        9    me.  And ultimately there could be many of

       10    these reports that are out there and go beyond

       11    simply what the evidence has shown thus far.

       12            MR. GREENWALD:  I apologize for

       13    interruption.  Again, we'd like to lodge our

       14    continuing objection.

       15            THE COURT:  All right.

       16    BY MS. FISHMAN:

       17        Q.  Dr. Eckel, to follow up on that, why do

       18    you say there could be many of these

       19    differential responders for adverse events

       20    beyond what we currently have evidence of?

       21        A.  Well, I think it takes a fair amount of

       22    time for a practicing physician to write up

       23    these types of reports.  First of all,

       24    physicians are busy in the clinic, and if, in

1    fact, a patient does not respond to Repatha and

2    is given Praluent, that's an unlikely report to

3    file, simply because it takes time to do these

4    reports, and ultimately, most physicians

5    because of their practice agenda don't have and

6    don't make that type of time.

7              And adverse effects, basically,

8    the physician is the person of record that's

9    going to be dealing with an individual patient

10   and his or her problem.  So although proof may

11   not be that that medication itself caused the

12   adverse effect, ultimately decisions need to be

13   made clinically that are in the best interest

14   of the patient.  And I go through this all the

15   time with adverse effects.

16       Q.   Not to belabor it here, but do

17   physicians rely on what the patients tell them

18   and what is put in adverse event reporting in

19   treating their patients?

20       A.   It can affect treatment, yes.  Some

21   adverse effects may be insignificant, and we

22   bond with a patient, try to understand it.  But

23   other ones might be more severe where the

24   patient, him or herself may refuse to continue

```
 1    on that medication.  So this comes up not

 2    infrequently in clinical practice.

 3         Q.  The second reason you've mentioned that

 4    in your opinion it would disserve the public

 5    interest to remove Praluent from the market

 6    with what you call demonstrated clinical

 7    benefits.  What did you mean by demonstrated

 8    clinical benefits?

 9         A.  We're talking about data largely coming

10    from Odyssey Outcomes that suggests some

11    uniqueness in cases of acute coronary syndrome

12    wherein Praluent has had an outcome that's

13    favorable.

14         Q.  And do you have a slide that summarizes

15    these demonstrated clinical benefits of

16    Praluent?

17         A.  Right, we've heard a little bit about

18    this already, it's reduction of hospitalization

19    from unstable angina.  Not unstable angina,

20    it's hospitalization from unstable angina;

21    secondly, it's the reduction of a type 2 heart

22    attack; and finally, the mortality benefit,

23    which again, we've heard much discussed already

24    today.
```

```
 1          Q.   Just to be clear, well, let's start
 2     with has Repatha demonstrated these same
 3     benefits in its clinical trial, which was the
 4     Fourier trial?
 5          A.   No, it hasn't.
 6          Q.   Now, we heard when Dr. Stein testified
 7     earlier today, he said that he believes we are
 8     making a superiority claim with respect to
 9     Praluent as opposed to Repatha.  Is he correct
10     about that?
11          A.   The superiority claim cannot be made
12     here.  These are two different trials,
13     Dr. Stein has carefully outlined this, two
14     different trials and two different types of
15     patients.  These are simply different outcomes
16     in different trials.
17          Q.   So then why are these clinical benefits
18     that have been demonstrated with Praluent but
19     not demonstrated with Repatha, if it's not a
20     superiority claim, why are these differences or
21     why are these demonstrated benefits relevant to
22     patients and physicians?
23          A.   Because as a prescribing physician, and
24     I outline with my patients a choice of these
```

1   two drugs, the PCSK9 inhibitors, if that

2   patient has presented to the hospital

3   previously with an acute coronary syndrome, so

4   they meet the criteria of the Odyssey Outcomes

5   trial, I have a conversation with them based on

6   these three outcomes of potentially reducing

7   their hospitalization risk for unstable angina,

8   for preventing the less common form of heart

9   disease or heart attack, the type 2, and

10   finally, the mortality benefit.  And this gives

11   me a three-pronged arm of approach to the

12   patient that may favor a Praluent prescription

13   rather than Repatha.

14        Q.   And then the third reason, again, just

15   summarizing your opinion, the third reason that

16   you offered for why it would disserve the

17   public to remove this medicine from the market

18   was the dosing flexibility.  Let's talk about

19   Praluent's dosing flexibility.  How does

20   Praluent's dosing regimen differ from

21   Repatha's?

22        A.   Not to be redundant to Dr. Stein's

23   comments, but this slide clearly demonstrates

24   there are different doses for these two drugs.

1    Praluent comes at a 75 every two weeks dose,

2    Praluent comes in a 150 every two or a 300

3    hundred every four.  Repatha has different

4    doses at different intervals.  But the amount

5    of LDL cholesterol lowering shown on the right

6    part of this slide is identical for every dose

7    but the Praluent 75 milligram dose.

8         Q.   This may be an obvious question, but

9    are all of these doses approved by the FDA?

10        A.   Yes, they are.

11        Q.   So in other words, the FDA separately

12   approved a 75 milligram dose of Praluent and a

13   150 milligram dose of Praluent that has

14   different degrees of LDL lowering; is that

15   correct?

16        A.   That's correct, that's the initial

17   approval.

18        Q.   Now, have you personally made use of

19   Praluent's dosing flexibility in your clinical

20   practice?

21        A.   I do this all the time.  That's for two

22   reasons.  One is that levels of LDL cholesterol

23   to be achieved in my strong opinion is under 40

24   milligrams per deciliter.  The data doesn't

1   convince me of anything lower being better,

2   despite Dr. Stein's contention that it is.

3           The other thing is an adverse

4   effect.  I have patients that have had an

5   adverse effect on one drug versus the other,

6   therefore, I would have an option of reducing

7   the dose to 75.  In fact, a fairly recent

8   patient had a cutaneous eruption, a site

9   injection reaction to the 150 that ultimately

10  over time subsided, but when we went to the 75

11  milligram dose, there was no such reaction.

12       Q.  To touch on the first point you just

13  made, Dr. Eckel, why don't physicians just try

14  to get a patient's LDL cholesterol down as low

15  as it can go?

16       A.  I can't tell you how often I get

17  emailed or called by a physician in practice

18  who calls me about an LDL cholesterol of 10 or

19  12 or 8, very low levels, and they get my

20  advice as to what they should do.  And here's

21  what I tell them.  Very low levels of LDL

22  cholesterol treated with a PCSK9 inhibitor at

23  this point have not proven harmful.  We have no

24  justifiable reason to change the dose.  But we

don't know 10 and 20 years from now what this
very low level might do.  Hopefully it's not
doing harm, but I can't promise a decade or two
decades worth of experience of levels of LDL
cholesterol that low.

     I think it's important to note
that we're born with LDL cholesterol levels of
between 20 to 40 milligrams per deciliter.  So
we're lowering with these drugs, either the 150
of Praluent or the 140 of Repatha, to levels
that are quite low, and I want the option to
reduce the dose from 150 to 75 because of this
long-term concern.

    Q.  You said a couple of things there I
want to follow up on.  First you used the term
low versus very low.  How do you define what's
a low LDL cholesterol versus a pretty low
level?

    A.  This is pretty much, you know,
argumentative, it's how we defined this within
this courtroom, three-and-a-half years ago I
defined it as such.  40 milligrams per
deciliter or lower I would call low, under 25 I
would call very low.  These are just terms I

1    would use to define levels.

2          Q.   Now, you mentioned that there's no

3    long-term data on the safety of this, and we'll

4    come back to it.  Can I ask in the context of

5    patients being put on PCSK9 inhibitor therapy,

6    why is long-term data so important?

7          A.   Well, there's a history of drugs that

8    have been on the market for 10 or 20 years that

9    ultimately have had adverse effects that have

10   shown up much later, and that could be possible

11   for PCSK9 inhibitors.  I have no prophecy right

12   here.  But nevertheless, we have drugs, again,

13   that over time have proven to be unsafe.

14         Q.   When you are initiating a patient on

15   PCSK9 therapy, PCSK9 inhibitor therapy,

16   Praluent or Repatha, for how long are you

17   expecting that patient will remain on the

18   treatment?

19         A.   This is what I call a lifer.  So in

20   other words, once a prescription is written for

21   a PCSK9 inhibitor, I fully expect the patient

22   of record to be on this for the rest of their

23   life.

24         Q.   Is there any evidence that very low LDL

1    cholesterol offers any incremental benefit to

2    patients?

3         A.   I believe not.

4         Q.   And why do you say that?

5         A.   Well, because I think the slide that

6    Dr. Stein showed showed this incremental lower

7    is better, but I'm challenging if he would

8    compare 35 to 15, that there would be no

9    statistically significant difference between

10   those levels.

11        Q.   My next question was have you prepared

12   a demonstrative to depict what you're talking

13   about?

14        A.   Yes.

15        Q.   Can you please explain to the Court

16   what you generated here?

17        A.   What this graph is is an original

18   publication by O'Keefe published a number of

19   years ago from a variety of statin trials in

20   terms of comparing the placebo effect to the

21   drug effect.  So these statin trials give you

22   the presumption that a continued lower LDL

23   cholesterol may be additionally beneficial.

24              And let me note, the level here

1    of 35 to 40 might be associated with no

2    coronary heart disease events.  But then what

3    I've done is add additional trials to this

4    graph.

5               So these additional trials

6    include ultimately Odyssey Outcomes,

7    Improve-It, and Fourier.  Improve-It is a trial

8    with ezetimibe plus statins, and as Dr. Stein

9    has indicated, both Fourier and Odyssey

10   Outcomes are trials done in patients treated

11   with maximum statin therapy as tolerated.

12               So when we plot the results of

13   these trials, we, in fact, find this line is no

14   longer linear, getting to no coronary heart

15   disease events over the period of observation.

16   So what we're looking at here is the baseline

17   level versus the level accomplished at the end

18   of the trial, and I would say this looks pretty

19   curvilinear.  So the idea below 40 produces

20   maximum benefit I think is consistent with this

21   type of graph demonstrating an unlikely benefit

22   at levels that go as low as 5, 10, or even 20

23   milligrams per deciliter.

24          Q.   Do either of these lines represent the

1     theory of lower is better?

2         A.   Well, yes, up to a certain point.  I

3     mean, if we look at the graph, we have an

4     opportunity to show that down here, yes, lower

5     is better.  And Dr. Stein indicated that, in

6     fact, when we start much higher, the benefit of

7     lowering is much greater.  But when we get down

8     to here, this gets pretty flat.  So just in

9     terms of this very low LDL or perceived or

10    unperceived long-term risk, and ultimately, the

11    fact that no additional benefit is ensured

12    here, I feel importantly comfortable having a

13    dosage option for Praluent that's not there for

14    Repatha.

15        Q.   And you mentioned concerns about the

16    safety about very low LDL cholesterol.  Do we

17    have experience or are there clinical

18    experiences with other LDL cholesterol lowering

19    medications that might inform physicians about

20    concerns with maintaining very low LDL

21    cholesterols?

22        A.   Well, the statin trials bring two

23    points to focus on.  The first is that, you

24    know, statins, I remember like it was

```
 1    yesterday, my first prescription for lovastatin
 2    was in August of 1987.  And subsequent to that,
 3    in 2008, it startled me to realize that
 4    patients on higher doses of statins,
 5    particularly with lower levels of LDL
 6    cholesterol, had a 10 percent increased risk of
 7    the development of type 2 diabetes.  So this is
 8    an opportunity to look back historically and
 9    say here's an unexpected adverse effect that
10    occurred two decades later with drugs that
11    lowered LDL cholesterol, and particularly doses
12    that were higher and lowered LDL cholesterol
13    more.
14        Q.   Dr. Eckel, you personally were involved
15    in the 2013 American College of Cardiology
16    American Heart Association guidelines on lipid
17    management, correct?
18        A.   I was, and I'm not on the current
19    guidelines because of this expert witness role
20    I'm playing.
21        Q.   We're sorry about that.  Are you
22    familiar with the updated 2018 ACC AHA
23    guidelines?
24        A.   Yes, I am familiar with it.  In fact,
```

1        tomorrow night at the American Diabetes

2        Association meeting in San Francisco, I'm

3        talking on the updated guidelines.

4            Q.   Very good.   Let me show what has been

5        marked as Defense Exhibit 3578.   Do the most

6        recent clinical guidelines speak to this issue

7        of very low LDL cholesterol?

8            A.   Yes, that's what the document says.

9            Q.   Can we turn to pages 20 and 21?

10       I believe they've already been shown for

11       Dr. Stein.

12                   But I'd like, Dr. Eckel, if you

13       can to read for us what the guidelines say

14       about patients who have very low LDL

15       cholesterol measurements.

16           A.   I apologize for the redundancy here in

17       part.   But what it reads to say is, "If

18       patients develop two consecutive LDL

19       cholesterol levels that are less than 25

20       milligrams per deciliter," previously defined

21       as very low, "while on a PCSK9 inhibitor,

22       clinical judgment should be used to determine

23       whether deintensification of lipid lowering

24       regimen is warranted, as long-term safety of

1    such low levels of LDL cholesterol remains

2    unknown."

3        Q.  Dr. Eckel, what does deintensification

4    mean?

5        A.  Well, deintensification, as Dr. Stein

6    implies, would be a conversation between you

7    and the patient to determine if, in fact, we're

8    both comfortable maintaining those levels, or

9    whether we should modify the dose if we have

10   that option.

11       Q.  Now, Doctor, in your clinical practice,

12   do you try to avoid very low levels of LDL

13   cholesterol in your patients?

14       A.  Routinely if possible.  It's not always

15   possible.

16       Q.  Do you know if other physicians

17   likewise try to avoid very low levels of LDL

18   cholesterol in their patients?

19       A.  I do, and I get this information again

20   by email, by phone calls, and at medical

21   meetings where I'm presenting this topic to a

22   wide variety of physicians.

23       Q.  Thank you, Doctor.  Now, moving on to

24   some of the new developments since you filed

1    your declaration.  Since you submitted your

2    April 7 declaration, have there been new

3    publications, new data that's come out about

4    the opinions that you offered here today?

5        A.  Yes.

6        Q.  So let's take these one at a time.

7    First of all, earlier today, we were talking

8    about Praluent's update in April.  Defendant's

9    Exhibit 4449, which is now in evidence.  Are

10   you familiar with this document?

11       A.  Yes.

12       Q.  Are you familiar with Praluent's

13   updated label?  It's fair to say that Praluent

14   is now indicated for unstable angina requiring

15   hospitalization, correct?

16       A.  Right, I think it's important to

17   qualify the indications.  It's for

18   hospitalization in adults with established

19   cardiovascular disease, and that's

20   hospitalization for unstable angina.

21       Q.  What benefit did Odyssey Outcomes with

22   Praluent show with respect to unstable angina

23   requiring hospitalization?

24       A.  Well, the data, as already alluded to,

```
 1    showed that patients who have had an acute
 2    coronary syndrome who were discharged on
 3    Praluent had a reduction in risk for
 4    rehospitalization for unstable angina.
 5        Q.  And Repatha did not show the same
 6    clinical benefit in Fourier, right?
 7        A.  Well, again, different trial, different
 8    patients, but no.
 9        Q.  Is Repatha indicated for unstable
10    angina requiring hospitalization?
11        A.  No.
12        Q.  So Judge Andrews asked Dr. Stein
13    earlier today why would sponsors include this
14    as an endpoint basically in their clinical
15    studies?  So can you perhaps answer the
16    question?  Why is the reduction of unstable
17    angina requiring hospitalization clinically
18    significant?
19        A.  It's another thing to explain to
20    patients that, in fact, if unstable angina
21    develops, that ultimately -- first of all, just
22    to pause for a second.  Unstable angina is
23    indicated for hospitalization.  If somebody has
24    chest pain that's relieved by nitroglycerine
```

1      once a month who now is having 30 minutes of

2      continuous chest pain needs to be hospitalized.

3      Ultimately, that type of hospitalization is

4      really what is prevented.  In other words, as

5      Dr. Stein clearly pointed out, unstable angina

6      often leads to a heart attack.  Not always, but

7      often does.  So this is an important

8      consideration when we think there's going to be

9      less hospitalization for unstable angina, and

10     that relates to the disease process, per se.

11         Q.  And is that clinically important to a

12     physician in deciding how to treat a patient

13     coming in who is eligible for a PCSK9 inhibitor

14     therapy?

15         A.  We'll I'd like to repeat what I said

16     earlier.  These three combinations of unstable

17     angina related hospitalization, the type 2

18     infarct which we've not discussed, and the all

19     cause mortality, all favor a prescription for

20     Praluent in patients that have a history of

21     acute coronary syndrome.

22         Q.  Let's move along then to Plaintiff's

23     Exhibit Number 10118, which is a European

24     Journal article.  Have you seen this article

1    before?

2         A.   Yes, I have.

3         Q.   This was published after your

4    declaration was filed; is that correct?

5         A.   That's correct.

6         Q.   What is notable about the publication?

7         A.   Well, prespecified endpoint in Odyssey

8    Outcomes was to examine the types of heart

9    attacks that might be modified by Praluent in

10   this study.  So, in fact, they've looked at all

11   five types, all the type 3 and type 5 were rare

12   and not importantly examined.  But this study

13   showed that the type 1 heart attack, just like

14   Fourier had, in fact, had reductions with

15   Praluent therapy.  But, in fact, the type 2

16   heart attack, which is a heart attack that

17   tends to be more severe and outcomes less

18   favorable, was also impacted favorably.

19        Q.   Is this a novel finding?

20        A.   I would say yes, it's a novel finding.

21        Q.   In other words, have there been other

22   lipid lowering therapies that have shown

23   reduction on type 2 heart attack events?

24        A.   No, but keep in mind, this has not been

```
 1     a frequent attempt to do so.  In other words,

 2     the various types of heart attacks have been

 3     recently more promoted.

 4          Q.   Has Repatha been shown to reduce type 2

 5     heart attacks?

 6          A.   In the population studied, no.

 7          Q.   Next, let me show you what's been

 8     marked as defense Exhibit 4442, which is a

 9     circulation, paper published in circulation.

10     Have you seen this article before?

11          A.   Yes.

12          Q.   And what is it?

13          A.   Well, it's a paper outlining the effect

14     of alirocumab, which is Praluent, on mortality

15     after an acute coronary syndrome.

16          Q.   This was published after your

17     declaration was filed, correct?

18          A.   That is correct.

19          Q.   What is notable about this publication?

20          A.   Well, all-cause mortality is what we

21     call a very hard endpoint.  We have a lot of

22     discussion about where this falls into

23     importance, but nevertheless, this paper now

24     has ultimately been accepted by other journals.
```

1    Q.   And have you prepared a slide on what

2    this paper shows in terms of the mortality

3    benefit?

4    A.   Well, here's the slide that

5    demonstrates for all-cause death, in the upper

6    panel, we're seeing a 15 percent reduction in

7    all-cause mortality.  And at the bottom, we're

8    looking at this high risk subgroup of patients

9    with an LDL cholesterol of 100 milligrams per

10   deciliter, and here that risk reduction is

11   nearly 30 percent at 29 percent.

12   Q.   Did Repatha show any benefit of

13   reducing all-cause death in the Fourier study?

14   A.   No such benefit.

15   Q.   Dr. Eckel, do you believe that

16   Praluent's mortality benefit is important to

17   physicians and patients alike?

18   A.   Very much so.  When I discuss with a

19   patient drug choice, having them live longer is

20   an important thing to transmit.

21            MS. FISHMAN:  Thank you,

22   Dr. Eckel.

23            I pass the witness.

24            MR. GREENWALD:  Your Honor, we'd

1    like to pass out the binders, Dr. Eckel's

2    declaration and several depositions in this

3    case, and the other contains exhibits we may or

4    may not discuss during his cross-examination.

5                              -  -  -

6                    CROSS-EXAMINATION

7    BY MR. GREENWALD:

8        Q.   So I'd like to start by recalling your

9    testimony on direct that you are not, according

10   to you, making an implied superiority claim for

11   Praluent.  Did I hear that correctly?

12       A.   That's true.  Comparing trials, it's

13   not appropriate.

14       Q.   Sure, it's not appropriate.  Then let

15   me understand, then.  Can we turn to your

16   declaration that you submitted in the spring?

17       A.   And where is that?

18       Q.   That would be tab 1 of the smaller

19   binder.

20       A.   Binder 2, then?

21       Q.   Yes, yes.

22       A.   Okay, I have that up.

23       Q.   I just want to say, so then when you

24   wrote in the beginning of paragraph 10, "First

```
1        Praluent provides unique and important
2        clinical benefits to patients and physicians
3        which Repatha does not," you were there not
4        making an implied superiority claim, right?
5             A.   Now, are we looking at what's on the
6        slide here?
7             Q.   I'm looking at the words you wrote,
8        sir.
9             A.   Oh, at the top, "First, Praluent
10       provides unique and important clinical benefits
11       to patients and physicians which Repatha does
12       not."  Yes, I don't think that's inconsistent
13       with my current opinion.
14            Q.   I also take it in paragraph 14 where
15       you wrote -- we can turn to that, Richie, as
16       much as you can, the table below.  When you
17       wrote in paragraph 14, "For convenience, I
18       provided a table of some of the key
19       distinctions between Praluent and Repatha, all
20       of which I discussed down below," and you list
21       demonstrated to reduce patient death,
22       demonstrated to reduce unstable angina
23       requiring hospitalization, demonstrated to
24       reduce type 2 heart attacks, et cetera, et
```

```
1   cetera, I understand there, too, you were not
2   in your opinion making an implied superiority
3   claim, correct?
4        A.  Can I see this entire document?
5        Q.  It should be in hard copy.
6        A.  This is easier; thank you.  Yes, I'm
7   not claiming superiority, just differences.
8        Q.  You discussed heart attack and unstable
9   angina.  You agree that they're so closely
10  related that, in your words to me two days ago,
11  a patient can both be diagnosed with unstable
12  angina and, in fact, have a heart attack; isn't
13  that correct?
14       A.  Not always.
15       Q.  Not always, but you can have a patient
16  coming to an emergency room, diagnosed with
17  unstable angina, and in fact, have had a heart
18  attack?
19       A.  That would be common.  As I just said,
20  those patients should be hospitalized.
21       Q.  Correct.  Now, you've testified and you
22  have written extensively in your declaration
23  that there are some patients who in your view
24  respond to Praluent but not Repatha, and there
```

```
 1    are some that experienced side effects with

 2    Repatha but not with Praluent, correct?

 3        A.   Correct.

 4        Q.   According to your report, you base that

 5    opinion upon your review of entries in adverse

 6    event report databases that Amgen maintains.

 7        A.   I'm sorry, I didn't quite hear that.

 8        Q.   Sure.  You base that opinion upon your

 9    review of entries in adverse event report

10    databases that Amgen maintains; is that

11    correct?

12        A.   Again, I didn't clearly understand you.

13        Q.   Sure.  So maybe -- let me just ask it

14    again.

15        A.   I want to make sure I understand it.

16        Q.   If I read your report correctly, and

17    I'm referring to paragraph 77 to 83, you base

18    that opinion upon your review of entries in

19    adverse event report databases that Amgen

20    maintains?

21        A.   Yes, you spoke a little more slowly.

22    Yes.

23        Q.   I'm on a clock here; I apologize.  You

24    didn't in contrast base your opinion upon
```

1      patient reports or blood test results, did you?

2          A.   Correct.

3          Q.   And you agree that adverse event

4      reports are not a reliable source of

5      information about whether patients who do not

6      respond to Repatha may, in fact, respond to

7      Praluent?

8          A.   I used the term reliable, but I think

9      in terms of my current opinion, that statement

10     is not inconsistent.  I think the term reliable

11     in context related to the fact is it perfect

12     and optimal, and the answer would be less or

13     not reliable.

14         Q.   But you would agree that they are not

15     reliable, correct?

16         A.   Again, my current opinion is that

17     sometimes that type of information is extremely

18     important, because it's an observation of a

19     practicing physician who is listening to their

20     patient and trying to understand an adverse

21     effect or lack of response to a medication.

22         Q.   You would agree that they're not

23     reliable evidence of differential efficacy or

24     differential side effects, wouldn't you?

         A.   The best test would be to rechallenge
    the patient with the medication after wash out.
         Q.   And due to their anecdotal nature,
    they're also not a reliable indicator whether
    patients who experience side effects from
    Repatha will not experience the same side
    effects from Praluent?
         A.   Yes, and I've had that example where,
    in fact, patients did not respond to either of
    the drugs.  Keep in mind, these are reports
    that we're seeing the tip of the iceberg.  As I
    said earlier, physicians need to take some time
    to write these things up.  This is not
    something physicians readily do, and I think
    Dr. Stein testified to that.
         Q.   Isn't it true that this happens every
    day in the practice of a physician and every
    day in our own lives, side effects often
    resolve on their own spontaneously, correct?
         A.   That's correct.
         Q.   And the spontaneous resolution of side
    effects may happen to coincide with cessation
    of administration of a drug?
         A.   Correct.

1     Q.  But that doesn't mean that the drug is

2    what caused the side effects?

3     A.  I agree totally with that statement.

4     Q.  Now, in your declaration, and let's now

5    turn to it, paragraph 80, which is on page 36,

6    if that's helpful.  Page 36, paragraph 80,

7    third bullet point from the top.  You described

8    a patient who, according to a Sanofi adverse

9    event report database actually, was "on Repatha

10   and had neurocognitive adverse events, but when

11   switched to Praluent, they did not."

12     A.  Excuse me counsel, I'm -- oh, you've

13   got it, okay.

14     Q.  Do you recall that from your

15   declaration?

16     A.  Yes.

17     Q.  Now, this is a patient of a Dr. Rakesh

18   Shah, right?

19     A.  I don't recall which physician it is.

20     Q.  I'm sorry, this is the wrong bullet

21   point.  Could you please turn to page 36?

22   Let's do this one.  Third bullet point from the

23   top.  From the bottom, I'm sorry.  The report

24   from a physician, Dr. Rakesh Shah, about a

```
 1    patient who was on Repatha and had
 2    neurocognitive adverse events but when switched
 3    to Praluent, they did not.  The patient's
 4    adverse events included word-finding
 5    difficulties.  Do you see that?
 6         A.  I do.
 7         Q.  When you wrote that -- when I showed
 8    you the actual medical records of Dr. Shah's
 9    patient at your deposition, you stated you
10    didn't recall having reviewed them; isn't that
11    right?
12         A.  I don't recall that for certain, but I
13    may have said that.
14         Q.  And after you reviewed the records at
15    your deposition and saw that the word-finding
16    difficulties came and went in four hours, you
17    agreed with me that the far more likely cause
18    of the word-finding difficulties was a
19    transient ischemic attack, not a reaction to
20    Repatha.
21         A.  That's correct.
22         Q.  And you would agree with me a transient
23    ischemic attack, that's a mini stroke?
24         A.  Correct.  It's not really a stroke.
```

1      It's signs of a stroke that's impending.

2          Q.   Yet you still in your declaration

3      included Dr. Shah's patient as an example of a

4      patient who experienced a side effect on

5      Repatha but not on Praluent.

6          A.   If it's included, I didn't recall that,

7      but so be it.

8          Q.   Yes, mistakes happen.  Sure.

9                    Now, as a preventive

10     cardiologist, your goal is to prevent

11     cardiovascular events, right?

12         A.   To clarify, I'm an endocrinologist who

13     cross-dresses as a preventive cardiologist.

14         Q.   Your words, not mine.

15                   As a preventive cardiologist --

16     fair?

17         A.   That's fair.

18         Q.   If you prefer being called an

19     endocrinologist, I'll do it.  As an

20     endocrinologist who treats many, many diabetic

21     patients with cardiovascular risk is a major,

22     major reason why diabetes is such a public

23     health concern.  But your goal is to prevent

24     cardiovascular events, correct?

1        A.   Absolutely.

2        Q.   And as a physician, would you not

3    prescribe Praluent to any patient if you had a

4    real concern that it might cause a patient to

5    die sooner?

6        A.   Yes.

7        Q.   That's basic, right?

8        A.   Yes.

9        Q.   You regularly prescribe Repatha, right?

10       A.   I do.

11       Q.   And you also regularly prescribe

12   Praluent, right?

13       A.   Absolutely.

14       Q.   And you have patients today who started

15   taking Praluent when their LDL cholesterol

16   levels while on statins was between 80 and 100,

17   right?

18       A.   You mean baseline LDL cholesterols?

19       Q.   Baseline defined as when taking

20   maximally tolerated statins.

21       A.   Yes.

22       Q.   And for some of those patients, you

23   determined they could benefit from more LDL

24   cholesterol reduction and therefore prescribe

1    Praluent, right?

2         A.   Correct.

3         Q.   I'd like you to turn to tab 7 in your

4    bigger cross binder.  Do you see that?

5         A.   Are you going to portray that, also?

6         Q.   I'm going to ask Richie to flash it up

7    on the screen.  The numbers may be small.  So

8    I'd like you to turn to tab 7, which is PTX

9    9966, this is a supplementary appendix to the

10   new Odyssey New England Journal of Medicine

11   article that Mr. Wolf questioned Dr. Stein

12   about.  He questioned about the article, but I

13   want to direct you to the lengthy supplementary

14   appendix that appeared also in the Journal, and

15   I want to direct your attention to the last

16   page, which is 40.  I'd like you to agree with

17   me that this shows data on the reduction of

18   death, or I should say the effect on death in

19   the Odyssey trial of Praluent according to

20   baseline LDL-C level, right?

21        A.   Yes.

22        Q.   And if you could turn to the fourth row

23   under coronary heart disease, you'll see

24   there's an 80 to 100 mg per deciliter.  This is

1    my cross.  I want to do 80 to 100 mg per

2    deciliter, right?

3         A.   Yes.

4         Q.   I want you to look at the hazard ratio,

5    1.17, right?

6         A.   I see that.

7         Q.   That tells you as a physician, as a

8    scientist that in the Odyssey trial, if you had

9    a baseline level of LDL between 80 to 100 mgs

10   per deciliter, you had a 17 percent higher risk

11   of death than if you weren't taking Praluent at

12   all.

13        A.   Well, the trial design may influence

14   these data.  As you well know, many people back

15   titrated on medication dosage because their LDL

16   cholesterol rates got too low.

17        Q.   Not my question.  My question is if you

18   saw -- this result says to you that there was a

19   17 percent increase in death of the patients

20   taking Praluent if they started at a baseline

21   level of 80 to 100.  And now I take you to a

22   few rows down --

23                THE COURT:  I'm sorry,

24   Mr. Greenwald.  I'm not sure he actually

1    answered before you moved on.  That's what that

2    says?

3                    THE WITNESS:  That does say that

4    there's a 17 percent higher risk based on the

5    hazard ratio.  But as we've heard many times in

6    this courtroom today, it's not statistically

7    significant.

8                    THE COURT:  So basically you

9    would just discount that as essentially

10   meaningless?

11                   THE WITNESS:  Right.  I would

12   treat the patient anyway.

13   BY MR. GREENWALD:

14       Q.   Just to recall, the injuries and death

15   seen in Repatha was also statistically

16   insignificant, right?

17       A.   I agree.

18       Q.   And also the FDA in the label for

19   Praluent indicates the all-cause mortality

20   result for Praluent is statistically

21   insignificant?

22       A.   I'm also aware of that.

23       Q.   Just not to beat the point too hard,

24   let's go to cardiovascular death, also 80 to

1    100.   Do you see there a hazard ratio of 1.12,

2    and that means for patients taking Praluent who

3    started at a baseline level of 80 to 100, they

4    saw their risk of death increase by 12 percent,

5    correct?

6         A.   That's correct.

7         Q.   And now if we go to all-cause death, we

8    see that in this population of 80 to 100, there

9    was a smaller but still present apparent

10   observed increase in all-cause death among

11   those patients taking Praluent, correct?

12        A.   True, counsel, but again, the trial

13   design may influence those data.

14        Q.   Sure.   When you prescribe Praluent to

15   patients with baseline LDL between 80 and 100,

16   you don't tell them that's going to increase

17   their risk of death, correct?

18        A.   That's correct.

19        Q.   Because you don't believe it, correct?

20        A.   That's correct, based on trial design.

21        Q.   And when you prescribe Repatha to your

22   patients, you don't tell them that you think

23   it's going to increase their risk of death?

24        A.   That's correct.

```
 1          Q.   You don't even tell them that you think
 2     it has a better effect on death than Praluent
 3     because as you testified, cross-trial
 4     comparison is completely a problem?
 5          A.   I agree with that, too.
 6          Q.   Thank you.
 7                    Now, you've testified that you
 8     believe the 75 milligram dosage form offers
 9     physicians and patients a valuable choice in
10     avoiding, quote, risks associated with very low
11     levels of LDL cholesterol, right?
12          A.   Yes.
13          Q.   You're familiar with a man named
14     Dr. Jay Edelberg, right?
15          A.   Yes.
16          Q.   He's a very high ranking, what would
17     you say, executive research physician at
18     Sanofi?
19          A.   Whatever his title is, yes.  Something
20     up there.
21          Q.   I'd like to put up a short clip of his
22     testimony in this case.  Richie, could you put
23     up 127?
24                    (Beginning of video deposition
```

```
 1    excerpt.)
 2                    "Question:  And no clinical study
 3    has ever shown that there is a statistically
 4    significant difference between the incidence of
 5    any side effect with the 75 mgs of Praluent
 6    every other week as compared to the 150 mgs of
 7    Praluent every other week?
 8                    "Answer:  We have not seen any
 9    difference in the safety nor tolerability of
10    either of the doses."
11                    (End of video deposition
12    excerpt.)
13    BY MR. GREENWALD:
14        Q.   You don't have any basis to question
15    Dr. Edelberg's testimony, do you?
16        A.   Any question about the testimony?
17        Q.   Yeah.
18        A.   No questions.
19        Q.   In your declaration, you stated that
20    you thought that based on results of the
21    Fourier trial, there are unresolved safety
22    concerns with Repatha but not with Praluent.
23    Agreed?  That was at your declaration section
24    7.   That was the heading.  Unresolved safety
```

1    concerns with Praluent but not for Repatha,
2    right?
3        A.   Again, I want to see what you're
4    demonstrating here.
5        Q.   That was your words, a heading, but
6    nonetheless, a heading you wrote.  There are
7    unresolved safety concerns with Repatha but not
8    with Praluent, right?
9        A.   I still don't see where you're
10   pointing.
11       Q.   Sorry.  Richie, could you highlight it?
12       A.   I see it now.  Thank you.
13       Q.   Is that still your testimony, sir?
14       A.   Well, my current opinion may be
15   modified to some extent.  The whole issue of
16   new onset diabetes I think has changed some of
17   the additional data from the use of Repatha.
18   The type disorders thing is just a numbers
19   game.  I mean, in a sense it's true in terms of
20   absolute numbers, but I'm not terribly
21   concerned about any of these adverse effects.
22       Q.   You certainly agree the safety
23   concerns, whatever they are, are not serious?
24       A.   I agree with that.

1          Q.   So now you've talked about data from

2     the Odyssey trial that showed that Praluent

3     reduced type 2 heart attacks by 23 percent,

4     right?

5          A.   Correct.

6          Q.   You compared that data point for

7     Praluent with data from the Fourier trial,

8     correct?

9          A.   Well, comparisons are not appropriate,

10    but no such outcome.

11         Q.   But on your direct, you talked about

12    these two points of data, right?

13         A.   I've learned something since then

14    perhaps about comparing trials.  But

15    nonetheless, these are different patients,

16    different trials.

17         Q.   You learned something since you put in

18    your declaration?

19         A.   Well, no, I'm just thinking about

20    whether the comparison between two trials, it's

21    not really the right thing to do.  We look at

22    each trial individually and the data are the

23    data from each trial.  We need to interpret

24    that appropriately.

1      Q.   I take it what you're saying is the

2   nine percent increase in the incidents,

3   observed incidence of type 2 heart attacks in

4   Fourier is not reliable data?

5      A.   Well, again, it was statistically

6   significant in Odyssey Outcomes, but not

7   significantly different in Repatha.

8      Q.   The Repatha increase, the apparent

9   observed increase of 9 percent was not

10   statistically significant?

11      A.   That's correct.

12      Q.   Even if it were, even if it had been,

13   you would agree the comparison of a 23 percent

14   decrease on the one hand and a 9 percent on

15   another from two different trials are a

16   completely invalid scientific undertaking?

17      A.   That's true that these type of data and

18   outcomes may influence my prescribing patterns

19   and very well could.

20      Q.   Let's see if that's, in fact, the case.

21   You don't, in fact, believe that Praluent

22   reduces type 2 heart attacks better than type

23   1, do you?

24      A.   I'm sorry?

1      Q.   You don't, in fact, believe that

2    Praluent reduces type 2 heart attacks better

3    than Repatha does?

4      A.   Again, there's been no head-to-head

5    comparison.  I can't speak to that in the same

6    types of patients.  These trials are different.

7      Q.   Let's put up a demonstrative that we

8    showed you and that you confirmed was correct

9    at your deposition a few days ago.  Could we

10   get up, this I believe is Eckel Deposition 783.

11            Do you recall seeing this at your

12   deposition?

13     A.   I do.

14     Q.   You confirmed that the numbers were

15   right, right?

16     A.   Yes, the numbers were right.

17     Q.   Just again, so the transcript is clear,

18   Amgen firmly rejects post-hoc cross-trial

19   comparisons as the proper basis for scientific

20   conclusions.  But if one were to engage in the

21   same type of post-hoc, post-trial comparison

22   that you engaged in in your declaration with

23   respect to type 1 and type 2 heart attacks and

24   you do it instead for type 1, you'd see that

```
 1      Repatha reduces the incidence of type 1 heart

 2      attacks, by far the most common, by 32 percent,

 3      whereas Praluent reduces it by only 13 percent.

 4           A.   Correct, these are percent reductions

 5      comparing one type to another.

 6           Q.   But as you told me a few days ago, that

 7      comparison is apples to oranges?

 8           A.   Yes, it is.

 9           Q.   Just like the type 2 comparison?

10           A.   Right.

11           Q.   And overall, Repatha reduced all heart

12      attacks of all types by 27 percent whereas

13      Praluent reduced it only 15 percent, right?

14           A.   That's what the data showed by percent

15      reduction.  But absolute risk reduction is not

16      shown on this slide.

17           Q.   But when you prescribe Praluent to your

18      patients, you're not telling them that you're

19      giving them a drug that's going to protect them

20      from heart attacks almost half as well as

21      Repatha?

22           A.   Of course not.

23           Q.   Of course not.  Exactly.

24                     All right.  Let's go to one of
```

1    the slides you presented in your testimony

2    today, this is the seventh slide, I think, the

3    one with that complicated graph.  I don't know

4    what better to call it.  Yeah, this.

5                    Now, you describe it as having

6    been adapted from O'Keefe 2004.

7        A.   Yeah, my initials and then 2018.

8        Q.   To be clear, RHE 2018, that's not a

9    publication, correct?

10       A.   That's correct.

11       Q.   That's your adaptation?

12       A.   Correct.

13       Q.   At your -- this is a graph that I first

14   saw when you presented it during question by

15   your own attorney, Mr. Lynn, at the very end of

16   your deposition in October, right?

17       A.   That's correct.

18       Q.   In fact, we could put it up, the

19   deposition exhibit, could we get up PTX 10165?

20   At that deposition, you acknowledged that you

21   had not included it in your earlier expert

22   report, right?

23       A.   That's correct.

24       Q.   And even this April, months after the

1    deposition, you didn't include this adapted

2    graph or any discussion of it in your

3    declaration?

4        A.   It doesn't refute the data, but that's

5    correct.

6        Q.   Just to be clear, we saw this for the

7    first time last night.  But at your deposition,

8    you testified that the reason you didn't submit

9    this graph you made for publication is, quote,

10   because there's a bit of concern about whether

11   a reviewer would accept this slide, right?

12       A.   Well, the reason for that -- well,

13   first of all, this is simply an analysis of new

14   trial data superimposed on statin trials in

15   patients with acute coronary syndrome.  The

16   slide differs because Fourier is not an acute

17   coronary syndrome trial.  And if anything, the

18   data for Fourier would be more favorable

19   because these are stable patients and less

20   likely to have an event.

21                So this is just for my own use.

22   I'm trying to understand how the newer trials,

23   pass statins only, influence my clinical

24   decisionmaking.

```
 1          Q.   It's for your own use, not for external
 2     consumption?
 3          A.   Well, I present this slide at meetings
 4     I go to and talk about treating levels of LDL
 5     cholesterol, and I opine that these are
 6     unpublished and this is my view of the current
 7     data.
 8          Q.   But at your deposition, going back to
 9     the question I asked, you were asked this
10     question and gave this answer.  If we could get
11     up 221 starting amount line 10.  "First take a
12     look at the document, Dr. Eckel.  You have
13     Eckel Exhibit 26 in front of you," and that's
14     the exhibit up there which I believe is PTX
15     10165, and I asked you, "Question: Can you
16     describe what this is?
17                "Answer:  Right.  Now, I was
18     asked by Amgen counsel --
19                MS. FISHMAN:  What line are you
20     at?
21                MR. GREENWALD:  2010 lines 10
22     through 17.
23     BY MR. GREENWALD:
24          Q.   You were asked this question and gave
```

1    this answer.

2                "Question:  Can you describe what

3    this is?

4                "Answer:  Right.  Now, I was

5    asked by Amgen counsel whether or not this has

6    been submitted to publication, and the reason I

7    haven't I submitted it is because there's a bit

8    of concern about whether a reviewer would

9    accept this for publication."

10               That's what you said, correct?

11       A.   That's correct, and I explained why I

12   thought that was true.

13       Q.   You did explain, and your explanation

14   was it was because you had added the Fourier

15   point to the graph, right?

16       A.   Yes.

17       Q.   And by adding a non-acute coronary

18   syndrome trial to the data analysis, you were

19   basically making this more of an apples to

20   oranges comparison, right?

21       A.   Yes and no.  Because we know patients

22   with stable cardiovascular disease have less

23   frequent event to follow.  So every time I show

24   the slide or present it, I qualify the

1    interpretation based on that statement.

2         Q.   You testified also at your deposition

3    that it might have been inappropriate for you

4    to include the Fourier data point on this

5    graph.  And by the way, that's the data point

6    to sort of, in your words, not mine, plateau

7    out, right?

8                   MS. FISHMAN:  Where are you

9    reading from?

10                  MR. GREENWALD:  I'll tell you.

11   I'm reading right from page 221, line 24 --

12   Richie, call this up.  221, line 24, to 222,

13   line 3.

14   BY MR. GREENWALD:

15        Q.   Did you provide this addition to your

16   answer?  "So when I present this as a slide, I

17   qualify this and carefully describe that this

18   is not an ACS trial," meaning Fourier, "so it

19   may be inappropriate for me to put this here,

20   but the primary outcomes were identical from

21   both trials."  Right?

22        A.   Can I respond to that?

23        Q.   Yes.

24        A.   Could we put the slide up that we

1    recharacterized for your use here today,

2    please?

3         Q.   Mm-hmm.

4         A.   So what you just presented, I agree

5    with.  This is what I said in my deposition.

6         Q.   So then at the end of the deposition I

7    asked you where the graph came from, you didn't

8    tell me it was based on the O'Keefe article,

9    did you?

10        A.   Based on what?

11        Q.   The O'Keefe article.

12        A.   Oh, I think I did.  I think it's in the

13   label below the slide.

14              But what I want to point out here

15   is that green line is not simply Fourier.

16   Those other trials including Improve-It and

17   Odyssey Outcomes are really very much along

18   that line.

19        Q.   Sure.  Let me ask you why you've gone

20   to this.  I was going to get to that a little

21   later but we'll get to it now.  Fourier,

22   Odyssey, Improve-It, those are all trials where

23   the placebo arm includes statins, right?

24        A.   Correct.

1      Q.   As opposed to no medication, right?

2      A.   Correct.

3      Q.   So a lot of the benefit that you see in

4   the other trials higher up or on the board on

5   the right, those are showing greater absolute

6   risk reductions because they're being compared

7   against patients who haven't seen any LDL

8   lowering medication, correct?

9      A.   That's partly correct, but in addition,

10  they have much higher levels of LDL

11  cholesterol.

12     Q.   And another thing about this curve is

13  that it shows absolute risk reduction that's

14  not relative, right?

15     A.   This is a percent of coronary heart

16  disease events in the various trials, correct.

17     Q.   So I'm correct?

18     A.   Percent.

19     Q.   If you plotted this as showing the

20  relative risk reductions in all those trials,

21  you would see a linear graph, wouldn't you not,

22  sir?

23     A.   Have you something to show me?

24     Q.   No, I'm asking you based on your

1    knowledge of the difference between absolute

2    risk reduction and relative risk reduction in

3    your 45 years' experience in the field.

4         A.   I simply built on what O'Keefe had

5    published over a decade ago with more recent

6    trials.  I did not go to relative risk

7    reduction.

8         Q.   Thank you.

9              Based on their identical

10   mechanism of action, Repatha and Praluent

11   prevents heart attacks only by reducing LDL

12   cholesterol; isn't that right?

13        A.   That's the mechanism.

14        Q.   They don't, have an effect on heart

15   rhythm, heart rate, blood pressure, right?

16        A.   Yes, they showed no differences in

17   heart rate, blood pressure.

18        Q.   Now, you agree you're not an expert in

19   statistics, right?

20        A.   I'm not an expert in statistics.

21        Q.   And you agree that the FDA's expertise

22   is statistics and reviewing data with that,

23   from that perspective at least is more informed

24   than your own?

1          A.   That's correct.  But again, another

2    journal, that's a high-impact journal,

3    obviously published these data.  So their

4    statistical stringency in reviewing data

5    somewhat differs than the New England Journal.

6          Q.   I'd like to turn back to an article you

7    discussed in your direct examination, and that

8    is the paper in circulation, it's behind tab 10

9    in your cross binder.  We have it marked as

10   Plaintiff's Exhibit 10117.  You'll agree that

11   the lead authors are Philippe Steg and Gregory

12   Schwartz, but the authors also include

13   Dr. Edelberg who we've spoken about, right?

14         A.   Yes.

15         Q.   And Dr. Pordy for Regeneron, right?

16         A.   Yes.

17         Q.   And also an individual whom the court

18   will come to know next week, a Dr. Michael

19   Szarek, correct?

20         A.   Correct.

21         Q.   I'd like to direct your attention to

22   page 13 of that article, now published, in

23   which second paragraph, second sentence --

24   let's start at the first sentence.  The authors

1    write, A lower mortality was observed with

2    alirocumab in the Odyssey Outcomes trial,

3    whereas no difference in death was found with

4    evolocumab or another drug compared with

5    placebo in the Fourier trial and another trial.

6    Do you see that?

7         A.   I do.

8         Q.   And then what the investigators or

9    authors of this article including Dr. Szarek

10   and others wrote, quote, This may be due to

11   differences in the drugs and in the trial

12   populations.  The different findings in Odyssey

13   Outcomes versus the Fourier and Spire trials

14   may be related to a population of patients with

15   recent ACS in the former, whereas Fourier

16   enrolled stable patients with established

17   atherosclerotic cardiovascular disease."  Do

18   you see that?

19        A.   I see that, yes.

20        Q.   You would agree that these authors, the

21   potential explanation for the observed

22   differences in mortality seen in the two trials

23   is a potentially valid one?

24        A.   Yes.

```
1                    MR. GREENWALD:  Thank you.

2                    MS. FISHMAN:  Just a few

3       questions on follow-up.

4                    THE COURT:  Make sure you speak

5       up.

6                         -  -  -

7                    REDIRECT EXAMINATION

8       BY MS. FISHMAN:

9            Q.   Let me do that.

10           A.   And perhaps my hearing, too.

11           Q.   Late in the day.

12                    First of all, Dr. Eckel, I'd like

13      to talk to you a little bit about the

14      differential responders and adverse event

15      reports that Mr. Greenwald was speaking to you

16      about.  Explain to us, what are adverse event

17      reports?

18           A.   Adverse event reports are produced by

19      the physician after he or she observes an

20      adverse effect in the patient that ultimately

21      the patient believes is typically due to the

22      medication.  That may not be certain, but this

23      is a job the physician has to assure his or her

24      patient that he's concerned about this, and
```

1    many times will take the time to do this.  But

2    so often not, again, in a busy practice, many

3    of these reports never go in.

4         Q.   So under what circumstances do treating

5    physicians typically prepare adverse event

6    reports?

7         A.   Well, they typically prepare them when

8    they feel that the event is serious enough or,

9    in fact, they have the time to do it or both.

10   But again, I think Dr. Stein also said these

11   don't occur regularly in practice because of

12   the time needed to do it.

13        Q.   And so to whom are the physicians

14   submitting this adverse event report?

15        A.   These are the physicians that are

16   concerned about the adverse effect because they

17   believe it may be related to the drugs, or

18   secondly, because the patient refuses to

19   continue on therapy if the drug continues to be

20   prescribed.  In other words, I want other

21   options, the patient says.

22        Q.   Let me ask the question a little

23   differently.  Are physicians submitting these

24   adverse event reports to the drug manufacturer?

1      A.  Yes, they're submitting them to the

2  drug manufacturer and/or the FDA.

3      Q.  Thank you.

4          Mr. Greenwald in his questioning

5  of you suggested that adverse event reports are

6  not reliable or cannot demonstrate causation.

7  Do you recall those questions?

8      A.  I do.

9      Q.  Do these adverse event reports

10  definitively prove that Repatha caused the

11  adverse reaction experienced by the patient?

12      A.  No, they don't.

13      Q.  Do these adverse event reports have

14  absolutely no value?

15      A.  I would say absolutely no to that.

16  They do have value.  It's a differential

17  response of a patient to one drug or, in fact,

18  an adverse effect of one drug.  It doesn't

19  prove anything beyond that.  It needs further

20  steps.

21      Q.  Do physicians who report on these

22  adverse events or who hear about the adverse

23  events from their patients rely on that

24  information in making treatment decisions?

```
1          A.   Absolutely.

2          Q.   And why do you rely on adverse event

3     reporting here to support your opinion?

4          A.   This is common in clinical practice.

5     And I had the privilege of doing my internal

6     medicine training where the chairman of

7     medicine was also board-certified in

8     psychiatry.  He told me one thing I'll never

9     forget: Listen to the patient.  And so if the

10    patient tells me they have an adverse effect, I

11    listen, and that will influence my

12    decision-making in terms of the severity of it

13    and their willingness to continue with that

14    drug or other options that are available.

15         Q.   Now, Dr. Eckel, during your

16    cross-examination, Mr. Greenwald also asked you

17    questions about the Praluent mortality benefit

18    and suggested that it was not significant

19    because of a break in the hierarchical testing

20    chain.  Do you recall that?

21         A.   I do.

22         Q.   Nonetheless, even if there's a break

23    hierarchy, do you believe that the Praluent

24    mortality benefit is nonetheless clinically
```

1  meaningful?

2      A.   I do believe that.

3      Q.   Why is that?

4      A.   Because the data, the overall data

5  suggests that; it's been accepted in a high

6  impact peer review journal.  And as we know,

7  hierarchal testing can go in any direction one

8  way or another, and the stringency of the

9  Journal and its statistical evaluation changes

10  that outcome.  Thirdly, I think that ultimately

11  this is important information that can be

12  extended to the patient in clinical

13  decision-making.

14      Q.   Similarly, Mr. Greenwald asked you a

15  series of questions about whether or not you

16  can make cross-trial comparisons, essentially

17  saying that you cannot compare in this case

18  mortality benefit, benefits generally across

19  clinical trials.  Do you recall that?

20      A.   I do.

21      Q.   Is that what you're doing here?

22      A.   Not really.  I'm assuming that the

23  trials were carried out, you know, as designed,

24  and the outcomes are based on each of the

1     trials and the patient populations treated.  So

2     the trial with Praluent had a different outcome

3     than that in Fourier, so I accept the data for

4     what they are in terms of the analysis of the

5     data that are available to me.

6          Q.  So we have data that Praluent reduces

7     the risk of type 2 heart attack; reduces the

8     risk of hospitalization from unstable angina;

9     and reduces all-cause mortality; is that

10    correct?

11         A.  Yes.

12         Q.  And we do not have similar data from

13    Repatha coming out of Fourier; is that correct?

14         A.  That's correct, and it would influence

15    my prescribing patterns in patients who have a

16    history of an acute coronary syndrome.

17         Q.  That was exactly the question I was

18    going to ask you.  Why does it matter that we

19    have data for Praluent but we don't as of today

20    have data from Repatha?  Why does that matter

21    clinically?

22         A.  Well, I think it would be a disservice

23    if Praluent were removed from the market for

24    three reasons:  The individual responsiveness,

```
1    either lack of responsiveness or an adverse
2    effect; the clinical data from Odyssey Outcomes
3    that point to a benefit of alirocumab or
4    Praluent that we don't have with Repatha; and
5    finally, I think the whole issue of dosage,
6    we've been over for some time here today, the
7    dosage options really make you more comfortable
8    in treating these patients.
9                    MS. FISHMAN:  Thank you,
10   Dr. Eckel.
11                   THE COURT:  Dr. Eckel, the
12   adverse events reports that are in your expert
13   report, they are a subset of all the adverse
14   events reports Amgen ever got about Repatha?
15                   THE WITNESS:  Well, I'd rather
16   have counsel answer that.  I'm not sure how all
17   those reports were gathered.  But ultimately,
18   these were the reports that showed lack of a
19   benefit compared to Praluent.  Those are some
20   49 reports, I believe.  The adverse event
21   reports can be much more numerous than those
22   that were gathered.  So keep in mind, this is
23   the tip of the iceberg.
24                   THE COURT:  That's what I'm
```

1    trying to get at.  Do you know how big an

2    iceberg it is?

3                    THE WITNESS:  I have no idea.

4    Dr. Stein quoted a number I believe of 100,000.

5    I don't know the accuracy of that number, but

6    there are a lot of these reports that go in.

7                    THE COURT:  And I take it

8    essentially other than the 49 that are in your

9    report, you don't know what the other 999,951

10   reports are about?

11                   THE WITNESS:  Yes, and I think

12   it's important to say that ultimately this goes

13   the other way, too.  Patients who respond to

14   Repatha who don't respond to Praluent, I'm sure

15   it goes the other way.  These are just a

16   selection of reports that help make the case

17   that taking Praluent off the market could be a

18   disservice to patients who responded adversely

19   to Repatha.

20                   THE COURT:  Thank you.

21                   MR. GREENWALD:  Your Honor, a

22   little recross?

23                   THE COURT:  All right.

24                   RECROSS-EXAMINATION

BY MR. GREENWALD:

Q.  I heard you just say, Dr. Eckel, if you had a patient with acute coronary syndrome, the data that has come in from the two trials would influence your prescribing practices.  Did I hear that correct?

A.  I think I said that the data from Odyssey Outcomes could influence my decision, yes.

Q.  But presumably the data from Fourier, as well, would influence it?

A.  The data from Fourier, yeah.  I prescribe a fair amount of Repatha.

Q.  For a patient who has established cardiovascular disease arises from a prior ACS event, that is a prior incidence of unstable angina requiring hospitalization or a heart attack, you would agree that the most serious risks those patients face short of death would be a stroke or a heart attack, right?

A.  I agree, yes.

Q.  If you actually look at the data from the two different trials, you'd agree that in Fourier, there was a 27 percent reduction of

1  heart attack overall with Repatha whereas only

2  a 14 percent reduction in Odyssey with

3  Praluent.

4  　　A.　Those are the numbers you just showed,

5  yes.

6  　　Q.　So wouldn't that suggest that if you're

7  basing your prescribing practices on comparison

8  of trials, that should lead you to prescribe

9  Repatha instead of Praluent to these patients?

10  　　A.　Again, if a patient with stable

11  cardiovascular disease for three-plus years, I

12  think that was the inclusion criteria, that's

13  the data actually from Fourier, that patient I

14  would not necessarily prescribe one PCSK9

15  inhibitor versus the other except for those

16  other reasons why I might effect one versus the

17  other.

18  　　Q.　The Fourier patient population

19  certainly included patients who had suffered

20  acute coronary syndromes, correct?

21  　　A.　There were some in Fourier, correct.

22  　　Q.　More than some, correct?

23  　　A.　I don't remember the percentage.

24  　　Q.　And a high percentage had suffered from

1     a heart attack?

2      A.   Yes.

3             MR. GREENWALD:   Thank you.

4             THE COURT:   All right.

5     Dr. Eckel, thank you.   You may step down.

6     Watch your step, okay?

7             THE WITNESS:   Should I take these

8     things with me?

9             THE COURT:   Just leave them.   And

10     watch your step.

11             THE WITNESS:   I will.   Thank you

12     for reminding me.

13             THE COURT:   I've already had one

14     physician pitch out of the witness stand, and

15     he was much younger, so he hopped right

16     afterwards, but even him I was worried about.

17             So does that finish what we're

18     doing testimonially today?

19             MR. WOLF:   Yes, your Honor.

20             THE COURT:   I know you submitted

21     a stipulation and I signed it.   I'm just trying

22     to make sure that I have in mind, I'm just

23     looking at my calendar for next week, and is it

24     the case that next week you are planning -- I

1    don't really care what you're doing, but you're

2    planning to take up from 11:00 to 5:00 of my

3    time?

4              MS. SHARP:  Your Honor, I think

5    that's right.  You had indicated --

6              THE COURT:  Yeah, this is not

7    cross-examination.  And was that the day, or

8    maybe it was what you were about to say, is

9    this the one where I volunteered that if I

10   needed to, I'd stay later?

11             MS. SHARP:  It is.

12             THE COURT:  I remember doing

13   that, but I didn't put it down on any calendar,

14   so that's okay; I have nothing to do later on

15   in the evening.

16             Does that mean that the time that

17   I have on Friday the 14th, that I don't need

18   that time?

19             MS. SHARP:  I think that's right,

20   your Honor.

21             MR. WOLF:  Your Honor, I think

22   for all of our scheduling purposes, we can

23   release the 14th.

24             THE COURT:  And then there's some

```
 1    smaller thing that's the following week, right?
 2                    MS. SHARP:  On June 21st
 3    beginning at 11:00, three witnesses.
 4                    THE COURT:  Do I have that down
 5    for essentially until 2:00?  So that's three
 6    hours?
 7                    MS. SHARP:  Yes.
 8                    THE COURT:  You know, I hadn't
 9    thought about this before, and maybe this is
10    the best thing.  Most of the testimony both
11    direct and cross that I heard the two experts
12    say, other than the stuff about the label, it
13    all sounded very familiar to me and I guess
14    that's because they're pretty much limited to
15    what were in the reports that I read in
16    advance, right?
17                    MR. WOLF:  I think both sides
18    were in good faith struggling for how much
19    should we summarize what's there versus just
20    warm up the witness quickly and turn them over
21    to cross.  So both sides will take whatever
22    guidance you offer us.
23                    THE COURT:  I'm not really sure,
24    because in a way, you know, when I said I was
```

1    going to read these things in advance, I
2    imagined them being, I don't know, eight or
3    nine pages long each; I didn't imagine reading
4    150 pages of stuff.  On the other hand, it
5    doesn't take that long, and it does give me a
6    much better appreciation of what the witnesses
7    are saying.  So if you had to ballpark it, how
8    much reading are you going to give me to read
9    for next week?

10              MS. SHARP:  Your Honor, I'd have
11   to add that up.

12              MR. WOLF:  It's roughly the same
13   ratio as today.

14              THE COURT:  In other words, if
15   it's six hours, being 150 pages, it's going to
16   be 300 pages?

17              MR. WOLF:  It's substantial, your
18   Honor.

19              MS. SHARP:  It's probably three
20   times as much.  I'm sorry, I didn't do a page
21   count.

22              THE COURT:  That's make work.
23   You're giving me the answer.

24              And next week, are the witnesses

```
 1    all experts?  I remember seeing something about
 2    fact witnesses.
 3              MS. SHARP:  There are two issues
 4    I'd like to address on that.  Next week we
 5    begin with fact witnesses that are essentially
 6    Amgen's fact witnesses.
 7              THE COURT:  For them I'm not
 8    going to get any reading material in advance,
 9    right?
10              MS. SHARP:  There are
11    declarations.  Those declarations are
12    relatively short.  So those are pretty thin for
13    those fact witnesses.  Then there are economic
14    witnesses, those are somewhat longer.
15    Defendants then put on their case with some
16    fact witnesses and experts I think comparable
17    in number.  Then at the end of the day, we go
18    back to these medical issues with the
19    biostatisticians who both have declarations
20    that are somewhat on the longer side.  So
21    that's what the lineup looks like for next
22    week.
23              THE COURT:  Why don't you just
24    give it all to me, but instead of 48 hours in
```

1    advance, is it unreasonable --

2                     MS. SHARP:  Your Honor, we have

3    those with us today if you're looking at the

4    declarations, so we can submit them quickly.

5    There are a few we have to work out with the

6    defendants on the strike-throughs on the LPA.

7                     THE COURT:  I appreciate every

8    word you're saving me from reading.

9                     MS. SHARP:  We have to do a

10   little bit of closure on that, but we have

11   those ready.

12                    MR. WOLF:  We can turn them

13   around on 24 hours.

14                    THE COURT:  Do you think you

15   could get them here by 4:00 tomorrow?

16                    MR. WOLF:  Sure.

17                    MS. SHARP:  Absolutely.

18                    THE COURT:  I think that will be

19   best, and I will endeavor to read them and I

20   think you should just do about what you did

21   today.  I think it's helpful because I read it

22   and there's a certain amount of a big mush, and

23   when I hear what it is you think is important

24   out of it, it's helpful.  So I think the way it

```
 1    actually works is probably about as good a way

 2    to do it.

 3                   So Ms. Sharp, I've still got two

 4    more things to do today, so let's be quick

 5    about it.

 6                   MS. SHARP:  One more quick

 7    question is the parties each agreed to not call

 8    two witnesses each unless your Honor wanted to

 9    hear from those witnesses.

10                   THE COURT:  I'm pretty sure that

11    anyone you don't call is someone I don't want

12    to hear from.

13                   MS. SHARP:  Understood.  I think

14    that's it.

15                   MR. WOLF:  I think it is, your

16    Honor.

17                   THE COURT:  All right.  Thank

18    you.  We'll be in recess.

19                   (Court stood in recess at 4:57

20    p.m.)

21

22

23

24
```

1    State of Delaware)
2    New Castle County)

3

4                      CERTIFICATE OF REPORTER

5

6            I, Jennifer M. Guy, Registered

7    Professional Reporter and Notary Public in the

8    State of Delaware, do hereby certify that the

9    foregoing record, Pages 1 to 153 inclusive, is

10   a true and accurate record of the

11   above-captioned proceedings held on the 6th day

12   of June, 2019, in Wilmington.

13         IN WITNESS WHEREOF, this 7th day of June,

14   2019, at Wilmington.

15

16

17

18        /S/  Jennifer M Guy, RPR
            Jennifer M. Guy, RPR
19

20

21

22

23

24